# 13-4829-cv

## United States Court of Appeals

*for the*

## Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH
GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all
others similarly situated, PAUL DICKSON, THE MCGRAW-HILL
COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER,
INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and
on behalf of all others similarly situated,

*Plaintiffs*,

v.

GOOGLE, INC.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS
## (UN-SEALED REDACTED VERSION)

FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

– and –

JENNER & BLOCK
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000

*Attorneys for Plaintiffs-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned, counsel for Plaintiffs-Appellants, certifies that none of the

Plaintiffs-Appellants have any parent corporation and no publicly-held corporation

owns 10% or more of any of the Plaintiffs-Appellants' stock.


By:   /s/ Edward H. Rosenthal       
Edward H. Rosenthal
Jeremy S. Goldman
Anna Kadyshevich
Andrew D. Jacobs
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

Paul M. Smith
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ........................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 5

STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW ....... 6

STATEMENT OF THE CASE ............................................................. 6

    I.  Google's Digital Books Program ............................................... 7

           A.     Google's Licensed Partner Program....................................... 7

           B.     Google's Unlicensed Library Project ................................... 8

                1.     Mass Digitization of Copyrighted Books ...................... 8

                2.     Agreements with Library Partners................................12

                3.     Google's Overriding Commercial Purposes .................14

                4.     Impact on the Authors' Books .....................................15

    II.  Procedural History ................................................................ 17

           A.     The Lawsuit .................................................................17

           B.     Settlement History .......................................................18

           C.     Class Certification .......................................................20

           D.     The Decision Below.....................................................21

SUMMARY OF ARGUMENT ........................................................21

ARGUMENT...............................................................................22

    I.  THE DISTRICT COURT ERRED IN DETERMINING THAT THE
       LIBRARY PROJECT MAKES FAIR USE OF THE AUTHORS'
       COPYRIGHT-PROTECTED BOOKS .....................................22

A.    Purpose and Character of the Use ...........................................24

    1.    Google's Uses Are Highly Commercial .......................24

    2.    Google's Uses Are Not Transformative .......................31

B.    Nature of the Copyrighted Work ...............................................40

C.    Amount and Substantiality of the Portion Used......................42

    1.    Google's Uses Far Exceed That Necessary for the Search and Text Mining Functions.....................43

    2.    Snippets May Contain the "Heart" of the Book............44

D.    The Effect of the Use Upon the Market for or Value of the Work .......................................................................46

    1.    Google Destroyed Existing and Emerging Markets for Digital Books ..................................................47

    2.    The District Court Ignored Evidence of the Risk and Immense Consequences of a Data Breach...........................................................................522

    3.    The District Court's Decision Clears the Way for Other, Less Responsible Parties to Engage in Their Own Mass Digitization Programs ..........55

II.    A FUNDAMENTAL CHANGE IN THE BALANCE BETWEEN THE RIGHTS OF COPYRIGHT HOLDERS AND USERS MUST BE MADE BY CONGRESS, NOT BY A PRIVATE COMMERCIAL ENTITY ...................................................................................... 56

CONCLUSION ................................................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
802 F. Supp. 1 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913 (2d Cir. 1995)...........*passim*

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. Mar. 21, 2013)..................................31

*Authors Guild, Inc. v. Google Inc.*,
721 F.3d 132 (2d Cir. 2013)...............................................20

*Authors Guild, Inc. v. HathiTrust*,
902 F. Supp. 2d 445 (S.D.N.Y. 2012) .......................................36, 44

*Authors Guild v. Google, Inc.*,
282 F.R.D. 384 (S.D.N.Y. 2012)...........................................20

*The Authors Guild v. Google, Inc.*,
770 F. Supp. 2d 666 (S.D.N.Y. 2011) .......................................*passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)...........................................28, 29, 30, 38

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)...........................................28, 29, 30

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).......................................................*passim*

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013)...........................................28, 31, 35, 37

*Castle Rock Entm't v. Carol Publ'g Grp.*,
150 F.3d 132 (2d Cir. 1998)...........................................37

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)...................................................44, 45, 47, 56

*HarperCollins Publishers L.L.C. v. Gawker Media LLC*,
721 F. Supp. 2d 303 (S.D.N.Y. 2010) .......................................37, 45

iii

*Heim v. Universal Pictures Co.*,
   154 F.2d 480 (2d Cir. 1946) ............................................................46

*Infinity Broad. Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) ....................................................*passim*

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) .......................................... 34, 38, 39

*New Era Publ'ns Int'l., ApS v. Carol Publ'g Grp.*,
   904 F.2d 152 (2d Cir. 1990) ...........................................................41

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ...........................................................24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ..................................... 31, 34, 38, 39

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ......................................................... 30

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir.), *cert. denied*, 484 U.S. 890 (1987) ................................55

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ...................................................... 4, 28, 47

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
   996 F.2d 1366 (2d. Cir. 1993) ........................................................37

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ......................................... 30, 33

*United States v. ASCAP*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) .................................. 30, 38, 51

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003) ...................................................... 39, 40

## Statutes

17 U.S.C. § 106 ........................................................................ 23, 55, 57

17 U.S.C. § 107 ..................................................................*passim*

17 U.S.C. § 108 .................................................................. 12, 13, 57

28 U.S.C. § 1291 .................................................................. 5

28 U.S.C. § 1338(a) .................................................................. 5

**Other Authorities**

2013 Data Breach Investigations Report (2013),
    http://www.verizonenterprise.com/ DBIR/2013 .............................. 52

Eric Pfanner, *Google Has Deal in France for Book-Scanning Project*,
    N.Y. Times, June 12, 2012 .................................................... 16, 50

Fred von Lohmann, Google Book Search Settlement: A Reader's
    Guide, Electronic Frontier Foundation Deep Links Blog (Oct. 31,
    2008), http://www.eff.org/deeplinks/2008/10/google-books-
    settlement-readers-guide .................................................... 27

Gini Graham Scott, *The Battle Against Internet Book Piracy* (2013) .................... 54

Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* (2011) ..... 32, 42, 46

*Norway Decided to Digitize All the Norwegian Books*, The Atlantic,
    December 3, 2013,
    http://www.theatlantic.com/technology/archive/2013/12/norway-
    decided-to-digitize-all-the-norwegian-books/282008/; .................... 49

3 *Omnibus Copyright Revision Legislative History* 120-27 (George
    Grossman ed., 2001) .................................................... 57

Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev.
    1105 (1990) .................................................... 33

Richard Pérez-Peña*, Campuses Face Rising Threat from Hackers*,
    N.Y. Times, July 17, 2013 .................................................... 17, 53

S. Rep. No. 105-90 (1998) .................................................... 54, 57

*Sweden's Digital Library*, March 3, 2011, http://slidesha.re/1luSlna .................... 50

Wallace D. Loh, UMD Data Breach: Update #6 (Feb. 25, 2014),
    http:// uhr.umd.edu/2014/02/umd-data-breach-update-6-02252014............17, 53

## PRELIMINARY STATEMENT

This case tells the story of how Google Inc. ("Google"), a commercial enterprise with virtually unlimited resources, enhanced its search engine, drove potential book purchasers away from online book retailers, increased its advertising revenue and stifled its competition by digitizing, distributing and monetizing millions of copyright-protected books without permission or payment.

When the mass digitization of books became technologically feasible, companies other than Google approached the opportunity with an appropriate respect for copyright.  In 2003, Amazon asked publishers for permission to scan entire books and display up to twenty percent of those books in response to customer searches.  (A56.)[1]  After reaching agreements with over 190 publishers, including many of the largest in the United States, Amazon launched its "Search Inside the Book" program, with over 120,000 books and 33 million pages available for search and partial display.  (A1292-93.)  In order to use the service, Amazon required users to have an account with a credit card number attached to it so that the searchable books were only one click away from purchase.  (A1293.)  With this program, Amazon provided a retail environment where rightsholders could choose to make their books available for sale.

---

[1] As used herein, citations of the form "A____" refer to the Joint Appendix, "CA____" to the Joint Confidential Appendix, and "SPA___" to the Special Appendix.

Amazon's Search Inside the Book program threatened Google's dominance as *the* place people go to find information. (*See* A1294-98.) Indeed, just four months before Google's initial public offering in August 2004, Amazon launched its own search engine, A9.com, that included the materials licensed from rightsholders. But Google found a way to beat the competition by scanning copyright-protected books without permission from rightsholders. This way, it would avoid having to negotiate with publishers and authors—as Amazon did—about critical issues such as the extent of permitted text display, the security of the books and reasonable compensation. (*See* A1298-99.) In other words, Google would "neatly leapfrog" its competitors by ignoring copyright law and trampling the right of authors to control their works. (A1298.)

In December 2004, Google struck back, shocking the literary community by launching its unprecedented "Library Project," through which Google partnered with some of the world's largest libraries to gain free access to millions of copyright-protected books. Google emptied the shelves of libraries and delivered truckloads of printed books to scanning centers, where the books were converted into digital format. The resulting e-books were then copied onto Google's servers and ingested into its search engine. Google was savvy enough not to pay the libraries in cash for the incredible commercial advantage it gained from these

2

books.  Instead, it provided the libraries with e-books worth millions of dollars as payment for their participation in the Library Project.

Google's ambitious Library Project was designed to lure potential book purchasers away from online retailers like Amazon—a website focused on selling books—and drive them to Google, a website focused on selling advertisements and keeping the resulting revenue.  (CA440.) ████████████████████

████████████████████████████████

████████████████████████████

████████████ Google's conduct also exposed the authors' works to new and serious security risks by converting their print books into digital format, storing the resulting e-books on multiple servers connected to the Internet and distributing millions of additional copies to the libraries, all without any promises to prevent loss of their property in the event of a data breach.

The District Court upheld Google's Library Project in its entirety, only a little more than two years after it had rejected a settlement that would have permitted Google's use of copyrighted works while providing rightsholders with revenue and security.  At that time, the District Court had been broadly critical of Google's actions.  *See The Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 669, 682-83 (S.D.N.Y. 2011) (observing that the settlement would reward Google for "engaging in wholesale copying of copyrighted works without permission").

The District Court concluded that fundamental changes in copyright law in the face of technological innovation are best left to Congress.  *See id.* at 677-78 (citing *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003) ("it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives")).  *Accord Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 429 (1984).

Now the District Court has endorsed each and every aspect of Google's Library Project by applying an unprecedented, expansive and erroneous interpretation of the fair use doctrine.  The District Court essentially ignored the inherently commercial nature of the Library Project and wrongly determined that the entire program is "transformative."  In doing so, the District Court failed to separately evaluate whether each of Google's uses, including its reproduction, archival storage and distribution of the books in full, passes the transformative use test.  The District Court further disregarded that, in order for Google's search function to operate, Google did not need to distribute the e-books to its Library Partners, display "snippets" of search results to its users or store multiple copies of the e-books on online servers.  The District Court brushed aside the actual and potential harm to the literary market inflicted by the Library Project.  And the District Court failed to heed one of the Supreme Court's key mandates in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), by failing to acknowledge that its ruling will open the door for others to copy, display and distribute digital

4

versions of copyrighted works for their own commercial advantages and subjecting those works to further security risks.

For the reasons set forth herein, Appellants request that this Court reverse the District Court's grant of summary judgment in favor of Google, grant Appellants' motion for partial summary judgment and hold Google liable for its copyright infringement. The case should be remanded to the District Court for the fashioning of an appropriate remedy. Authors wrote the books that fill the shelves of our bookstores and libraries. Appellants seek fair compensation for Google's commercial use of their books and for Google's distribution of their e-books to libraries. Google also must be required to remove its unauthorized digital library from servers connected to the Internet and otherwise to ensure that much of the world's literary heritage is not left susceptible to data breaches that would lead to widespread piracy and dissemination.

Google must not be permitted to build its financial empire on the backs of authors.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because it arises under the copyright laws of the United States. (A177.) This Court has jurisdiction over this appeal pursuant to 28 U.S.C.

§ 1291. The District Court entered judgment on November 27, 2013 (SPA31-32), and an Amended Judgment entered on December 10, 2013 (SPA33-34).

The Notice of Appeal was timely filed on December 23, 2013. (A1639.)

## STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW

I.     Did the District Court err when it held that Google's unauthorized copying of millions of copyright-protected literary works as part of its Library Project is fair use under the Copyright Act?

Standard of Review: *De Novo*

II.     Did the District Court err when it held that Google's unauthorized distribution of millions of copyright-protected works to its Library Partners is fair use under the Copyright Act?

Standard of Review: *De Novo*

III.     Did the District Court err when it held that Google's unauthorized display of millions of copyright-protected literary works is fair use under the Copyright Act?

Standard of Review: *De Novo*

## STATEMENT OF THE CASE

This is an appeal from the grant of summary judgment in favor of Google by the United States District Court for the Southern District of New York (Chin, J.) and the denial of the motion by the Appellants for partial summary judgment on

the issue of liability. (*See* SPA1-30); *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 292 (S.D.N.Y. 2013). In the District Court, Appellants The Authors Guild, Inc., Betty Miles, Joseph Goulden and Jim Bouton (collectively, the "Authors") argued that Google's copying, distribution and display of millions of copyrighted books without permission of the copyright holders infringed their rights under the Copyright Act, 17 U.S.C. § 101 *et seq*. The District Court held that Google's entire Library Project is protected fair use and that Google owes no compensation to rightsholders for the commercial use of their books.

## I.    Google's Digital Books Program

### A.    Google's Licensed Partner Program

In October 2004, Google announced its original digital books program, calling it Google Print. (*See* CA3; CA40-41.) Significantly, Google Print included a program that displayed portions of books only with the permission of the publishers of each book (the "Partner Program"). (*See* A931 ¶¶ 22-24.)[2] The Partner Program allowed publishers and other rightsholders to permit Google to display their works in exchange for a split of ad revenue. Partners decided "how much of the book is browsable" on Google, "anywhere from a few sample pages

---

[2] As of early 2012, the Partner Program included approximately ▮▮▮▮▮ books, by permission of approximately 45,000 rightsholders, with the number of partners continuing to grow. (CA92.) By early 2012, Google had phased out advertising adjacent to the display pages of books in the Partner Project. (CA1603.)

to the whole book." (A581.) In return, Google agreed to share with its partners a portion of the revenue it earned from ads shown next to pages of books searched in the Partner Program. (CA92.)

## B.  Google's Unlicensed Library Project

In December 2004, Google embarked on a new program to digitize millions of books without the permission of rightsholders. Google entered into agreements with several university libraries and the New York Public Library to "digitally scan books from their collections so that users worldwide can search them in Google." (A556.) In consideration for access to a library's print books, Google distributed copies of the resulting e-books to the contributing library. (A592; CA28.) Google referred to this endeavor as its "Library Project." (CA25-26; A583-85.) Since launching the Library Project, Google has entered into agreements with additional libraries, developed and patented scanning technology and copied over twenty million books. (A932 ¶¶ 27-29.)

### 1.  Mass Digitization of Copyrighted Books

Google engaged in "bulk scanning," with libraries providing "carts of books" for Google to scan. (CA21, 43.) ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████Some libraries (*e.g.*, the New York Public Library, Harvard, Columbia, and Princeton) allowed Google to scan

only public domain works, while others (*e.g.*, the Universities of California, Michigan and Wisconsin) allowed Google to scan copyright-protected works as well.  (*See* CA22; A593-684; CA116-308.)

In scanning upwards of four million books per year, Google did not independently assess the copyright status, commercial availability or content of any particular book.  (CA63, 377.)  Rather, Google copied every book its Library Partners provided, unless (a) Google determined that it already had copied or was scheduled to copy the book from another library, (b) the book was physically not fit to be copied, or (c) Google had received a specific request from a copyright owner not to scan the book.  (CA316-17, 345, 377.)

Once a Library Partner's books were selected, they were shipped to Google's scanning centers to be digitized and indexed, a process that yielded numerous digital copies of each book. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

9

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████

The scanning process resulted in an index that contains the complete text of all the books copied in the Library Project. The index is integrated into Google's all-purpose search index, so that regardless of whether a user submits a search via a general "Web" query or a "Books" query, Google will search the Library Project index and return results from Library Project books to the user. (CA48, 76.)

If a user clicks on a search result referring to a particular book, she will be taken to an "About the Book" page for that book. Since 2005, Google has displayed verbatim text from copyrighted books on these pages. (A699; CA384-85.) Google generally divides each page image into eighths, which it calls "snippets." (A706; CA383-84.) Once a user retrieves a book through her initial search, she can enter any other search terms she chooses, and the author's verbatim words will be displayed in three snippets for each search. Although Google has stated that any given search by a user "only" displays three snippets of each book (A699), a single user can view far more than three snippets from a

Library Project book by performing multiple searches using different terms, including terms suggested by Google.  (*See* A445-509; CA28.)  Even minor variations in search terms will yield different displays of text.  (*Compare* A511-15, *with* A517-21; *see also* CA28.)[3]  Google displays snippets from each book, except that it withholds display of 10% of the pages in each book and of one snippet per page.  (A225 ¶ 10; CA383-84.)  Thus, Google makes the vast majority of the text of these books—in all, 78% of each work—available for display to its users.[4]

Although snippets are shown in connection with user searches, they are *not* necessary to the indexing or other non-display functions upon which Google has sought to justify the Library Project.  (*See* CA381-82; CA49.)  Indeed, the Library Partners created a search engine for the e-books they received from Google that

---

[3] The Record includes examples of verbatim text displays for one book of each of the three named Authors.  (*See* A982-1073 (222 unique snippets and ~11,611 words of text from Bouton's *Ball Four*); A1074-1171 (220 unique snippets and ~9,676 words of text from Goulden's *The Super-Lawyers*); A1172-1203 (61 unique snippets and ~1,760 words of text from Miles's *The Trouble with Thirteen*).)

[4] Google has disabled the display function for certain limited categories of works it has chosen to exclude, ██████████████████████████████ ██████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████  In limiting the display of these books but not others, Google recognizes that in some instances showing even a "snippet" of a work may operate as a substitute for the original.

does not display any copyrighted book content.  *See* HathiTrust Digital Library, http://www.hathitrust.org.

To date, Google has scanned over twenty million books through its Library Project, and it has made over four million in-copyright English language books available for snippet display.  (A588; *see* CA25-26.)  Google did not seek or obtain permission from the Authors or any other rightsholders before it made these uses, and it has not compensated them.  (A701-03.)

### 2.    Agreements with Library Partners

Pursuant to its agreements with its Library Partners, Google distributes digital copies of e-books to the providing library as payment for permission to scan.  (CA28; CA504-05 ¶ 64.)[5]  The providing library "owns" the digital copies distributed by Google.  (CA505-06 ¶¶ 68-70.)  As of March 26, 2012, Google had distributed 2.7 million of scanned books to the Library Partners.  (A430.)

Google has little control over what the Library Partners do with their e-books; indeed, its library agreements presume the Library Partners' further use of the digitized works.  (CA506 ¶ 71.)[6]  For example, Google's agreement with the

---

[5] Google distributes copies to libraries through an online portal that allows Library Partners to request and download e-book versions of the books they provided to Google.  (A396-7.) ██████████████████████████████████████
████████████████████████

[6] The agreements make no effort to comply with Section 108 of the Copyright Act, which expressly governs permissible copying by libraries.  Among other things,

University of Michigan specifically provides that Michigan's copies may be used for "inclusion in Michigan's search services" (A594); the university has since deposited those files—including files of works that are in-copyright—in its HathiTrust database index, which is accessible to anyone in the United States with an Internet connection (CA426, 429).  Similarly, ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

---

Section 108 requires that any copying or distribution be "made without any purpose of direct or indirect commercial advantage" (17 U.S.C. § 108(a)), allows copying for preservation purposes only where a work is unpublished (17 U.S.C. § 108 (b)), and allows copying for replacement of "damaged, deteriorating, lost or stolen" books only if new copies are not commercially available at a fair price (17 U.S.C. § 108(c)).

### 3. Google's Overriding Commercial Purposes

It is undisputed that the motivation behind Google's systematic digitization of millions of copyrighted works, ███████████████████████████

███████████████████████████████████████████████

Google operates the largest Internet search engine in the world, which it monetizes by displaying advertisements in response to search queries (CA46). Google reported over $36.5 billion in advertising revenues for 2011, up from $28 billion in 2010.  (A563, 566-67.)   The Library Project gives Google access to a vast universe of searchable data: the contents of millions of in-copyright books. Google's competitors, of course, do not have access to this material; on the contrary, they limited their own digitization projects to public domain or authorized works (*see* A56; A67).  Thus, as Yahoo! explained in its objection to the proposed settlement in this case, the Library Project gives Google a distinct edge over competitors on its flagship product:

> With sole access to [its unauthorized scans], Google can better refine its search algorithm and gain a tremendous advantage against other search providers. . . . As a consequence of Google's singular position in the emerging book search marketplace  . . . Google will gain a tremendous advantage in its core business area: Google Search.

(A81; *see also* A79; A941 ¶ 75-77.)

Indeed, Google launched the Library Project in direct response to Amazon's announcement that it was introducing a licensed full-text book search portal.

(A1298-99.) ███████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████

### 4.    Impact on the Authors' Books

Google's massive, unauthorized digitization campaign has acutely harmed the interests of the Authors and other rightsholders whose works have been copied. Most directly, Google has lured potential book buyers away from online bookstores and provided no compensation to rightsholders for Google's revenue-generating uses of their books (A702-03).

The Library Project also has impeded the emerging market for digital uses of books by search engines, libraries and others. Collective management organizations ("CMOs") typically pay rightsholders based on actual use of their works (A786-87), which can result in substantial revenue. For example, the Copyright Clearance Center ("CCC"), which licenses printed material of the same nature as that scanned by Google (A785), paid rightsholders more than $171 in 2011 (A791). Although collective licensing markets often have emerged

in response to new technologies (A785-786, 795), Google's indiscriminate and unauthorized uses "thwart the development of collective management systems for the digital use of book and book excerpts that authors and publishers would otherwise likely develop." (A796.) Significantly, there is strong evidence that a collective license approach would develop here, as evidenced both by the proposed settlement to this action (*see generally* A83-126) and by agreements reached abroad by Google, among others, regarding book digitization.[7]

Moreover, Google has subjected copyright-protected books to unacceptable security risk. Google acknowledges that its "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data." (A562.) Worse, Google is not contractually obligated to, and does not in practice, monitor or control the security of the e-books it distributes to Library Partners. (*See* CA508 ¶ 108.) The risk of a potential security breach is exacerbated by this distribution, as the Library Partners' copies are stored on campus servers connected to the Internet—a prime target for hackers and activists.

---

[7] *See, e.g.*, Pls' Reply Br. Summ. J. at 16, ECF No. 1085 (citing Eric Pfanner, *Google Has Deal in France for Book-Scanning Project*, N.Y. Times, June 12, 2012, at B5); *see also* Alexis C. Madrigal, *Norway Decided to Digitize All the Norwegian Books*, The Atlantic, December 3, 2013, http://www.theatlantic.com/technology/archive/2013/12/norway-decided-to-digitize-all-the-norwegian-books/282008/.

(A802-03; *see also* Richard Pérez-Peña, *Campuses Face Rising Threat from Hackers*, N.Y. Times, July 17, 2013, at A1.; Wallace D. Loh, UMD Data Breach: Update #6 (Feb. 25, 2014), http://uhr.umd.edu/2014/02/umd-data-breach-update-6-02252014.)  As the number of unlawful copies of an in-copyright book increases, so does the risk of further infringement and piracy of the work. (A801-02, 805-06.)  In this way, even one security breach could devastate the literary market.  (A806.)

## II. Procedural History

### A. The Lawsuit

This action was commenced on September 20, 2005.  The original plaintiffs were The Authors Guild, which sued as an associational plaintiff on behalf of its members, as well as a number of individual authors, suing on their own behalf and on behalf of those similarly situated.  Plaintiffs filed amended complaints on July 26, 2006 (ECF No. 36), October 31, 2008 (ECF No. 59), November 16, 2009 (ECF No. 782), and October 14, 2011 (ECF No. 985).  The now-operative Fourth Amended Class Action Complaint alleges that Google's Library Project constitutes copyright infringement on a massive scale.  (A176.)

The Authors Guild, the nation's largest membership organization of published authors, advocates for and supports the copyright and contractual interests of published writers.  (A547.)  It seeks equitable relief for authors affected

17

by Google's copyright infringement.  The representative plaintiffs are the authors of published, in-copyright books that have been copied, distributed, and displayed by Google without the Authors' permission.  Jim Bouton holds the copyright in *Ball Four* (A435-37); Betty Miles holds the copyright in *The Trouble With Thirteen* (A438-40); and Joseph Goulden holds the copyright in *The Superlawyers* (A441-43).  The representative plaintiffs seek damages in addition to injunctive and declaratory relief.

### B.    Settlement History

Initial settlement discussions began in the fall of 2006.  After more than two years of negotiations, the parties filed a proposed settlement agreement on October 28, 2008.  The agreement was preliminarily approved by Judge John E. Sprizzo on November 17, 2008. (Order, ECF No. 64.)  Notice of the proposed settlement triggered a number of objections, in response to which the parties entered into further negotiations.  On November 13, 2009, the parties executed and filed a motion for approval of a proposed Amended Settlement Agreement ("ASA").  (*See* ECF No. 768.)  Judge Chin entered an order preliminarily approving the ASA on November 19, 2009.  (Order, ECF No. 772.)

Under the ASA, Google was to pay to plaintiff class members 63% of the revenues earned from specific, circumscribed uses, in the United States, of certain copyrighted works.  (A85-87, 112-113.)  Google also was to pay $34.5 million to

fund a Book Rights Registry, managed jointly by authors and publishers, that would locate rightsholders, maintain a database of their contact information, collect and pay revenues to the rightsholders for Google's use of works and otherwise protect and represent rightsholders' interests.  (A85-87, 116-26.)  Google further agreed to pay a minimum of $45 million to rightsholders in consideration for the release of Plaintiffs' claims for past copyright infringement.  (A85.)  Significantly, under the ASA, rightsholders were to retain control over the scanning, storage, display and sale of their works.  In addition, because Google's rights were to be non-exclusive, rightsholders could license the same works to others, including Google's competitors.  (A87-111.)

Notice of the ASA triggered another round of objections.  The objections varied widely, raising copyright, antitrust, privacy and international law concerns.  Judge Chin conducted a fairness hearing on February 18, 2010.  On March 22, 2011, he rejected the ASA, holding that it "contemplates an arrangement that exceeds what the Court may permit under Rule 23" and thus failed to meet the "fair, reasonable, and adequate" standard.  *Authors Guild*, 770 F. Supp. 2d at 667.  Judge Chin emphasized that the issues raised by Google's mass digitization were "a matter more suited for Congress than this Court."  *Id.* at 677.

## C.    Class Certification

On October 14, 2011, in the wake of the rejection of the ASA, Plaintiffs filed the Fourth Amended Class Action Complaint.  (A175-90.)  On December 12, 2011, the representative plaintiffs moved for class certification, and on December 22, 2011, Google moved to dismiss the Authors Guild's claims under Rule 12(b)(1) for lack of associational standing.  On May 31, 2012, Judge Chin granted the representative plaintiffs' motion for class certification and denied Google's motion to dismiss.  *Authors Guild v. Google, Inc.*, 282 F.R.D. 384 (S.D.N.Y. 2012).

On July 27, 2012, Plaintiffs moved for partial summary judgment on their copyright infringement claims, and Google cross-moved for summary judgment based on its fair use defense.  (ECF Nos. 1031, 1044.)  On September 17, 2012, before summary judgment briefing was completed, this Court stayed proceedings in the District Court pending Google's appeal of the class certification order.  (ECF No. 1063.)  On July 1, 2013, this Court, in a *per curiam* opinion, vacated the certification order, concluding that "resolution of Google's fair use defense in the first instance will necessarily inform and perhaps moot our analysis of many class certification issues," and remanded the case "for consideration of the fair use issues."  *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 134-35 (2d Cir. 2013). The parties then completed briefing on their summary judgment motions.

### D.    The Decision Below

In an opinion dated November 14, 2013, the District Court denied Plaintiffs' summary judgment motion and granted Google's motion, holding that "Google's use of the copyrighted works is 'fair use' under the copyright laws." (SPA16.)  For the reasons set forth below, the District Court's decision must be reversed, summary judgment granted to the Authors and the case remanded to the District Court so that it can fashion a remedy that provides compensation to the Authors and security for their works.

<u>**SUMMARY OF ARGUMENT**</u>

The District Court erred in determining that Google's wholesale reproduction, storage, dissemination and display of millions of in-copyright works is fair under 17 U.S.C. Section 107.  As shown herein, application of the four factors to each of Google's uses weighs against a finding of fair use.

As to first factor—the purpose and character of the use—the District Court did not accord any meaningful weight to Google's overriding commercial purpose, failed to consider each of Google's uses separately and erred in finding that such uses are "highly transformative."  Next, in light of the vast number of highly creative and original works copied, distributed and displayed by Google, application of the second factor—the nature of the copyrighted work—also weighs against fair use.  Google's indiscriminate copying, distribution and near-complete

display of copyrighted works plainly is far in excess of what it needed even to achieve the search and text mining functionality of the Library Project that the District Court found to be transformative.  Accordingly, the third factor weighs heavily in the Authors' favor.  Finally, as to the fourth factor, Google's uses inflict significant harm on the market and value of the Authors' works.  Not only did Google fail to pay the Authors, but the Library Project undermines existing licensing markets and impedes the development of emerging ones.  It also subjects the Authors' works to new risks of digital piracy and theft.

Because all four statutory factors weigh against fair use, Google's reproduction, distribution and display of e-books infringed the Authors' copyrights.  Further, any change in the established balance between rightsholders and users should be made by Congress, not a private commercial entity like Google.

## **ARGUMENT**

## **I.**

## **THE DISTRICT COURT ERRED IN DETERMINING THAT THE LIBRARY PROJECT MAKES FAIR USE OF THE AUTHORS' COPYRIGHT-PROTECTED BOOKS**

The District Court recognized that "Google has digitally reproduced millions of copyrighted books, including the individual plaintiffs' books," that "Google has made digital copies available for its Library Project partners to download," and that "Google has displayed snippets from the books to the public"—all "without license

22

or permission from the copyright owners." (SPA15-16.) Thus, it is undisputed that Google violated the Authors' exclusive rights of reproduction, distribution and display under Sections 106(1), (3) and (5) of the Copyright Act. The sole question on this appeal is whether the District Court erred in ruling that these acts are non-infringing because each and every part of Google's Library Project constitutes a fair use of the Authors' books.[8]

In the pages below, the Authors will show that the uses challenged here, including reproducing and storing the entirety of millions of copyrighted books, distributing those e-books to libraries as payment for access to their collections and displaying 78% of the e-books to the public—do not, and as a matter of sound copyright policy, *should* not constitute fair uses under the Copyright Act. While Google may have figured out a way to transform the creative output of authors into additional advertising dollars for Google's shareholders, Google's unauthorized commercial uses are not transformative within the meaning of copyright law.

Far from encouraging creative expression, Google has profited handsomely from the labors of the Authors while leaving them nothing for their efforts. Properly applied, all four factors militate strongly against a finding of fair use.

---

[8] Fair use is an affirmative defense as to which the alleged infringer has the burden of proof. *Campbell*, 510 U.S. at 590.

## A.      Purpose and Character of the Use

The first statutory factor, "the purpose and character of the use," 17 U.S.C. §
107(1), is "[t]he heart of the fair use inquiry."  *On Davis v. The Gap, Inc*., 246 F.3d
152, 174 (2d Cir. 2001).  In considering this factor, a court examines "whether the
new work merely 'supersede[s] the objects' of the original creation . . . or instead
adds something new, with a further purpose or different character, altering the first
with new expression, meaning, or message; it asks, in other words, whether and to
what extent the new work is 'transformative.'"  *Campbell*, 510 U.S. at 579
(citations omitted).  By express statutory instruction, the Court must also consider
"whether the use is of a commercial nature" or whether it is "for nonprofit
educational purposes."  17 U.S.C. §107.

### 1.      Google's Uses Are Highly Commercial

The District Court failed to give any meaningful weight to the undisputed
fact that the nature of Google's Library Project is highly commercial.  At most, the
court gave lip service to the statutory language, merely mentioning "[t]he fact that
a use is commercial 'tends to weigh against a finding of fair use,'" (SPA21
(quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562
(1985))), and then essentially disregarding it.

The District Court, however, trivialized Google's overriding commercial
purpose.  While acknowledging that Google "benefit[s] commercially in the sense

that users are drawn to the Google websites by the ability to search Google books," it stated that Google "does not sell the scans it has made of books[,] . . . does not sell the snippets that it displays[,] and . . . does not run ads on the About the Book pages that contains snippets."  (SPA21-22.)  It found support for its position in cases that could hardly be more different than the case before this Court—cases involving creative secondary uses of a single or small number of copyrighted works.  In its ruling, the District Court completely ignored evidence demonstrating that (a) Google's embarked on its Library Project for the sole purpose of gaining a competitive advantage and increasing revenues, and (b) the scope of Google's Library Project dwarfs that of any prior fair use case.

Google's brazen mass digitization project was designed and has helped Google to dominate the search engine market and reap vast corporate profits. ■

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

As Yahoo! explained in its objection to the ASA, "the more data available . . . the better the search engine" (A81); as a result, the Library Project has given Google "a tremendous advantage in its core business area: Google Search." (*Id.*; *see also* A1298-99 (Google began digitizing copyright-protected books in direct response to Amazon's announcement that it was launching a licensed full-text book search portal).)

The District Court makes much of the fact that Google "does not run ads on the About the Book pages that contain snippets." (SPA21-22.) This reflects a fundamental misunderstanding of Google's business model. The main source of Google's advertising profits does not come from the "About the Book" pages, but rather the ad-laden search results pages that link to them. When Google's millions of U.S. users come to the site every month to locate relevant information, the results pages display content from, and links to, *all* of the content in Google's massive database, including content ingested from the Library Project. In many instances, this content runs alongside paid advertisements tied to the search results. For example, a search for "Steve Hovley" yielded not only an excerpt from Plaintiff-Appellant Jim Bouton's *Ball Four*, but also paid advertisements for three public records search services and eBay. (A242.) In this way, Google derives direct commercial benefit from the Authors' words, phrases, and creative expression.

Google also uses the copyrighted material for myriad commercial purposes beyond advertising, all designed to enhance the functionality of Google's services and, as a result, increase its dominance in the information technology market. As one commentator explained in connection with the proposed settlement:

> It seems likely that the 'nondisplay uses' of Google's scanned corpus of text will end up being far more important than anything else in the agreement. Imagine the kinds of things that data mining all the world's books might let Google's engineers build: automated translation, optical character recognition, voice recognition algorithms. And those are just the things we can think of today. Under the agreement, Google has unrestricted, royalty-free access to this corpus.

Fred von Lohmann, Google Book Search Settlement: A Reader's Guide, Electronic Frontier Foundation Deep Links Blog (Oct. 31, 2008), http://www.eff.org/deeplinks/2008/10/google-books-settlement-readers-guide.

Thus, while its competitors went through the "painstaking" and "costly" process of obtaining permission before scanning copyrighted books, "'Google by comparison took a shortcut by copying anything and everything regardless of copyright status.'" *Authors Guild*, 770 F. Supp. 2d at 679 (quoting Hr'g Tr. 43 (Thomas Rubin, counsel for Microsoft)). "As one objector put it: 'Google pursued its copyright project in calculated disregard of authors' rights. Its business plan was: So, sue me.'" *Id.* (quoting Obj. of Robert M. Kunstadt to Proposed Settlement at 3, ECF No. 74).

Because this case involves the wholesale digitization and use of *millions* of works for commercial purposes, it is vastly different from the many fair use cases that challenged an artist's or author's unauthorized use of one or a small handful of copyrighted works for the purpose of creating a new work of creative expression. *See, e.g.*, *Campbell*, 510 U.S. at 571-72 (rap group's use of iconic guitar riff and lyrical refrain to create a parody of the original); *Cariou v. Prince*, 714 F.3d 694, 699-702 (2d Cir. 2013) (appropriation artist's use of photographs to create new artwork); *Blanch v. Koons*, 467 F.3d 244, 246 (2d Cir. 2006) (visual artist's use of single photograph in creating a new collage painting); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 607 & n.1 (2d Cir. 2006) (use of seven *Grateful Dead* concert posters in book about the band).

In *Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913, 923 (2d Cir. 1995), then-District Judge Pierre Leval observed an analytic distinction between "productive" copying cases (*i.e.*, the "classic" fair use cases like those described above that involve the limited use of a pre-existing work to create something truly new) and "nonproductive" copying cases (*i.e.*, less common cases that involve mechanical copying on a larger scale). Judge Leval noted that, in the wake of the Supreme Court's ruling in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), courts had held that certain

28

nonproductive copying could be fair use, *id.* at 12-13, but only where such uses were noncommercial:

> What has emerged . . . seems to be a two-track pattern of interpretation of the first factor:  Secondary users have succeeded in winning the first factor by reason of either (1) transformative (or productive) nonsuperseding use of the original, or (2) noncommercial use, generally for a socially beneficial or widely accepted purpose.

*Id.* at 12.  For classic "productive" fair use cases, the transformative use test has dominated the first-factor inquiry.  *See id.*  By contrast, where the challenged use adds nothing new to the original by "altering the first with new expression, meaning, or message," *Campbell*, 510 U.S. at 579, the commerciality of the use is paramount.  *See Texaco*, 802 F. Supp at 13.

Here, the District Court erred by employing a fair use analysis designed and best suited for cases involving use of a single or small number of copyrighted works.  Thus, the District Court's reliance on cases like *Blanch* and *Bill Graham Archives*, in which the challenged use was deemed fair despite having a commercial aspect (*i.e.*, selling artwork or books), is misplaced.  (SPA20-21.)  In those cases, an artist or author took a small number of pre-existing works for the purpose of creating a new work of expression.  By contrast, Google used millions of pre-existing works to build its search engine and drive advertising revenue.  Google's commercial enterprise stands in stark contrast to the lone visual artist creating a collage in his studio out of images scanned from glossy magazine

photographs, *see Blanch*, 467 F.3d at 247, or a Grateful Dead enthusiast collecting concert posters to include in a biographical anthology about the band, *see Bill Graham*, 448 F.3d at 607.

When considering the commercial aspect of Google's enterprise, a far more analogous case is *Princeton Univ. Press v. Michigan Document Servs., Inc.*, in which the Sixth Circuit held that the duplication of copyrighted materials by a copy shop was "for sale by a for-profit corporation that has decided to maximize its profits—and give itself a competitive edge over other copy shops—by declining to pay the royalties requested by the holders of the copyrights."  99 F.3d 1381, 1386 (6th Cir. 1996).  *See also United States v. ASCAP*, 599 F. Supp. 2d 415, 429 (S.D.N.Y. 2009) ("Because the [free ringtone] previews constitute a form of advertisement for applicant's ringtones and ringback tones . . . , applicant's use of ASCAP music to increase revenues from sales of ringtones and ringback tones is commercial."); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (commercial use where defendant offered free subscriptions to its service and did not sell the songs it had illegally copied in order "to attract a sufficiently large subscription base to draw advertising and otherwise make a profit").

Contrary to the District Court's holdings, the commerciality of Google's uses weighs very strongly against a finding of fair use.

## 2.    Google's Uses Are Not Transformative

The reproduction, distribution and display of millions of in-copyright works do not constitute transformative uses.[9]  In *Campbell*, the Supreme Court stated that a use is transformative when it "adds something new, with a further purpose or different character, altering the first with *new expression, meaning, or message*." 510 U.S. at 579 (1994) (emphasis added).  The requirement that the use have "a further purpose or different character" does not stand alone, but instead modifies the ultimate requirement that the secondary use "adds something new."  *Id.*  As a result, merely articulating a new "purpose" for a use of a copyrighted work, without changing or adding anything new, is not enough to render the work transformative.  *See id.*; *Cariou*, 714 F.3d at 706 (while a work need not "comment on the original or its author in order to be considered transformative," it still must "alter[] the original with new expression, meaning or message").  Indeed, if a

---

[9] These uses must be analyzed separately.  Section 107 of Copyright Act requires an examination of "whether *the use* made of a work in any particular case is a fair use." 17 U.S.C. § 107 (emphasis added).  It does not ask whether all of an infringer's various uses, taken in the aggregate, are fair.  *Cf.  Cariou*, 714 F.3d at 711-12 (holding "all except five" of alleged infringer's artworks to be fair use and remanding remaining five for further analysis); *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 557 (S.D.N.Y. Mar. 21, 2013) ("The fact that [defendant] also offers a number of analysis tools does not render its copying and redistribution of article excerpts transformative."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169-73 (9th Cir. 2007) (upholding as fair use one of Google's uses (thumbnail displays of images), but determining that Google could be liable for another use (in-line linking to full-sized infringing images)).

"further purpose" alone were sufficient, a secondary user could always claim transformativeness merely by articulating some different purpose when infringing on a copyright. "Such a strategy empties the term of meaning—for the 'transformative' moniker to guide, rather than follow, the fair use analysis, it must amount to more than a conclusory label." 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 13.05[A][1][b] (2011).

In its analysis, the District Court seized on certain features of the Library Project, labeled those uses "transformative," and then applied that label to the entirety of the Library Project. In doing so, the Court transformed "transformative" into exactly the kind of conclusory label Professor Nimmer warned against.

### (a)    Reproducing and Storing Exact Digital Copies Are Not Transformative Uses

Google has scanned over four million in-copyright print books into e-books and has permanently stored multiple copies of those e-books on its servers. This use—mechanical conversion—is not transformative. Digitization, like photocopying, "merely transforms *the material object* embodying the intangible article that is the copyrighted original work." *Texaco*, 60 F.3d at 923 (emphasis added); *see Princeton Univ. Press*, 99 F.3d at 1389 ("mechanical 'transformation'" of photocopying "bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case"). Converting print books into

32

e-books adds no "new information, new aesthetics, [or] new insights and understandings," to the copyrighted books.  Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990).  *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (retransmission of radio broadcast, which merely repackages the original, is not transformative because it adds "neither new expression, new meaning nor new message") (quotation omitted).  While mass digitization operations "may be innovative, they are not transformative."  *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d at 351 (claim that the conversion of CDs into computer files is transformative "is simply another way of saying that the unauthorized copies are being retransmitted in another medium—an insufficient basis for any legitimate claim of transformation").

The District Court sidestepped Google's reproduction and creation of millions of e-books, instead improperly focusing its analysis of transformativeness on the Library Project's independent search index and text mining functions.  In determining that the Library Project "transforms expressive text into a comprehensive word index" and "has transformed book text into data for purposes of substantive research," it concluded that "Google's use of the copyrighted works is highly transformative."  (SPA19-20.)  However, to the extent that either of those purposes fits within the rubric of fair use (and it is the Authors' contention that

33

they do not), Google should not be permitted to make uses unnecessary to those purposes. *See Campbell*, 510 U.S. at 589 (remanding to determine whether defendant's repetition of the copyrighted song's bass riff was excessive copying in light of the song's parodic purpose). Because Google's permanent storage of multiple digital copies of every digitized book on its servers is entirely unnecessary for purposes of the Library Project's search index and text mining functions (*see* CA70, 352-53, 381-82), those purposes cannot render Google's reproduction transformative.

The Ninth Circuit cases cited by the District Court, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), which address the legality of copying web pages for the purpose of creating a search index, are easily distinguishable. Unlike Google's perpetual storage of high resolution image files and text files of every book it scans, the images copied by the search engines in *Kelly* and *Perfect 10* were not permanently stored. *See Kelly*, 336 F.3d at 815 (after copying full size images onto its server for the purpose of creating "thumbnails," the search engine *deletes the original copy* from its server) (emphasis added); *Perfect 10, Inc.*, 508 F.3d at 1156-57 (noting that "Google does not store the images" and that "Google's cache contains the text of the webpage as it appeared at the time Google indexed the page, *but does not store images from the webpage*") (emphasis added). Here,

34

Google not only copies books for the purpose of ingesting the content into its search index, but it also permanently stores complete copies of the books for future exploitation and distribution to the libraries.  Even if the Ninth Circuit considered the mechanical indexing of the words in a book to be "transformative," it does not follow that Google's reproduction, storage and distribution of unaltered copies of the books also is transformative.  *See Texaco*, 60 F.3d at 924 ("In this case, the predominant archival purpose of the copying tips the first factor against the copier, despite the benefit of a more usable format.").

### (b)    Disseminating Millions of Copyrighted Books to Google's Library Partners is a Not Transformative Use

Google has distributed a vast number of copyright-protected e-books to its Library Partners.  As of March 2012, the Library Partners had received over 2.7 million e-books.  (A430.)  Google is obligated to provide these e-books as in-kind payment for the Library Partners' allowing Google to digitize and commercially exploit their print collections.  (CA28; CA504-05 ¶ 64.)  Like Google's other challenged uses, this distribution-as-payment does not "alter the original[s] with 'new expression, meaning or message'" and thus is plainly non-transformative. *Cariou*, 714 F. at 706.

To the extent the District Court addressed this issue in isolation, it did so only with reference to the purposes of the Library Partners to which Google has distributed its digital copies.  It held that "Google's actions constitute fair use [with

regard to distribution] as well," relying entirely on the determination that "the libraries . . . use these digital copies in transformative ways." (SPA26-27.) But the purposes of Google's end users, as opposed to those of Google, are irrelevant to a fair use analysis. *See Infinity*, 150 F.3d at 108 ("[I]t is [defendant's] own retransmission of the broadcasts, not the acts of his end-users, that is at issue here.").

Like the radio re-transmitter in *Infinity*, who sold "access to unaltered radio broadcasts," *id.*, Google has sold to its Library Partners access to unaltered copyrighted books. Moreover, pursuant to their agreements with Google, the Library Partners are not restricted to the uses that Judge Baer found transformative in *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012), and on which Judge Chin relied in his analysis. Indeed, the agreement between Stanford and Google contemplates possible commercial uses of unauthorized e-books. (CA133-34.) Accordingly, there is a "total absence of transformativeness in [defendant's] acts." *Infinity*, 150 F.3d at 109.[10]

---

[10] Even if the Court determines that the Library Partners' uses are relevant when considering the fairness of Google's uses, the Authors disagree that the libraries' conduct, which is in direct contravention of the restrictions in Section 108 of the Copyright Act, is non-infringing. The Authors Guild and other authors and rights organizations have appealed Judge Baer's dismissal of their copyright claims against certain of Google's Library Partners. That appeal now is *sub judice* before this Court. *See Authors Guild, Inc. v. HathiTrust*, No. 12-4547.

**(c)    Displaying Large Portions of Millions of Copyrighted Books is Not Transformative**

Google's display of 78% of the verbatim text of millions of in-copyright books is non-transformative because it does not "alter the original[s] with 'new expression, meaning or message.'" *Cariou*, 714 F. 3d at 706 (quoting *Campbell* at 589). Indeed, this Court has declined to find the use of verbatim excerpts transformative even where the use was less extensive and more creative than Google's unauthorized display. *See Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 141-143 (2d Cir. 1998) (use of forty-one verbatim quotations in trivia book that "involve[d] some creative expression" held non-transformative); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372-77 (2d. Cir. 1993) (chapter of trivia questions featuring one page of verbatim quotations from television series held non-transformative).

The District Court erred in accepting Google's argument that helping readers "determine whether [a particular book] may be of interest" is a "different purpose for the book." (SPA20.) While the unauthorized display of snippets may incidentally inform readers whether a particular book is of interest, allowing users to view verbatim copyrighted material is a non-transformative and infringing substitute. *See, e.g.*, *HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 306 (S.D.N.Y. 2010) (blog that displayed excerpts from forthcoming book had "not used the copyrighted material to help create something

new" but "merely copied the material in order to attract viewers"); *ASCAP*, 599 F.
Supp. 2d at 424 ("Applicant's use of [ringtone] previews is not transformative. It
is undisputed that the music segments used in applicant's previews are exact copies
of ASCAP music."); *see also Texaco,* 60 F.3d at 923 ("[A]n untransformed copy is
likely to be used simply for the same intrinsic purpose as the original"). According
to the District Court's logic, any otherwise non-transformative use would be
deemed fair so long as it also attracts readers to the original.

Similarly, the District Court's reliance on the *Bill Graham* case in this
Circuit and *Perfect 10* and *Kelly* from the Ninth Circuit is misplaced. *Bill Graham*
involved a 480-page book about the Grateful Dead. *Id.* at 607. The book included
2,000 images presented in chronological order, combining those images with text
and graphic art to convey the history of the band. *Id.* At issue were seven of those
images, photographs of concert posters greatly reduced in size for the book format
and interspersed with narrative text and graphic art about those concerts. *Id.* This
Court held the use transformative because "enhancing the biographical information
in *Illustrated Trip* [was] a purpose separate and distinct from the original artistic
and promotional purpose for which the images were created." *Id*. at 610. Here, by
contrast, Google has displayed copyrighted language verbatim without
incorporating it into any new work. Google did not, for example, publish an
original biography about Jim Bouton's major league baseball career, using the

cover page and brief excerpts from *Ball Four* as part of that biography to illustrate that career.

*Perfect 10* and *Kelly* each held that a search engine's display of thumbnail images was transformative. In those cases, however, the copyright holders voluntarily placed their content on publicly-accessible webpages which, by default, are copied by "web crawlers" and ingested into their dispatchers' search engines. Indeed, webpages are there to be located and accessed. Here, the Authors did not upload the content of their books onto the Web to be copied, indexed, stored and disseminated by search engines.

The Third Circuit case, *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191 (3d Cir. 2003), is far more analogous to this case. There, the defendant compiled movie trailers and clips and copied them into a database without authorization. *Id.* In rejecting the defendant's reliance on *Kelly* to argue that its database of video clips was fair use, the Third Circuit held:

> Video Pipeline's database does not, however, serve the same function as did Arriba Soft's search engine. As used with retailers' websites, VideoPipeline.net does not improve access to authorized previews located on other websites. Rather, it indexes and displays unauthorized copies of copyrighted works. VideoDetective.com does permit viewers to link to legitimate retailers' web sites, but a link to a legitimate seller of authorized copies does not here, if it ever would, make prima facie infringement a fair use.

*Id.* at 199; *see also id.* at 200 (Video Pipeline's clip previews lack any significant transformative quality and the commercial nature of the clip previews weighs more strongly against their use).

Finally, even if certain of Google's uses of copyrighted books are found to be transformative, the inquiry must not end there.  As the *Campbell* court made clear, the extent to which a new work transforms the copyrighted work is simply a factor that is balanced against the other fair use factors.  510 U.S. at 577-78.  Here, Google gained an enormous commercial and competitive advantage from its use of others' copyrighted works and, as described above and reiterated in the analysis of factor four below, stopped the emergence of a licensed market (already begun by Amazon) in its tracks.  Google could have paid for the right to include copyrighted works in its search engine, as it agreed to do in the ASA, or worked to establish a collective licensing scheme of the sorts now being adopted in other countries.  Google should not be permitted to reap enormous financial rewards on the backs of authors even if the Court finds that making books searchable is transformative.

## B.    Nature of the Copyrighted Work

Just as the District Court essentially wrote out of the statute the explicit requirement that the commercial nature of the use be considered as part of the first factor, it essentially eliminated factor two.  The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection

than others, with the consequence that fair use is more difficult to establish when
the former works are copied." *Campbell*, 510 U.S. at 586. While the District
Court found that the "vast majority" of the books in the Library Project are non-
fiction and published (SPA22-23), the works digitized, distributed and displayed as
part of the Library Project include every conceivable type of book, including
fiction and non-fiction, obscure academic works and bestsellers. In making its
selections, Google gave no consideration to the nature of the books copied. (A932-
33 ¶¶ 32-34.) Under the unusual and unprecedented circumstances of this case,
where Google indiscriminately scanned millions of books in assembly-line fashion,
Google cannot meet its burden of showing that the nature of the copyrighted work
favors a finding of fair use.

The proposition that the second factor can be found to favor this massive
*prima facie* infringement is troubling. As this Court recognized in the context of a
single author's copyrighted works, "there is no easy distinction between works that
are factual on the one hand, and 'creative' or expressive on the other, because
creation of a nonfiction work, even a compilation of pure fact, entails originality."
*New Era Publ'ns  Int'l., ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 158 (2d Cir.
1990) (internal citation and quotation marks omitted). Had Google scanned the
entirety of a single work of fiction, the second factor presumably would have
weighed in the favor of the rightsholder. The answer cannot be different where

41

Google scanned hundreds of thousands of works of fiction, along with a vast

number of non-fiction works.

## C.    Amount and Substantiality of the Portion Used

The District Court's disregard of the second fair use factor pales in

comparison with its treatment of the third factor, which considers "the amount and

substantiality of the portion used in relation to the copyrighted work as a whole,"

or whether "the quantity and value of the materials used[] are reasonable in relation

to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal quotation

marks and citations omitted). This factor "recognizes that the more of a

copyrighted work that is taken, the less likely the use is to be fair, and that even a

less substantial taking may be unfair if it captures the essence of the copyrighted

work." *Infinity*, 150 F.3d at 109. "Though not an absolute rule, 'generally, it may

not constitute a fair use if the entire work is reproduced.'" *Id.* (quoting Nimmer,

§ 13.05[A][3] at 13-178).

Here, the third fair use factor takes on particular significance because

truckloads of books were digitized, copied and disseminated in their entirety. 78%

of each of these books was made available for public display. But while the

District Court correctly found that "Google scans the full text of books—the entire

books," it concluded that "the third factor weighs *slightly* against a finding of fair

use." (SPA23-24) (emphasis added). It held that "full-work reproduction is

42

critical to the functioning of Google Books" and that because "Google limits the amount of text it displays in response to a search," Google's unbounded uses were mitigated. (SPA23.) Neither of these considerations stand to reason: the former is simply not true, and the latter ignores quantitative and the qualitative substantiality of snippets.

### 1. Google's Uses Far Exceed That Necessary for the Search and Text Mining Functions

The District Court's reference to "the functioning of Google Books" is vague; given that its analysis of Google's purpose centers entirely on the search and text mining functions, it may be assumed that it was referring to those functions in finding that "full-work reproduction is critical" here. (SPA23.) However, even accepting, *arguendo*, that it might be fair use to digitize books as an intermediate step in the creation of a searchable index and text mining database, the facts show that Google has gone much further than necessary to accomplish these purposes. *Cf. Campbell*, 510 U.S. at 589 (remanding case to determine whether the repetition of original song's iconic bass riff was excessive).

Google made and has kept multiple copies of the image and text files, but it has not demonstrated any search-related purpose served by the retention of such files after they are ingested into the search index. It made digital copies of the books available to its Library Partners (A396-97), not in furtherance of its search project, but rather as in-kind payment for access to the libraries' massive

43

collections of print books (CA28; CA504-05 ¶ 64).  As part of the search function,

Google displays significant portions of the books, even though its Library Partners

concluded that no such display was required to fulfill the index and search

purposes.  *HathiTrust*, 902 F. Supp. 2d at 448.  Far from being "critical" to the

search index and text mining functions, the reproduction, distribution and display

of e-books are completely unnecessary to the functioning of the search engine.

In short, the District Court minimized Google's taking of copyrighted works

by focusing on one aspect of Google's  program—search—in isolation, and

ignoring the broader picture. As explained above, separate uses must be analyzed

separately, and courts have refused to allow an activity that may qualify as fair use

to excuse infringing activities that do not.  The District Court erred in allowing

Google's search function to excuse all its other uses of the Authors' copyrighted

materials.

### 2.    Snippets May Contain the "Heart" of the Book

The District Court's search-centric analysis also glosses over the great extent

to which Google displays the Authors' works, minimizing the significance of this

taking by relying on the bare fact that "Google limits the amount of text it displays

in response to a search."  (SPA23.)  Putting aside that Google collectively displays

78% of each book, even single snippets are highly expressive and indeed may take

"what [is] essentially the heart of the book."  *Harper & Row*, 471 U.S. at 564-65

(internal quotation marks omitted); *see id.* at 565 (that quoted passages "qualitatively embodied [the author's] distinctive expression" weighs against finding of fair use); *see also HarperCollins Publishers L.L.C*, 721 F. Supp. 2d at 305-06 ("images of portions of 12 pages" of memoir "amounts to a substantial portion of the Book").

By disabling snippet view for recipes, cookbooks, and other reference works, Google has implicitly acknowledged the threat that public display of even short excerpts may pose to the "heart" of a book.  But why should Google be allowed to make the decision as to which works fall into which category and which categories present a risk to Authors' rights?  Google's own examples of allegedly lawful display from *Ball Four*, Jim Bouton's memoir about Steve Hovley, demonstrate the important difference between a mere index and the display of expressive text from a copyrighted work:

> Steve Hovley has been called up.  Old Tennis Ball Head hasn't had a haircut since he left.  Which means Joe Schultz had four comments to him the very first day.  "Where's your barber?" "Don't you need a haircut?"
>
> * * *
>
> Moments later, perhaps feeling bad about his comment, or perhaps wishing to stick the needle in further, Pattin approaches Hovley and says, "I don't care you long you wear your hair, Hovley.  You can wear it down to your ass as far as I'm concerned."

(A246.)

45

If the Library Project were merely to enable a user to search for books that reference "Steve Hovley," or view the number of times that the name "Steve Hovley" appears in a book, that would be one thing.  But permitting users to read excerpts that bring to bear all of the author's originality, subjective insights, creative spirit and unique voice—is quite another.  *See Heim v. Universal Pictures Co.*, 154 F.2d 480, 488 (2d Cir. 1946) (a single phrase may be sufficiently "idiosyncratic in its treatment" so as to receive protection).  These, of course, are but two examples.  Google users are able to view other displays of expression from millions of in-copyright books *ad infinitum.*  Google's appropriation and display of expression has occurred on a massive, unprecedented scale that goes far beyond what is meaningfully connected to search and indexing functions.

## D.    The Effect of the Use Upon the Market for or Value of the Work

The fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4),

> requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringed, but also "whether unrestricted and wide-spread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market" for the original.

*Campbell*, 410 U.S. at 590 (quoting Nimmer, § 13.05[A][4]).  The copyright holder need not show either "actual present harm" or "with certainty that future harm will result," but rather "a showing by a preponderance of the evidence that

*some* meaningful likelihood of future harm exists." *Sony*, 464 U.S. at 451

(emphasis in original). Courts must consider not only any damage caused to the

original work, but also any harm to the market for derivative uses. *Harper & Row*,

471 U.S. at 568. As with the other fair use factors, Google bears the burden of

showing that its use does not harm the Authors' interests. *Infinity*, 150 F.3d at 110.

Speculating that "Google Books enhances the sales of books to the benefit of

copyright holders," the District Court concluded that "the fourth factor weighs

strongly in favor of a finding of fair use." (SPA24.) This conclusion totally

disregards existing and emerging markets for the uses at issue in this case. The

District Court failed to consider the consequences its ruling will have on uses of

copyrighted works by actors *other* than Google, and it ignores the reality of today's

digital world, in which the question is not if, but when, a data breach will occur.

### 1.    Google Destroyed Existing and Emerging Markets for Digital Books

It is well established that the "impact on potential licensing opportunities for

traditional, reasonable or likely to be developed markets should be legally

cognizable when evaluating a secondary use's 'effect upon the potential market for

or value of the copyrighted work.'" *Texaco*, 60 F.3d at 930. The undisputed

evidence establishes that Google's activities will harm the Authors by undermining

existing and emerging licensing opportunities.

47

In *Texaco*, this Court considered whether a corporate library's systematic photocopying of scientific journal articles for research and archival purposes was fair use. 60 F.3d at 91. In analyzing whether it was appropriate for the district court to have considered the increase in publishers' revenue that would result if Texaco's unauthorized copying was not permitted as fair use, this Court observed that "the publishers still have not established a conventional market for the direct sale and distribution of individual articles[.]" *Id.* Nevertheless, the Court found that "they have created, primarily through [the Copyright Clearance Center], a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying." *Id.* The Court reasoned that:

> it is not unsound to conclude that the right to seek payment for a particular use tends to become legally cognizable under the fourth fair use factor when the means for paying for such a use is made easier. This notion is not troubling: it is sensible that a particular unauthorized use should be considered "more fair" when there is no ready market or means to pay for the use, while such an unauthorized use should be considered "less fair" when there is a ready market or means to pay for the use.

*Id.* at 930-931.

Here, there is a "ready market or means" for Google's uses. A prime example is Google's own Partner Program, in which more than 45,000 rightsholders have given Google permission to display partial book content on the Internet in exchange for compensation from ad revenues. (CA92.) Beginning in

48

2004, the Partner Program allowed publishers and other rightsholders to permit Google to display their works in exchange for a split of ad revenue. Google could have extended this licensing model to meet the broader aims of the Google Books project. Indeed, Google *has* paid for the ability to use millions of copyrighted works; it just hasn't paid the Authors. Instead, it has opted to pay independent contractors and scanning vendors hundreds of millions of dollars, and it has paid libraries with the currency of infringing e-books.

Further, as described in detail in the expert report of Professor Daniel Gervais, collective management organizations provide a market-based mechanism by which libraries could compensate authors and rightsholders in exchange for a license to mass digitize and make various uses of copyrighted books in their collections. (*See* A785-87.) Just as in *Texaco*, the CCC and other collective management organizations around the world presently license the same types of materials that are scanned by Google, generating a significant stream of revenue for rightsholders. (A785, 791.) For example, authors and their associational representatives in Norway and Sweden have entered into or are finalizing license agreements to permit their national libraries to digitize entire collections of books in exchange for royalty payments.[11] In 2012, Google announced that in France "it

---

[11] *See* Alexis C. Madrigal, *Norway Decided to Digitize All the Norwegian Books*, The Atlantic, December 3, 2013, http://www.theatlantic.com/technology/archive/2013/12/norway-decided-to-

49

had an industrywide book-scanning agreement in place to cover works that are out of print but still under copyright—a category that covers most of the world's books," and that Google was "interested in exporting these deals elsewhere."  Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y. Times, June 12, 2012, at B5.

Although the District Court ultimately rejected the Amended Settlement Agreement, the proposed resolution provides further compelling evidence that there is a ready market or means to pay for the uses that Google is making. Among other things, the ASA provided a mechanism to compensate the millions of authors whose copyrighted works had been digitized by Google without authorization.  (A85-87, 116-26.)  Under the ASA, the class of affected authors and rightsholders, including the Authors, would have granted a license to Google to digitize works and sometimes sell, display and make certain non-display uses of the works it had scanned, in exchange for a portion of the revenues earned from those uses.  (A85-87, 112-13.)  As part of this license, Google was expressly authorized to index the contents of the digitized works for search purposes and to allow researchers to conduct "non-consumptive research" using the digitized corpus (ASA, ECF No. 770-1 at § 7.2(d).)  The ASA shows how a collective

---

digitize-all-the-norwegian-books/282008/; Jerker Rydén, *Sweden's Digital Library*, March 3, 2011, http://slidesha.re/1luSlna.

management system might work to permit Google's activities in this case while providing compensation to copyright owners.

In addition to thwarting the development of emerging and potential markets, Google's various unauthorized uses also undermine *existing* licenses for the use of the Authors' books.  Rightsholders routinely grant online distributors a license to index their books and make them searchable as part of a commercial arrangement intended to promote book sales.  (*See, e.g.*, A56; A67.)  Amazon's Search Inside the Book program, described above, is a prime example.  *See supra* at 2-3.  Google's Library Project was designed to drive traffic away from Amazon, an online retailer, and toward Google.  (CA 440).  As courts have held, a secondary use that replaces a comparable service licensed by the copyright holder, even without charge, may cause market harm.  *See Infinity*, 150 F.3d at 111 (although copyright holder provided a comparable service to its customers at no additional cost, defendant's use "replaces" the broadcaster "as the supplier of those broadcasts to meet the demand of his customers"); *ASCAP*, 599 F. Supp. 2d at 422, 432 (performance rights organization established existence of market for ringtone previews by showing that musicians generally granted a license to online distributors to allow their users to search for and play ringtone clips for promotional purposes).

**2.    The District Court Ignored Evidence of the Risk and Immense Consequences of a Data Breach**

Google is playing with fire.  Google's Library Project converts print books into digital files and then replicates those files, stores them on multiple servers connected to the Internet, and grants its Library Partners access to an online portal that permits them to simultaneously download millions of e-books onto their own computers.  These unauthorized activities subject the Authors' books to the same types of risks of digital piracy that battered the market for sound recordings.  While this issue was fully briefed below, the District Court failed to address it at all. (*Compare* Mem. Supp. Pls.' Mot. Summ. J. at 45-46, ECF No. 1050; Pls.' Reply Supp. Mot. Summ. J. at 16-17, ECF. No. 1085, *with* SPA24-28.)

The risks of data breaches are real and on the rise,[12] leading many information security professionals acknowledge that breaches are sure to occur.  A day hardly passes without reports of damaging cyberattacks on even the most sophisticated technology companies, including Google.  There are people who specifically target digital libraries and similar databases, and they have succeeded. In 2011, an activist was indicted for hacking into a proprietary database of journal articles by sneaking into a network interface closet in the MIT library, hooking his

---

[12] *See, e.g.,* 2013 Data Breach Investigations Report (2013), http://www.verizonenterprise.com/ DBIR/2013/.

laptop directly into the network and downloading *over 4.8 million articles*, with the intent to disseminate the archive throughout the Internet. *See* Indictment, *U.S. v. Swartz*, No. 11-CR-10260 (D. Mass. July 14, 2011).

As it must, Google acknowledges there is a risk that its "security measures may be breached due to the actions of outside parties, employee error, malfeasance, or otherwise, and, as a result, an unauthorized party may obtain access to our data or our users' or customers' data." (A562.)  To make matters worse, Google does not monitor or control the security of the e-books it provides to its Library Partners (*see* CA508 ¶ 108), subjecting rightsholders to the potentially inadequate security measures of libraries and exacerbating the risk of a security breach (A802-03).   In this way, Google's unauthorized uses create new risks to the literary market, further demonstrating that the Library Project is likely to cause harm to the "potential market" for the Authors' books.

Google, for its part, dismisses plaintiffs' security concerns as "doomsday hacker scenarios" (Google Opp'n Br. at 35, ECF No. 1072.)  But there is nothing remote or speculative about such online security risks.  *See, e.g.*, Richard Pérez-Peña, *Campuses Face Rising Threat from Hackers*, N.Y. Times, July 17, 2013, at A1; Wallace D. Loh, UMD Data Breach: Update #6 (Feb. 25, 2014), http:// uhr.umd.edu/2014/02/umd-data-breach-update-6-02252014/ ("In the past couple of years, some 20 large universities across the country have [] reported major data

breaches.  There is an arms race between hackers playing offense and universities playing defense.").

Nor is there anything remote or speculative about the fact that piracy can have devastating consequences for rightsholders.  *See, e.g.*, S. Rep. No. 105-90, at 61 (1998) (recognizing "risk that uncontrolled public access to [libraries'] copies . . . in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies . . .  of the work").  Indeed, a 2010 study showed that publishers lost almost $3 billion in sales as a result of e-book piracy.  Gini Graham Scott, *The Battle Against Internet Book Piracy* 12 (2013).  Even if Google has thus far avoided a data breach, there is no assurance it will succeed in the future.  Security could be compromised by increased pressure from hackers, foreign governments or private actors determined to disrupt American interests, budget cuts, a disgruntled employee or mistakes that lead to the release of copyright-protected materials.

The ASA reflected the importance of allowing rightsholders to decide whether and how to make their works available on the Internet.  It included specific security procedures agreed upon by authors, a procedure for security audits and remedies in the event of any potential breaches.  (*See* ASA, ECF No. 770-1, Art. VIII.)  In sharp contrast, Google's unilateral mass digitization offers none of these protections.

54

Finally, it is the Authors, not Google, who should be entitled to decide whether "to reproduce" and "to authorize" others "to reproduce" their works into digital format, 17 U.S.C. § 106, and thereby subject their works to risks of piracy. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987), (author "has the right to change his mind" regarding whether or not to publish work and is "entitled to protect his *opportunity* to sell his [works]").  By undermining Authors' rights to control whether, how and by whom their works are to be digitally exploited, Google disempowers Authors and diminishes the value of their works.

### 3.    The District Court's Decision Clears the Way for Other, Less Responsible Parties to Engage in Their Own Mass Digitization Programs

In analyzing the fourth factor, a court must consider the consequences to the market if the infringer's conduct were to become "unrestricted and widespread." *Campbell*, 510 U.S. at 590; *see Texaco*, 60 F.3d at 927 n.12.  If this Court upholds the District Court's determination that the Library Project constitutes fair use, it will open the door to others to engage in their own unauthorized digitization programs, further exacerbating the harm to the Authors and putting more books within the reach of digital thieves on countless more servers.  Absent a legal obligation, these actors are unlikely to implement the security measures necessary to safeguard intellectual property that does not belong to them, especially when armed with a decision that the public interest in disseminating information easily

trumps the interests of copyright holders.[13]  Even if these actors may want to implement necessary security measures, they may not have the technological or financial means to do so.  As a result, the security risk posed by Google's uses, already multiplied by Google's distribution to its Library Partners, would be multiplied yet again.

For all these reasons, the fourth factor, like all of the factors in this fair use analysis, weighs against Google.

## II.

## A FUNDAMENTAL CHANGE IN THE BALANCE BETWEEN THE RIGHTS OF COPYRIGHT HOLDERS AND USERS MUST BE MADE BY CONGRESS, NOT BY A PRIVATE COMMERCIAL ENTITY

In determining whether Google's mass digitization program constitutes fair use, the Court should also take account of the fact that in drafting the Copyright Act, Congress recognized and granted rightsholders protections against the dangers inherent in copying protected works into digital format.  As early as 1963, at a Copyright Office hearing, witnesses expressed concerns over the rise of computer technology and the rightsholders' loss of control that would result if users were permitted to copy books and other works into machine-readable format without

---

[13] *Accord Harper*, 471 U.S. at 559 ("[T]o propose that fair use be imposed whenever the social value [of dissemination] . . . outweighs any detriment to the artist, would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it.") (alteration in original, internal quotation marks omitted).

authorization.  These and other concerns led to the inclusion in Section 106 of the Copyright Act of language clarifying that rightsholders have the exclusive right "to do and *to authorize"* others to copy, display and distribute copyrighted works, including in digital format.  *See* 3 *Omnibus Copyright Revision Legislative History* 120-27 (George Grossman ed., 2001).

Moreover, Section 108 of the Copyright Act, which gives libraries and archives the right to make copies of printed books in their collections under very limited circumstances (*see supra* note 6), was enacted after years of debate over the appropriate balance between rightsholders and users.  It was not until the 1998 passage of the Digital Millennium Copyright Act that Section 108 was amended to permit libraries to make and use copies of books in digital format.  However, the amended statute included important restrictions on libraries' ability to use digital copies, including that no more than three digital copies could be made and that digital copies not be "made available to the public in that format outside the premises of the library or archives in lawful possession of such copy."  17 U.S.C § 108(c)(2).  Congress placed these restrictions on digital copying "in recognition of the risk that uncontrolled public access to the copies [] in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies [] of the work."  S. Rep. No. 105-90, at 61-62 (1998).

These very specific rights and limitations addressing libraries and archives make it doubly implausible to read the Act as authorizing a commercial entity like Google to expose copyrighted works to the very risk Congress sought to address. As the District Court noted in rejecting the ASA, if there is going to be a major change in the established balance between rightsholders and users, it should be made by Congress not Google. *See Authors Guild*, 770 F. Supp. 2d at 677.

## CONCLUSION

Plaintiffs-Appellants respectfully request that this Court vacate the Judgment of the District Court; mandate that the District Court grant the Authors' motion for summary judgment and remand the case for consideration of a proper remedy that includes payment to Authors for the use of their works, an end to Google's provision of e-books to libraries and real protections from the risk of theft and dissemination.

Dated:  New York, New York
        April 7, 2014

FRANKFURT KURNIT KLEIN & SELZ, P.C.


By:   /s/ Edward H. Rosenthal
Edward H. Rosenthal
Jeremy S. Goldman
Anna Kadyshevich
Andrew D. Jacobs
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

Paul M. Smith
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because based on the word count of the word-processing system used to prepare the brief (Microsoft Word), this brief contains 13,583 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because  this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  April 7, 2014

By:   /s/ Edward H. Rosenthal
        Edward H. Rosenthal

**SPECIAL APPENDIX**

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order or the Honorable Denny Chin,
dated November 14, 2013 ..................................... SPA-1

Judgment, dated November 27, 2013 ........................ SPA-31

Amended Judgment, dated December 10, 2013 ........ SPA-33

17 U.S.C. §106............................................................ SPA-35

17 U.S.C. §107............................................................ SPA-36

17 U.S.C. §108............................................................ SPA-37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

THE AUTHORS GUILD, INC., and          :
BETTY MILES, JOSEPH GOULDEN,
and JIM BOUTON, on behalf of          :
themselves and all others
similarly situated,                    :

                    Plaintiffs,       :

            - against -               :

GOOGLE INC.,                          :

                    Defendant.        :

- - - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____        │
│ DATE FILED: 11/14/13         │
└─────────────────────────────┘
```

**OPINION**

05 Civ. 8136 (DC)

**APPEARANCES:**   (See last page)

**CHIN, Circuit Judge**

        Since 2004, when it announced agreements with several

major research libraries to digitally copy books in their

collections, defendant Google Inc. ("Google") has scanned more

than twenty million books.  It has delivered digital copies to

participating libraries, created an electronic database of books,

and made text available for online searching through the use of

"snippets."  Many of the books scanned by Google, however, were

under copyright, and Google did not obtain permission from the

copyright holders for these usages of their copyrighted works.

As a consequence, in 2005, plaintiffs brought this class action

charging Google with copyright infringement.

SPA-2

Before the Court are the parties' cross-motions for summary judgment with respect to Google's defense of fair use under § 107 of the Copyright Act, 17 U.S.C. § 107. For the reasons set forth below, Google's motion for summary judgment is granted and plaintiffs' motion for partial summary judgment is denied. Accordingly, judgment will be entered in favor of Google dismissing the case.

## BACKGROUND

### A.    The Facts

For purposes of this motion, the facts are not in dispute. (See 9/23/13 Tr. 10-11, 15, 25-28 (Doc. No. 1086)).[1] They are summarized as follows:

### 1.    The Parties

Plaintiff Jim Bouton, the former pitcher for the New York Yankees, is the legal or beneficial owner of the U.S. copyright in the book Ball Four. Plaintiff Betty Miles is the legal or beneficial owner of the U.S. copyright in the book The Trouble with Thirteen. Plaintiff Joseph Goulden is the legal or beneficial owner of the U.S. copyright in the book The

---

[1] When pressed at oral argument to identify any factual issues that would preclude the award of summary judgment, plaintiffs' counsel was unable to do so. (Id. at 25-26).

-2-

<u>Superlawyers:  The Small and Powerful World of the Great</u>

<u>Washington Law Firms</u>.  (Google Resp. ¶¶ 1-3).[2]  All three books

have been scanned by Google and are available for search on

Google's website, without plaintiffs' permission.  (Google Resp.

¶ 4).  Plaintiff The Authors Guild, Inc., is the nation's largest

organization of published authors and it advocates for and

supports the copyright and contractual interests of published

writers.  (Google Resp. ¶¶ 7-8).

Google owns and operates the largest Internet search

engine in the world.  (Google Resp. ¶ 9).  Each day, millions of

people use Google's search engine free of charge; commercial and

other entities pay to display ads on Google's websites and on

other websites that contain Google ads.  (Google Resp. ¶ 10).

Google is a for-profit entity, and for the year ended December

31, 2011, it reported over $36.5 billion in advertising revenues.

(Google Resp. ¶ 11).

---

[2]     "Google Resp." refers to Google's Responses and
Objections to plaintiffs' Statement of Undisputed Facts in
Support of Their Motion for Partial Summary Judgment (Doc. No.
1077).  "Pl. Resp." refers to plaintiffs' Response to Google's
Local Rule 56.1 Statement (Doc. No. 1071).  I have relied on the
parties' responses to the statements of undisputed facts only to
the extent that factual statements were not controverted.

-3-

**2.    The Google Books Project**

In 2004, Google announced two digital books programs. The first, initially called "Google Print" and later renamed the "Partner Program," involved the "hosting" and display of material provided by book publishers or other rights holders.  (Google Resp. ¶¶ 13, 14).  The second became known as the "Library Project," and over time it involved the digital scanning of books in the collections of the New York Public Library, the Library of Congress, and a number of university libraries.  (Clancy Decl. ¶ 5 (Doc. No. 1035); Google Resp. ¶¶ 25, 26, 27; Pl. Resp. ¶ 14).

The Partner Program and the Library Project together comprise the Google Books program ("Google Books").  (Google Resp. ¶ 15).  All types of books are encompassed, including novels, biographies, children's books, reference works, textbooks, instruction manuals, treatises, dictionaries, cookbooks, poetry books, and memoirs.  (Pl. Resp. ¶ 6; Jaskiewicz Decl. ¶ 4 (Doc. No. 1041)).  Some 93% of the books are non-fiction while approximately 7% are fiction.[3]  Both in-print

---

[3]    These estimates are based on studies of the contents of the libraries involved.  (Def. Mem. at 7 (Doc. No. 1032) (citing Brian Lavoie and Lorcan Dempsey, Beyond 1923:  Characteristics of Potentially In-Copyright Print Books in Library Collections, 15-D-Lib 11/12 (2009), available at http://www.dlib.org/dlib/november09/lavoie/11lavoie.html (last visited November 12,

and out-of-print books are included, although the great majority are out-of-print.  (Jaskiewicz Decl. ¶ 4).

In the Partner Program, works are displayed with permission of the rights holders.  (Google Resp. ¶ 16).  The Partner Program is aimed at helping publishers sell books and helping books become discovered.  (Google Resp. ¶ 18). Initially, Google shared revenues from ads with publishers or other rights holders in certain circumstances.  In 2011, however, Google stopped displaying ads in connection with all books. (Google Resp. ¶¶ 17, 21; Dougall Decl. ¶¶ 5-8 (Doc. No. 1076)). Partners provide Google with a printed copy of their books for scanning, or a digital copy if one already exists.  (Google Resp. ¶ 19).  Partners decide how much of their books -- from a few sample pages to the entire book -- are browsable.  (Google Resp. ¶ 20).  As of early 2012, the Partner Program included approximately 2.5 million books, with the consent of some 45,000 rights holders.  (Google Resp. ¶ 24).

As for the Library Project, Google has scanned more than twenty million books, in their entirety, using newly-developed scanning technology.  (Google Resp. ¶¶ 28, 29).

_____

2013)).  The numbers are not disputed.  (<u>See</u> 9/23/2013 Tr. at 26).

-5-

Pursuant to their agreement with Google, participating libraries can download a digital copy of each book scanned from their collections.  (Google Resp. ¶ 30).  Google has provided digital copies of millions of these books to the libraries, in accordance with these agreements.  (Google Resp. ¶ 85).  Some libraries agreed to allow Google to scan only public domain works, while others allowed Google to scan in-copyright works as well. (Google Resp. ¶ 36).

Google creates more than one copy of each book it scans from the library collections, and it maintains digital copies of each book on its servers and back-up tapes.  (Google Resp. ¶¶ 40, 41).  Participating libraries have downloaded digital copies of in-copyright books scanned from their collections.  (Google Resp. ¶¶ 53, 54).  They may not obtain a digital copy created from another library's book.  (Jaskiewicz Decl. ¶¶ 6, 8).  The libraries agree to abide by the copyright laws with respect to the copies they make.  (Clancy Decl. ¶ 5).

Google did not seek or obtain permission from the copyright holders to digitally copy or display verbatim expressions from in-copyright books.  (Google Resp. ¶¶ 53, 54). Google has not compensated copyright holders for its copying of or displaying of verbatim expression from in-copyright books or

-6-

its making available to libraries for downloading of digital
copies of in-copyright books scanned from their collections.
(Google Resp. ¶ 55).

   3.   **Google Books**

          In scanning books for its Library Project, including
in-copyright books, Google uses optical character recognition
technology to generate machine-readable text, compiling a digital
copy of each book.  (Google Resp. ¶ 62; Pl. Resp. ¶ 18;
Jaskiewicz Decl. ¶ 3).  Google analyzes each scan and creates an
overall index of all scanned books.  The index links each word or
phrase appearing in each book with all of the locations in all of
the books in which that word or phrase is found.  The index
allows a search for a particular word or phrase to return a
result that includes the most relevant books in which the word or
phrase is found.  (Clancy Decl. ¶ 6; Pl. Resp. ¶¶ 22-26).
Because the full texts of books are digitized, a user can search
the full text of all the books in the Google Books corpus.
(Clancy Decl. ¶ 7; Google Resp. ¶ 42).

          Users of Google's search engine may conduct searches,
using queries of their own design.  (Pl. Resp. ¶ 10).  In
response to inquiries, Google returns a list of books in which
the search term appears.  (Clancy Decl. ¶ 8).  A user can click

-7-

on a particular result to be directed to an "About the Book" page, which will provide the user with information about the book in question.  The page includes links to sellers of the books and/or libraries that list the book as part of their collections.  No advertisements have ever appeared on any About the Book page that is part of the Library Project.  (Clancy Decl. ¶ 9).

        For books in "snippet view" (in contrast to "full view" books), Google divides each page into eighths -- each of which is a "snippet," a verbatim excerpt.  (Google Resp. ¶¶ 43, 44).  Each search generates three snippets, but by performing multiple searches using different search terms, a single user may view far more than three snippets, as different searches can return different snippets.  (Google Resp. ¶ 45).  For example, by making a series of consecutive, slightly different searches of the book Ball Four, a single user can view many different snippets from the book.  (Google Resp. ¶¶ 46, 47).

        Google takes security measures to prevent users from viewing a complete copy of a snippet-view book.  For example, a user cannot cause the system to return different sets of snippets for the same search query; the position of each snippet is fixed within the page and does not "slide" around the search term; only the first responsive snippet available on any given page will be

-8-


returned in response to a query; one of the snippets on each page is "black-listed," meaning it will not be shown; and at least one out of ten entire pages in each book is black-listed. (Google Resp. ¶¶ 48-50; Pl. Resp. ¶¶ 35, 37-40). An "attacker" who tries to obtain an entire book by using a physical copy of the book to string together words appearing in successive passages would be able to obtain at best a patchwork of snippets that would be missing at least one snippet from every page and 10% of all pages. (Pl. Resp. ¶ 41). In addition, works with text organized in short "chunks," such as dictionaries, cookbooks, and books of haiku, are excluded from snippet view. (Pl. Resp. ¶ 42).

4. **The Benefits of the Library Project and Google Books**

The benefits of the Library Project are many. First, Google Books provides a new and efficient way for readers and researchers to find books. (See, e.g., Clancy Decl. Ex. G). It makes tens of millions of books searchable by words and phrases. It provides a searchable index linking each word in any book to all books in which that word appears. (Clancy Decl. ¶ 7). Google Books has become an essential research tool, as it helps librarians identify and find research sources, it makes the process of interlibrary lending more efficient, and it

facilitates finding and checking citations.  (Br. of Amici Curiae American Library Ass'n et al. at 4-7 (Doc. No. 1048)).  Indeed, Google Books has become such an important tool for researchers and librarians that it has been integrated into the educational system -- it is taught as part of the information literacy curriculum to students at all levels.  (Id. at 7).

        Second, in addition to being an important reference tool, Google Books greatly promotes a type of research referred to as "data mining" or "text mining."  (Br. of Digital Humanities and Law Scholars as Amici Curiae at 1 (Doc. No. 1052)).  Google Books permits humanities scholars to analyze massive amounts of data -- the literary record created by a collection of tens of millions of books.  Researchers can examine word frequencies, syntactic patterns, and thematic markers to consider how literary style has changed over time.  (Id. at 8-9; Clancy Decl. ¶ 15).  Using Google Books, for example, researchers can track the frequency of references to the United States as a single entity ("the United States is") versus references to the United States in the plural ("the United States are") and how that usage has changed over time.  (Id. at 7).  The ability to determine how often different words or phrases appear in books at different times "can provide insights about fields as diverse as

-10-

lexicography, the evolution of grammar, collective memory, the adoption of technology, the pursuit of fame, censorship, and historical epidemiology." Jean-Baptiste Michel et al., Quantitative Analysis of Culture Using Millions of Digitized Books, 331 Science 176, 176 (2011) (Clancy Decl. Ex. H).

Third, Google Books expands access to books. In particular, traditionally underserved populations will benefit as they gain knowledge of and access to far more books. Google Books provides print-disabled individuals with the potential to search for books and read them in a format that is compatible with text enlargement software, text-to-speech screen access software, and Braille devices. Digitization facilitates the conversion of books to audio and tactile formats, increasing access for individuals with disabilities. (Letter from Marc Maurer, President of the National Federation for the Blind, to J. Michael McMahon, Office of the Clerk (Jan. 19, 2010) (Doc. No. 858)). Google Books facilitates the identification and access of materials for remote and underfunded libraries that need to make efficient decisions as to which resources to procure for their own collections or through interlibrary loans. (Br. of Amici Curiae American Library Ass'n at 5-6).

Fourth, Google Books helps to preserve books and give
them new life.  Older books, many of which are out-of-print books
that are falling apart buried in library stacks, are being
scanned and saved.  See Authors Guild v. Google Inc., 770 F.
Supp. 2d 666, 670 (S.D.N.Y. 2011).  These books will now be
available, at least for search, and potential readers will be
alerted to their existence.

Finally, by helping readers and researchers identify
books, Google Books benefits authors and publishers.  When a user
clicks on a search result and is directed to an "About the Book"
page, the page will offer links to sellers of the book and/or
libraries listing the book as part of their collections.  (Clancy
Decl. ¶ 9).  The About the Book page for Ball Four, for example,
provides links to Amazon.com, Barnes&Noble.com, Books-A-Million,
and IndieBound.  (See Def. Mem. at 9).  A user could simply click
on any of these links to be directed to a website where she could
purchase the book.  Hence, Google Books will generate new
audiences and create new sources of income.

As amici observe:  "Thanks to . . . [Google Books],
librarians can identify and efficiently sift through possible
research sources, amateur historians have access to a wealth of
previously obscure material, and everyday readers and researchers

-12-

can find books that were once buried in research library
archives."  (Br. of Amici Curiae American Library Ass'n at 3).

**B.    Procedural History**

Plaintiffs commenced this action on September 20, 2005,
alleging, inter alia, that Google committed copyright
infringement by scanning copyrighted books and making them
available for search without permission of the copyright holders.
From the outset, Google's principal defense was fair use under §
107 of the Copyright Act, 17 U.S.C. § 107.

After extensive negotiations, the parties entered into
a proposed settlement resolving plaintiffs' claims on a class-
wide basis.  On March 22, 2011, I issued an opinion rejecting the
proposed settlement on the grounds that it was not fair,
adequate, and reasonable.  Authors Guild v. Google Inc., 770 F.
Supp. 2d 666 (S.D.N.Y. 2011).

Thereafter, the parties engaged in further settlement
discussions, but they were unable to reach agreement.  The
parties proposed and I accepted a schedule that called for the
filing of plaintiffs' class certification motion, the completion
of discovery, and then the filing of summary judgment motions.
(See 9/16/11 Order (Doc. No. 982)).  Plaintiffs filed a fourth
amended class action complaint (the "Complaint") on October 14,

-13-

2011.  (Doc. No. 985).  While the dates in the schedule were subsequently extended, the sequence of events was retained, with the class certification motion to precede the summary judgment motions, and adding dates for Google's filing of a motion to dismiss the Authors Guild's claims.  (See, e.g., 1/17/12 Order (Doc. No. 996); 3/28/12 Order (Doc. No. 1007)).

Plaintiffs filed their class certification motion and Google filed its motion to dismiss the Authors Guild's claims. On May 31, 2012, I issued an opinion denying Google's motion to dismiss and granting the individual plaintiffs' motion for class certification.  Authors Guild v. Google Inc., 282 F.R.D. 384 (S.D.N.Y. 2012).

On June 9, 2012, I issued an order re-setting the briefing schedule for the summary judgment motions.  (6/19/12 Order (Doc. No. 1028)).  The parties thereafter filed the instant cross-motions for summary judgment.  Before the motions were fully submitted, however, the Second Circuit issued an order on September 17, 2012, staying these proceedings pending an interlocutory appeal by Google from my decision granting class certification.  (9/17/12 Order (Doc. No. 1063)).

On July 1, 2013, without deciding the merits of the appeal, the Second Circuit vacated my class certification

-14-

decision, concluding that "resolution of Google's fair use
defense in the first instance will necessarily inform and perhaps
moot our analysis of many class certification issues." Authors
Guild, Inc. v. Google Inc., 721 F.3d 132, 134 (2d Cir. 2013).
The Second Circuit remanded the case "for consideration of the
fair use issues." Id. at 135.

On remand, the parties completed the briefing of the
summary judgment motions.  I heard oral argument on September 23,
2013.  I now rule on the motions.

## DISCUSSION

For purposes of these motions, I assume that plaintiffs
have established a prima facie case of copyright infringement
against Google under 17 U.S.C. § 106.  See Feist Publ'ns, Inc. v.
Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  Google has
digitally reproduced millions of copyrighted books, including the
individual plaintiffs' books, maintaining copies for itself on
its servers and backup tapes.  See 17 U.S.C. § 106(1)
(prohibiting unauthorized reproduction).  Google has made digital
copies available for its Library Project partners to download.
See 17 U.S.C. § 106(3) (prohibiting unauthorized distribution).
Google has displayed snippets from the books to the public.  See
17 U.S.C. § 106(5) (prohibiting unauthorized display).  Google

-15-

has done all of this, with respect to in-copyright books in the Library Project, without license or permission from the copyright owners.  The sole issue now before the Court is whether Google's use of the copyrighted works is "fair use" under the copyright laws.  For the reasons set forth below, I conclude that it is.

A.  **Applicable Law**

Fair use is a defense to a claim of copyright infringement.  The doctrine permits the fair use of copyrighted works "to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'"  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8)); accord Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013).  Copyright law seeks to achieve that purpose by providing sufficient protection to authors and inventors to stimulate creative activity, while at the same time permitting others to utilize protected works to advance the progress of the arts and sciences.  See Eldred v. Ashcroft, 537 U.S. 186, 212 (2003); Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006); Hon. Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1107-08 (1990).  As the Supreme Court has held, "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill

-16-

copyright's very purpose." <u>Campbell</u>, 510 U.S. at 575; <u>see also</u>

<u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539,

560 (1985) (recognizing "the latitude for scholarship and comment

traditionally afforded by fair use").

The fair use doctrine is codified in § 107 of the

Copyright Act, which provides in relevant part as follows:

> [T]he fair use of a copyrighted work, . . .
> for purposes such as criticism, comment, news
> reporting, teaching (including multiple
> copies for classroom use), scholarship, or
> research, is not an infringement of
> copyright.  In determining whether the use
> made of a work in any particular case is a
> fair use the factors to be considered shall
> include --
>
> > (1)  the purpose and character of
> > the use, including whether such use
> > is of a commercial nature or is for
> > nonprofit educational purposes;
> >
> > (2)  the nature of the copyrighted
> > work;
> >
> > (3)  the amount and substantiality
> > of the portion used in relation to
> > the copyrighted work as a whole;
> > and
> >
> > (4)  the effect of the use upon the
> > potential market for or value of
> > the copyrighted work.

17 U.S.C. § 107.

The determination of fair use is "an open-ended and

context-sensitive inquiry," <u>Blanch v. Koons</u>, 467 F.3d at 251, and

-17-

thus the fair use doctrine calls for "case-by-case analysis,"
Campbell, 510 U.S. at 577; see also Harper & Row, 471 U.S. at
553.  The four factors enumerated in the statute are
non-exclusive and provide only "general guidance"; they are to be
explored and weighed together, "in light of the purposes of
copyright."  Campbell, 510 U.S. at 578-79; Harper & Row, 471 U.S.
at 560-61.  As fair use is an affirmative defense to a claim of
copyright infringement, the proponent carries the burden of proof
as to all issues in dispute.  Am. Geophysical Union v. Texaco
Inc., 60 F.3d 913, 918 (2d Cir. 1994); see also Campbell, 510
U.S. at 590.

        A key consideration is whether, as part of the inquiry
into the first factor, the use of the copyrighted work is
"transformative," that is, whether the new work merely
"supersedes" or "supplants" the original creation, or whether it:

>           instead adds something new, with a further
>           purpose or different character, altering the
>           first with new expression, meaning, or
>           message; it asks, in other words, whether and
>           to what extent the new work is
>           "transformative."

Campbell, 510 U.S. at 579 (quoting Leval, Toward a Fair Use
Standard, 103 Harv. L. Rev. at 1111); accord Bill Graham Archives
v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006)

("Most important to the court's analysis of the first factor is
'transformative' nature of the work."); Am. Geophysical Union, 60
F.3d at 923.  Although transformative use is not "absolutely
necessary" to a finding of fair use, "the goal of copyright, to
promote science and the arts, is generally furthered by the
creation of transformative works."  Campbell, 510 U.S. at 579.

**B.   Application**

I discuss each of the four factors separately, and I
then weigh them together.

**1.   Purpose and Character of Use**

The first factor is "the purpose and character of the
use, including whether such use is of a commercial nature or is
for nonprofit educational purposes."  17 U.S.C. § 107(1).

Google's use of the copyrighted works is highly
transformative.  Google Books digitizes books and transforms
expressive text into a comprehensive word index that helps
readers, scholars, researchers, and others find books.  Google
Books has become an important tool for libraries and librarians
and cite-checkers as it helps to identify and find books.  The
use of book text to facilitate search through the display of
snippets is transformative.  See Perfect 10, Inc. v. Amazon.com,
Inc., 508 F.3d 1146, 1168 (9th Cir. 2007) (holding that use of

-19-

works -- "thumbnail images," including copyrighted

photographs -- to facilitate search was "transformative");  Kelly

v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003) (same); see

also Bill Graham Archives, 448 F.3d at 609-11 (holding that

display of images of posters in 480-page cultural history of the

Grateful Dead was transformative, explaining that "[w]hile the

small size [of the images of the posters] is sufficient to permit

readers to recognize the historial significance of the posters,

it is inadequate to offer more than a glimpse of their expressive

value").  The display of snippets of text for search is similar

to the display of thumbnail images of photographs for search or

small images of concert posters for reference to past events, as

the snippets help users locate books and determine whether they

may be of interest.  Google Books thus uses words for a different

purpose -- it uses snippets of text to act as pointers directing

users to a broad selection of books.

Similarly, Google Books is also transformative in the

sense that it has transformed book text into data for purposes of

substantive research, including data mining and text mining in

new areas, thereby opening up new fields of research.  Words in

books are being used in a way they have not been used before.

Google Books has created something new in the use of book

-20-

text -- the frequency of words and trends in their usage provide substantive information.

Google Books does not supersede or supplant books because it is not a tool to be used to read books.  Instead, it "adds value to the original" and allows for "the creation of new information, new aesthetics, new insights and understandings." Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. at 1111. Hence, the use is transformative.

It is true, of course, as plaintiffs argue, that Google is a for-profit entity and Google Books is largely a commercial enterprise.  The fact that a use is commercial "tends to weigh against a finding of fair use." Harper & Row, 471 U.S. at 562; accord Campbell, 510 U.S. at 585.  On the other hand, fair use has been found even where a defendant benefitted commercially from the unlicensed use of copyrighted works.  See, e.g., Blanch, 467 F.3d at 253; Bill Graham Archives, 448 F.3d at 612.  See also Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 142 (2d Cir. 1998) (observing that Second Circuit does "not give much weight to the fact that the secondary use was for commercial gain").  Here, Google does not sell the scans it has made of books for Google Books; it does not sell the snippets that it displays; and it does not run ads on the About the Book

-21-

pages that contain snippets.  It does not engage in the direct commercialization of copyrighted works.  See 17 U.S.C. § 107(1). Google does, of course, benefit commercially in the sense that users are drawn to the Google websites by the ability to search Google Books.  While this is a consideration to be acknowledged in weighing all the factors, even assuming Google's principal motivation is profit, the fact is that Google Books serves several important educational purposes.

Accordingly, I conclude that the first factor strongly favors a finding of fair use.

## 2.   **Nature of Copyrighted Works**

The second factor is "the nature of the copyrighted work."  17 U.S.C. § 107(2).[4]  Here, the works are books -- all types of published books, fiction and non-fiction, in-print and out-of-print.  While works of fiction are entitled to greater copyright protection, Stewart v. Abend, 495 U.S. 207, 237 (1990), here the vast majority of the books in Google Books are non-fiction.  Further, the books at issue are published and

_____

[4]   The parties agree that the second factor plays little role in the ultimate fair use determination.  (Pl. Mem. at 36 n.18 (Doc. No. 1050); Def. Mem. at 25).  See On Davis v. Gap, Inc., 246 F.3d 152, 175 (2d Cir. 2001) ("The second statutory factor, the nature of the copyrighted work, is rarely found to be determinative.") (internal citation omitted).

-22-

available to the public.  These considerations favor a finding of fair use.  See Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1078 (2d Cir. 1992) ("Whether or not a work is published is critical to its nature under factor two because the scope of fair use is narrower with respect to unpublished works.") (quoting New Era Publ'ns Intern., ApS v. Carol Publ'g Grp., 904 F.2d 152, 157 (2d Cir. 1990) (internal quotation marks ommitted)).

### 3.    Amount and Substantiality of Portion Used

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  Google scans the full text of books -- the entire books -- and it copies verbatim expression.  On the other hand, courts have held that copying the entirety of a work may still be fair use.  See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 449-50 (1984); Bill Graham Archives, 448 F.3d at 613 ("copying the entirety of a work is sometimes necessary to make a fair use of the image").  Here, as one of the keys to Google Books is its offering of full-text search of books, full-work reproduction is critical to the functioning of Google Books.  Significantly, Google limits the amount of text it displays in response to a search.

-23-

On balance, I conclude that the third factor weighs slightly against a finding of fair use.

**4.    Effect of Use Upon Potential Market or Value**

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  Here, plaintiffs argue that Google Books will negatively impact the market for books and that Google's scans will serve as a "market replacement" for books.  (Pl. Mem. at 41).  It also argues that users could put in multiple searches, varying slightly the search terms, to access an entire book. (9/23/13 Tr. at 6).

Neither suggestion makes sense.  Google does not sell its scans, and the scans do not replace the books.  While partner libraries have the ability to download a scan of a book from their collections, they owned the books already -- they provided the original book to Google to scan.  Nor is it likely that someone would take the time and energy to input countless searches to try and get enough snippets to comprise an entire book.  Not only is that not possible as certain pages and snippets are blacklisted, the individual would have to have a copy of the book in his possession already to be able to piece the different snippets together in coherent fashion.

-24-

To the contrary, a reasonable factfinder could only find that Google Books enhances the sales of books to the benefit of copyright holders.  An important factor in the success of an individual title is whether it is discovered -- whether potential readers learn of its existence.  (Harris Decl. ¶ 7 (Doc. No. 1039)).  Google Books provides a way for authors' works to become noticed, much like traditional in-store book displays.  (Id. at ¶¶ 14-15).  Indeed, both librarians and their patrons use Google Books to identify books to purchase.  (Br. of Amici Curiae American Library Ass'n at 8).  Many authors have noted that online browsing in general and Google Books in particular helps readers find their work, thus increasing their audiences. Further, Google provides convenient links to booksellers to make it easy for a reader to order a book.  In this day and age of on-line shopping, there can be no doubt but that Google Books improves books sales.

Hence, I conclude that the fourth factor weighs strongly in favor of a finding of fair use.

### 5.   Overall Assessment

Finally, the various non-exclusive statutory factors are to be weighed together, along with any other relevant considerations, in light of the purposes of the copyright laws.

-25-

In my view, Google Books provides significant public benefits. It advances the progress of the arts and sciences, while maintaining respectful consideration for the rights of authors and other creative individuals, and without adversely impacting the rights of copyright holders. It has become an invaluable research tool that permits students, teachers, librarians, and others to more efficiently identify and locate books. It has given scholars the ability, for the first time, to conduct full-text searches of tens of millions of books. It preserves books, in particular out-of-print and old books that have been forgotten in the bowels of libraries, and it gives them new life. It facilitates access to books for print-disabled and remote or underserved populations. It generates new audiences and creates new sources of income for authors and publishers. Indeed, all society benefits.

Similarly, Google is entitled to summary judgment with respect to plaintiffs' claims based on the copies of scanned books made available to libraries. Even assuming plaintiffs have demonstrated a prima facie case of copyright infringement, Google's actions constitute fair use here as well. Google provides the libraries with the technological means to make digital copies of books that they already own. The purpose of

SPA-27

the library copies is to advance the libraries' lawful uses of
the digitized books consistent with the copyright law.  The
libraries then use these digital copies in transformative ways.
They create their own full-text searchable indices of books,
maintain copies for purposes of preservation, and make copies
available to    print-disabled individuals, expanding access
for them in unprecedented ways.  Google's actions in providing
the libraries with the ability to engage in activities that
advance the arts and sciences constitute fair use.

        To the extent plaintiffs are asserting a theory of
secondary liability against Google, the theory fails because the
libraries' actions are protected by the fair use doctrine.
Indeed, in the HathiTrust case, Judge Baer held that the
libraries' conduct was fair use.  See Authors Guild, Inc. v.
HathiTrust, 902 F. Supp. 2d 445, 460-61, 464 (S.D.N.Y. 2012) ("I
cannot imagine a definition of fair use that would not encompass
the transformative uses made by Defendants' [Mass Digitization
Project] and would require that I terminate this invaluable
contribution to the progress of science and cultivation of the
arts that at the same time effectuates the ideals espoused by the
[Americans with Disabilities Act].").  The fair use analysis set

-27-

SPA-28

forth above with respect to Google Books applies here as well to the libraries' use of their scans, and if there is no liability for copyright infringement on the libraries' part, there can be no liability on Google's part.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment is denied and Google's motion for summary judgment is granted.  Judgment will be entered in favor of Google dismissing the Complaint.  Google shall submit a proposed judgment, on notice, within five business days hereof.

SO ORDERED.

Dated:    November 14, 2013
          New York, New York

DENNY CHIN
United States Circuit Judge
Sitting By Designation

-28-

**<u>APPEARANCES</u>**

For Plaintiffs:


      BONI & ZACK LLC
          By:  Michael J. Boni, Esq,
             Joshua D. Snyder, Esq.
             John E. Sindoni, Esq.
             15 St. Asaphs Road
             Bala Cynwyd, PA  19004


      FRANKFURT KURNIT KLEIN & SELZ P.C.
          By:  Edward H. Rosenthal, Esq.
             Jeremy S. Goldman, Esq.
             488 Madison Avenue
             New York, NY  10022


      MILBERG LLP
          By:  Sanford P. Dumain, Esq.
             1 Pennsylvania Plaza
             New York, NY  10119



For Defendant Google, Inc.


      DURIE TANGRI LLP
          By:  Daralyn J. Durie, Esq.
             Joseph C. Gratz, Esq.
             David McGowan, Esq.
             Genevieve P. Rosloff, Esq.
             217 Leidesdorff Street
             San Francisco, CA  94111

For Amicus Curiae Digital
  Humanities and Law Scholars:


            SAMUELSON LAW, TECHNOLOGY & PUBLIC POLICY CLINIC
                  By:  Jennifer M. Urban, Esq.
                       Babak Siavoshy, Esq.
                       Jason Schultz, Esq.
                       University of California, Berkeley,
                         School of Law
                       396 Simon Hall
                       Berkeley, CA  94720
                            - and -
                       Matthew Sag, Esq.
                       Loyola University of Chicago School of Law
                       25 East Pearson Street
                       Chicago, IL  60611


For Amicus Curiae American Library
  Association, Association of
  College and Research Libraries,
  Association of Research Libraries,
  and Electronic Frontier Foundation:


            JONATHAN BAND PLLC
                  By:  Jonathan Band, Esq.
                       21 Dupont Circle, NW
                       Washington, DC  20036


-30-

SPA-31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

                              :

THE AUTHOR'S GUILD, <u>et al.</u>,

                              :

               Plaintiffs,

                              :

       - against -

                              :

GOOGLE, INC.,

                              :

               Defendant.

                              :

- - - - - - - - - - - - - - - - - - -x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 11/27/13

**JUDGMENT**

05 Civ. 8136 (DC)

**CHIN, Circuit Judge**

      This matter having been duly heard by the undersigned on the parties' cross-motions for summary judgment (the "Motions"), and the Court having considered the memoranda and declarations filed by the parties and amici curiae in support of and in opposition to the Motions and the oral argument presented at the hearing before the Court on September 23, 2013, and the Court having granted the Motion of Defendant for summary judgment, ECF No. 1031, and having denied the Motion of Plaintiffs for partial summary judgment, ECF No. 1049,

      NOW, upon this Court's opinion, entered November 14, 2013, ECF No. 1088, it is hereby

      ORDERED, ADJUDGED, AND DECREED that,

      1.   Plaintiffs' Motion for Partial Summary Judgment is denied;

SPA-32

2.   Defendant's Motion for Summary Judgment is

granted;

3.   Plaintiffs' claims are dismissed with prejudice;

4.   Costs in this action are awarded to Defendant, as

the prevailing party in this action; and

5.   Any application for attorneys' fees must be made

within 14 days after entry of judgment pursuant to

Fed. R. Civ. P. 54(d)(2)(B)(i).

SO ORDERED.

Dated:   New York, New York
         November 27, 2013

DENNY CHIN
United States Circuit Judge
Sitting by Designation

-2-

From Durie Tangri 1.888.231.9862 Mon Dec  9 16:37:11 2013 MST Page 3 of 4
Case 1:05-cv-08136-DC   Document 1091   Filed 12/10/13   Page 1 of 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, INC., et al.,

           Plaintiffs,

     v.

GOOGLE INC.,

           Defendant.

[PROPOSED] AMENDED JUDGMENT 

05 Civ. 8136 (DC)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/10/13

CHIN, Circuit Judge

    This matter having been duly heard by the undersigned on the parties' cross-motions for summary judgment (the "Motions"), and the Court having considered the memoranda and declarations filed by the parties and amici curiae in support of and in opposition to the Motions and the oral argument presented at the hearing before the Court on September 23, 2013, and the Court having granted the Motion of Defendant for summary judgment, ECF No. 1031, and having denied the Motion of Plaintiffs for partial summary judgment, ECF No. 1049,

    NOW, upon this Court's opinion, entered November 14, 2013, ECF No. 1088, it is hereby

    ORDERED, ADJUDGED, AND DECREED that,

    1. Plaintiffs' Motion for Partial Summary Judgment is denied;

    2. Defendant's Motion for Summary Judgment is granted;

    3. Plaintiffs' claims are dismissed with prejudice;

4. Costs in this action are awarded to Defendant, as the
   prevailing party in this action; and

5. Any application for attorneys' fees must be made within
   14 days of the final resolution of all appeals or, if no
   appeal is taken, within 14 days after the expiration of
   time for filing a notice of appeal.

**SO ORDERED.**

Dated:   New York, New York,
         December 10, 2013

         DENNY CHIN
         United States Circuit Judge
         Sitting by Designation

6. The Clerk of the Court shall close this case.

DC

**17 U.S.C.**
United States Code, 2012 Edition
Title 17 - COPYRIGHTS
CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT
Sec. 106 - Exclusive rights in copyrighted works
From the U.S. Government Printing Office, www.gpo.gov

## §106. Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 101–318, §3(d), July 3, 1990, 104 Stat. 288; Pub. L. 101–650, title VII, §704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub. L. 104–39, §2, Nov. 1, 1995, 109 Stat. 336; Pub. L. 106–44, §1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub. L. 107–273, div. C, title III, §13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

**SPA-36**

**17 U.S.C.**
United States Code, 2012 Edition
Title 17 - COPYRIGHTS
CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT
Sec. 107 - Limitations on exclusive rights: Fair use
From the U.S. Government Printing Office, www.gpo.gov

## §107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 101–650, title VI, §607, Dec. 1, 1990, 104 Stat. 5132; Pub. L. 102–492, Oct. 24, 1992, 106 Stat. 3145.)

**17 U.S.C.**
United States Code, 2012 Edition
Title 17 - COPYRIGHTS
CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT
Sec. 108 - Limitations on exclusive rights: Reproduction by libraries and archives
From the U.S. Government Printing Office, www.gpo.gov

## §108. Limitations on exclusive rights: Reproduction by libraries and archives

(a) Except as otherwise provided in this title and notwithstanding the provisions of section 106, it is not an infringement of copyright for a library or archives, or any of its employees acting within the scope of their employment, to reproduce no more than one copy or phonorecord of a work, except as provided in subsections (b) and (c), or to distribute such copy or phonorecord, under the conditions specified by this section, if—

(1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage;

(2) the collections of the library or archives are (i) open to the public, or (ii) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field; and

(3) the reproduction or distribution of the work includes a notice of copyright that appears on the copy or phonorecord that is reproduced under the provisions of this section, or includes a legend stating that the work may be protected by copyright if no such notice can be found on the copy or phonorecord that is reproduced under the provisions of this section.

(b) The rights of reproduction and distribution under this section apply to three copies or phonorecords of an unpublished work duplicated solely for purposes of preservation and security or for deposit for research use in another library or archives of the type described by clause (2) of subsection (a), if—

(1) the copy or phonorecord reproduced is currently in the collections of the library or archives; and

(2) any such copy or phonorecord that is reproduced in digital format is not otherwise distributed in that format and is not made available to the public in that format outside the premises of the library or archives.

(c) The right of reproduction under this section applies to three copies or phonorecords of a published work duplicated solely for the purpose of replacement of

a copy or phonorecord that is damaged, deteriorating, lost, or stolen, or if the existing format in which the work is stored has become obsolete, if—

(1) the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price; and

(2) any such copy or phonorecord that is reproduced in digital format is not made available to the public in that format outside the premises of the library or archives in lawful possession of such copy.

For purposes of this subsection, a format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.

(d) The rights of reproduction and distribution under this section apply to a copy, made from the collection of a library or archives where the user makes his or her request or from that of another library or archives, of no more than one article or other contribution to a copyrighted collection or periodical issue, or to a copy or phonorecord of a small part of any other copyrighted work, if—

(1) the copy or phonorecord becomes the property of the user, and the library or archives has had no notice that the copy or phonorecord would be used for any purpose other than private study, scholarship, or research; and

(2) the library or archives displays prominently, at the place where orders are accepted, and includes on its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(e) The rights of reproduction and distribution under this section apply to the entire work, or to a substantial part of it, made from the collection of a library or archives where the user makes his or her request or from that of another library or archives, if the library or archives has first determined, on the basis of a reasonable investigation, that a copy or phonorecord of the copyrighted work cannot be obtained at a fair price, if—

(1) the copy or phonorecord becomes the property of the user, and the library or archives has had no notice that the copy or phonorecord would be used for any purpose other than private study, scholarship, or research; and

(2) the library or archives displays prominently, at the place where orders are accepted, and includes on its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(f) Nothing in this section—

(1) shall be construed to impose liability for copyright infringement upon a library or archives or its employees for the unsupervised use of reproducing

equipment located on its premises: *Provided*, That such equipment displays a notice that the making of a copy may be subject to the copyright law;

(2) excuses a person who uses such reproducing equipment or who requests a copy or phonorecord under subsection (d) from liability for copyright infringement for any such act, or for any later use of such copy or phonorecord, if it exceeds fair use as provided by section 107;

(3) shall be construed to limit the reproduction and distribution by lending of a limited number of copies and excerpts by a library or archives of an audiovisual news program, subject to clauses (1), (2), and (3) of subsection (a); or

(4) in any way affects the right of fair use as provided by section 107, or any contractual obligations assumed at any time by the library or archives when it obtained a copy or phonorecord of a work in its collections.

(g) The rights of reproduction and distribution under this section extend to the isolated and unrelated reproduction or distribution of a single copy or phonorecord of the same material on separate occasions, but do not extend to cases where the library or archives, or its employee—

(1) is aware or has substantial reason to believe that it is engaging in the related or concerted reproduction or distribution of multiple copies or phonorecords of the same material, whether made on one occasion or over a period of time, and whether intended for aggregate use by one or more individuals or for separate use by the individual members of a group; or

(2) engages in the systematic reproduction or distribution of single or multiple copies or phonorecords of material described in subsection (d): *Provided*, That nothing in this clause prevents a library or archives from participating in interlibrary arrangements that do not have, as their purpose or effect, that the library or archives receiving such copies or phonorecords for distribution does so in such aggregate quantities as to substitute for a subscription to or purchase of such work.

(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

(2) No reproduction, distribution, display, or performance is authorized under this subsection if—

(A) the work is subject to normal commercial exploitation;

SPA-40

   (B) a copy or phonorecord of the work can be obtained at a reasonable price; or
   (C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.


   (3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.
   (i) The rights of reproduction and distribution under this section do not apply to a musical work, a pictorial, graphic or sculptural work, or a motion picture or other audiovisual work other than an audiovisual work dealing with news, except that no such limitation shall apply with respect to rights granted by subsections (b), (c), and (h), or with respect to pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to works of which copies are reproduced or distributed in accordance with subsections (d) and (e).

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 102–307, title III, §301, June 26, 1992, 106 Stat. 272; Pub. L. 105–80, §12(a)(4), Nov. 13, 1997, 111 Stat. 1534; Pub. L. 105–298, title I, §104, Oct. 27, 1998, 112 Stat. 2829; Pub. L. 105–304, title IV, §404, Oct. 28, 1998, 112 Stat. 2889; Pub. L. 109–9, title IV, §402, Apr. 27, 2005, 119 Stat. 227.)