# 13-4829-CV

## United States Court of Appeals

*for the*

## Second Circuit

⎯⎯⎯⎯⎯⎯⎯⎯◆⎯⎯⎯⎯⎯⎯⎯⎯

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

GOOGLE, INC.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* INTERNATIONAL PUBLISHERS
ASSOCIATION (IPA), INTERNATIONAL ASSOCIATION OF
SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS
(STM), INTERNATIONAL FEDERATION OF
REPRODUCTION RIGHTS ORGANISATIONS (IFFRO),
AND FORMER U.S. REGISTER OF COPYRIGHTS
MARYBETH PETERS IN SUPPORT OF APPELLANTS**

JOAN MORGAN MCGIVERN
*Attorney for Amici Curiae*
110 East 57th Street, Suite 14H
New York, New York 10022
(646) 226-8902

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned attorney of record for *Amici Curiae* certifies as follows:

1.     The International Publishers Association has no parent corporation, and no publicly held company holds more than 10% of its stock.

2.     The International Association of Scientific, Technical and Medical Publishers has no parent corporation, and no publicly held company holds more than 10% of its stock.

3.     The International Federation of Reproduction Rights Organisations has no parent corporation, and no publicly held company holds more than 10% of its stock.

4.     Former Register of Copyrights Marybeth Peters is an individual.


DATED: April 14, 2014


By:  /s/ Joan Morgan McGivern
       Joan Morgan McGivern

       Attorney for *Amici Curiae*

i

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTERESTS OF *AMICI CURIAE* .................................................................. 1

SUMMARY OF ARGUMENT ......................................................................... 3

ARGUMENT ................................................................................................... 6

I.    The District Court's Approach To Fair Use Is Inconsistent
With The International Obligations Of The United States ............................ 6

        A.    The United States Has Agreed To Ensure That All Limitations
On The Exclusive Rights Of Copyright Owners
Will Comply With A "Three-Step Test." .............................................. 6

                1.    *Limitations Must Be Confined To Certain Special Cases.* ......10

                2.    *Limitations Must Not Conflict With The Normal
Exploitation Of Works.* ............................................................11

                3.    *Limitations Must Not Unreasonably Prejudice
The Legitimate Interests Of Copyright Owners.* ......................13

        B.    The Scope And Impact Of Google's Mass-Digitization Project Do
Not Meet The International Norm Of The Three-Step Test. ............. 14

                1.    *The District Court Did Not Confine Its Fair Use
Holding To Certain Special Cases.* ..........................................14

                2.    *The District Court Did Not Take Into Account The
Legitimate Interest Of Publishers In Entering And
Developing Markets For Digital Exploitation
Of Their Works.* .......................................................................16

II.    Requiring Google To Pay For The Right To Digitize Books
Would Better Serve The Purposes Of Copyright Law. ............................... 19

        A.    Finding Google Liable Would Not Necessarily
Put An End To Google's Digitization Project. ................................. 19

# TABLE OF CONTENTS

**Page**

B.    Equitable Solutions For Mass Digitization
Are Already In Place In Other Countries. ........................................... 24

CONCLUSION ................................................................................................. 29

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A) ........................ 30

CERTIFICATE OF SERVICE ............................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abend v. MCA, Inc.*,
　863 F.2d 1465 (9th Cir. 1988) ...........................................................21

*Am. Geophysical Union v. Texaco Inc.*,
　60 F.3d 913 (2d Cir. 1994) .............................................5, 12, 18, 25

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
　931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...............................................20

*Authors Guild, Inc. v. Google Inc.*,
　954 F. Supp. 2d 282 (S.D.N.Y. 2013) .........................................passim

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
　758 F. Supp. 1522 (S.D.N.Y. 1991) ..................................................13

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
　448 F.3d 605 (2d Cir. 2006) .......................................................12, 19

*Blanch v. Koons*,
　467 F.3d 244 (2d Cir. 2006) ............................................................19

*Campbell v. Acuff-Rose Music, Inc.*,
　510 U.S. 569 (1994)................................................................passim

*Cariou v. Prince*,
　714 F.3d 694 (2d Cir. 2013) .........................................................3, 11

*Carter v. Helmsley-Spear, Inc.*,
　71 F.3d 77 (2d Cir. 1995) ..................................................................7

*eBay, Inc. v. MercExchange, LLC*,
　547 U.S. 388 (2006).............................................................21, 22, 23

*Golan v. Holder*,
　132 S. Ct. 873 (2012)....................................................................6, 13

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
　471 U.S. 539 (1985)..........................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kelly v. Ariba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ...........................................................................19

*Muchnick v. Thomson Corp.*,
   509 F.3d 116 (2d Cir. 2007) ............................................................................24

*Muchnick v. Thomson Corp.*,
   654 F.3d 242 (2d Cir. 2011) ............................................................................24

*Murray v. The Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) ...............................................................................9

*N.Y. Times v. Tasini*,
   533 U.S. 483 (2001).........................................................................21, 24, 25

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010).........................................................................................24

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ...............................................................................21

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ...............................................................18

*United States v. Am. Soc'y of Composers, Authors and Publishers:*
   *In the Matter of the Application for the Determination of*
   *Reasonable License Fees for Performances via Wireless*
   *Transmissions and Internet Transmissions by*
   *AT&T Wireless f/k/a Cingular Wireless*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) ..............................................................20

*United States v. Weingarten*,
   632 F.3d 60 (2d Cir. 2011) .................................................................................9

*Universal City Studios v. Sony Corp. of Am.*,
   659 F.2d 963 (9th Cir. 1981) ...........................................................................20

*Zomba Enters. v. Panorama Records, Inc.*,
   491 F.3d 574 (6th Cir. 2007) ...........................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

### STATUTES

Berne Convention Implementation Act of 1988,
 Pub. L. No. 100-568, 102 Stat. 2853 ..........................................................4, 7, 8

Copyright Act, 17 U.S.C.
 §§ 101, *et. seq.* ............................................................................................2, 6, 21
 § 107.............................................................................................................4, 10, 15
 § 110(5) ...........................................................................................................8
 § 411 .................................................................................................................24
 § 502(a) ............................................................................................................21

Copyright Act of the Republic of Korea, art. 31(3) and (5) (2013) ......................17

Digital Millennium Copyright Act,
 tit. I, Pub. L. No. 105-304, 112 Stat. 2860, 2861 (1998)................................2, 4

Law No. 2012-287 of March 1, 2012 on the Digital Exploitation
 of Unavailable Books of the Twentieth Century (French System) ...................26

Swedish Act on Copyright in Literary and Artistic Works,
 Article 42h (2013)..............................................................................................26

United Kingdom Enterprise and Regulatory Reform Act 2013,
 pt. 6, sec. 77 ......................................................................................................26

Uruguay Round Agreements Act,
 Pub. L. No. 103-465, 108 Stat. 4809 (1994) ...................................................2, 4

### OTHER AUTHORITIES

1996 World Intellectual Property Organization's Copyright Treaty
 Dec. 20, 1996, 36 I.L.M. 65...........................................................................2, 4, 7

Agreement on Trade-Related Aspects of Intellectual Property Rights,
 Apr. 15, 1994, Marrakesh Agreement Establishing the
 World Trade Organization, Annex 1C,
 1867 U.S.T. 154, 33 I.L.M. 81 .....................................................................passim

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Andre Lucas & Pascal Kamina, *France*, § 8[2][e][iv],
    *in* 1 INTERNATIONAL COPYRIGHT LAW & PRACTICE
    (P.E. Geller & M.B. Nimmer, eds., 2013)....................................27, 28

Berne Convention for the Protection of Literary and Artistic Works,
    Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979),
    25 U.S.T. 1341, 828 U.N.T.S. 221 .................................................4, 6

Eric J. Schwartz & David Nimmer, *United States*, § 1[1][a],
    *in* 2 INTERNATIONAL COPYRIGHT LAW AND PRACTICE
    (P.E. Geller & M.B. Nimmer, eds., 2013)............................................6

European Commission, Memorandum of Understanding on Key
    Principles on the Digitisation and Making Available of Out-of-
    Commerce Works (2011)...............................................................17

Jo Oliver, *Copyright in the WTO:*
    *The Panel Decision on the Three-Step Test*,
    25 COLUM. J.L. & ARTS 119 (2002)...................................8, 13, 16, 23

John Plender, *The Great Google, Facebook and Apple Cash Pile*,
    FINANCIAL TIMES, Dec. 31, 2013.....................................................23

*Legal Issues In Mass Digitization:*
    *A Preliminary Analysis and Discussion Document*,
    U.S. Copyright Office (2011) ..................................................passim

Matt Williams, *Recent Second Circuit Opinions Indicate That
    Google's Library Project Is Not Transformative*,
    25 Cardozo Arts & Ent. L.J. 303 (2007) ............................................19

MIHALY FICSOR, THE LAW OF COPYRIGHT AND THE INTERNET
    280-88, 300-03 (2002) ....................................................................7

4 M.B. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT
    § 13.05 (2013).............................................................................22

5 NIMMER ON COPYRIGHT
    § 14.06 [A][5][d]..........................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

III Paul Goldstein, Goldstein On Copyright
§ 18.3 (2013)..................................................................................7

Press Release, Conference of European National Libraries, *et al.*,
*Making Out-of-Commerce Works Available in EU Member States*
(Sept. 2012)..................................................................................27

Press Release, VG Wort, *New German Legislation on Orphan
and Out-of-Commerce Works* ........................................................26

Rep. of the Panel, United States – Section 110(5) of the U.S.
Copyright Act, WT/DS160/R (June 15, 2000)...........................passim

Rep. on the WIPO Copyright Treaty (WCT) and WIPO Performances
and Phonograms Treaty (WPPT), S. Comm. on Foreign Relations,
S. Ex. Rep. No. 105-25 (1998)..........................................................7

Richard Dannay, *Copyright Injunctions and Fair Use:
Enter eBay – Four Factor Fatigue or Four-Factor Freedom?*,
55 J. Copyright Soc'y U.S.A. 449 (2008) .........................................22

I Sam Ricketson & Jane C. Ginsburg, International Copyright
and Neighbouring Rights § 4.38 (2d ed. 2006)................................8

Tarja Koskinen-Olsson, *Collective Management
in the Nordic Countries*, in
Collective Management of Copyright and Related Rights
283-306 (D. Gervais, ed., 2d ed., 2010) ..........................................25

U.K. Intellectual Property Office, *Extending the Benefits
of Collective Licensing:  Consultation on the U.K.'s
New Extended Collective Licensing System* (2013)...........................26

# INTERESTS OF *AMICI CURIAE*

The International Publishers Association ("IPA") is the international industry federation representing all aspects of book and journal publishing.[1] Established in 1896, IPA actively fights against censorship and promotes copyright, literacy, and freedom of speech on behalf of its member associations and publishers in more than 55 countries.[2]

The International Association of Scientific, Technical & Medical Publishers ("STM") was founded in 1969 and has its Secretariat in the Netherlands. STM is the voice of scholarly and academic publishers world-wide and comprises approximately 120 scientific, technical, medical, and scholarly publishers, collectively responsible for more than 65% of the global annual output of scientific and technical research articles, over half the active research journals, and hundreds of thousands of print and electronic books, reference works, and databases.

The International Federation of Reproduction Rights Organisations ("IFRRO"), based in Brussels, and its 143 member organizations worldwide, represent millions of authors and publishers who work to increase the lawful use of text- and image-based copyrighted works and to eliminate unauthorized copying,

---

[1] All parties consented to *Amici* filing this brief. No party's counsel authored any part of this brief. Only *Amici* contributed money to fund this brief.

[2] Although the Association of American Publishers, Inc. ("AAP") is a member of IPA, it has not participated in the preparation or submission of this brief.

1

by promoting efficient collective rights management through Reproduction Rights Organisations ("RROs") to complement the efforts of authors, publishers and other copyright owners.[3]

Marybeth Peters served as the top copyright official in the United States government  –  Register of Copyrights for the Copyright Office of the Library of Congress  – from 1994 to 2010.  She has also taught copyright law at the Columbus School of Law of the Catholic University of America, Georgetown University Law Center, University of Miami Law School, and John Marshall Law School.  As Register of Copyrights, she testified before Congress on more than 40 occasions.  During her tenure, she was instrumental in the consideration and enactment of many amendments to the Copyright Act, including in particular those aimed at bringing U.S. copyright law into compliance with international treaty standards.  Examples include the Uruguay Round Agreements Act of 1994, which implemented the World Trade Organization's Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPs"), and the Digital Millennium Copyright Act, which implemented the 1996 World Intellectual Property Organization's Copyright Treaty ("WCT") and Performances and Phonograms Treaty ("WPPT").  Ms. Peters is currently a Senior Counsel in the law firm Oblon, Spivack, McClelland, Maier & Neustadt, LLP.

---

[3] AAP is also a member of IFRRO.

2

Collectively, *Amici* have strong interests in U.S. compliance with copyright-related international treaties and agreements and with preserving an effective level of copyright protection for authors and copyright owners from the U.S. and abroad. Their breadth of experience with how copyright laws facilitate creative output around the world provides them with a unique perspective on Google's mass-digitization efforts and on the district court's erroneous approach to the fair use doctrine.

## SUMMARY OF ARGUMENT

The district court's fair use analysis conflicts with this Circuit's precedents, which require courts to assess each instance of copying on a "case-by-case" basis to determine, *inter alia*, whether the defendant has created a transformative work that provides the public with "new expression, meaning, or message," or has instead merely repurposed copyrighted material for commercial purposes in a manner that harms the copyright owner's potential markets for exploiting the work. *See, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 705-06 (2d Cir. 2013). The district court's approach also raises serious questions regarding whether the United States is complying with its international obligations. Reversing and remanding the case could lead to a more equitable, calibrated solution, similar to the licensing solutions that have emerged in other cases and countries.

In the past several decades, the United States has embraced and joined the international system for protecting the exclusive rights of copyright owners, including by implementing the Berne Convention,[4] the WTO TRIPs Agreement,[5] and the WIPO Copyright Treaty.[6]  To ensure that member nations provide an adequate and effective level of protection for authors and other copyright owners, these agreements only allow exceptions to exclusive rights, including the reproduction right, if a "three-step" test is satisfied.  *E.g.*, TRIPs, art. 13; WCT, art. 10(2); Berne Convention, art. 9(2).  Under this test, all exceptions must be limited to (1) certain special cases (2) that do not conflict with the normal exploitation of works and (3) do not unreasonably prejudice the legitimate interests of copyright owners.  *Id.*

Properly construed, the non-exhaustive statutory factors that Congress has instructed courts to consider when analyzing the fair use defense – *see* 17 U.S.C. §

---

[4] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979), 25 U.S.T. 1341, 828 U.N.T.S. 221 [hereinafter "Berne Convention"]; *see also* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (implementing Berne Convention).

[5] Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1867 U.S.T. 154, 33 I.L.M. 81 [hereinafter "TRIPs"]; *see also* Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (implementing TRIPs).

[6] WIPO Copyright Treaty, Dec. 20, 1996, 36 I.L.M. 65 [hereinafter "WCT"]; *see also* Digital Millennium Copyright Act, tit. I, Pub. L. No. 105-304, 112 Stat. 2860, 2861 (1998) (implementing WCT).

107 – reflect the same concerns as the three-step test regarding overly expansive exceptions to exclusive rights.  Congress, and the courts, developed the factors to prevent an exception from swallowing the rule.  However, the district court's approach to fair use, which absolves Google of all liability for digitizing millions of books in order to create a publicly accessible database, gave short shrift to these concerns.  The exclusive rights of authors and publishers cannot be allowed to wither on the vine just because technological progress has made it possible to render works published in traditional formats more accessible.  Thus, *Amici* respectfully urge the Court to reverse the district court's indiscriminate fair use holding and to remand the case for a more nuanced analysis of the types of books that Google copied and the various potential markets that already exist for exploiting those books, and could grow more robustly, but for the hindering effect of this case.

Under U.S. law and international norms, it is simply not enough to conclude, as the district court did, that Google's unauthorized uses are lawful because they have some social "benefits."  *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 287-88, 293 (S.D.N.Y. 2013).  Instead, the district court should have explored thoroughly how "widespread" copying of the type at issue here could harm the publishing industry.  *See Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 928 (2d Cir. 1994).  Given that copyright owners in other countries are already being

5

paid – through, for example, collective licensing mechanisms – for the types of

uses that Google has unilaterally undertaken, harm is apparent.  Thus, even if the

public interest favors Google's project remaining operational, the proper

mechanism for proceeding would be a calibrated finding of liability, combined

with a measured approach to relief, which should include payments to certain

authors and publishers.  Such an approach would be viable under international

norms that bind the U.S.; the district court's boundless approach to fair use is not.

## **ARGUMENT**

## I. **The District Court's Approach To Fair Use Is Inconsistent With The International Obligations Of The United States.**

### A. The United States Has Agreed To Ensure That All Limitations On The Exclusive Rights Of Copyright Owners Will Comply With A "Three-Step Test."

"Congress [has] determined that U.S. interests [a]re best served by our full

participation in the dominant system of international copyright protection."  *Golan*

*v. Holder*, 132 S. Ct. 873, 894 (2012).  Thus, beginning in the 1970's, Congress

passed a series of laws to bring the U.S. Copyright Act into accord with

international norms.  *See* Eric J. Schwartz & David Nimmer, *United States*, §

1[1][a], *in* 2 INTERNATIONAL COPYRIGHT LAW AND PRACTICE (P.E. Geller & M.B.

Nimmer, eds., 2013) (listing statutory amendments).

Now, *inter alia*, the U.S. is obligated to meet the minimum standards for

copyright protection required of members of the Berne Convention, the WTO

TRIPs Agreement, and the WCT.[7]  In exchange for the U.S. recognizing the rights of foreign nationals, other member nations also protect the rights of U.S. authors and copyright owners under the principle of national treatment, which "obligates a country to protect the works of foreign nationals on at least the same terms that it extends to works of its own nationals."  III PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 18.3 (2013).

This international regime requires the U.S. to provide copyrightable works of authorship, including virtually all the works contained in the books that Google copied, with certain exclusive rights, including the right to reproduce the works in copies and to display the works publicly.  Berne Convention, arts. 2, 9(1); TRIPs, art. 9; WCT, art. 8.  The regime also prohibits the U.S. from creating any exceptions to these exclusive rights, other than (1) in certain special cases that do not (2) conflict with the normal exploitation of works or (3) unreasonably prejudice the legitimate interests of copyright owners.  *See* MIHALY FICSOR, THE

---

[7] These treaties and agreements are not self-executing.  *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 83 (2d Cir. 1995).  Thus, U.S. accession to these treaties and compliance with these agreements is based on a determination by the President, ratified by the Senate, that U.S. law (including the scope of exclusive rights and exceptions thereto) was fully compliant with the obligations in those treaties and agreements.  *See, e.g.*, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT), S. Comm. on Foreign Relations, S. EX. REP. NO. 105-25, at 17 (1998) ("[T]he Committee's resolution of ratification contains a proviso that prohibits the United States from taking the final step in the ratification process – the deposit of instruments of ratification for these Treaties – until the President has signed into law a bill that implements the Treaties.").

LAW OF COPYRIGHT AND THE INTERNET 280-88, 300-03 (2002) (discussing article 9(2) of the Berne Convention and article 13 of the TRIPs Agreement). This standard for judging the legitimacy of limitations and exceptions, which is a pervasive feature of the entire international copyright system, is referred to as the "three-step test."

When a signatory to the TRIPs agreement fails to provide the requisite level of protection, other WTO members can bring dispute-resolution proceedings against that country. *See* I SAM RICKETSON & JANE C. GINSBURG, INTERNATIONAL COPYRIGHT AND NEIGHBOURING RIGHTS § 4.38 (2d ed. 2006) (summarizing articles 63 and 64 of TRIPs). If a WTO-appointed panel determines that insufficient protection is provided, monetary sanctions can result. *Id.*

In one such case, the European Union brought a dispute against the United States based on overly broad exceptions, contained in section 110(5) of the Copyright Act, to the exclusive right to publicly perform musical works. *See generally* Jo Oliver, *Copyright in the WTO: The Panel Decision on the Three-Step Test*, 25 COLUM. J.L. & ARTS 119 (2002). In an authoritative and detailed opinion, a WTO panel defined the requirements of the three-step test and concluded that the U.S. statute violated the test by exempting millions of bars, restaurants and other venues from paying royalties to songwriters and music publishers. *See* Rep. of the Panel, United States – Section 110(5) of the U.S. Copyright Act, WT/DS160/R

8

(June 15, 2000) [hereinafter "WTO Report"].[8]  Subsequently, the U.S. has paid the E.U. millions of dollars of compensation.[9]

Ever since the Supreme Court's decision in *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), U.S. courts have been bound to interpret and apply statutes passed by Congress in a way that avoids conflicts with the law of nations, particularly explicit obligations that the U.S. has undertaken by negotiating and ratifying international treaties.  *See United States v. Weingarten*, 632 F.3d 60, 64-65 (2d Cir. 2011) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.") (citation omitted). Thus, U.S. courts are required to apply the fair use doctrine in a manner that satisfies the requirements of the three-step test, if there is "any possible construction" of fair use that would do so.  And, in fact, there is no logical reason why fair use cannot be applied consistently with the three-step test.  Indeed, traditional fair use principles line up with the three-step test quite well.  The decision below is a striking outlier in this regard.

---

[8] The report is available here:
http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds160_e.htm.

[9] The United States Trade Representative summarizes the dispute and payments here:  http://www.ustr.gov/trade-topics/enforcement/dispute-settlement-proceedings/united-states-%E2%80%94-section-1105-us-copyright-ac.

1.    *Limitations Must Be Confined To Certain Special Cases.*

The first step in the three-step test requires limitations and exceptions to be confined to "certain special cases."  TRIPs, art. 13.  "Certain" cases are those that are "clearly defined," such that they provide "a sufficient degree of legal certainty."  WTO Report ¶ 6.108.  "Special" cases are "limited in [their] field of application or exceptional in [their] scope.  In other words, an exception or limitation should be narrow in [a] quantitative as well as a qualitative sense."  *Id.* ¶ 6.109.

Consistent with this first step of the three-step test, fair use also requires a "case-by-case" analysis.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  The analytical factors identified in the statute's non-exhaustive list, such as the "purpose and character of the use," the "nature of the copyrighted work," and "the effect of the use upon the potential market for or value of the copyrighted work," call out for such individualized consideration.  17 U.S.C. § 107.  Thus, fair use decisions cannot validly declare broad, vague swaths of conduct to be categorically lawful for all works, and traditionally they have not done so.  Instead, courts must adjudicate the merits of particular instances of copying by specific defendants of certain copyrighted works for specific purposes, as well as the impact of such copying on particular markets.

10

This Court's recent opinion in *Cariou v. Prince*, 714 F.3d 694, exemplifies this well-settled "case-by-case" approach.  In *Prince,* the Court considered 30 instances of copying by a painter of works by a single photographer.  Even though all the works were of the same kind, created by the same author, and copied by the same copyist, the court examined each use individually, and concluded that while 25 of the 30 were fair uses, remand was necessary for the district court to assess whether a different outcome should apply to the other 5 instances.  This type of "context-sensitive inquiry" (*id.* at 704) renders fair use, when properly applied, available as a defense only in certain special cases, as the first of the three steps binding on U.S. courts requires.

2.    *Limitations Must Not Conflict With The Normal Exploitation Of Works.*

The second step of the three-step test prohibits limitations and exceptions that conflict with the normal exploitation of works.  TRIPs, art. 13.  "Normal" exploitations include those that are regular or significant in the current marketplace, as well as those that could become regular or significant in the future as technology progresses.  WTO Report ¶ 6.180.  A limitation "conflict[s]" with normal exploitations if it "enter[s] into economic competition with the ways that right holders normally extract economic value" from works.  *Id.* ¶ 6.183.

Fair use analysis under U.S. law overlaps considerably with this second step when U.S. courts consider the fourth statutory factor, namely "the effect of the use

11

upon the potential market for or value of the copyrighted work." *See, e.g., Texaco*, 60 F.3d at 930 (fourth fair use factor involves assessing what impact a defendant's use could have on all of the plaintiff's "traditional, reasonable, or likely to be developed markets"). Courts also assess, under the first statutory factor, whether the nature of a defendant's use makes it likely to compete with uses that authors typically exploit. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550 (1985) ("[T]he fair use doctrine has always precluded a use that '[supersedes] the use of the original.'") (citation omitted). This analysis includes, importantly, determining whether a use is "transformative." *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) ("The question is 'whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'") (citations omitted). Where a use is not transformative, the "commercial" nature of a use weighs more heavily against a fair use finding, because commercial uses are more likely to supplant methods of normal exploitation. *See Campbell*, 510 U.S. at 579.[10]

---

[10] Commercial enterprises cannot stand in the shoes of their customers who make non-commercial uses. *See, e.g.*, *Zomba Enters. v. Panorama Records, Inc.*, 491 F.3d 574, 582 (6th Cir. 2007) ("[T]he end-user's utilization of the product is largely irrelevant; instead, the focus is on whether alleged infringer's use is transformative and/or commercial.").

3.   *Limitations Must Not Unreasonably Prejudice The Legitimate Interests Of Copyright Owners.*

The third step in the three-step test prohibits limitations and exceptions that unreasonably prejudice the legitimate interests of copyright owners.  TRIPs, art. 13.  The "legitimate" interests of copyright owners include those that are consistent with copyright's underlying purpose and goals, both economic and moral.  *See* WTO Report ¶ 6.224.  A limitation unreasonably prejudices those interests where it "causes, or has the potential to cause, an unreasonable loss of income to copyright owners," if the limitation were widely used.[11]  *Id.* at ¶¶ 6.225, 6.226, 6.229.

As the Supreme Court has regularly articulated, the purpose of copyright law is to provide incentives for authors and their business partners to generate and disseminate new works of authorship.  *See, e.g.*, *Golan*, 132 S. Ct. at 889 ("Our decisions . . . recognize that 'copyright supplies the economic incentive to create and *disseminate* ideas.'") (emphasis in original) (citation omitted); *see also Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1529-30 (S.D.N.Y. 1991) ("The copyright law, through the fair use doctrine, has promoted the goal of encouraging creative expression and integrity by ensuring that those who produce intellectual works may benefit from them.").

---

[11] Where allowing an unlicensed use would unreasonably prejudice the legitimate interests of copyright owners, a compulsory license or some form of compensation, at least, must be provided for.  *See* Oliver, *supra* p. 8, at 169.

13

In order to ensure that the fair use defense does not undermine these incentives, courts consider, under the fourth statutory factor, whether creative output could be inhibited by allowing a defendant, and all persons similarly situated to that defendant, to engage in a use without authorization. *See Campbell*, 510 U.S. at 590 (The fourth U.S. fair use factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original.") (citation omitted). Thus, the fair use factors, when properly construed, shield creators from the same harms, and protect the public from the same threats to its welfare that the three-step test is designed to prevent.

> B.    The Scope And Impact Of Google's Mass-Digitization Project Do Not Meet The International Norm Of The Three-Step Test.
>
> > 1.    *The District Court Did Not Confine Its Fair Use Holding To Certain Special Cases.*

The scope of Google's copying is mind-boggling. The Internet giant has copied tens of millions of books. Anything between two covers was fair game, without regard to whether the books were in-print or out-of-print; whether they were published last week, last year, or 50 or 100 years ago; whether their contents were fiction or non-fiction, prose or poetry; whether they were first published in

14

the U.S. or abroad; whether they were best sellers or self-published works of obscurity.  Compilations, reference books, romance novels, technical manuals, and works of literary criticism, for example, were all digitized verbatim and *in toto*.

Perhaps due to the unprecedented amount of copying at issue here, the district court did not analyze the nature of each copied work separately; nor did it even attempt to engage in a "case-by-case" analysis of any of the categories into which these works could reasonably have been classified.  *Authors Guild*, 954 F. Supp. 2d at 291-94.  Instead, just as Google copied every book without discrimination or differentiation, so too the court below considered all this copying *en masse*, and concluded that all of it was lawful because it serves the beneficial purpose of "expand[ing] access to books."  *Id.* at 288, 293.

This approach disrespected the long U.S. legal tradition of requiring nuanced analyses of fair use defenses, and cannot be squared with the binding obligation that U.S. law confine exceptions to copyright protection to "certain special cases." TRIPs, art. 13.  It is self-evident that the operation of any of the section 107 statutory factors, or of the second and third "steps" of the international three-step test, could vary dramatically among the different categories of publications involved.  While *Amici* recognize that the unprecedented scope of mass-digitization projects such as Google's puts the long-standing norm that fair use must be assessed on a "case-by-case" basis under considerable stress, that norm

15

was authoritatively established as Supreme Court law in *Campbell*, 510 U.S. at 577, and the court below was bound to follow it.  As well, it defies logic that an exception to copyright protection that allows every book in massive university libraries to be copied in its entirety, without discriminating among the differential impacts of such copying on different categories of works or the different audiences they seek to serve, could be considered an exception that applies only to "certain special cases."  Since a copyright exception must satisfy all three of the steps in the international standard in order to be acceptable (Oliver, *supra* p.8, at 150-51), the divergence between the first step and the approach taken by the court below should be sufficient by itself to require a remand.

> 2.    *The District Court Did Not Take Into Account The Legitimate Interest Of Publishers In Entering And Developing Markets For Digital Exploitation Of Their Works.*

Markets for mass digitization of books are already emerging in the U.S. and abroad.  As the U.S. Copyright Office discussed in its 2011 report, *Legal Issues In Mass Digitization:  A Preliminary Analysis and Discussion Document* [hereinafter "*Legal Issues*"],[12] the Nordic countries (Denmark, Finland, Iceland, Norway and Sweden) have had in place for some years privately-negotiated, collective licensing agreements, buttressed by statutes that extend their terms to significant numbers of works.  *See infra* section II(B).  More recently, the European Commission

---

[12] The report is available here:  http://www.copyright.gov/docs/massdigitization/, follow link to "Full Discussion Document."

facilitated a privately-negotiated memorandum of understanding ("MoU") regarding the digitization and making available of out-of-print works by non-profit libraries through collective licenses.[13]  *Id.*  Since that time, several E.U. countries have adopted schemes to implement such licensing practices.[14]  *Id.*

As the world increasingly becomes an interconnected, digital marketplace, exploiting opportunities for digital distribution and display is increasingly "normal."  Google's commercial mass-digitization project hinders authors' and publishers' negotiations with other potential licensees, and thus conflicts with, and unreasonably prejudices, publishers' efforts to compete in the digital arena.[15]  For example, the ability of Google to make unauthorized databases available for free interferes with the launch of licensed databases, including those which could provide more unrestricted access to books – and thus could be of greater and more certain public benefit – than what even the district court's vague conception of fair use allows Google to offer.  Valuable and socially beneficial business models may

---

[13] The MoU is available here: http://ec.europa.eu/internal_market/copyright/docs/copyright-infso/20110920-mou_en.pdf.

[14] South Korea has also adopted a regime for mass digitization within libraries whereby the libraries compensate copyright owners.  *See* Copyright Act of the Republic of Korea, art. 31(3) and (5), *available at* http://eng.copyright.or.kr/.

[15] Google benefits commercially because the availability of digitized books through the Google search engine draws users to Google's service.  *See* Authors Guild Brief at 14-15, 24-30.  Google, among other things, collects data on the searches and other online activities of consumers, which enables it to deliver advertisements to them more efficiently and in a more targeted fashion.

never see the light of day because unfair competition from Google reduces incentives by cutting into the profits that licensed services could otherwise yield.

As this Court has recognized, almost all commercial, non-transformative uses, such as Google's, that do not involve the creation of new works of authorship, present this kind of unfair competition with authorized offerings. *See Texaco*, 60 F.3d at 923 ("Rather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use."). That is why the Supreme Court has said that transformative uses should be favored under the first statutory factor: they are unlikely to "supersede the objects of the original." *Campbell*, 501 U.S. at 578-79.

Since *Campbell*, courts in this Circuit have rejected the argument that using a work in a new format, alone, renders the use transformative. *See, e.g.*, *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("[D]efendant adds no 'new aesthetics, new insights and understandings' to the original music recordings it copies, [] but simply repackages those recordings to facilitate their transmission through another medium. While such services may be innovative, they are not transformative.") (citation omitted). Yet, the district court based its view of transformation on Ninth Circuit cases that are inconsistent with

18

this Circuit's own precedents. *See generally* Matt Williams, *Recent Second Circuit Opinions Indicate That Google's Library Project Is Not Transformative*, 25 Cardozo Arts & Ent. L.J. 303 (2007) (distinguishing *Kelly v. Ariba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) from *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) and *Bill Graham Archives*, 448 F.3d 605). The district court's expansive definition of "transformative," which lacks any contours and merely asks whether a use has public benefits, undercuts the legitimate expectations of copyright owners and undermine copyright's objectives. Because this approach to fair use favors users who threaten the welfare of individual copyright owners and also weakens the economic scheme for stimulating creative production, it does not satisfy the second and third steps of the three-step test.

## II.   Requiring Google To Pay For The Right To Digitize Books Would Better Serve The Purposes Of Copyright Law.

### A.   Finding Google Liable Would Not Necessarily Put An End To Google's Digitization Project.

The court below acted as if it faced a Hobson's Choice between shutting down a mass-digitization program with undisputed social benefits, or changing the fair use analysis to allow Google to make complete copies of any and all works it chose to exploit. This was a false dichotomy. If the district court had analyzed the fair use factors according to their different impacts on different categories of books (as both the "case by case" fair use doctrine and the three-step test would have

19

required), it could have concluded that the mass digitization of some categories respected the bounds of fair use while mass copying of other categories exceeded those bounds.

For example, many researchers often seek out only as much information as would be contained in one or a few "snippets." While displaying snippets of lengthy novels might not harm the markets for those books, displaying snippets from technical manuals, scientific treatises, or other non-fiction works used for research purposes impacts existing markets for those works. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 560-61 (S.D.N.Y. 2013) (making available small portions of news stories was not fair use); *United States v. Am. Soc'y of Composers, Authors and Publishers: In the Matter of the Application for the Determination of Reasonable License Fees for Performances via Wireless Transmissions and Internet Transmissions by AT&T Wireless f/k/a Cingular Wireless*, 599 F. Supp. 2d 415, 431-33 (S.D.N.Y. 2009) (making available small portions of songs for online listening was not fair use).

If the district court had found Google liable for some, or even for all, of its copying, fashioning the appropriate damages and injunctive relief would, admittedly, be a very difficult task. "[T]he difficulty of fashioning relief cannot, however, dissuade the federal courts from affording appropriate relief to those whose rights have been infringed." *Universal City Studios v. Sony Corp. of Am.*,

659 F.2d 963, 976 (9th Cir. 1981), *rev'd on other grounds by* 464 U.S. 417 (1984).

That "appropriate relief" might well have included allowing the program to

continue so long as provision was made for compensation to the copyright owners

whose rights had been infringed.

The Copyright Act states that a court "may" enjoin infringement.  17 U.S.C.

§ 502(a).  Thus, U.S. courts have made clear that issuing permanent injunctions in

copyright cases is a matter of discretion.  Sometimes, injunctions are not in the

public interest.  *See, e.g.*, *Campbell*, 510 U.S. at 578 n.10 ("[T]he goals of

copyright law . . . are not always best served by automatically granting injunctive

relief."); *N.Y. Times v. Tasini*, 533 U.S. 483, 505 (2001) ("[I]t hardly follows from

today's decision [finding infringement] that an injunction . . . must issue."); *Abend*

*v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988) ("[W]here great public injury

would be worked by an injunction, the courts might . . . award damages or a

continuing royalty instead of an injunction in such special circumstances.")

(citation omitted), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990).

In *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), the Supreme

Court ruled that even where a court determines that infringement has occurred, it

must carefully assess whether equity favors the issuance of a complete injunction.

*See Salinger v. Colting*, 607 F.3d 68, 76-83 (2d Cir. 2010) (remanding for

21

reconsideration of injunctive relief analysis in case involving unauthorized sequel

to *Catcher In The Rye*).

> According to well-established principles of equity, a plaintiff seeking
> a permanent injunction must satisfy a four-factor test before a court
> may grant such relief.  A plaintiff must demonstrate: (1) that it has
> suffered an irreparable injury; (2) that remedies available at law, such
> as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and
> defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391.

Here, even if the district court found infringement, it would have needed to

consider these factors, and to determine what scope of injunctive relief was most

appropriate, including whether ordering Google to pay copyright owners in

exchange for the continued operation of some aspects of its accessible database

would better serve the public interest than shutting down the project entirely.  *See* 4

M.B. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 13.05 (2013) (endorsing

concept that courts may order infringers to make mandatory ongoing payments

rather than issuing permanent injunctions); 5 NIMMER ON COPYRIGHT § 14.06

[A][5][d]("exceptional cases can arise" where the public interest does not favor the

issuance of permanent injunctions against infringers who assert unsuccessful fair

use defenses); Richard Dannay, *Copyright Injunctions and Fair Use: Enter eBay –

Four Factor Fatigue or Four-Factor Freedom?*, 55 J. Copyright Soc'y U.S.A. 449,

459 (2008) ("The threat of injunctive relief has always been the 800-pound gorilla

in the fair use road.  The additional *eBay* four-factor test . . . should compel more serious attention to the propriety of the remedy in *each* case.") (emphasis in original).

If this Court reverses the district court's blanket fair use ruling, it should also remand with instructions to the district court to carefully conduct the *eBay* analysis, should the case proceed to its merits.  A solution that would lead Google to make appropriate payments, rather than issuing a complete injunction, would not only fulfill *eBay*'s requirements, but could also satisfy the three-step test (1) by refining the scope of the allowable uses to specified cases; (2) acknowledging the copyright owner's exclusive right to exploit the market for access to digital copies of her works; and (3) "curing" through monetary compensation the unreasonable prejudice to the copyright owner's legitimate interest in exploiting that market. *See* Oliver, *supra* p. 8, at 169 (international law allows for compensating authors for unauthorized exploitations in some circumstances).[16]

---

[16] Google clearly has the resources to compensate authors and publishers for using their works.  *See Authors Guild*, 954 F. Supp. 2d at 285 ("Google is a for-profit entity, and for the year ended December 31, 2011, it reported over $36.5 billion in advertising revenues."); John Plender, *The Great Google, Facebook and Apple Cash Pile,* FINANCIAL TIMES, Dec. 31, 2013, *available at* http://www.cnbc.com/id/101302701.  Further enriching this corporation at the expense of creators by diminishing copyright protection is perverse, when the law provides a channel for a more equitable outcome.

Remand would also put the case in a posture where the parties would be more likely either to explore the option of seeking a legislative resolution, or to agree upon an appropriate licensing solution.  The latter is what happened after the Supreme Court, in *Tasini*, affirmed this Court's opinion and held that electronic database providers infringed the copyrights in myriad news articles by copying them and rendering them accessible without the permission of their authors.  *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 158-59 (2010) (describing subsequent settlement).  There, after remand, court-ordered mediation led the parties to a deal that provided compensation to authors and also enabled the articles to remain accessible via the databases.  *Muchnick v. Thomson Corp.*, 509 F.3d 116, 120 (2d Cir. 2007).[17]  Here too, a finding of liability could, after remand, result in a negotiated solution that benefits copyright owners, Google, and the public.

B.    Equitable Solutions For Mass Digitization Are Already In Place In Other Countries.

Negotiated solutions to the problems presented by mass-digitization projects, in the form of extended collective licenses ("ECLs"),[18] compulsory collective

_____

[17] Although this Court initially rejected the settlement after concluding that it covered claims that the Court lacked jurisdiction to hear under 17 U.S.C. § 411, which requires copyright registration prior to bringing a lawsuit, the Supreme Court reversed that holding.  *Muchnick*, 559 U.S. at 160.  This Court then remanded the case to the district court for proper class certification.  *See generally Muchnick v. Thomson Corp.*, 654 F.3d 242 (2d Cir. 2011).

[18] Extended collective licenses involve government authorization of collective organizations to negotiate licenses for a particular class of works or a particular

management, or on the basis of a legal presumption of representation by collective

management organizations, have been implemented abroad, and here, through

private negotiations (*see supra* section II(A), *Tasini*, 533 U.S. at 498).[19]  U.S.

courts should take these developments into consideration in cases involving mass

digitization, both in applying the fair use statutory factors (consistent with the

three-step test), and in fashioning the appropriate remedy for any infringement

found.  *See Texaco*, 60 F.3d at 930 (availability of licenses for use at issue weighs

against fair use defense where use is not transformative).

Such licenses, which now cover certain types of mass digitization, have long

been in place in the Nordic countries, including Denmark, Finland, Iceland,

Norway, and Sweden.  *See Legal Issues*, *supra* p. 16, Appendix F (summarizing

the Nordic systems); Tarja Koskinen-Olsson, *Collective Management in the Nordic

Countries*, *in* COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS

---

class of uses.  *See Legal Issues*, *supra* p. 16, at 35.  Once the designated collective
organization freely negotiates a license for a particular class of works with a
particular class of users, that license is extended by statute and/or by regulation to
all of the works in that class, including works owned by persons who are not
members of the collective organization.  *Id.*  The licensed users then pay royalties
to the collective organization, which are distributed to copyright owners.  *Id.*  In
some instances, copyright owners can "opt out" of extended collective licenses.  *Id.*

[19] A publication jointly authored by WIPO and IFRRO that summarizes different
collective management models is available here:
http://www.ifrro.org/sites/default/files/wipo_ifrro_collective_management_1.pdf.

283-306 (D. Gervais, ed., 2d ed., 2010) (same).[20]  Recently other E.U. countries,

including France, Germany, and the United Kingdom, have also allowed certain

types of mass digitization pursuant to specific terms, which include processes by

which copyright owners may proactively withdraw their works.[21]  These

developments took place after the European Commission "asked a group of

authors, publishers, and other stakeholders to develop a proposal for digitizing 'out

of commerce' (out-of-print) literary works . . . and for making these works

available to the public for noncommercial use."  *Legal Issues*, *supra*, at 36.  The

discussions led to a memorandum of understanding ("MoU") that enables "national

libraries and other cultural institutions to license [the right to copy and

---

[20] The Swedish ECL regime for mass digitization, set forth in article 42h of the Act on Copyright in Literary and Artistic Works, took effect in November 2013.  An unofficial English translation of the Swedish law is available here: http://www.regeringen.se/content/1/c6/01/22/48/5956fbbf.pdf.

[21] For information on the French system, *see* Law No. 2012-287 of March 1, 2012 on the Digital Exploitation of Unavailable Books of the Twentieth Century, *available at* http://www.wipo.int/wipolex/en/details.jsp?id=12007.   For information on the German system, *see* Press Release, VG Wort, *New German Legislation on Orphan and Out-of-Commerce Works*, *available at* http://www.vgwort.de/fileadmin/pdf/allgemeine_pdf/German_legislation_on_orphan_and_out-of-commerce_works.pdf.  For information on the U.K. system, *see* U.K. Intellectual Property Office, *Extending the Benefits of Collective Licensing: Consultation on the U.K.'s New Extended Collective Licensing System* (2013), *available at* http://www.ipo.gov.uk/consult-2013-ecl.pdf (describing process for approving regulations to implement ECL regime); Enterprise and Regulatory Reform Act 2013, pt. 6, sec. 77, *available at* http://www.legislation.gov.uk/ukpga/2013/24/contents/enacted  (setting out new statutory provisions establishing ECL regime in U.K.).  The U.K. has not yet fully implemented its regime, which requires the adoption of governing regulations.

disseminate] books and journals from collective organizations[,]. . . although rights holders would be allowed to opt out of the system and withdraw their works from a particular project upon request." *Id.*[22]

The French scheme provides a good specific example of how these systems work generally.  In France, books are now available for mass digitization if they were first published in France before January 1, 2001, are not commercially distributed by a publisher, and are no longer published in print or digital form.  *See* Andre Lucas & Pascal Kamina, *France*, § 8[2][e][iv], *in* 1, INTERNATIONAL COPYRIGHT LAW & PRACTICE (P.E. Geller & M.B. Nimmer, eds., 2013).

> Any person can request that these books be included in a public database maintained by the National Library.  During six months following this inclusion, the author or prior publisher may object to it, entitling it to bring the book back into exploitation within two years. Failing such objection or exploitation, a collective-management society will exercise the right to authorize the digital reproduction and the representation of the book and to collect royalties for such use. The author or publisher of the print version retains a right of preference with regard to the exploitation proposed by this society.  At any stage, the author, if he has retained the relevant rights, or the publisher under certain conditions, can terminate the exploitation through the collective-management society, subject to transitional arrangements.  The fees collected by the collecting society are distributed between known authors and publishers or retained for ten years for orphan works, after which they are used for general purposes.

*Id.*

---

[22] S*ee* Press Release, Conference of European National Libraries, *et al.*, *Making Out-of-Commerce Works Available in EU Member States* (Sept. 2012), *available at* http://www.ifrro.org/sites/default/files/2page_on_mou_oocw-omit_2.pdf.

Similarly, Sweden enacted a "general" ECL regime in 2013 that allows a user to digitize published works and make them available, through the Internet or otherwise, so long as a collective management organization that represents a significant number of copyright owners has voluntarily negotiated an agreement with the user or a group to which the user belongs. *See* note 20, *supra*.   The statute requires such a user to make payments to the organization, which any copyright owner, including non-members, can collect if a request is made within three years of the use. *Id.*  All works by all authors are covered by this general ECL scheme, unless an author files a statement with the contracting parties instructing them not to use her works or "there are otherwise specific reasons to assume that the author objects to the exploitation." *Id.*

What both the French and Swedish approaches possess, consistent with other collective licensing regimes across Europe, and what the district court's blanket endorsement of Google's copying lacks, is (1) an acknowledgement that copyright owners control the exclusive right to digitize their works, including the ability to opt-out of future uses; (2) an element of negotiation between users and copyright owners; (3) payments to organizations representing copyright owners; and (4) different treatment for different categories of works and users – for instance, whether the books were in print or out of print; whether they were first published in the territory of the jurisdiction in question; or their age.  These are among the

28

distinctions which the district court declined to make but that it should have considered in order to act within the bounds of international norms that apply to the United States.  Some or all of these considerations could be part of any court-ordered, or party-negotiated, restructuring of Google's project, after a ruling on liability.  By contrast, affirming the district court would isolate the U.S. as one of the few countries that deprives copyright owners both of control over, and of compensation for, digitization of their works.

Reversing the district court's finding on fair use, and remanding for consideration of class certification issues, the scope of damages, and the scope of injunctive relief, would replace the false Hobson's Choice between complete absolution and a permanent injunction with a more beneficial and equitable outcome, similar to and informed by those that have emerged abroad, and in other U.S. cases.

## <u>CONCLUSION</u>

*Amici* respectfully urge the Court to reverse.

DATED: April 14, 2014

By:  <u>/s/ Joan Morgan McGivern</u>
Joan Morgan McGivern

Attorney for *Amici Curiae*

29

## <u>CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF</u>
## <u>APPELLATE PROCEDURE 32(A)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:  this brief contains 7,000 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14 point, Times New Roman.


DATED:  April 14, 2014          By:    /s/ Joan Morgan McGivern
                                        Joan Morgan McGivern

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of April, a true and correct copy of the foregoing *Amici Curiae* Brief was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h).

DATED:  April 14, 2014          By:    /s/ Joan Morgan McGivern
                                                Joan Morgan McGivern