# 13-4829-CV

## United States Court of Appeals

*for the*

## Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

GOOGLE INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICUS CURIAE* THE MOTION PICTURE ASSOCIATION OF AMERICA IN SUPPORT OF APPELLANTS AND REVERSAL

ROBERT H. ROTSTEIN
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064
(310) 312-2000

J. MATTHEW WILLIAMS
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street, NW, 8th Floor
Washington, DC 20036
(202) 355-7900

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned

attorney of record for *Amicus Curiae* certifies as follows:

1.     The Motion Picture Association of America, Inc. has no parent

corporation, and no publicly held company holds more than 10% of its stock.


DATED: April 14, 2014          MITCHELL SILBERBERG & KNUPP LLP
                               Robert H. Rotstein
                               J. Matthew Williams


                               By:  /s/ Robert H. Rotstein
                                    Robert H. Rotstein

                               Attorneys for *Amicus Curiae*

# TABLE OF CONTENTS

INTERESTS OF *AMICUS CURIAE* ......................................................... 1

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ....................................................................... 5

I.    The District Court Applied An Overly Expansive Definition Of "Transformative" Under The First Fair-Use Factor. ...................................... 5

II.   Under The Fourth Fair-Use Factor, The District Court Failed To Consider Harm To Existing And Likely To Be Developed Markets. .......... 11

      1.    *There Is A Market For Access To Excerpts.* ............................14

      2.    *There Is A Market For Searchable Databases.* ........................15

CONCLUSION ..................................................................... 18

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A) ............................................... 20

CERTIFICATE OF SERVICE ........................................................ 21

# TABLE OF AUTHORITIES

## CASES

*A & M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................9

*Am. Broad. Cos. v. Aereo, Inc.*,
874 F. Supp. 2d 373 (S.D.N.Y. 2012) ................................................9

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) .........................................................passim

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) ..............................................14

*Authors Guild, Inc. v. Google Inc.*,
954 F. Supp. 2d 282 (S.D.N.Y. 2013) .........................................passim

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991) ...................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ...............................................................6

*Blanch v. Koons*,
396 F. Supp. 2d 476 (S.D.N.Y. 2005) ................................................4

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) ...........................................................2, 6

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .............................................................2

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).................................................................passim

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ...............................................................6

iii

*Elektra Records Co. v. Gem Elec. Distrib., Inc.*,
   360 F. Supp. 821 (E.D.N.Y. 1973) ....................................................9

*Golan v. Holder*,
   132 S. Ct. 873 (2012)........................................................................18

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985)......................................................................3, 14

*Infinity Broad. Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) ...............................................5, 7, 8, 11

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) .............................................................8

*Leibovitz v. Paramount Pictures Corp.*,
   137 F.3d 109 (2d Cir. 1998) .........................................................2, 5

*N.Y. Times Co. v. Tasini*,
   533 U.S. 483 (2001)........................................................................15

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*,
   166 F.3d 65 (2d Cir. 1999) ................................................................7

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ..............................................................6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...........................................................8

*RCA Records v. All-Fast Sys., Inc.*,
   594 F. Supp. 335 (S.D.N.Y. 1984) ....................................................9

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir. 1992) ............................................................12

*Sony BMG Music Entm't v. Tenenbaum*,
   672 F. Supp. 2d 217 (D. Mass 2009)..................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)........................................................................13

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
   742 F.3d 17 (2d Cir. 2014) .........................................................7, 8, 11

*United States v. Am. Soc'y of Composers, Authors and Publishers: In*
   *the Matter of the Application for the Determination of Reasonable*
   *License Fees for Performances via Wireless Transmissions and*
   *Internet Transmissions by AT&T Wireless f/k/a Cingular Wireless*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) ...............................................14

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ...................................................9

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ...............................................................9

*Video Pipeline v. Buena Vista Home Entm't*,
   342 F.3d 191 (3d Cir. 2003) .............................................................14

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) .............................................................10

## STATUTES

Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.* ...........................passim
   § 106.................................................................................................18
   § 107.........................................................................................passim
   § 108.................................................................................................12

## OTHER AUTHORITIES

Jessica E. Vascellaro & Geoffrey A. Fowler, *Tech's Bigs Put*
   *Google's Books Deal In Crosshairs*, WALL ST. J., Aug. 21, 2009 ....................16

2 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT
   § 8.03 (2013)....................................................................................12

Maria A. Pallante, U.S. Copyright Office*, Priorities and Special*
   *Projects of the United States Copyright Office: October 2011 –*
   *October 2013* (2011)..........................................................................17

Orphan Works and Mass Digitization; Request for Additional
   Comments and Announcement of Public Roundtables, 79 Fed.
   Reg. 7,706 (Feb. 10, 2014) ...............................................................17

1 Paul Goldstein, GOLDSTEIN ON COPYRIGHT
　§ 1.14 (3d ed. 2014) ........................................................................10

Pierre Leval, *Toward a Fair Use Standard*,
　103 HARV. L. REV. 1105 (1990) ...................................................4, 18

U.S. Copyright Office*, Legal Issues in Mass Digitization: A
　Preliminary Analysis and Discussion Document* (2011)....................17

U.S. Dept. of Commerce, *Copyright Policy, Creativity, and
　Innovation in the Digital Economy* (2013) ........................................17

## INTERESTS OF *AMICUS CURIAE*

The Motion Picture Association of America, Inc. ("MPAA") is a not-for-profit trade association founded in 1922 to address issues of concern to the motion picture industry.[1] MPAA member companies include Paramount Pictures Corp., Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corp., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. These companies and their affiliates are the leading producers and distributors of filmed entertainment in the theatrical, television, and home-entertainment markets.

MPAA's members depend upon effective copyright laws to protect the films, television shows, and new media content that they invest in, create and disseminate. Unlicensed copying on the scale at issue in this case could cause a fundamental upheaval in the operation of the traditional copyright system. As a result, MPAA's members have a significant interest in the important questions that this case presents concerning the interpretation of the Copyright Act, 17 U.S.C. §§ 101, *et seq.*

MPAA members both enforce their copyrights and heavily rely on the fair use doctrine in producing and distributing their expressive works. Thus, MPAA

---

[1] All parties consented to *Amicus* filing this brief. No party's counsel authored any part of this brief. No person other than *Amicus* contributed money intended to fund the preparation of this brief.

members are steadfast proponents of the fair use doctrine, which serves to protect the free speech interests of filmmakers and their distributors. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998). Accordingly, the MPAA is well positioned to provide the Court with a unique and balanced perspective on the proper contours of the fair use defense generally, as well as its application in the context of mass digitization specifically.

## SUMMARY OF ARGUMENT

The Supreme Court has held that a use is "transformative" under the first fair-use factor (17 U.S.C. § 107) where the defendant incorporates copyrighted content into a "fresh," expressive work of authorship that "adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579-80 (1994). *See also Blanch v. Koons*, 467 F.3d 244, 255 (2d Cir. 2006) (transformative use requires "a genuine *creative* rationale for borrowing" from a copyrighted work) (emphasis added). In systematically copying millions of copyrighted books without authorization, Appellee Google Inc. created no new expression, meaning, or message.

Nevertheless, the district court found Google's conduct to be "highly transformative" under the first fair-use factor merely because Google's copying

2

provides the public benefit of "expand[ing] access to books." *Authors Guild, Inc.*

*v. Google Inc.*, 954 F. Supp. 2d 282, 288, 291 (S.D.N.Y. 2013).  But under

applicable law, a use is not transformative simply because it increases public

access to a copyrighted work.  Indeed, if the district court were correct, all

unrestrained infringement might be deemed transformative.  *See Harper & Row,*

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985) ("Any copyright

infringer may claim to benefit the public by increasing public access to the

copyrighted work.").

　　　Moreover, the Supreme Court has cautioned against undue reliance on a

single fair-use factor.  *Campbell*, 510 U.S. at 578 ("Nor may the four statutory

factors be treated in isolation, one from another.  All are to be explored, and the

results weighed together, in light of the purposes of copyright.").  When

considering a fair use defense, courts must look at each instance of unlicensed

copying on a "case-by-case" basis to assess whether allowing the use serves "the

purposes of copyright" (*i.e.*, preserving incentives to create and disseminate new

works for the ultimate benefit of the public).  *Campbell*, 510 U.S. at 577-78.  Here,

the district court failed to adhere to these principles and instead allowed its first-

factor analysis of the benefits of Google's copying to color its consideration, under

the fourth fair-use factor, of the potential negative economic effects that Google's

uses could have on the publishing industry.  The court did not give due

3

consideration to the harm that Google's uses could cause to all "reasonable[] or likely to be developed markets" for exploiting various categories of books. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994). Instead, the court considered only whether the traditional market for sales of entire books would be harmed, without inquiring into whether Google's copying could undermine emerging markets for licensing the creation of digital databases and access to book excerpts. *Authors Guild*, 954 F. Supp. 2d at 292-93.

By misconstruing the first factor and giving short shrift to the fourth, the district court failed to engage in the kind of case-by-case approach to fair use that the Supreme Court requires. *Campbell*, 510 U.S. at 577. Unless corrected, the district court's analytical errors could alter the course of fair use jurisprudence and in future cases "excessively diminish[] the incentives for creativity" that copyright protection provides. *Blanch v. Koons*, 396 F. Supp. 2d 476, 480 (S.D.N.Y. 2005), (*quoting* Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1110 (1990)). *Amicus* therefore urges this Court to reverse and remand the case so that the district court can engage in the "subtle, sophisticated" analysis that the fair use doctrine demands. *Texaco Inc.*, 60 F.3d at 921. The district court must consider the *specific* non-transformative uses made by Google, taking into account, under the fourth factor, the *specific* potential markets for the *specific* categories of works at issue.

4

## **ARGUMENT**

### I.    **The District Court Applied An Overly Expansive Definition Of "Transformative" Under The First Fair-Use Factor.**

The district court concluded that Google's copying of books was "highly transformative" under the first fair-use factor because it provides the societal "benefit" of "expand[ing] access to books." *Authors Guild*, 954 F. Supp. 2d at 287-88, 291.  The court held that Google: (1) "transform[ed] expressive text into a comprehensive word index[;]" (2) "use[d] snippets of text to act as pointers directing users to a broad selection of books[;]" and (3) "transformed book text into data for purposes of substantive research." *Id.* at 291.

As a matter of Supreme Court and Second Circuit law, however, a defendant's copying is transformative where it creates a new expressive work that "adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning, or message." *Campbell*, 510 U.S. at 579.  In the words of this Court, "difference in purpose is not quite the same thing as transformation." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998) (retransmitted radio broadcasts were not transformative).

In light of this definition, the Second Circuit has found copying to be transformative in only a handful of cases, all of which are consistent with the mandate of *Campbell* and *Kirkwood*.  In *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114-15 (1998), the Court concluded that parodying a high art

photograph of a pregnant actress in a low art movie poster for a slapstick comedy qualified as transformative. In *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004), the Court determined that quoting portions of copyrighted course materials on a website that criticized the plaintiff's seminars was transformative. In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006), the Court found that reproducing reduced size copies of concert posters in a book that analyzed the historical impact of a rock n' roll band constituted a transformative use because the book's author used the posters as a means of more effectively conveying commentary on the band's history. Finally, in the specific circumstances presented in *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) and *Cariou v. Prince*, 714 F.3d 694, 706-07 (2d Cir. 2013), the Court decided that appropriating copyrighted content for the purpose of incorporating it into new, original, and singular works of fine art sometimes qualified as transformative.

In each of these cases, the defendants created a new expressive work, consistent with the purposes of the Copyright Act. *See Campbell*, 510 U.S. at 579 ("[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."). Conversely, where a defendant's use of a plaintiff's work does not result in the creation of a new expressive work, this Circuit has found such use *non*-transformative. *E.g.*, *Texaco*, 60 F.3d at 920-23 (rejecting defendant's argument that photocopying a journal article was

6

transformative because it "separated it from a bulky journal, made it more amenable to markings, and provided a document that could be readily replaced if damaged in a laboratory, all of which 'transformed' the original article into a form that better served [defendant's] research needs"). This is true even where, as here, the defendant's use purportedly increases public access to the plaintiff's work. *E.g.*, *Kirkwood*, 150 F.3d at 108-09 ("[T]he public benefit from other uses of [Defendant's technology] . . . is simply not enough to justify [his] non-transformative retransmissions.").[2]

Indeed, as recently as a few months ago, this Court concluded that where a defendant news organization "obtained a sound recording and written transcript of [a plaintiff's conference call with investors] and made them both available online, without alteration or editorial commentary, to subscribers to [the defendant's] online financial research service" the use was "nontransformative." *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 742 F.3d 17, 22, 27 (2d Cir. 2014). Significantly, the Court so concluded even though it found that the defendant's use had significant public benefit. *Id.* at 27, 35.[3]

---

[2] Moreover, where the defendant engages in copying that merely supersedes a clear derivative market for a plaintiff's work, the use is not transformative. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*, 166 F.3d 65, 72 (2d Cir. 1999) (direct translations of plaintiff's articles were not transformative).

[3] The Court in *Swatch* ultimately found fair use, in part because under the first factor, the defendant's use of the sound recording was newsworthy – a favored

Here, the district court incorrectly relied on two Ninth Circuit decisions involving search engines that created reduced-size copies of images – *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) – for the conclusion that "use of book text to facilitate search through the display of snippets is transformative." *Authors Guild*, 954 F. Supp. 2d at 291.  In those cases, however, the Ninth Circuit adopted an approach to transformation that this Court has never endorsed.  The Ninth Circuit reasoned that where a defendant's use merely serves a "different function" from the plaintiff's use, such as "improving access to information on the internet versus artistic expression," that qualifies the use as transformative.  *Kelly*, 336 F.3d at 819.  But this analytical leap, which the district court here unfortunately adopted, squarely conflicts with *Campbell* and this Court's opinions in *Kirkwood* and the other salient cases.

The district court's failure to follow the law of this Circuit could have a deleterious effect on future copyright infringement cases.  Every instance of mass copyright infringement arguably increases access to the infringed works and thereby enables members of the public to use those works in their own creative or

---

category under section 107.  In contrast, Google's mass copying is not for the purpose of news.  Moreover, in *Swatch*, the Court undertook close analysis of a single work, while here the district court failed to consider specific books at all, or even specific categories of books.  *See* discussion in section II, *infra*.

educational pursuits.  Yet, this fact hardly makes the copying "fair."  *See Am. Broad. Cos. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 404 (S.D.N.Y. 2012) ("The same logic would support a finding that the public interest favors imposing no copyright restrictions on any form of redistribution of Plaintiffs' [works], as unrestrained piracy of that content would also increase public access to content . . ."), *aff'd on other grounds* 712 F.3d 676 (2d Cir. 2013); *Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217, 228 (D. Mass 2009) ("Nearly *every* unauthorized reproduction or distribution increases access to some degree.  . . .  In any case, the balance between unlimited public access and the desire to spur artistic creation is the very policy choice embodied by the provisions of the Copyright Act.  Congress has purposefully restricted access by vesting an exclusive right in the copyright holder.") (emphasis in original), *aff'd in part, rev'd in part on other grounds*, 660 F.3d 487 (2011).[4]

A regime that fails to provide adequate copyright protection, while perhaps providing greater initial public access to *existing* works of authorship, will ultimately act as a disincentive to potential authors, thus depleting the number of

---

[4] For this reason, courts often reject fair use arguments where large scale infringers claim to be engaged in fair use.  *E.g.*, *Elektra Records Co. v. Gem Elec. Distrib., Inc.*, 360 F. Supp. 821 (E.D.N.Y. 1973); *RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335 (S.D.N.Y. 1984); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

*new* expressive works. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating [them]. Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works.") (citations omitted); 1 Paul Goldstein, GOLDSTEIN ON COPYRIGHT § 1.14 (3d ed. 2014) ("To give fewer property rights than are needed to support this investment [in creative production] would give users freer access, but to a less than socially desirable number and quality of works."). The district court's approach to fair use, if widely followed, could result in an unreasonably low level of copyright protection and thereby threaten creative output. This Court should not take that path.

In sum, the district court misapplied the transformative test by broadly focusing on the so-called public benefit of Google's copying. Rather than creating a new work that conveys an expressive or meaningful message, however, Google systematically copied books to increase their accessibility in a manner analogous to other uses that this Court has found to be non-transformative. The district court's analytical approach, which is based on Ninth, not Second Circuit law, could ultimately erode copyright protection and in future cases reward large-scale

10

infringers just because their acts increase public access to copyrighted works. This Court should reaffirm its existing jurisprudence on transformation, as articulated in opinions such as *Kirkwood* and *Swatch*, and reverse and remand to the district court for further consideration of whether the first factor favors Google despite the non-transformative nature of Google's commercial copying.[5]

## II. Under The Fourth Fair-Use Factor, The District Court Failed To Consider Harm To Existing And Likely To Be Developed Markets.

In *Campbell*, the Supreme Court "abandon[ed] the idea that any [fair-use] factor enjoys primacy." *Texaco*, 60 F.3d at 926. However, the district court allowed its misinterpretation of the transformative test under the first factor to overwhelm its analysis of the other factors, especially the fourth factor. That factor requires courts to analyze "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This analysis involves assessing what impact a defendant's uses could have on all of the plaintiff's "traditional, reasonable, or likely to be developed markets." *Texaco*, 60 F.3d at 930. Where "there is a ready market or means to pay for the use," that fact weighs against the defendant under the fourth factor. *Id.* at 931. "The reason for this rule relates to a central concern of copyright law that unfair copying undercuts demand for the

---

[5] Although Google does not charge consumers to search its database of digitized books, Google monetizes the database by gathering data regarding users, which enables Google to attract users to its brand and to reap substantial profits from targeted advertising across its properties.

11

original work and, as an inevitable consequence, chills creation of such works."
*Rogers v. Koons*, 960 F.2d 301, 312 (2d Cir. 1992).

Moreover, under the fourth factor, courts must determine whether the existence of other, specific exceptions in the Copyright Act "implicitly suggests that Congress views [copyright owners] as possessing the right to restrict" activities not covered by the exceptions. *Texaco*, 60 F.3d at 931. For example, in *Texaco*, this Court held that the existence of the narrow exceptions set forth in section 108 for copying by libraries and archives must be considered when assessing copying that could have been, but was not, sanctioned by section 108.[6]

Here, without considering how its decision interacts with section 108 or any other statutory exception, the district court concluded that "the fourth factor weighs strongly in favor of a finding of fair use." *Authors Guild*, 954 F. Supp. 2d at 293. In its view, "a reasonable factfinder could only find that Google Books enhances the sale of books to the benefit of copyright holders" by "help[ing] readers find"

---

[6] Section 108 allows a library or archive to make and distribute no more than one copy of a work for certain purposes so long as the copy is not made for the purpose of direct or indirect commercial advantage; the collection is open to the public or to researchers who are not affiliated with the library or archive; and a copyright notice is affixed on the copy. Section 108 also allows for three copies to be made if done to preserve unpublished works or for the purpose of replacing damaged or lost copies of published works when replacement copies cannot be obtained at a fair price. In instances where libraries or archives distribute copies to individual researchers, additional limitations apply. "Systematic" copying is not allowed. For a general discussion of section 108, *see* 2 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 8.03 (2013).

books and by "provid[ing] convenient links to booksellers to make it easy for a reader to order a book." *Id*. In other words, simply because Google increased the availability of books, which the district court found to be transformative, the court found that no market harm was likely, especially because it is "not possible" for a consumer to access an entire book through Google's search engine. *Id.*

This approach to the fourth factor uses too broad a brush. First, it considers only "traditional" markets for books (*i.e.*, sales) and ignores other existing and "likely to be developed markets." *Texaco*, 60 F.3d at 930. Second, it fails to acknowledge and address the different types of books at issue. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984) ("[I]t is not true that all copyrights are fungible. Some copyrights govern material with broad potential secondary markets. Such material may well have a broader claim to protection because of the greater potential for commercial harm."). So, as the Supreme Court instructs in *Campbell*, 510 U.S. at 577, the district court was required to analyze fair use on a "case-by-case" basis. At the very least, that analysis demanded that the court examine the different potential markets that may be available for different categories of books.

Although it may be true that Google does not enable consumers to access complete books and that Google's efforts to direct users to online bookstores may, at times, increase sales for some books, the district court should have considered

13

the possible harm to (1) potential revenues earned from monetizing the provision of access to book excerpts; and (2) potential revenues earned from monetizing searchable databases of books.

### 1.    *There Is A Market For Access To Excerpts.*

Where a segment of a work is entertaining or useful in itself, a potential market for providing access to that segment exists.  In other words, there is "qualitative value" in a segment "whose power lies in the author's individualized expression." *Harper & Row*, 471 U.S. at 563, 565.  For authors and publishers of at least some categories of books, digitization that enables public access to book segments is an *existing* market with significant potential to expand.  Indeed, before Google began copying libraries full of books without authorization, it and Amazon actually negotiated with copyright owners for permission to provide access to book excerpts.  *See* Authors Guild Brief at 1-3, 7-8, 51.  Yet, the district court failed to examine the effect of Google's unauthorized mass copying on that market.

Moreover, markets for accessing segments from news stories, audiovisual works, and musical works already exist.  *See Associated Press v. Meltwater U.S. Holdings, Inc*., 931 F. Supp. 2d 537, 560-61 (S.D.N.Y. 2013) (using automated computer program to create and disseminate extracts from news stories was infringing); *Video Pipeline v. Buena Vista Home Entm't*, 342 F.3d 191, 202 (3d Cir. 2003) (clips from movies for online viewing were infringing); *United States v.*

14

*Am. Soc'y of Composers, Authors and Publishers: In the Matter of the Application for the Determination of Reasonable License Fees for Performances via Wireless Transmissions and Internet Transmissions by AT&T Wireless f/k/a Cingular Wireless*, 599 F. Supp. 2d 415, 431-33 (S.D.N.Y. 2009) (using unauthorized clips from songs to enable online shoppers to preview sound recordings was not fair use).

Indeed, MPAA members regularly license the use of film clips in a variety of contexts.  For example, licensed, advertising-supported websites enable consumers to view brief clips from their favorite movies.[7]  There is no reason that, absent unfair competition from mass copiers, publishers of at least some types of books could not similarly exploit a business model that would provide access to brief segments of text.  Yet, the district court never considered such a market.

2.    *There Is A Market For Searchable Databases.*

The district court also failed to consider that numerous, licensed, searchable databases of copyrighted works have developed via market forces.  For example, Hein Online, JSTOR, Lexis, and Westlaw all provide access to searchable databases of copyrighted academic articles.  Lexis and Westlaw also provide access to databases of many other types of literary works, including newspapers and legal treatises.  *See generally N.Y. Times Co. v. Tasini*, 533 U.S. 483 (2001).

---

[7] *See* AnyClip, http://www.anyclip.com/ (last visited Apr. 11, 2014); MovieClips, http://movieclips.com/ (last visited Apr. 11, 2014).

Outside of the market for literary works, efforts to provide online, licensed access to large numbers of works owned by large numbers of copyright holders, such as via Corbis and Getty Images, Netflix, Spotify, or Apple's iTunes, have also succeeded.[8]  Similar models exist and are developing for access to books, as Amazon's licensed offerings and Google's existing partnership program with major publishers demonstrate.  *See* Authors Guild Brief at 51.  It is telling that Google's primary competitors – including Microsoft, Yahoo! and Amazon, which have developed or would like to develop such models – have voiced concerns over Google's efforts to monopolize online access to books.[9]  *See* Jessica E. Vascellaro & Geoffrey A. Fowler, *Tech's Bigs Put Google's Books Deal In Crosshairs*, WALL ST. J., Aug. 21, 2009, at B1.  The district court failed to inquire under the fourth factor into what business models these other innovative companies would have offered to the public had Google not undercut their efforts to provide access to digitized books while at the same time complying with copyright law.

---

[8] In the past, methods for collective licensing have also developed where transaction costs impeded the negotiation of individual licenses.  For example, through the Copyright Clearance Center, users may obtain licenses to make copies of articles.  And the American Society of Composers, Authors, and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc. offer "blanket licenses" to publicly perform extensive catalogues of musical works.  Similarly, SoundExchange, Inc. offers licenses to publicly perform sound recordings in specific online contexts.

[9] Among other things, these entities filed objections to the now defunct class-action settlement.

16

The ability to exploit searchable databases of books could become a significant source of licensing or advertising revenue for publishers and authors. Ongoing discussions are taking place on, *inter alia*, the very topic of how to establish licensing mechanisms for mass digitization. *See, e.g.*, Orphan Works and Mass Digitization; Request for Additional Comments and Announcement of Public Roundtables, 79 Fed. Reg. 7,706 (Feb. 10, 2014); *see also* U.S. Dept. of Commerce, *Copyright Policy, Creativity, and Innovation in the Digital Economy*, at 33-35 (2013). The Copyright Office has issued a detailed report on mass digitization, outlining several global efforts to deal with the issue. *See* U.S. Copyright Office*, Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (2011); *see also* Maria A. Pallante, U.S. Copyright Office*, Priorities and Special Projects of the United States Copyright Office: October 2011 – October 2013*, at 5 (2011). In that report, the Copyright Office, which has considerable expertise on fair use issues, found that "the large scale scanning and dissemination of entire books is difficult to square with fair use." *Legal Issues in Mass Digitization*, at 23.

Yet despite prior examples of successful methods for licensing large numbers of copyrighted works and the ongoing efforts to explore and develop similar licensing mechanisms for books, the district court ignored the ways in

17

which Google's uses could undermine efforts to facilitate licensing.  As such, the court below failed to consider harm to yet another potential market.

## CONCLUSION

"Copyright supplies the economic incentive to create and *disseminate* ideas."  *Golan v. Holder*, 132 S. Ct. 873, 889 (2012) (emphasis in original; citation omitted).  The Copyright Act therefore presumes that unless a statutory exception applies, "the owner of copyright . . . has the exclusive rights to do and to authorize" certain uses of copyrighted works, including their reproduction, adaptation, distribution, public performance and public display.  17 U.S.C. § 106.  The fair use defense of section 107 is therefore an exception to a generally applicable rule.  "In analyzing a fair use defense, it is not sufficient simply to conclude whether or not justification exists.  The question remains how powerful, or persuasive, is the justification, because the court must weigh the strength of the secondary user's justification against factors favoring the copyright owner."  Leval, *supra* p. 4, at 1111.

The district court's misconstruction of the first factor and concomitant failure to give due weight to the fourth factor is squarely at odds, not only with applicable law, but with copyright law's salutary objectives.  The availability of Google's unauthorized, digital copies could unfairly compete with and crowd out legitimate, innovative digital offerings and business models that publishing

18

companies are already developing.  Because the district court failed to consider rigorously whether this potential interference will improperly hinder further development of these nascent markets, its incomplete examination of the issues could ultimately result in reduced creative output.  Unless this Court remands and instructs the district court to apply this Circuit's well-settled approach to fair-use jurisprudence, creators and licensed distributors of copyrighted content could be significantly harmed to the ultimate detriment of the general public, which would be deprived of expressive works.

MPAA respectfully urges the Court to reverse and remand so that the district court can conduct a proper fair use analysis of Google's conduct.

DATED: April 14, 2014   MITCHELL SILBERBERG & KNUPP LLP
          Robert H. Rotstein
          J. Matthew Williams

          By:  /s/ Robert H. Rotstein
             Robert H. Rotstein

          Attorneys for *Amicus Curiae*

19

## <u>CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:  this brief contains 4,548 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

DATED:  April 14, 2014        By:      /s/ Robert H. Rotstein
                                                  Robert H. Rotstein

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of April, a true and correct copy of the foregoing *Amicus Curiae* Brief was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h).

DATED:  April 14, 2014        By:    /s/ Robert H. Rotstein____
                                                 Robert H. Rotstein