# 13-4829-CV

## United States Court of Appeals

*for the*

## Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE* AMERICAN PHOTOGRAPHIC ARTISTS, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., GRAPHIC ARTISTS GUILD, MYSTERY WRITERS OF AMERICA, THE NATIONAL ASSOCIATION OF SCIENCE WRITERS, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, NATIONAL WRITERS UNION, NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, ROMANCE WRITERS OF AMERICA, SOCIETY OF CHILDREN'S BOOK WRITERS AND ILLUSTRATORS, THE SONGWRITER'S GUILD OF AMERICA, TEXT AND ACADEMIC AUTHORS ASSOCIATION, THE DIGITAL MEDIA LICENSING ASSOCIATION AND WESTERN WRITERS OF AMERICA IN SUPPORT OF APPELLANT THE AUTHORS GUILD**

Author block

STEPHEN E. GILLEN
WOOD HERRON & EVANS LLP
2700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
(513) 241-2324

MARY E. RASENBERGER
NANCY E. WOLFF
ELEANOR M. LACKMAN
SCOTT J. SHOLDER
COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
*Attorneys for Amici Curiae*
41 Madison Avenue, 34th Floor
New York, New York 10010
(212) 974-7474

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all
others similarly situated, PAUL DICKSON, THE MCGRAW-HILL
COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER,
INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and
on behalf of all others similarly situated,

*Plaintiffs*,

v.

GOOGLE, INC.,

*Defendant-Appellee*.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* submit the following corporate disclosure statements with respect to those *Amici*, that are corporations:

1.     American Photographic Artists (APA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

2.     American Society of Media Photographers, Inc. (ASMP) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

3.     Graphic Artists Guild (GAG) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

4.     Mystery Writers of America (MWA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

5.     National Press Photographers Association, Inc. (NPPA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

6.     National Writers Union (NWU) is a national amalgamated union (Local 1981) of the United Auto Workers, AFL-CIO. NWU states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

7.     North American Nature Photography Association (NANPA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

8.     Professional Photographers of America (PPA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

9.     Romance Writers of America (RWA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

10.    Society of Children's Book Writers and Illustrators (SCBWI) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

11.    The Digital Media Licensing Association (PACA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

12.    The National Association of Science Writers (NASW) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

13.    The Songwriters Guild of America (SGA) states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

14.    Text and Academic Authors Association states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

15.    Western Writers of America, Inc. states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ................................................................ ii

STATEMENT OF INTEREST ............................................................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT ....................................................................................6

    I.    GOOGLE'S USES OF COPYRIGHTED WORKS ARE
        NOT "TRANSFORMATIVE".........................................................6

    II.   THE DISTRICT COURT DID NOT SUFFICIENTLY
        CONSIDER THE HIGHLY COMMERICAL NATURE OF
        GOOGLE'S USE ...................................................................... 11

    III.  THE DISTRICT COURT FAILED TO GIVE EACH OF
        THE OTHER STATUTORY FAIR USE FACTORS DUE
        CONSIDERATION AND WEIGHT ........................................... 14

        A. The District Court Failed to Adequately Analyze the
           Second Factor and So Erred in Holding that the Second
           Factor Weighed in Favor of Fair Use...................................... 15

        B. The District Court Failed to Adequately Analyze the
           Third Factor and So Erred in Holding that the Third
           Factor Weighed Only Slightly Against Fair Use ..................... 19

        C. The District Court Failed to Adequately Analyze the
           Fourth Factor and Erred in Holding that the Fourth Factor
           Weighed Strongly in Favor of Fair Use .................................. 22

CONCLUSION ................................................................................ 28

CERTIFICATE OF COMPLIANCE ................................................. 29

APPENDIX : DESCRIPTION AND INTEREST OF *AMICI CURIAE* ...........A1

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...................................................10, 11, 12, 13, 22

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ...........................................................................8

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2012) ...........................................................................11

*Authors Guild, Inc. v. Google Inc.*,
954 F. Supp. 2d 282 (S.D.N.Y. 2013) .......................................................*passim*

*Authors Guild, Inc. v. HathiTrust*,
902 F. Supp. 2d 445 (S.D.N.Y. 2012) ...............................................................14

*Authors Guild, Inc. v. Google, Inc.*,
282 F.R.D. 384 (S.D.N.Y. 2012) ......................................................................19

*Authors Guild v. Google, Inc.*,
770 F. Supp. 2d 666 (S.D.N.Y. 2011) ...............................................................23

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ............................................................................15

*Campbell v. Acuff-Rose*,
510 U.S. 569 (1994).................................................................................*passim*

*Capitol Records, LLC v. ReDigi Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013) ...............................................................10

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ............................................................................15

*Castle Rock Ent'm't, Inc. v. Carol Publ'g Group, Inc.*,
150 F.3d 132 (2d Cir. 1998) ..............................................................................8

*Golan v. Holder*,
132 S. Ct. 873 (2012) ........................................................................17

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
471 U.S. 539 (1985) ....................................................................18, 23

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) ...............................................................10

*Peter Mayer Publishers Inc. v. Shilovskaya*,
12 CIV. 8867 PGG, 2014 WL1325744, at* 8
(S.D.N.Y. March 31, 2014) ...............................................................11

*Princeton Univ. Press v. Michigan Doc. Svcs.*,
99 F.3d 1381 (6th Cir. 1994) ............................................................10

*Stewart v. Abend*,
495 U.S. 207 (1990)...........................................................................16

**Statutes**

17 U.S.C. § 106 ...........................................................................................23

17 U.S.C. § 107 ....................................................................................passim

17 U.S.C. § 108(c) ...............................................................................20, 26

U.S. CONST., art. I, § 8, cl. 8 ...............................................................8, 17

**Other Authorities**

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*,
§ 13.05(A)(4) (2012)............................................................................5

Alexandra Drury, Note, *How Internet Users' Identities are Being
Tracked and Used*, 15 TUL. J. TECH. & INTELL. PROP. 219, 227
(2012)(citing Arjun Kulkarni, *How Does Facebook Make Money*,
BUZZLE (Jan. 9, 2012), http://www.buzzle.com/articles/how-does-
facebook-make-money.html)..............................................................13

Craig W. Dallon, *Original Intent and the Copyright Clause: Eldred v.
Ashcroft Gets It Right*, 50 ST. LOUIS U. L.J. 307, 329 (2006) ............18

iii

GOOGLE, COMPANY, OUR PRODUCTS AND
SERVICES, http://www.google.com/about/company/products ..............................9

Horace E. Scudder, *Noah Webster, American Men of Letters* 55-64,
67-68 (1890) http:// www.gutenberg.org/files/31238/31238-
h/31238-h.htm .................................................................................................18

Joanna Greary, *Google: What Is It and What Does It Do?* THE
GUARDIAN (April 23, 2012),
http://www.theguardian.com/technology/2012/apr/23/google-
tracking-trackers-cookies-web-monitoring .........................................................9

Joshua Kendall, *The Forgotten Founding Father: Noah Webster's
Obsession and the Creation of an American Culture* 65-66, 93,
100-02 (2010) http://www.theforgottenfoundingfather.com ............................18

Mary Rasenberger & Chris Weston, *Overview of the Libraries and
Archives Exception in the Copyright Act: Background, History,
and Meaning*, at 17-21 (April 2005), available
at: http://www.section108.gov/docs/108BACKGROUNDPAPER(f
inal).pdf...............................................................................................................26

Patrick Cronin, *The Historical Origins of the Conflict Between
Copyright and the First Amendment*, 35 COLUM. J.L. & ARTS 221,
232 (2012)..........................................................................................................17

Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of
Fair Use*, 13 Cardozo Arts & Ent. L.J. 19, 22 (1994) .......................................14

Pierre N. Leval, *Toward A Fair Use Standard*, 103 HARV. L. REV.
1105, 1112 (1990)........................................................................................passim

Preservation and Reuse of Copyrighted Works: *Hearing Before the
Subcomm. on Courts, Intellectual Property, and the Internet of the
H. Comm. On the Judiciary, 113th Cong.* (2014)..............................................24

Rebecca Tushnet, *My Library: Copyright and the Role of Institutions
in A Peer-to-Peer World*, 53 UCLA L. Rev. 977, 981 (2006) ...........................26

The Copyright Clearance Center
(CCC), http://www.copyright.com/content/cc3/en.html ....................................25

## STATEMENT OF INTEREST[1]

*Amici* are fifteen associations of independent authors' organizations, representing text writers, songwriters, visual artists, illustrators and photographers.[2] They are concerned about the widespread impact of affirming this case and respectfully ask this Court to view it with a wide lens. The district court's opinion establishes a precedent that, if followed, will unleash commercial, large-scale digital copying of all types of creative works. For instance, owners of collections of photographs or other artwork will feel free to create online, searchable databases with high quality thumbnails of the images in direct competition with authorized image licensors; and owners of musical recordings may create searchable databases of music and make portions available to users without any security. In each case, the author would get nothing in exchange for the use and would have no control over ultimate uses.

Allowing mass digitization and mass use as fair use is an extensive taking, one that has no precedent in the history of fair use jurisprudence. It will harm the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than the *amici curiae*, their members, or counsel, contributed money intended to fund preparation or submission of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief.

[2] The names of *amici* and further details about their activities are included in the Appendix to this brief.

1

ability of authors to profit from their works and ultimately to make a living from their creative work – in a manner not experienced since prior to the enactment of copyright laws in this country.   If the decision is allowed to stand, there will be less incentive for authors to create – particularly scholarly, educational, and non-fiction authors – thus contravening the purpose of copyright to promote the progress of science and useful arts.

## SUMMARY OF ARGUMENT

An affirmance of the district court's opinion will set a novel, unparalleled precedent that will allow the exception (fair use) to swallow the rule (the exclusive rights), crippling copyright law's ability to incentivize new creativity.  Any entity, whether commercial or not, and whether or not technologically capable of keeping digital works secure to protect them from piracy, might engage in mass digitization of third-party works and make large portions of those works available to the public.  This includes musical works, sound recordings, photographs and other images, audiovisual and other works, as well as texts.

The district court's decision allows Google, one of the richest companies in the world, to reap profits from the use of millions of books under the guise of fair use, with no payment to authors.  It allows a commercial enterprise to scan millions of books (and in so doing to usurp the author's right to decide when or if to make his or her work available in digital form), use those scans for its own

2

internal business purposes, provide whole digital copies to participating libraries in consideration for access to the books, and make a full 78 percent of the books available to the public on a per snippet basis (Appellant's Br. 11) – all without permission or paying the authors a cent.  Copyright law, and with it fair use, calls for balance.  The district court's decision is not a balanced one.  As Judge Leval warned "extensive taking may impinge on creative incentives."  Pierre N. Leval, *Toward A Fair Use Standard*, 103 HARV. L. REV. 1105, 1112 (1990).

*Amici* urge this Court to take a fresh look at the fair use doctrine and the role of transformative use in particular.   Fair use is an integral part of U.S. copyright law.  It is a doctrine that provides "breathing room" to copyright law, recognizing that copyright law, in some cases when strictly construed, does not serve its own objectives—to incentivize creation and dissemination of works of authorship.  If, however, the end result of a finding of fair use would be to diminish the copyright incentives, as is the case here, the use should not be deemed a fair one.

While courts need to have flexibility in interpreting the fair use doctrine to accommodate new technologies, the district court's gross extension of fair use to cover mass digitization and access favors Google's uses to the extreme detriment of rights holders generally. If the mass digitization and the uses at issue here become unrestricted and widespread, it may become impossible for the marketplace to pay authors for many books, particularly those with narrow

3

margins. This is equally true with respect to the markets for images, musical works, sound recordings and other types of works.

Several aspects of the district court's opinion warrant close examination. First, the district court erroneously held that the first fair use factor – nature and character of the use – strongly weighs in favor of fair use, relying on its determination that the use was transformative and socially beneficial.
But a use is not transformative simply because it adds functionality to the original use. Moreover, purported public benefit of a use, although it may be considered and weighed, should not nullify consideration of the use's commercial nature and the user's private gain. The district court's myopic analysis ignores the purely commercial nature of Google's use of the works, and it overlooks the very real evidence of potential harm from widespread use of this nature and, in particular, the relevance of affected licensing markets.

Second, the district court reduced the fair use inquiry to a one-factor test – whether, in the court's view, the defendant has made a convincing case that the use is in some manner "transformative." The district court consistently overemphasized its finding of transformative use and views each of the other factors under the lens of this purported transformative use, giving those other factors only cursory analysis. However, the statute clearly provides that a

4

determination of fair use must be made by independently, weighing and assessing each factor on its own merits. 17 U.S.C. § 107.

The district court virtually dismisses the second factor by its gross generalization of the nature of the works; it summarily treats the millions of works at issue as published "non-fiction books," weighing in favor of fair use—notwithstanding the fact there are a huge variety of types of works at issue, including images and articles, as well as books, and that not all non-fiction works lack creativity. The court also errs in finding that the third factor weighs only slightly against fair use because it focuses almost exclusively on the end-user's snippet use, disregarding the fact whole copies were made and provided to libraries and are used by Google.

Finally, the district court conflated the market for the works with the "sale" of "books" to consumers and thereby ignored major licensing and other markets, including for excerpts of books. The market for books today, even out of print books, is far broader than sales of copies. The court neglected to consider the effect on the potential market for or value of the work of "unrestricted and widespread conduct of the sort engaged in by the defendant…" *Campbell v. Acuff-Rose*, 510 U.S. 569, 590 (1994) (*citing* Nimmer § 13.05[A] [4]). In this case, snippet use could have tremendous adverse impact on the market or value of the works, especially if widespread. Works, especially short works that can be easily

assembled from snippets and works whose major markets are excerpts use or research use (which rarely requires reading a book from end to end), are particularly vulnerable to market usurpation as a result of snippet use.

## ARGUMENT

## I.  GOOGLE'S USES OF COPYRIGHTED WORKS ARE NOT "TRANSFORMATIVE"

The district court held that "Google's use of copyrighted works is highly transformative" because it digitized and indexed books in a manner that facilitates search and research: "The use of book text to facilitate search through display of snippets is transformative." *Authors Guild, Inc. v. Google Inc*., 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013) (hereinafter "Op"). "Google Books is also transformative in the sense that it has transformed book text into data for purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research." *Id.* The court concluded that "Google Books does not supersede or supplant books because it is not a tool to be used to read books." *Id.*

This conclusion misunderstands the meaning of "transformative."  The uses the district court described are not the type of "transformative use" the Supreme Court carefully analyzed in *Campbell*, nor do Google's uses fall within any of the types of uses contemplated by Judge Leval in his seminal 1990 article, *Toward A*

6

*Fair Use Standard,* upon which the Supreme Court's discussion of transformative use in *Campbell* largely relies.

In delineating the boundaries of "transformative use," the Supreme Court in *Campbell* focused on whether the new use added new creative expression to the body of creative works, or whether the use simply substituted for the original—whether it:

> Adds something new, with a further purpose or different character, *altering the first with new expression, meaning, or message*; it asks, in other words, whether and to what extent the new work is 'transformative.'

*Campbell*, 510 U.S. at 579 (quoting Leval, *Toward A Fair Use Standard*, *supra* at 1111) (emphasis added).  Judge Leval provides examples of transformative uses: they may "include criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it."  Leval, *Toward A Fair Use Standard*, *supra* at 1111.  They may also include "parody, symbolism, aesthetic declarations, and innumerable other uses."  *Id.*  He explains that "a quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test."  *Id.*

All of the uses contemplated by Leval, as well as by the Supreme Court, "alter" the original work by creating a new work:  they add new creative expression to the original in a way that transforms the original work into a new work.  This, in turn, furthers the purposes of copyright.   As this Court has noted,

7

"[t]he ultimate test of fair use … is whether the copyright law's goal of "promoting the Progress of Science and useful Arts," U.S. CONST., art. I, § 8, cl. 8, would be better served by allowing the use than by preventing it." *Castle Rock Ent'm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (citing *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992)). Judge Leval states, a fair use

> must be of a character that services the copyright objective of stimulating productive thought and public instruction without excessively diminishing the incentives for creativity. One must assess each of the issues that arise in considering a fair use defense in light of the governing purposes of copyright law.

Leval, *Toward A Fair Use Standard*, *supra* at 1110.

Consistent with the foregoing, the Supreme Court explained that parody often "has an obvious claim to transformative value" in that it can "shed[] light on an earlier work, and, in the process, creat[e] a new one." *Campbell*, 510 U.S. at 579. Because parody is a form of criticism, it must refer to the original in order to conjure it up to make its point. And, as criticism, it generally will not supplant the original, precisely because it is making fun of and commenting on the original. But, as the Court describes, even commentary is not always fair use:

> If, on the contrary, *the commentary has no critical bearing on the substance or style of the original composition*, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.

8

510 U.S. at 580 (emphasis added).  As the Court recognized, the less the work is used for purposes of creating new and different speech, the less likely it will be transformative.

Google's purpose in digitizing books was not to comment on the original works in any way or to create new works of authorship.  Indeed, Google's wholesale copying of millions of books to improve its search and translation services and other "nondisplay" uses can hardly be compared to core fair uses such as parody or quotation—uses that incorporate portions of preexisting works as an integral part of the new expression.  Adding new functionality to an existing work without adding new expression is not transformative in the sense used by the Court; it does not alter the original work itself, but simply provides new means of use, access or distribution for the work—all traditionally licensed uses.

While Google Books Search is a tool to search books for terms and retrieve snippets of the book that include the search term, it does not create any new expression, meaning or message.[3]  All that has occurred in this case is a transfer to

---

[3] Instead, Google's primary purpose almost assuredly was to acquire massive amounts of language data in order to improve its search algorithms and translation capabilities, and to increase (or at least maintain) its competitive edge in the world of Internet search. *See* GOOGLE, COMPANY, OUR PRODUCTS AND SERVICES, http://www.google.com/about/company/products/; Joanna Greary, *Google: What Is It and What Does It Do?* THE GUARDIAN (April 23, 2012), http://www.theguardian.com/technology/2012/apr/23/google-tracking-trackers-cookies-web-monitoring.

a text-searchable format (a change not authorized by the author)—a quintessential example of non-transformative copying that violates the reproduction right. First, digitizing others' works to enhance one's own business is simply a form of copying; it does not transform the work or alter the original work in any way. *See, e.g.*, *Princeton Univ. Press v. Michigan Doc. Svcs.*, 99 F.3d 1381, 1389 (6th Cir. 1994) ("This kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case.") Merely adding search does not alter this analysis; it allows the work to be accessed in a different way, but does not create new expression or meaning. *See A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1015 (9th Cir. 2001) (downloading MP3 files is not transformative); *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (abstracts that are mostly direct translations do not add new expression); *Capitol Records, LLC v. ReDigi Inc.,* 934 F. Supp. 2d 640, 653 (S.D.N.Y. 2013) ("the upload, sale, and download of music files on ReDigi's website does nothing to 'add something new…'"). In this case, the search and indexing functions are tools that allow users to create new meaning, but do not themselves create new meaning. While this may seem like a subtle distinction, it is an important one.

If furthering access so that people could use the works for creating new expression were transformative use, then most infringing distribution, display or

performance would be transformative merely because they allowed more access. For instance, creating MP3s of sound recordings and making them available for download or creating a searchable e-book would be transformative. But these types of uses have been found infringing and not transformative new expression. *See, e.g., Napster, Inc.,* 239 F.3d at 1015; *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 124 (2d Cir. 2012) (uploads and downloads of digital copies on P2P network not fair use); *Peter Mayer Publishers Inc. v. Shilovskaya*, 12 CIV. 8867 PGG, 2014 WL 1325744, at *8 (S.D.N.Y. Mar. 31, 2014) (eBook does not contain "content-based changes" reflecting new authorship as required for a derivative work).

In addition to adding search functionality to the books, Google made perfect digital copies of the books and provided them to the participating libraries *in exchange* for access to the books. (Op. at 285.) This use was completely ignored by the district court in its analysis, although it is wholesale copying in its purest form and provides a direct substitute for library purchase of books. There is nothing arguably transformative about this use.

## II.   THE DISTRICT COURT DID NOT SUFFICIENTLY CONSIDER THE HIGHLY COMMERCIAL NATURE OF GOOGLE'S USE

As the *Campbell* Court explained, whether a use is commercial does not create a presumption that a use is fair or unfair; however, it is a factor that must be weighed – particularly in a case like the one at bar. *See Campbell,* 510 U.S. at 580 ("If … the commentary has no critical bearing on the substance or style of the

11

original composition…the claim to fairness in borrowing from another's work diminishes accordingly (*if it does not vanish*), and *other factors, like the extent of its commerciality, loom larger*.") (emphasis added).[4]  The district court's failure to appreciate the commerciality of Google's uses is reversible error.

The district court acknowledged that Google's use of its digitized book collections was commercial, s*ee* Op. at 291, then inferred that the "educational benefits" of the service negated Google's commercial purposes.  *Id.* at 292 ("even assuming Google's principal motivation is profit, the fact is that Google Books serves several important educational purposes.").  The court improperly allowed this potential end-use to dominate its analysis of the first factor.

In bolstering its results-driven outlook, the court lost sight of the complexities of the Internet economy, assuming instead that Google does not "engage in the direct commercialization of copyrighted works" in that it does not "sell" books or snippets or have paid advertisements on the accompanying pages. *Id*. at 291-92.  However, most Internet-based companies and services do not make money from direct sales or direct commercialization.  Many online businesses create value by drawing users to their services.  *See, e.g., Napster,* 239 F.3d at

---

[4] As the legislative history for Section 107 Provides:  "[T]he commercial or non-character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions.  H.R. REP. NO. 94-1476, at 66 (1976).

1015-16 (the fact that Napster users did not pay for the service did not negate its commercial nature).[5]  Google Books Search is no different.

As the *Napster* court stated, "[d]irect commercial benefit is not required to show commercial use."  239 F.3d at 1015.  Google derives direct economic benefit from Google Books by drawing users to Google and by using the texts of the works at issue to improve its search, analytics, and translation capabilities. Google's scanning of millions of books provided it with a market advantage that no other search engine or other entity will be able to match.  Google took advantage of a one-time deal, scanning the rich trove of scholarship in the country's major academic libraries, for commercial purposes.  The ancillary benefits to the public of its doing so should not tip the scales in favor of fair use.

There is nothing at all "fair" about a wealthy company taking millions of authors' works for free, depriving the authors of important licensing revenue, for its own commercial benefit.  Entities that produce or distribute educational textbooks, films and other educational works – or access to those works – are subject to copyright law; otherwise, there would be no market for them and they

---

[5] S*ee also* Alexandra Drury, Note, *How Internet Users' Identities are Being Tracked and Used*, 15 TUL. J. TECH. & INTELL. PROP. 219, 227 (2012) (citing Arjun Kulkarni, *How Does Facebook Make Money*, BUZZLE (Jan. 9, 2012)), http://www.buzzle.com/articles/how-does-facebook-make-money.html

would not get produced.  There is no reason why Google should get a special exception.[6]

## III.    THE DISTRICT COURT FAILED TO GIVE EACH OF THE OTHER STATUTORY FAIR USE FACTORS DUE CONSIDERATION AND WEIGHT

A fair use analysis should not begin and end with whether a court finds a use is "transformative."  Section 107 clearly requires courts to consider and weigh all four enumerated fair use factors.  No one factor – much less a judicially created subset of one factor – should be dispositive.  As the Supreme Court stated in *Campbell*, "[n]or may the four statutory factors be treated in isolation … All are to be explored, and the result, weighed together, in light of the statutory purposes of copyright."  *Campbell*, 510 U.S. at 577.  Further, "every fair use factor is to be considered as a subset of th[e] overall goal" of determining the limits of authors' rights so as to best serve the goals of copyright.  Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of Fair Use*, 13 Cardozo Arts & Ent. L.J. 19, 22 (1994).   The district court allowed its finding of publicly beneficial, transformative use to decide the case and, as described below, only summarily

---

[6] In addition, as noted above, Google provided exact copies of the works at issue to libraries, in a traditional commercial barter as consideration for access to the books—copies which the libraries have made use of and obtained value from.  *See HathiTrust*, 902 F. Supp. 2d at 448.  This was purely a commercial transaction.

14

considered the other three fair use factors and failed to give them full weight. This type of analysis threatens to lead to a fair use standard that looks solely at "transformative use," contrary to the Supreme Court's instructions in *Campbell*.

### A.   The District Court Failed to Adequately Analyze the Second Factor and So Erred in Holding that the Second Factor Weighed in Favor of Fair Use

The district court incorrectly minimized the importance of the second fair use factor—the nature of the work—and in doing so assumed that non-fiction works are not creative. Moreover, it generalized about the millions of works in question, analyzing them as if they were a single non-fiction, published work—ignoring the fact there are a variety of types of works at issue, including images and articles, as well as books, and erroneously concluding that all non-fiction works lack creativity and are entitled to less protection. All of these errors are problematic.

*First*, the district court noted that the second fair use factor "plays little role in the ultimate fair use determination." Op. at 292 n.4. Although, troublingly, other recent cases have made similar statements with respect to transformative uses, [7] there is no justification in the statute, the legislative history, or Supreme Court jurisprudence for ignoring the second factor. Section 107 clearly enumerates

---

[7] *See, e.g., Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).

four factors that need to be weighed; it treats all four the same and does not say that courts may disregard the second factor—even if a use is "transformative." *See* 17 U.S.C. § 107*; Campbell*, 510 U.S. at 578.

*Second*, the district court found that the majority of the works at issue are works of non-fiction, and therefore the corpus of works as a whole was entitled to less copyright protection than if it were comprised of a higher proportion of fictional works. *See* Op. at 292. The second fair use factor, however, looks toward the level of *creativity* inherent in a given work. *See Stewart v. Abend,* 495 U.S. 207, 237 (1990) (explaining that under the second factor a use is less likely fair if the copyrighted work is "a creative product," as opposed to "factual"). Whether a work is fiction or non-fiction is not necessarily determinative of whether a work is creative. Not all non-fiction works are non-creative, factual works. Some non-fiction works, such as pure news reports, product labels, and instruction manuals, are primarily fact-based and do not exhibit a high degree of creativity; but others, including scholarly and educational works, may be highly creative and expressive. Conversely, certain works of fiction, such as those written by a formula, may lack significant creativity.

A large number of the non-fiction works at issue in this case are scholarly works; such works are often highly creative and expressive. They do not report on facts like news, but analyze prior scholarship or facts and add to prior learning

16

through interpretation and expression. Much scholarship attempts to resolve issues and convincingly persuade readers of a point of view; they may provide clear and original expression, interpretation and advocacy. This requires a high degree of originality and expressive writing. Non-expressive writing, such as a mere report of facts or data, by contrast, does not. Library shelves are not filled with yellow pages, but highly expressive books created by talented authors.

By creating a dichotomy between non-fiction and fictional works, the court fundamentally misunderstood the purpose of the second fair use factor and the meaning of authorship and expression under the copyright law. Nonfiction works —such as scholarly works—were the very types of works the Founders had in mind when including copyright protection in the Constitution.[8] The Founders, like the colonial governments, which had enacted copyright laws, recognized the need to develop an American market for educational and informative works from which people could learn and spread knowledge and sought to do so by encouraging the production of works of authorship. *See Golan v. Holder*, 132 S. Ct. 873, 901 (2012) ("Many early colonial copyright statutes, patterned after the Statute of Anne, also stated that copyright's objective was to encourage authors to produce

---

[8] Indeed, the Constitution's Copyright Clause uses the term "Progress of Science" to refer to copyright. U.S. CONST. art. 1, § 8, cl. 8; *see also* Patrick Cronin, *The Historical Origins of the Conflict Between Copyright and the First Amendment*, 35 COLUM. J.L. & ARTS 221, 232 (2012) ("Public educators, not artists, were intended to be the primary beneficiaries of copyrights.")

new works and thereby improve learning.").[9]  The Copyright Act of 1790, the first federal copyright law, also was "[a]n Act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies."  Informative and educational works were precisely the kinds of works the Founders and first Congress sought to encourage for the public benefit.[10]

*Finally*, drawing a line in the sand between fiction and non-fiction based on a majority of works at issue cannot justify a finding of fair use when there are many diverse types of infringed works in suit.  The district court acknowledged that there are many different types of works at issue in this case.  *See* Op. at 285 ("All types of books are encompassed, including novels, biographies, children's books, reference works, textbooks, instruction manuals, treatises, dictionaries, cookbooks, poetry books, and memoirs.").  Even if non-fiction works represent the "vast majority of the books in Google Books" (Op. at 292), the number of fiction

---

[9] Fittingly, one of the major lobbyists for the initial U.S. copyright laws was Noah Webster, who wrote the first American grammar book and campaigned for copyright protection so he could earn money from his grammar book to support his family while writing the first American dictionary.  Joshua Kendall, *The Forgotten Founding Father: Noah Webster's Obsession and the Creation of an American Culture* 65-66, 93, 100-02 (2010); Horace E. Scudder, *Noah Webster, American Man of Letters* 55-64, 67-68 (1890); *see also* Craig W. Dallon, *Original Intent and the Copyright Clause: Eldred v. Ashcroft Gets It Right*, 50 St. Louis U. L.J. 307, 329 (2006).

[10] *Harper & Row, Inc.v. Nation Enterprises*, 471 U.S. 539, 545 ("copyright is intended to increase… the harvest of knowledge.").

works is still substantial.  Seven percent (Op. at 285) of many millions is still a big number.

Nowhere in the law is there any basis for treating all of a wide variety of works the same under the second factor – as though they all had the same degree of creativity—simply because so many works are at issue.  Categories of fiction and nonfiction works that are highly creative should be analyzed separately, in separate buckets,[11] not lumped together with less creative works.

### B.    The District Court Failed to Adequately Analyze the Third Factor and So Erred in Holding that the Third Factor Weighed Only Slightly Against Fair Use

The district court also provided only a very summary, dismissive analysis of the third factor.  In no more than a few words, the district court held that the "amount and substantiality" factor weighed only "slightly" against a finding of fair use on the grounds that scanning entire works was necessary for Google's full-text search capabilities, and because Google only displayed snippets in response to user-generated searches.  *See* Op. at 292.  This rationale is a red herring.  Snippet display is only a small piece of the whole picture of Google's use.

The district court plainly acknowledged that entire works were being digitized and copied.  Google copied, verbatim, millions of works, and gave

---

[11] *See Authors Guild v. Google, Inc*., 282 F.R.D. 384, 390 (S.D.N.Y. 2012) ("The Court could effectively assess the merits of the fair-use defense with respect to each of these categories [of books] without conducting an evaluation of each individual work.").

libraries free, exact digital copies (which was surely not transformative use). Further, Google makes wholesale use of the full works, not small portions, for its own internal benefit, to the detriment of rights holders.

First, as noted above, Google made complete copies of millions of books for libraries, in exchange for libraries granting Google access to the works for digitization. There is no indication in the law that libraries' acquisition of free, complete copies of its books from a third party is intended to be fair use. To the contrary, Section 108(c) of the Copyright Act, which provides an express exception for libraries and archives to make replacement copies of full books, allows only books that are "damaged, deteriorating, lost, or stolen" or in obsolete formats and includes important restrictions on libraries' replacement copying. 17 U.S.C. § 108(c) ("The right of reproduction under this section applies … solely for the purposes of replacement of a copy or phonorecord" if "an unused replacement cannot be obtained at a fair price" and a copy reproduced digitally "is not made available to the public in that format outside the premises of the library"). The district court's analysis upsets the careful balance sought be Congress between libraries' needs and avoiding unreasonable market harm.

Second, the fact that Google makes only portions of books available to the public at once does not negate the fact that whole works were copied and are being used or that, despite the variety of measures in place, 78% of the books' snippets

20

ultimately could be accessed through a series of searches.   (Op. at 286-87 (describing that one snippet per page and one page in ten are blacklisted and other restrictions); Appellant's Brief at 11.)   As a practical matter, this type of use may well serve as a substitute for a book for many research and other uses. When scholars or students use books for research purposes, they are often not reading them from beginning to end like a novel; rather, they refer to certain portions, which can easily be accomplished by accessing Google's snippets.   Google's use may significantly impact authors despite the fact that the entire work is not accessible at once.

Last, Google did in fact scan and use the entirety of the books for "non-display" purposes – to improve its search and translation capabilities.   But by focusing on the allegedly "transformative" nature of Google's snippets and its need to use entire works for the purportedly novel purposes of text search and data mining, the district court treats the third fair use factor as irrelevant.   While "the extent of permissible copying varies with the purpose and character of the use," it still must be considered.  *Campbell*, 510 F.2d at 586-87,

As with the other three factors, the amount of the work used should be evaluated on its own merits, and when a work is copied verbatim in its entirety, such complete copying should be weighed as one of the factors against a finding of fair use, even in cases – unlike here – where the use is truly transformative.  Fair

21

use was intended to apply primarily to *partial* uses (with some exceptions), and the third factor was intended to be a key part of the fair use analysis.  As a general rule, wholesale coping "militates against a finding of fair use." *Napster*, 239 F.2d at 1016 (citations omitted).   A whole taking should be found fair only if, when balanced together with the other factors, the magnitude of that taking is outweighed by the other factors.

### C.    The District Court Failed to Adequately Analyze the Fourth Factor and Erred in Holding that the Fourth Factor Weighed Strongly in Favor of Fair Use

The fourth fair use factor requires courts to look at "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107, and to determine "whether *unrestricted* and *widespread conduct* of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market." *Campbell*, 510 U.S. at 591 (emphasis added).  Here, the district court wrote these requirements out of its analysis, and considered the effect of only one of the uses at issue, snippet availability, on only one of several existing and potential markets for the works at issue, namely, the sale of "books."  Again, its inquiry under this factor was conclusory at best.

The district court wrongly concluded that the fourth fair use factor weighed "strongly" in favor of fair use, on the grounds that "Google does not sell its scans, and the scans do not replace the books."  Op. at 292-293.   First, as discussed

22

above, Google Books Search does not sell any product, nor must it for purposes of usurping a relevant market.  Second, as the Supreme Court has clearly instructed, the question is not merely the effect of Google's use, but the effects if the use were "unrestricted" and "widespread."   The court nevertheless disregarded existing, as well as potential markets and failed to consider the impact when the use is magnified.

Moreover, the district court ignored the fact that authors have a marketable right to digitize their copyrighted works; it is a core right of the copyright owner under the section 106 reproduction right, subject to the author's authorization.  17 U.S.C. § 106.  A fundamental aspect of the exclusive rights under copyright is the right to decide how and when to make one's works available.  *Harper & Row*, 471 U.S. at 552 (the Copyright Act of 1976 expressly recognizes "a right of first publication").  Some authors do not want their works digitized; they may fear the widespread piracy that inevitably comes with the availability of unsecured digital copies on the internet or have other concerns. *See Authors Guild v. Google, Inc*., 770 F. Supp. 2d 666, 681-82 (S.D.N.Y. 2011).

If uses such as Google's become "widespread" and "unrestricted," then widespread, uncontrolled piracy is a likely result.   Given that piracy can cannibalize an entire market, many authors and publishers are rightfully cautious about who may digitize and have access to unsecured digital copies of their works;

23

if perfect, unsecured, free copies become viral, paying markets for the works will eventually be devastated.  While Google may have the capability of providing secure storage and display, few others have those same resources; and yet there is nothing in the district court's analysis that would prevent an entity completely lacking secure technologies from making the same uses.

Furthermore, the district court takes an exceedingly narrow view of the markets at issue, considering only consumer markets for books.  The court focuses narrowly on the alleged promotional value of Google Books, and how it could provide a new way for authors' works to be discovered on forums such as online booksellers.  Op. at 293.  The problem with this analysis is that there is no evidence that Google Books ever steers readers to online sellers;[12] and, even if it did, it is the overall impact of the use that must be carefully considered, not whether, incidentally, it is possible the infringing use might steer a person here or there to a legitimate purchase and offset potential losses.

The district court's conclusory analysis of the fourth factor misses a much broader and more complex picture of the marketplace, including the ways Google Books Search usurps revenue streams from licensed excerpts and replacement

---

[12] *See Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary,* 113th Cong. (2014) (statement of Jan Constantine, General Counsel, The Authors Guild, Inc.).

books, including the lucrative excerpt market for books.  There is a significant market for licensed excerpts of scholarly works, particularly for educational and scholarly uses.  The Copyright Clearance Center, for instance, licenses excerpts of books around the world, serving over 35,000 companies.[13]  The excerpt market for scholarly works is particularly robust because teachers, students, and academics often do not need access entire works, from front to back, to fulfill their purposes.

Google's dissemination of snippets is a direct substitute for this market because Google Books allows users to search for and view snippets from books on topics they are researching.  As described above, if a user runs enough searches, she can access almost the entire book through snippets.  As a result, the targeted consumers of excerpts – scholars, teachers and students – get what they need for free.  Despite this clear market usurpation, the district court failed to even consider the existence of a robust excerpt market.

The relevant markets also include the library market for replacement copies. Libraries are a major market for many books, and represent a major source of

---

[13] The Copyright Clearance Center (CCC) is "a global rights broker for the world's most sought after materials – such as in- and out-of-print books, journals, newspapers, magazines, movies, television shows, images, blogs and ebooks – CCC makes it easy for businesses and academic institutions to use copyright-protected materials while compensating publishers and content creators for their works."  CCC offers customers the option to "republish an article, book excerpt or other content in your own books, journals, newsletters and other materials." *See* http://www.copyright.com/content/cc3/en.html.

revenue for authors.[14]    Indeed, the purpose of Section 108(c),[15] which allows libraries and archives to make replacement copies in only very particular circumstances, as described above, is to prevent libraries from making replacement copies at will, so as to protect this important revenue stream.[16]    Google's dissemination of full copies of millions of books replaces a significant market for these books because Google gave libraries free digital backup copies (in exchange for access to full works) of these books –copies that would have otherwise been purchased by those libraries. It is simply not true that "the scans do not replace books."  Op. at 292-93.

If Google Books is allowed to substitute its free content, under fair use, for the paid content offered by authors, publishers and their licensing agents, whether as trade books, replacement editions, or licensed excerpts, authors will not be able to continue to afford to create (unless subsidized by government or private entities).  As *amici* member Linda Butler, author of materials for teachers and students of English as a second language (and one of TAA's members), offers:

---

[14] "[W]e should not forget that intermediate institutions like schools and libraries are major markets for copyright owners and, therefore, major sources of copyrighted works for many consumers." Rebecca Tushnet, *My Library: Copyright and the Role of Institutions in A Peer-to-Peer World*, 53 UCLA L. Rev. 977, 981 (2006).

[15] 17 U.S.C. § 108(c).

[16] Mary Rasenberger & Chris Weston, *Overview of the Libraries and Archives Exception in the Copyright Act: Background, History, and Meaning*, at 17-21 (April            2005),            available            at: http://www.section108.gov/docs/108BACKGROUNDPAPER(final).pdf.

My concern derives from the fact that this is how I make my living, writing educational materials, including textbooks. If the materials I produce, once published, become available to library patrons to borrow (and copy) for free, then I can't afford to go on producing them. I'll have to spend my time earning a living in some other way. I have good reasons to believe that the textbooks I've written are valuable to teachers and students, so if I—and people like me—stop writing them, because we cannot afford to volunteer *years* of our time to creating them, that's a loss not just to me and my family, but to teachers and students as well. Who will provide the materials that help young teachers learn how to teach, help experienced teachers do their jobs effectively, and help students get the education they need?

One group cannot simply be allowed to take from creators and give works to the public for free with impunity. This undermines the very purpose of copyright law and ultimately of fair use. Yet this is exactly what the decision below promotes.

27

## **CONCLUSION**

For the reasons set forth above, and for those set forth in Appellants' brief,

*amici curiae* respectfully request that the decision below be reversed.

Dated:      New York, New York
              April 14, 2014

                             s/ Mary E. Rasenberger
                             Mary E. Rasenberger
                             Nancy E. Wolff
                             Eleanor M. Lackman
                             Scott J. Sholder
                             COWAN, DeBAETS, ABRAHAMS &
                             SHEPPARD LLP
                             41 Madison Avenue, 34th Floor
                             New York, New York 10010
                             Tel: (212) 974-7474

                             *Attorneys for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,802 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by Microsoft® Word 2007, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2007, Times New Roman, 14 point.

s/ Mary E. Rasenberger
Mary E. Rasenberger
*Attorneys for Amici Curiae*
Dated:  April 14, 2014

29

**Appendix**

———————————————

**APPENDIX**

———————————————

## DESCRIPTION AND INTEREST OF AMICI CURIAE

1.      American Photographic Artists (APA) is a trade association of more than 2,000 photographic professionals who promote professional practices, standards, and ethics in the photographic community.

2.      American Society of Media Photographers, Inc. (ASMP) represents the interests of professional photographers whose photographs are created for publication and has approximately 7,000 members.  It is the oldest and largest organization of its kind in the world.

3.      Graphic Artists Guild (GAG) is a national union of graphic artists dedicated to promoting and protecting the social, economic and professional interests of its members.  The Guild's members include graphic designers, Web designers, digital artists, illustrators, cartoonists, animators, art directors, surface designers and various combinations of these disciplines.

4.      Mystery Writers of America (MWA) , an association of mystery writers, was founded in 1945 and is an independent New York 501-c-3 corporation. We have about 2800  members, 1500 of whom are published mystery writers (both fiction and non fiction such as true crime). Many of our 1300 associated members are also published but not in our genre. In addition to the Edgars, which are the Oscar of the mystery writer, we provide courses on the craft and business of mystery writing.

5.      National Press Photographers Association, Inc. (NPPA) is an association of 9,500 news photographers and related professionals.

6.      National Writers Union (NWU) The NWU is a national amalgamated union (Local 1981) of the United Auto Workers, AFL-CIO. It is a labor union that advocates for freelance and contract writers. The NWU includes local chapters as well as at-large members nationwide and abroad. The NWU works to advance the economic conditions of writers in all genres, media, and formats. NWU membership includes, among others, book authors, journalists, business and technical writers, website and e-mail newsletter content providers, bloggers, poets, playwrights, editors, and academic writers.

7.     North American Nature Photography Association (NANPA) is a trade organization with approximately 2,300 members involved in all aspects of nature photography.

8.     Professional Photographers of America (PPA) represents more than 17,000 photographers and photographic artists from dozens of specialty areas including portrait, wedding, commercial, advertising and art.

9.     Romance Writers of America (RWA), founded in 1980,  is a non-profit trade association, with a membership of more than 10,000 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living, to make a full-time career out of writing romance—or a part-time one that generously supplements his/her main income.

10.     Society of Children's Book Writers and Illustrators (SCBWI) is a non-profit, 501(c)3 organization, is one of the largest existing organizations for writers and illustrators. It was founded in 1972 by Lin Oliver and Stephen Mooser.  It is the only professional organization specifically for those individuals writing and illustrating for children and young adults in the fields of children's literature, magazines, film, television, and multimedia.  Our mission is to support the creation

A-3

and availability of quality children's books around the world. We accomplish this by fostering a vibrant community of individuals who bring books for young readers to the public including writers, illustrators, editors, publishers, agents, librarians, educators, booksellers, bloggers, enthusiasts and others. We provide education and support for these individuals through our awards, grants, programs and events. We strive to increase the quality and quantity of children's books in the marketplace, and act as a consolidated voice for professional writers and illustrators worldwide.

11.    The Digital Media Licensing Association (PACA) membership is comprised of over 150 stock image libraries across the world that are engaged in licensing millions of images, illustrations, film clips and other content on behalf of thousands of individual creators.  As part of its mission, PACA actively advocates copyright protection and enforcement for its members.

12.    The National Association of Science Writers (NASW)  is a New York corporation and a non-profit organization.  Founded in 1934 and formally incorporated in 1955, NASW is an independent organization with approximately 2100 members.   The mission of NASW is to foster accurate information about science and science's role in society as well as to advance the professional interests of science writers.  NASW members write about all areas of science for all types of

A-4

print and online media, including books, magazines, newspapers, trade publications, scholarly publications, institutional publications, and children's and young adult publications. The membership includes freelance writers as well as employees of media outlets, universities, research organizations and other institutions. Approximately 800 of its members are book authors. NASW provides its members varied educational and professional development resources and opportunities through an annual conference, a quarterly magazine, a substantial website, and other activities.

13. The Songwriters Guild of America (SGA) is the nation's oldest and largest organization run exclusively by and for songwriters, with more than 5,000 members nationwide and over seventy-five years advocating for songwriters' rights. It is a voluntary association of songwriters, composers, and the estates of deceased members. SGA provides a variety of services to members, including contract advice, copyright renewal and termination filings, and royalty collection and auditing to ensure that members receive proper compensation for their creative efforts. SGA's efforts on behalf of all U.S. songwriters include advocacy before regulatory agencies and Congress, and participating as *amicus* in litigation of significance to the creators of the American canon of popular music.

14. Text and Academic Authors Association, Inc. (TAA) is the only non-profit membership association dedicated solely to assisting authors of scholarly

books, textbooks, and journal articles.  Formed in 1987, the TAA has over 2,000 members, primarily consisting of authors or aspiring authors of scholarly books, textbooks, and academic articles.  Many of the TAA's members serve on college or university faculties.  The TAA's mission is to support textbook and academic authors in the creation of top-quality educational and scholarly works that stimulate the love of learning and foster the pursuit of knowledge."

15.    Western Writers of America, Inc. is the oldest non-profit membership association dedicated solely to promoting literature of the American West. Formed in 1953, WWA has more than 650 members who live and work in the United States and abroad, primarily consisting of authors of scholarly books, textbooks, popular history, biographies, memoirs, essays, encyclopedias and other reference works, dictionaries, cookbooks, novels, screenplays and television scripts, and popular and academic articles. Our members also write poetry, songs, and multi-media scripts all related to the American West and early frontier. WWA members create original books and materials that appeal to multi-generational readers, from very young readers to adults. The WWA mission is to further the appreciation of Western American literature and history and in preserving Western Americana through the written word.