# 13-4829-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs,*

—against—

GOOGLE, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR AUTHORS MALCOLM GLADWELL, J.M. COETZEE, MICHAEL POLLAN, MARGARET ATWOOD,  PETER CAREY, KAREN RUSSELL, URSULA LE GUIN, RON LARSON, THOMAS KENEALLY, TAYLOR BRANCH, TRACY CHEVALIER, LAWRENCE HILL, MICHAEL FRAYN, DIANE MCWHORTER, ROBERT CHRISTOPHERSON, TRACY KIDDER AND YANN MARTEL AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

GLORIA C. PHARES
CHRISTOPHER M. STRONG
HOFFMANN MARSHALL STRONG LLP
116 West 23rd Street, Suite 500
New York, New York 10011
(212) 851-8403

*Attorneys for Amici Curiae Authors*

## CORPORATE DISCLOSURE STATEMENT

Each of the *amici curiae* is a natural person and is not a nongovernmental corporation.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

IDENTITY AND INTEREST OF THE AMICI CURIAE ...................................... 1

STATEMENT OF RELEVANT FACTS................................................................ 7

ARGUMENT .....................................................................................................11

GOOLGE'S COPYING OF BOOKS TO CREATE A VAST
DATABASE OF BOOKS AND ITS DISTRIBUTION OF
COPIES OF THOSE BOOKS ARE NOT A FAIR USE ............................................11

A.     Google's Vast Unauthorized Copying and
    Reproduction of Authors' Copyrighted Works
    Do Not Justify the Harm to Authors…................................................14

    1.     Google's Library Project, Founded on
        Contracts to Make Millions of Unauthorized
        Copies, is Not Justified. ...........................................................14

    2.     Google's Distribution to the Libraries of Digital
        Copies of All the Books it Copies Is Not a Fair Use.............17

    3.     The Utility of a Full-Text Search Function
        Does Not Justify Copying Over 20 Million Books..............20

    4.     Google's "Use is of a Commercial Nature."........................22

B.     The District Court Gave Short Shrift to
    the Nature of the Copyrighted Works…........................................24

C.     Google Copies and Maintains Books in Its Book
    Database That It Does Not Use in the Library Project..................25

D.     Google's Conduct Harms Authors. .................................................. 27

i

E.    Google Cannot Justify its Use of
Copyrighted Works in the Library Project. ....................................30

CONCLUSION ................................................................................................32

## TABLE OF AUTHORITIES

Page

**<u>Cases</u>**

*American Geophysical Union v. Texaco, Inc.*,
37 F.3d 881 (2d Cir. 1994)........................................................................................12

*Authors Guild, Inc. v. Google, Inc.*,
954 F. Supp. 2d, 282 (S.D.N.Y. 2013) ..........................................................10, 23-24, 28

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ............................................................................... 13, 23

*Blanch v. Koons,* 467 F.3d 248 (2d Cir. 2006) ............................................................23

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
*150* F.3d 132 (2d Cir. 1998) ......................................................................................23

*Diversey v. Schmidly,* 738 F.3d 1196 (10th Cir. 2013) ................................................18

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ...........................................13

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
118 F.3d 199 (4th Cir. 1997) ....................................................................................18

*Kelly v. Arriba Soft Corp.,* 336 F.3d 811 (9th Cir. 2003) ............................................16

*Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146
(9th Cir. 2007).........................................................................................................16

*Salinger v. Colting*, 607 F.3d 88 (2010)......................................................................13

*Sony Corporation of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ................................................................................................12

## Statutes

17 U.S.C. §106 ................................................................................. 7

17 U.S.C. §106(3) ...........................................................................18

17 U.S.C. §107 ......................................................................... 11, 16

## Other Authorities

Edwin G. Burrows and Mike Wallace, *Gotham,*
*A History of New York City to 1898* (Oxford U. Press 1999) ....................................21

Richard Dannay, *Factorless Fair Use? Was Melville Nimmer Right?*,
60 J. Copyright Soc. of the U.S.A., 127 (2003)....................................................13

Richard Dannay, *Copyright Injunctions and Fair Use:*
*Enter eBay–Four-Factor Fatigue or Four-Factor Freedom?*,
55 J. Copyright Soc. of the U.S.A 449 (2008)....................................................13

Gallica Experiment:  Offering Copyrighted Digital Documents,
(available at http://www.bnf.fr/en/collections_and_
services/digital_libraries_gallica/a.gallica_experimentation_
digital_offer.html) ...................................................................................28

Georgetown Law Library's Guide to Legal History Databases
(available at https://www.law.georgetown.edu/library/
research/guides/legalHistory.cfm) .............................................................20

Google, Inc., Form 10-K , submitted to the Securities and Exchange
Commission for the Fiscal Year Ending Dec. 31, 2013,
(available at https://investor.google.com/pdf/
20131231_google_10K.pdf)..........................................................7, 8, 14, 22-23

Google, Inc. Information regarding the Library Project
available at http://books.google.com/intl/en-US/
googlebooks/publisher_library.html#options4 ............................................20

Google Inc. Opposition to Author Guild's Motion for Summary
Judgment [Doc. 1072] ............................................................................17

Google, Inc. Procedure for Excluding Books from Scanning,
(available at https://support.google.com/books/partner/
answer/3365282?hl-en&ref_topic_3396243) ............................................................19

Google, Inc. Procedure for Not Displaying Scanned Books,
available at https://support.google.com/books/partner/
answer/2520009.......................................................................................................19

Peter S. Menell, *In Search of Copyright's Lost Ark:
Interpreting the Right to Distribute in the Internet Age*,
59 J. Copyright Soc. of the U.S.A. 1 (2011).........................................................18

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*............................12, 18

Readers Guide to Periodical Literature, (H.W. Wilson (available
at http://www.hwwilsoninprint.com/periodicals.php)...........................................20

University of Connecticut Law Library's List of Legal Periodical
Indexes (U.S. and foreign) (available at http://library.law.
uconn.edu/research-resources/legal-periodical-indexes) ......................................21

## IDENTITY AND INTEREST OF THE AMICI CURIAE

The *amici* are American and foreign authors and copyright owners of bestselling works ranging from short stories to historical nonfiction to calculus textbooks to fantasy and science fiction novels.[1]  Works authored by the *amici* have won nearly every major literary prize, including the Nobel Prize in Literature, multiple Pulitzer Prizes and Booker Prizes.

Under the balance set by Congress under the Copyright Act, and with limited exceptions, no one can exercise any of the Section 106 rights without prior permission from the author.  Technological advances are challenging this balance.  The development of the ability to create digital copies and the proliferation of search engines and file sharing on the internet have introduced new concerns for authors:  the problem of controlling unauthorized digital copies of works and the associated problem of unauthorized distribution and display of those digital copies.  In addition to

---

[1]    This brief was authored entirely by counsel for *amici curiae*.  No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.  The Textbook and Academic Authors Association, an organization to which some amici curiae belong, contributed money to partially fund the preparation of this brief.

Counsel for both parties have consented in writing to the filing of this brief.

widespread copyright infringement, the unchecked mass digitization of written works interferes with an author's legitimate exploitation of works in new electronic formats and jeopardizes an author's reputation by making widely available earlier editions of works, such as textbooks, that have been updated and superseded.  These concerns—and whether the balance set by Congress in the Copyright Act is being irreparably disrupted—are paramount to any consideration of Google's Library Project.  All the *amici curiae* share an interest that authors' copyrights be protected from a for-profit company's unjustified commercial uses.

Malcolm Gladwell, a staff writer at the New Yorker, is the author of five bestselling books, including the nonfiction works *The Tipping Point*, *Blink*, and *Outliers*.  Mr. Gladwell has been named one of the 100 most influential people by TIME magazine.

J.M. Coetzee is the recipient of the 2003 Nobel Prize in Literature. A native of South Africa and now an Australian national, Mr. Coetzee is a playwright and novelist, including *Life & Times of Michael K* and *Disgrace*, both of which won the Booker Prize.  Mr. Coetzee has held a number of positions at universities in the United States, South Africa, and Australia.

Michael Pollan is the author of five New York Times bestsellers, including *The Omnivore's Dilemma*, which was named one of the ten best

books of 2006 by both the New York Times and the Washington Post, won the

California Book Award, the Northern California Book Award, and the James

Beard Award. Mr. Pollan is a journalism professor at the University of

California.

Margaret Atwood, a founder of the Writers' Union of Canada, is

the author of essays, poetry, short-stories and novels. Her novel *The Blind

Assassin* won the Booker Prize in 2000, and Ms. Atwood has received

countless other awards and honors. Her 2008 Massey Lecture series,

*Payback: Debt and the Shadow Side of Wealth* was adapted into the

documentary film *Payback*.

Peter Carey, an Australian, is one of only three writers to have

received the Booker Prize twice—for *Oscar and Lucinda* and *The True History

of the Kelly Gang.* Mr. Carey has won Australia's Miles Franklin Award three

times, the Commonwealth Writers' Prize twice, and the Prix du Meilleur Livre

Étranger. He has taught creative writing at several American universities, and

currently directs the MFA program in creative writing at Hunter College.

Karen Russell was named a Pulitzer Finalist for her first novel,

*Swamplandia!*, which was included in the New York Times's 10 Best Books of

2011. Ms. Russell was chosen as one of Granta's Best Young American

Novelists in 2007, and was named one of the best 20 under 40 writers by The

3

New Yorker.  In 2013, she received a MacArthur Fellowship.  Her short fiction has appeared in The New Yorker, Granta, Oxford American, Zoetrope and Conjunctions.

Ursula Le Guin, fiction writer and poet, is one of the world's most respected authors of imaginative writing.  She has received many honors and awards, including twenty-one Locus Awards, four Nebula Awards, two Hugo Awards, and the PEN/Malamud Award for short fiction.  In April 2000, the U.S. Library of Congress recognized Ms. Le Guin as a "Living Legend" for her significant contributions to America's cultural heritage.

Millions of students from middle school through graduate school rely on Ron Larson's algebra, trigonometry, and calculus textbooks.  Dr. Larson has published more than 400 books, including the first completely interactive online calculus textbook.  Mr. Larson is a professor at Pennsylvania State Erie, and his textbooks have won countless awards for pedagogy, innovation, and design.

Thomas Keneally is an Australian writer of novels and non-fiction with an international publishing record and reputation.  He is best known for writing *Schindler's Ark*, the Booker Prize-winning novel of 1982, later adapted to become the Oscar-winning movie, *Schindler's List*.

Taylor Branch is a historian, whose works include a three-volume narrative history of the civil rights era, *America in the King Years*.  The trilogy's first book, *Parting the Waters:  America in the King Years, 1954-63*, won the Pulitzer Prize.  Mr. Branch has received lifetime achievement awards from the Dayton Literary Peace Prize and the Anisfield-Wolf Book Awards.

Tracy Chevalier is an author of seven historical novels, including *Girl with a Pearl Earring*, is a Fellow of the Royal Society of Literature, and the recipient of honorary doctorates from Oberlin College and the University of East Anglia.

Lawrence Hill, a Canadian novelist and memoirist, is the author of nine books, including *The Book of Negroes* (published in the United States as *Someone Knows My Name*), which won the Rogers Writers' Trust Fiction Prize and the Commonwealth Writers Prize for Best Book.  Mr. Hill's 2013 Massey Lectures were drawn from his non-fiction book *Blood:  the Stuff of Life*.

Michael Frayn is an English novelist, translator, memoirist, nonfiction author and Tony Award winning playwright (for *Copenhagen*, in 2000).  His novels have won countless honors, including the Somerset Maugham Award, the Whitbread Novel Award, and the Commonwealth Writers Prize.  Mr. Frayn's plays also include *Noises Off* and *Democracy*.

Diane McWhorter, an author and journalist, won the Pulitzer Prize for General Nonfiction, the J. Anthony Lukas Book Prize, and many other awards for her book *Carry Me Home: Birmingham, Alabama, the Climactic Battle of the Civil Rights Revolution*.  She is a regular contributor to The New York Times and USA Today.

Robert Christopherson is the author of the leading physical-geography textbooks in the US and Canada, which since their 1992 publication have been used by millions of geography students in 39 countries in English and in translation.  Mr. Christopherson taught geography for thirty years at American River College.

Tracy Kidder won the Pulitzer Prize for General Nonfiction and the National Book Award for his book *The Soul of a New Machine*, which describes the race to design the next-generation of computers.  Mr. Kidder also has written short fiction, essays and articles for publications including The Atlantic, The New Yorker, The New York Times, and Granta.

Yann Martel is a Canadian author of novels and short stories.  His novel *Life of Pi* won the 2002 Booker Prize, was an international bestseller, and was adapted into a blockbuster movie.  In 2005 Martel was a visiting scholar at the University of Saskatchewan.

6

## STATEMENT OF RELEVANT FACTS

The *amici curiae*, U.S. and foreign, are the authors ("Authors") of works that are in copyright and were first published in the United States or in Berne Convention countries.  Some of the Authors' works are not currently in print, which does not mean they are not in copyright or that the Authors' rights in those works are diminished in any way.  The Authors are entitled to all of the rights granted to an author under 17 U.S.C. §106 ("Section 106").

Google is a for-profit company that is currently valued at over $350,000,000,000.  Google does not generate its own books of history, fiction, poetry, or other expressive works of authorship.  (Google 10-K at 3[2])  Google has assembled its massive wealth "primarily by delivering relevant, cost-effective online advertising." (*Id.*)  Its "business is primarily focused around the following key areas:  search and display advertising, the Android operating system platform, consumer content through Google Play, enterprise, commerce and hardware products." (*Id.*)  Google acknowledges that its search function "continues to evolve and improve as more information comes online,

---

[2]    "Google 10-K" refers to Google's Form 10-K submitted to the Securities and Exchange Commission for the period ending December 2013, available at https://investor.google. com/pdf/131231_google_10K.pdf.

and as people increasingly look to their mobile devices for answers throughout the day." (*Id.* at 4.)

One way that Google has "evolve[d]" is by increasing the volume of information it makes available online—and thereby improving its search function—by copying over 20 million books that it obtained from several research libraries, and by displaying digital copies of these books through Google Books.

There are two parts of the Google Books Program: (1) the Partners Program, where an author's Publisher has licensed Google to include the full text of designated portions of specified works in the search results, while also maintaining a full copy in the Google book database; use of copies of works provided to Google under the Partners Program is governed by contractual restrictions between Google and rightsholders;[3] and (2) the Library Project, where Google has not received permission from any rightsholder of a work, but still copies the work and returns searches on the internet in a form that Google calls a "snippet," which it defines as approximately 1/8 of a page. (A1616-1617 at ¶¶ 43-45.) Google has nowhere stated that it will not ever revise its current definition of a "snippet" to include

---

[3]     Some of the Authors' works are in the Partners Program.

8

a larger portion of a page's text.  Only the Library Project is at issue in this case.

Google's desire to build a national database of books was matched by the desire of many university libraries to digitize the volumes in their collections, a time-consuming and very costly process.  To achieve the goals of both Google and the libraries, they entered into agreements in which each library agreed to make the books in its collections available to Google for copying.  Some libraries allowed Google to copy only public domain works.  Other libraries allowed Google to scan books in copyright.  (*See, e.g.*, A593-604.)  As part of the consideration for that access (Google also offered indemnities), Google agreed to provide to each library digital copies of all the books that that library had provided to Google—i.e., unauthorized digital copies of millions of books in copyright.  (A1618-19 at ¶¶ 53-54.)

Libraries have no right to authorize the copying of the physical copies of works in their collections that are still in copyright, unless they also own the copyrights.  Google, similarly, has no right to reproduce and distribute to the libraries digital copies of works that it was not authorized to copy in the first place.

After Google scans a book, it applies optical character recognition technology (OCR) to produce a machine-readable text.  (A1622 at ¶ 62.)  The

result is not the kind of well-organized book index included in copyright-protected non-fiction works identifying names, places, concepts, subjects, etc. and directing the reader to a location in the book. Google's full-text search identifies words or phrases, but there is no selectivity or ability to search by topics or concepts.

Google says that it does not display any text of a work that, because of its brevity, might appear completely in the snippet display-format. This excludes works such as encyclopedias, almanacs, dictionaries, thesauri, trivia books, books of quotations, bibliographies, poetry books, sheet music, pricing guides, travel guides, joke books, recipe books, catalogs, and indexes. *Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282, 285 (S.D.N.Y. 2013). But having decided not to include these works in the search results, there is no evidence that Google deletes the original scans from its own database, and no explanation for why it is necessary for Google to retain unauthorized copies of those books if they are not used for readers and researchers.

Google "generated 91% of its revenues from [its] advertisers in 2013[,]" amounting to $46,025,980,000 in advertising revenues (Google 10K at 9, 27, 28.) Google does not currently display advertising on the specific "About a Book" pages of the Library Project (but it does display advertising on search results that link to these pages), but Google does not represent that it

10

never will display advertising on those pages.  Google also does not provide

any insight about how the Authors' works and the countless other copyrighted

materials in the Library Project will be used in the future.

## ARGUMENT

### GOOGLE'S COPYING OF BOOKS TO CREATE A VAST DATABASE OF BOOKS AND ITS DISTRIBUTION OF COPIES OF THOSE BOOKS ARE NOT A FAIR USE

When a for-profit organization worth hundreds of billions of

dollars, which depends on evolving forms of advertising to return a profit for

its investors, sets out to copy every book both in and out of copyright, invests

the kinds of money necessary to do so, and then rolls out its project without

making representations concerning how it will use these copies in the future,

a more searching examination is required than a rote application of the four

fair-use factors set out in 17 U.S.C. § 107.  A fair use by definition does not

require a copyright owner's prior approval.  But when the creation of a

massive digital library is required for the fair use, it is incumbent on this Court

to consider whether any interpretation of fair use has ever approved

unauthorized copying (and subsequent distribution) on such a massive scale

and whether approving such a scheme destroys the appropriate balance

between fair use and the rights of a copyright owner.

Twenty years ago, Judge Newman noted his concern that photocopying "creates a pressing need for the law 'to strike an appropriate balance between the authors' interest in preserving the integrity of copyright, and the public's right to enjoy the benefits that photocopying technology offers.'" *American Geophysical Union v. Texaco Inc.*, 37 F.3d 881, 885 (2d Cir. 1994) (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05 [E][1] at 13-226 ["Nimmer on Copyright"] and citing Justice Blackmun's dissent in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 467-68 n.16 (1984)).  Even then Judge Newman was skeptical about applying the mechanical photocopying process to the traditional fair use analysis developed to "adjust the competing interest of authors—the author of the original copyrighted work and the author of the secondary work that 'copies' a portion of the original work in the course of producing what is claimed to be a new work."  Photocopying, he observed, "is not concerned with creative authorship."  37 F.3d at 886.

Nor is the process of scanning a book and converting the scan to machine readable text concerned with creative authorship.  But if *Sony* requires this Court to apply the common law (now statutory) doctrine of fair use to the facts of this case, a more apt formulation of the inquiry might be whether "[i]n light of the purposes of copyright law and the public interest, is

12

there sufficient justification for the use to outweigh the copyright owner's interests in prohibiting the use or at least in being compensated for that use, if an injunction is not warranted."[4]  This does not mean the Court ignores the four factors, the preamble purposes, transformativeness, and other important considerations, but it focuses the inquiry on whether the ultimate goal justifies the inroads on the copyright owner's interests.[5]

Applied here, the question is whether Google, a for-profit company that profits commercially from the Library Project, has advanced sufficient justification for digitizing and making searchable over 20 million books and providing to the contributing libraries digital copies of those books that outweighs the copyright owner's right to prohibit those uses or, where an injunction would be judged inappropriate, being compensated for the use.

---

[4]    Richard Dannay, *Factorless Fair Use?  Was Melville Nimmer Right?*, 60 J. Copyright Soc. of the U.S.A. 127, 144, 148 (2013) ("Factorless Fair Use?").  This formulation also takes account of the holdings of *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006), and *Salinger v. Colting*, 607 F.3d 88 (2010), and, when applied in the fair-use context, could result in damages, not an injunction.  Richard Dannay, *Copyright Injunctions and Fair Use:  Enter eBay— Four-Factor Fatigue or Four-Factor Freedom?*, 55 J. Copyright Soc. of the U.S.A. 449, 456-60 (2008).

[5]    *See* Factorless Fair Use?, *supra*, n.4 at 144, 148.

13

A. **Google's Vast Unauthorized Copying and Reproduction of Authors' Copyrighted Works Do Not Justify the Harm to Authors.**

1. Google's Library Project, Founded on Contracts to Make Millions of <u>Unauthorized Copies, is Not Justified.</u>

The first fair-use factor asks the Court to examine the purpose and character of the use.  The district court was persuaded by Google's message that it is providing an apparently philanthropic service that permits researchers to use the Google Library Project to find books that justifies its copying of over 20 million books, many of them in copyright.  But helping people find books and data mining are not *Google's* reason for digitizing more than 20 million books:  that may be how those researchers use the Library Project, but as Google candidly admits, that is not its principal purpose.

Google's purpose is to sustain its economic growth, which depends upon the continued acquisition of more "information," because it attracts more people to its site increasing Google's value and making it more successful than its competitors (Google 10-K at 3, 4).  A project aimed at copying all the books in as many libraries as possible and making those copies available to the public for search—whether the authors of these books like it or not—is an ideal way of achieving that goal.

While Google does not currently offer advertising on the specific "About a Books" page, it does include advertising on search results that link to this page, and nothing guarantees that Google will not change its advertising model in the future or that Google will share advertising income fairly with the copyright owners whose works have driven that additional income to Google's bottom line. Authors should not be forced to be vigilant about Google's "next move" and to bring another case if those events occur; that would be a gross distortion of the statutory assumption that a user of a copyrighted work must seek permission in advance.

What undermines Google's fair use claim is that the entire project is founded on agreements that create unauthorized copies of copyrighted works. In exchange for access to books for copying—which the universities were not authorized to give—Google distributed to the universities digital copies of all the books copied from their collections—which Google was not authorized to do. The result of this transaction was the copying of over 20 million books without the permission of any copyright owner and the distribution to the libraries of digital copies that were not critical to Google's Library Project. Those digital copies were Google's payment for the extensive access it was given to copy the libraries' books, a kind of rental fee. That rental fee for the books was not a transformative use as that term has been

15

interpreted under Section 107.  In addition, that reproduction and distribution deprived authors of potential royalties for the copying of their books.[6]

It is not accurate for Google to say that the Library Project permits readers and researchers to "find" books to purchase, because many of the works in the Library project are very old and have not been available for sale for centuries.  Many other books are not for sale because they are out-of-print. Old and out-of-print books can be "identified," and some of them may be "found" on a used-book site, but as a practical matter, the only place they are "found" is in a library.  Nascent licensing of out-of-print books dried up when Google's preemptive, extensive, and royalty-free copying drove it away.

---

[6]    The facts of *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007), *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), and *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609-11 (2d Cir. 2006), on which the district court relied, are not comparable to the facts of this case.  Instead of textual works, all three cases involved visual images, which cannot be identified unless displayed in full.  To diminish the harm to the copyright owners of the images, all required the display of images in reduced size—"thumbnail images" online or reduced sizes on paper— sufficient to identify the work but without retaining full-size images once the thumbnails were created.  In addition, Amazon.com and Arriba Soft did not retain copies in their databases.  *Kelly*, 336 F.3d at 815; *Perfect 10*, 508 F.3d at 1156-57.

2.    Google's Distribution to the Libraries of Digital
       Copies of All the Books it Copied Is Not a Fair Use.

Even if Google were able to advance a justification for the massive unauthorized copying it claims is required for searching, that exception cannot apply to Google's creation of unauthorized digital copies, which it then distributed to libraries as in-kind payment for access to the books. Google acknowledged the force of this argument when it argued before the District Court that distribution to a library of digital copies of the books from that library was not a distribution under Section 106. (Google Opp. to AG's MSJ [Doc. 1072] at 13-14.)

Google created the Google Return Interface (GRIN) for the purpose of distributing digital copies to libraries. Through GRIN, Google makes available for downloading the digital copies made from the books that it rented from a library, and the library can then download the digital version. Because the library downloads the copy, Google claims that it has not reproduced or distributed the copy. However after the download, the library owns both the physical paper book and a digital copy of the book. It owns one more copy of a "book" than it owned before its agreement with Google.

17

Google's theory is not supported by the case law or the legislative history.[7] The Court should reject this elevation of form over reality.

Other evidence supports the conclusion that Google was more concerned with acquiring more "information" to sustain its dominant position in the search business and avoiding an infringement claim than with creating a philanthropic service for readers and scholars. Google apparently believed that displaying works in copyright in full text as part of its search function would be infringing, because it took steps to display those works only in "snippets," to return only three snippets per search from each work, and to black out certain snippets and pages of a book.

---

[7] Google's argument is no different from those made and rejected in two cases involving libraries: *Diversey v. Schmidly*, 738 F.3d 1196, 1202 (10th Cir. 2013) (placing unpublished dissertation on library shelves available to the public was an unauthorized distribution to the public); *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997) (holding that a library distributes a published work when it places an unauthorized copy of the work in its collection, includes the work's title in its catalog or index system, and makes the copy available to the public); 2 Nimmer on Copyright § 8.11[B][4][d] at 8-154.10 (2013) ("No consummated act of actual distribution need be demonstrated . . . to implicate the copyright owner's distribution right."); *see* Peter S. Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in the Internet Age*, 59 J. Copyright Soc. of the U.S.A. 1, 56-58 (2011) (analyzing the legislative history of the distribution right, §106(3), and concluding that it was intended to include "*offers* to distribute" previously included in the 1909 Copyright Act's rights to publish and vend (emphasis in original)).

Google also excluded whole categories of works, such as poetry, travel guides, encyclopedias, trivia books, indexes, etc. Yet, despite excluding them from all displays to users, Google does not delete copies of these works from its database. It provides no explanation why it maintains unauthorized copies of copyrighted works whose display in the Library Project would be infringing, and it makes no promises about what it may do with these copies in the future. The irony is that Google's decision results in the exclusion of "indexes," even though most professionally prepared indexes would often provide more utility to readers and researchers than the word searches Google offers.

Google offers copyright owners (although not prominently or very clearly) procedures for excluding their works from scanning as part of the Library program[8] or for not displaying at all books that have been scanned[9] by submitting a form that includes a list of all works that should not be scanned. This turns on its head the usual procedure by which a party seeking to exercise Section 106 rights seeks the consent of the copyright owner in advance. Instead, the burden is placed upon the copyright owner, who may

---

[8]    https://support.google.com/books/partner/answer/3365282?hl-en&ref_topic_3396243.

[9]    https://support.google.com/books/partner/answer/2520009.

not even be aware of the conduct until long after it occurs. Even if a copyright

owner follows the procedure for excluding a scanned book, Google does not

agree to remove it from Google's database.  An earlier version of Google's

support pages states that "We're happy to remove your book *from our search*

*results* at any time,"[10] leaving the clear implication that the work remains in

Google's database.

### 3. The Utility of a Full-Text Search Function Does Not Justify Copying Over 20 Million Books.

Google campaigns for the utility of its full-text word searches,

which return thousands of word or phrases, by comparing them to the library

catalogue MARC cards prepared by librarians, which provide bibliographic

and limited indexing information.  But this comparison overlooks the many

professional and more sophisticated indices and guides to books, newspapers,

literature, and journals—none that involves widespread copyright

infringement—on which readers and researchers have relied for decades

before the arrival of Google's Library Project (and still do).[11]

---

[10]    http://books.google.com/intl/en-US/googlebooks/publisher_library.
html#options4 (emphasis added).
[11]    *See, e.g.*, Readers Guide to Periodical Literature, (H.W. Wilson (available
at http://www.hwwilsoninprint.com/periodicals.php)); Georgetown Law
Library's Guide to Legal History Databases (available at https://www.law.
georgetown.edu/library/research/).

The examples Google offered the district court to show the alleged superiority of its full-text search mechanism are contrived.  It observes that the Library of Congress card catalogue has no entry for the search term, "500 Pearl Street" and using the word-search in the Library Project leads to information about a particular Chinese factory owner on the site in the late 19th century.  But a search in that same catalogue for "New York City/history" would turn up a reference to *Gotham, A History of New York City to 1898* by Edwin G. Burrows and Mike Wallace, which won the 1999 Pulitzer Prize for History.  The book has an extensive index, including a long entry for "Pearl Street," and references to the expansion of the Chinese community into the Pearl Street area.

Much of the claimed utility of the Library Project concerns the ability to search and discover ancient or otherwise long-forgotten texts.  If making such books available to the public was Google's true goal, it could have worked with libraries to scan only books in the public domain, which includes anything published before 1923.  This approach—which Google rejected—

---

guides/legalHistory.cfm), including indexes to several foreign and domestic newspapers; and the University of Connecticut Law Library's List of Legal Periodical Indexes (U.S. and foreign), including the Index to Legal Periodicals 1908-1981 (available at http://library.law.uconn.edu/research-resources/legal-periodical-indexes).

would have permitted Google to create a vast database of works while respecting the rights of copyright owners.  Instead, Google copied *all books* as a way to maximize its profitability, and chose to display works in copyright in "snippets," thereby sacrificing utility in an ill-fated attempt to avoid infringement claims.

### 4.  Google's "Use is of a Commercial Nature."

Addressing the question of whether Google's use is of a commercial nature, the district court acknowledged that "Google does, of course, benefit commercially in the sense that users are drawn to the Google websites by the ability to search [the more than 20 million] Google Books." 954 F. Supp. 2d at 292-93.  This is exactly what Google describes as the principal source of its income.  Despite that admission, the district court adopted verbatim Google's argument that it "does not engage in the direct commercialization of copyrighted works," apparently because Google does not include advertising on the specific "About a Book" pages of its website.  In other words, because Google has found a way to market this particular search function as a philanthropic benefit for the public, it claims that it is not commercializing copyrighted works.  This Court should not be distracted by Google's marketing message.

22

Of course Google benefits commercially from the addition of copies of over 20 million books to its search database.  As it explained to the SEC (Google 10-K at 3-4), the addition of additional "information" to its search database is what attracts more and more people to Google—and its advertising.  And even if Google does not currently include advertising on its "About a Book" pages, the search results that link to these results are full of paid advertising,

Further supporting its conclusion about the commercial nature of Google's use, the district court relied on this Court's observation that "fair use has been found even where a defendant benefitted commercially from the unlicensed use of copyrighted works," (954 F. Supp. 2d at 291), relying on *Blanch v. Koons*, 467 F.3d 244, 248, 258 (2d Cir. 2006) (defendant used only the image of a woman's leg from plaintiff's photograph, which she had never licensed, in a new work of art); *Bill Graham Archives*, 448 F.3d at 607, 609 (in a 480-page pictorial biography of the Grateful Dead band, publisher included for historical context reduced images of seven posters advertising the band's concerts); and *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142, 145 (2d Cir. 1998) (finding defendant's use of fictional facts from the *Seinfeld* TV show in a trivia-book repacked plaintiff's work for the same audience and preempted plaintiff's creation of a similar trivia book).  The

23

commercial character of the defendants' uses in none of these cases compares with Google's use of multiple copies of over 20 million books, without authorization or payment, to provide additional "information" for its multi-billion dollar search engine business. The district court's suggestion that Google's commercial interest is not "direct" is insupportable; but even if "indirect," the commercial benefit to Google is so overwhelming that it should result in a finding of commercial use.

Even if the Court concludes that Google's Library Project offers a useful online search mechanism, Google's enormous income from the addition of tens of millions of books to its search database and its unauthorized distribution to the contributing libraries of digital copies of the books as payment for the books' rental do not justify the uncompensated use of so many copyrighted books. The first fair-use factor does not favor Google.

### B. The District Court Gave Short Shrift to the Nature of the Copyrighted Works.

The district court acknowledged that Google has copied all kinds of books—fiction, non-fiction, children's books, cookbooks, etc. Then, because the court concluded that the "vast majority of the books in Google Books [not the Library Project] are non-fiction" (954 F. Supp. 2d at 24), it concluded that

the second factor favored fair use.  This analysis of the value of non-fiction

works is disturbing.

That non-fiction books include facts and ideas does not mean that

a non-fiction work does not also include extensive creative, moving,

persuasive, and enlightening expression that is every bit as copyrightable as is

a fictional work.  The district court's dismissal of fact works would have been

legitimate had an almanac been at issue, but it is not justified when the works

Google copied included a wide variety of expressive non-fiction works.

The district court also took no account at all of the presence of

fictional works in Google's Library Project.  Even accepting the district court's

finding about the high percentage (93%) of non-fiction works in the Library

Project, this still means that the other 7% of works Google copied amount to

nearly 1.5 million fictional works, yet the district court made no mention of

them in its analysis of factor two.  Before this factor can be weighed with the

others, it requires a more searching examination.

### C.    Google Copies and Maintains Books in its Book Database That It Does Not Use in the Library Project.

The district court concluded that the third fair-use factor—the

amount and substantiality of the portion used in relation to the copyrighted

work as a whole—weighed slightly in favor of fair use based on the fact that

full-text searching depends on copying the full text and that Google limits the

amount of text it displays in response to a search.  This presumably referred

to Google's display of snippets for works that are in copyright.

The district court did not explain why the display of snippets of

text justified copying an entire work and maintaining it in Google's database.

The district court also completely ignored examples of Google's policy of

copying and maintaining in its database copies of works that it does not use at

all—the certain categories of works Google excludes from display because

they are short and could be revealed completely in a snippet.  Even though

these works are not revealed to any researcher or reader, Google still copies

and maintains copies of them in its database.  Similarly, if an author

successfully manages to complete the papers necessary to exclude a scanned

work from the Library Project, Google does not exclude the work from its

database; it simply excludes it from the search results. (*See* links at nn. 8-10,

*supra*.)  Nor did Google exclude any works from the copies it made and

distributed to the libraries as payment for the original loan of the books.

The third fair-use factor is supposed to examine whether a second

user has used more of the first work than was necessary to achieve its alleged

fair use.  Google does not explain, and the district court ignored, why Google's

copying far exceeds its needs for its alleged fair use, as well as Google's unnecessary distribution of millions of books to its library partners.

### D.    Google's Conduct Harms Authors.

The district court's analysis of the fourth factor focused on the possibility that the Library Project will help readers locate a book, which could then lead to a purchase of the book and an economic benefit to the author.  But this assumption ignores the many ways that books can be located without resorting to widespread copyright infringement. (*See* pp. 20-21 & n.11, *supra*.)  This assumption also ignores the fact that most of the copyright-protected books in the Library Project are out of print and not available for sale.  By including, without compensation, millions of books in its database that are not readily available for purchase, Google increased the performance of its search results, but it did not benefit authors.  It also interfered with the developing licensing market for out-of-print books because Google forced those licensees out of the market when it began copying without paying licensing fees.  (A1299-1301.)

Due to the dominant position it has achieved in the marketplace, Google has left little room for authors and publishers to develop partnerships and licensing opportunities of their own.  The clearest example of Google's actions leading to an economic loss for authors is Google's decision to provide

libraries with complete digital copies of the books Google scans. The district court wrongly implies that libraries are entitled to make copies of books they own (954 F. Supp. 2d at 293), and thus ignored these lost sales. Because Google provides these copies to libraries (as payment from Google for the right to copy the books in the first place), libraries have no incentive to purchase or license digital copies of the books from the copyright owners, such as through print-on-demand programs or other programs that allow authors to sell or license out-of-print books.

In contrast to the model of allowing a for-profit company to digitize millions of books for its own gain, many libraries and non-profits outside the United States have worked with authors and publishers to make digital copies of books available online. These efforts—such as the Gallica project which has made over 1,600,000 documents and 320,000 books in French available online through the National Library of France—have been accomplished while respecting national copyright laws. *See* www.bnf.fr/en/ collections_and_services/digital_libraries_gallica/a.gallica_experimentation_di gital_offer.html.

The district court also ignored the threat to authors posed by the potential loss of the digital copies of books Google distributed to libraries. 954 F. Supp. 2d at 287. While Google may be confident of its own ability to

secure copies of books on its servers, no evidence supports that conclusion for Google's library partners.  A security breach of Google or its library partners could result in the distribution of electronic copies of millions of copyrighted books, thereby destroying the market for electronic copies of these works.  Authors should have at least the right to participate in the oversight of procedures to provide security and prevent theft and piracy of their works.

The district court did not consider other adverse consequences of Google's Library Project.  When Google copies and displays numerous prior editions of books that are frequently updated, such as textbooks, Google can mislead its users—and harm the reputation of authors—by presenting information that is stale or no longer accurate.  In addition, using so many authors' works as the subject of free, online searching may have the effect of fostering the belief (if it has not done so already) that these works are or should be available for free.  While this may be an unintended consequence of the general availability of material on the internet, Google's very prominent Books Program, which it promotes as a public good (despite Google's financial rewards) gives rise to an assumption of an entitlement to free access to copyrighted works.

The district court considered none of these issues, undermining its conclusion that the fourth fair-use factor favors Google.

### E.    Google Cannot Justify its Use of Works in the Library Project.

To decide this case, the Court must consider all the many factors that weigh on either side of the equation to determine whether Google has borne its burden of showing that its use of copyrighted works as part of the Library Project is justified.[12]  Google (and the district court) often confuse the works that are at stake by referring to "Google Books," which includes works in the Partners Program.

On one side of that balance is Google's claim that its Library Project helps users identify and locate books.  This Court must consider whether the public benefit such a project may have is justified by the harm to copyright owners if Google's Library Project is sanctioned as a fair use.

On the other side of the equation is the following:  (1) Google, one of the largest technology companies in the world, has made unauthorized copies of millions of books for its own commercial benefit.  (2) Without authority to do so, Google has distributed unauthorized digital copies to each

---

[12]    This balancing does not involve any of the works in the Partners Program, which are governed by contract.  At issue here are copyrighted works that Google displays in snippets, works Google has decided to exclude because it deems the works too short to be displayed even as snippets, and works excluded by authors who have directed Google to remove their works from the Library Project.  But these millions of "excluded" works remain in Google's book database.

library of all the books it received from those libraries, disavowing by contract any responsibility for the libraries' uses of those unauthorized copies (A601 at ¶10.1). (3) The mere presence of Google's royalty-free program has destroyed potential licensing opportunities for authors. (4) The creation of millions of digitized copies for itself and the libraries has created security risks concerning the control of those digital copies. (5) Google's display of text disembodied from its original context devalues the original works and fuels the notion that creative works are commodities available for other uses. And (6), despite being a company that has created enormous wealth by developing new ways to deliver advertising to users, Google has made no representations about how it will seek to profit further from the vast database of copyrighted works it has created.

Given this unequal balance of competing factors, Google cannot justify its mammoth Library Project.

This Court should not fall victim to Google's attempt to avoid the limits of the law by presenting the broader "Books Program" as a fait accompli that is too big to fail. No example of fair use allows the degree of copying undertaken by Google. The Library Project is not the type of creative authorship the fair use doctrine was designed to protect, and the district

31

court's effort to stretch the fair use doctrine beyond its limits should not be

sustained.

## CONCLUSION

For the foregoing reasons, the district court's order granting

summary judgment in favor of Google should be reversed.

New York, New York
April 14, 2014

Respectfully submitted,


s/ Gloria C. Phares
Gloria C. Phares
Christopher M. Strong

HOFFMANN MARSHALL STRONG LLP
116 West 23rd Street, Suite 500
New York, NY 10011
(646) 741-4503

*Attorneys for Amici Curiae Authors*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), it contains 6959 words as measured by the word-processing system used to prepare the brief (Microsoft Word); and

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface,14-point Cambria.


_____/s/ Gloria C. Phares_____
Gloria C. Phares

*Attorneys for Amici Curiae Authors*

Dated: April 14, 2014