# 13-4829-cv

## United States Court of Appeals

*for the*

## Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH
GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of
all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL
COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER,
INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually
and on behalf of all others similarly situated,

*Plaintiffs,*

— v. —

GOOGLE, INC.

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICUS CURIAE* INTERNATIONAL AUTHORS FORUM
IN SUPPORT OF APPELLANTS**

DAVID B. SUNSHINE
*Attorney for Amicus Curiae*
277 Park Avenue
New York, New York 10172
(212) 883-4900

# **Rule 26.1 Disclosure Statement**

The International Authors Forum ("IAF") is a private company, limited by guarantee, incorporated on April 19, 2013 under the United Kingdom Companies Act 2006 with its registered office in England and Wales. IAF has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

ARGUMENT ..................................................................................................2

I.      Introduction................................................................................3

II.     One work, not millions ..............................................................3

III.    The purported benefits of the Library Project and Google Books .................4

    A.      Generally .........................................................................4

    B.      Facilitating access by visually impaired persons .................5

IV.     The four factors of fair use .......................................................6

    A.      Purpose and character of use............................................7

    B.      Nature of copyright works................................................7

    C.      Amount and substantiality of portion used .......................9

    D.      Effect of use upon potential market or value ...................10

V.      Detriment to the author..............................................................11

VI.     Conclusion ...............................................................................12

CERTIFICATE OF COMPLIANCE...................................................14

CERTIFICATE OF SERVICE ...........................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berman v. Parker*,
348 US 26 (1954) ........................................................................6

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ....................................................................9

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F. 3d 121 (2d Cir. 2008) ....................................................11

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985) (Brennan, J., dissenting) ........................8, 9, 10

*Maxtone-Graham v. Burtchaell*,
803 F.2d 1253 (2d Cir. 1986) ....................................................9

*New Era Publications Int'l. v. Carol Pub. Group*,
904 F. 2d 152 (2d Cir. 1990) ....................................................8

*Ringgold v. Black Entertainment Television, Inc.*,
126 F. 3d 70 (2d Cir. 1997) ....................................................11

**Statutes**

17 U.S.C. § 106(1) ....................................................................11

17 U. S. C. § 106 & 107 ............................................................3

17 U.S.C. §107 ....................................................................3, 10

17 U.S.C. §121(1) ................................................................5, 6

**Other Authorities**

Fed. R. App. P. 32(a)(5) ............................................................14

Fed. R. App. P. 32(a)(6) ............................................................14

Fed. R. App. P. 32(a)(7)(B) ....................................................................14

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................14

# INTEREST OF *AMICUS CURIAE*[1]

The International Authors Forum ("IAF") is a private company, limited by guarantee, incorporated on April 19, 2013 under the United Kingdom Companies Act 2006 with its registered office in England and Wales.

IAF is a worldwide forum for organizations dedicated to the protection and advancement of authors' rights.  Its stated goals are to:

- Provide authors' organizations worldwide with an international platform to exchange information, develop positions and provide support in authors' rights matters;

- Advocate the author's role in society, pointing out the importance of creation for cultural diversity and the economic value which authors create;

- Promote and defend authors' interests and authors' rights including both moral and economic rights;

- Actively work in favor of balanced contractual legislation that guarantees fair practices for authors and ensures that authors retain their economic and moral rights against buyouts and other unfair practices;

- Promote the benefits of authors' rights in general and of collective management in particular in order to ensure that authors always receive fair and equitable remuneration whenever their works are exploited by third parties.

---

[1]No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that IAF paid the costs and expenses involved in filing this brief.

As of March 2014, IAF had 28 member organizations from around the world including countries in North America, Europe, Africa and Australasia. A list of member organizations is set out at ADD-1. IAF has also had interest in membership and attendance at its meetings from organizations from countries in Asia and South America.

IAF is a global organization representing authors and their interests. The litigation between the Plaintiffs and the Defendant will define the rights of millions of authors worldwide, many of whom will be members or affiliates of IAF's members. IAF has a significant interest in the outcome of the litigation.

This brief is supported by the International Federation of Reproduction Rights Organisations ("IFRRO"). IFRRO and its 143 member organizations worldwide represent millions of authors and publishers, and work to increase the lawful use of text- and image-based copyright works and to eliminate unauthorized copying, by promoting efficient collective rights management through Reproduction Rights Organizations to complement authors', publishers' and other right holders' own activities. A letter confirming IFRRO's support is attached at ADD-2.

All parties have consented to the filing of this brief.

# ARGUMENT

*"The super adding of ingenuity to robbery does not make the operation justifiable."* Lord Justice Bowen - Wenham Gas Co Ltd v Champion Gas Lamp Co (1892) 9 RPC 49 at 56, English Court of Appeal.

2

## I.    <u>Introduction</u>

IAF supports the Authors Guild's ("AG") appeal against the judgment of the District Court where it granted Google's motion for summary judgment on the issue of fair use and dismissed AG's motion for summary judgment.

## II.    <u>One work, not millions</u>

The District Court erred by effectively treating the Library Project as a single, collective entity, rather than individual books to be analyzed on their own.

Copyright protects a single work.  Questions of infringement and with them questions of fair use are wrapped up with that discrete unit.

<u>17 U.S.C. §107</u> is expressed in terms of fair use of a copyrighted work.  The special cases exception under Article 9 of the <u>Berne Convention</u> requires that "such reproduction does not conflict with a normal exploitation of <u>the work</u> and does not unreasonably prejudice the legitimate interests of <u>the author</u>" (emphasis added).  Article 10(2) of the <u>WIPO Copyright Treaty</u>, provides that limitations or exceptions to rights under the <u>Berne Convention</u> should be confined to special cases that do not conflict with a normal exploitation of <u>the work</u> and do not unreasonably prejudice the legitimate interests of <u>the author</u>."

Unless Google establishes that its acts are fair use in relation to each work, then those acts infringe.  *See, e.g.*, 17 U. S. C. § 106 & 107.

That Google has aggregated numerous works together should not absolve it from liability.  Otherwise, where does it stop?  Does infringement become fair use when two works are taken?  Three?  Ten thousand?  One million?  Looking away from Google for a moment, can it really be right that a prolific file-sharer would have a better defense to copyright infringement than someone who shared one file once?  The answer should be no.

## III.   The purported benefits of the Library Project and Google Books

### A.   Generally

The District Court erred in considering the Library Project and Google Books almost interchangeably.  Moreover, it erred in not separating the infringing works from the non-infringing works.  The background to Google's activities is set out in the judgment of the District Court.  In short, Google Books is a project to digitize books and convert them into computer readable text via optical character recognition technology.  The computer-readable text is indexed to allow searching via Google's search engine.  Content from the books is displayed in response to keyword searches, subject to certain limitations as set out in the judgment.  Google Books comprises the Library Project, where the books supplied by partner libraries, and the Partner Program, where books are supplied by rights holders with their consent.  The Library Project itself comprises both public domain works and works subject to copyright protection.

When looking at the benefits of Google Books and the Library Project, the District Court did not take into account the effect of removing in-copyright works from the Library Project.  If that occurred, Google Books and the public domain Library Project would:

(1)    remain an essential research tool;

(2)    continue to make the process of interlibrary lending more efficient;

(3)    continue to facilitate finding and checking citations;

(4)    remain an important tool for researchers and librarians;

(5)    continue to permit humanities scholars to analysis massive amounts of data;

(6)     continue to permit researchers to analyze word frequencies, syntactic patterns and thematic markers to consider how literary style has changed over time;

(7)     continue to expand access to books;

(8)     continue to facilitate the identification and access of materials for remote and underfunded libraries;

(9)     continue to help the preservation of books; and

(10)    continue to benefit authors and publishers <u>who wish to use the service and give their consent</u>.

While true that the Library Project would have fewer books available, the number would still run into the millions.

It cannot be right that Google can deprive the author of a single work of his exclusive rights simply by pointing at a huge mass of works and saying essentially: when compared to that substantial group of works , the individual work is not significant; it is meta-data.  On the contrary, the work *is* significant to the author. It matters.

## B.     <u>Facilitating access by visually impaired persons</u>

Nobody would deny that it is a commendable goal to ensure that visually impaired people and those with print disabilities have access to books.  Indeed legislatures and governments around the world have made express provision for making accessible copies available without infringing copyright.

The United States has made such provision at <u>17 U.S.C. §121(1)</u>.  The United States is also a signatory to the <u>Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise</u>

Print Disabled which contains similar provisions.  There are 2 mandatory features of the §121(1) limitation and like provisions under the Marrakesh Treaty:

(1)     The copies must be exclusively for use by blind or other persons with disabilities;

(2)     The limitation applies only to an authorized entity, defined as "a non-profit organization or governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."

Google's use of the works at issue is not exclusively limited for use by blind or other persons with disabilities.  Google is not a non-profit organization or government agency and its primary mission is not the  mission required by and described in the legislation.

When considering the fair use limitation, it is not appropriate to consider factors where the legislature has already make adequate provision.  *Cf. Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation.").  In doing so, the District Court erred.

## IV.     **The four factors of fair use**

When viewed from the perspective of a single work, the District Court's analysis is not sustainable.

6

### A. <u>Purpose and character of use</u>

A single book cannot be mined for useful data. It cannot be transformed into anything other than an electronic format of itself. The speed and power of computers today makes a search index for a single book a waste of time and space. When considering the purpose and character of use, the District Court's error of aggregating millions of works together is most conspicuous. The cumulative effect of millions of infringements may create new information but each individual does not. The question of fair use should not be judged by the audacity of the infringer.

Moreover, substantive research in the form of data mining and text analysis does not require the entire corpus of the written word to be mined and analyzed. The Partner Program and the public domain Library Project works number millions of texts, all available for those purposes without infringing anybody's copyright.

The character of the use should be assessed by looking at the use itself. If a user of Google's blog service were to scan, convert by optical character recognition, and upload the text of book in copyright to his blog, the book would become searchable and mineable and would accrue all the other attributes associated with electronic publication. It would still unquestionably infringe the rights holder's copyright; it could not be characterized as fair use.

For those reasons, the District Court erred when it concluded that the first fair use factor strongly favored a finding of fair use.

### B. <u>Nature of copyright works</u>

In its analysis of the nature of the copyright works, the District Court again erred by starting its analysis from the point of view that those works could treated as an amorphous mass. The nature of a copyright work depends upon the work itself, not the company it keeps.

In the Judge's analysis, he referred to the fact that the works are books. The mere fact that a work is a book cannot be either for or against a finding of fair use. It is entirely neutral.

The Judge also recognized a distinction between fiction and non-fiction works. But that does not mean use of a non-fiction work is fair use, merely because the work is non-fiction. *See e.g., New Era Publications Int'l. v. Carol Pub. Group*, 904 F. 2d 152, 158 (2d Cir. 1990) (noting that "creation of a nonfiction work, even a compilation of pure fact, entails originality" deserving of copyright protection) (internal punctuation and quotation marks omitted) (citations omitted).

The District Court also failed to analyze works of fiction and non-fiction separately. Can it be right that a fiction author be denied his rights because the infringer takes a mass of non-fiction at the same time? The answer must be no.

Moreover, the District Court did not analyze in any detail the distinction between published and unpublished works. It may be correct that the distinction is important in considering fair use. But merely because a work is published is not a good enough reason by itself to say its appropriation is fair use. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 597 (1985) (Brennan, J., dissenting) (disagreeing with majority's reliance on prepublication-post publication dichotomy and noting case law wherein the Court held that "the fair use inquiry could never be resolved on the basis of such a "two dimensional" categorical approach"). Otherwise, copyright would be defeated entirely; authors would not bother to publish and the arts and sciences would be deprived of their contribution.

8

The effect of the District Court analysis can be summed up as follows: if a work is a non-fiction book which has been published, there is a presumption towards finding fair use. That cannot be justified on its face. *See id*. When fiction or unpublished works are caught in the same net, merely by their proximity, the conclusion is self-evidently wrong.

### C.   <u>Amount and substantiality of portion used</u>

Under this heading, the District Court concluded that the factor weighed slightly against a finding of fair use. The finding that the Library Project was treated as a single, collective entity, rather than individual books to be analyzed on their own, seriously understated the use that Google is making of the individual works.

The District Court made that finding against the context of Google's necessary reproduction of the full work in order to offer full text search. The District Court's reasoning is flawed. The fact that something is necessary to an infringement does not mean the infringement becomes fair use. Amount and substantiality do not necessarily dictate a finding of fair use where the other fair use factors militate against such a finding. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) ("There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use"). Returning to the scenario of a file sharer, his activities do not become legitimate simply because it is necessary to offer a whole work for download.

Google's limit to the amount of text displayed in response to a search may be a partial answer to the "amount" prong of the factor but not to the "substantiality" prong. What is substantial imports a qualitative and quantitative assessment that must be performed on a case-by-case basis. *See, e.g. Campbell v.*

*Acuff-Rose Music, Inc.,* 510 U.S. 569, 586-589 (1994) (discussing how, when evaluating the substantiality prong of the fair use test, "context is everything"). The final chapter of the Harry Potter series might be said to be more substantial than some other chapters.  The face in a portrait painting might have more value than a section of the background.  These are points that can be analyzed only on a case-by-case basis.  *Harper & Row*, 471 U.S. at 559 ("Section 107 requires a case-by-case determination whether a particular use is fair").

> **D.    Effect of use upon potential market or value**

Once again, the District Court viewed the case through the incorrect lens. When it held that a reasonable fact finder could only find that Google Books enhances the sales of books to the benefit of copyright holders, he was considering the mass of copyright works Google had misappropriated and not individual works.

The reason the rights of a copyright holder are exclusive are to give him the freedom of choice of how, when, and whether to exploit his or her work.  *See Harper & Row,* 471 U.S. at 554-55.  If a copyright holder is satisfied that Google Books is a good way to commercialize his work, then he has the right to enroll it into the Partner Program.  On the other hand, if he is not satisfied, he should have the same right to choose not to participate.  That some rights holders might find an advantage is irrelevant since they  can choose to join the Partner Program if they choose.  One person's rights should not be deprived so others can benefit, especially when the beneficiaries can make that choice anyway.  It is an entirely unnecessary infringement.

In finding that the fourth factor weighed strongly in favor of fair use, the District Court started from the wrong point and came to the wrong conclusion.

## V.    Detriment to the author

An author is entitled to the benefits of his work.  The most obvious economic benefit to an author of course comes from royalties on the sale of books. *See Ringgold v. Black Entertainment Television, Inc.*, 126 F. 3d 70, 73 (2d Cir. 1997) ("[E]xclusive rights normally give a copyright owner the right to seek royalties from others who wish to use the copyrighted work.") (citations omitted). It should be up to the copyright owner how those rights are exploited.  Google's use, coupled with the nebulous promise of increased sales from links, is something that should be the owner's choice.

The benefits do not end with book sales.  A writer may be able to exploit his work if a movie is based upon it for example.

In many cases, a writer can obtain an income stream from reproduction of his work by others, an income stream that is expressly protected by the copyright laws.  *See, e.g., Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F. 3d 121, 126 (2d Cir. 2008) (highlighting and discussing the copyright holder's exclusive right "to reproduce the copyrighted work in copies" under 17 U.S.C. § 106(1)). The photocopying of substantial portions of a book requires the author's permission and he is entitled to withhold permission if he wishes to prevent that kind of reproduction.  *See Id*.  On a practical level, an individual author would find it difficult to enforce those rights on a global basis since he simply would not have the resources to monitor, let alone police, every photocopier in the world.

Fortunately, in most countries, there are licensing arrangements that deal with the issue.  Many of these arrangements are provided by, for example, members of IAF and IFRRO.  For modest license fees, an institution can reproduce

copyright works, within specified limits, without worrying about infringing copyright.  The license fees are then distributed to authors and publishers.

For many authors, these license fees are a crucial source of income.  This might be particularly true for writers of academic and educational works for whom license income has been proven to be critical to the process of creating new material.  A user of that work might not be able to justify purchasing the whole book.  But under a licensing system the author can confidently use the sections in which his interest lies without worrying about infringement.  The author and publisher benefit, the user benefits, society benefits.

These licensing arrangements demonstrably provide a pragmatic balance between the rights of copyright holders and society's need to advance the arts and sciences.

The Google Library Program has the potential to bypass these licensing systems, causing considerable detriment to authors and publishers and, in turn, reducing the pool of content available to users.

## VI.    Conclusion

The District Court's reasoning was flawed because it started from the wrong point and erred in considering critical points in the analysis.  Had it correctly analyzed the factors from the correct starting point of looking at a single work, it could only have concluded that the case in favor of infringement and against fair use was overwhelming.

Ultimately, the issue comes down to this: an author asked about why he wrote what he did may give many answers.  He may say that it was a labor of love.  He may say that it was to make a living.  He may say many things.  But what he

will not say is that he wrote his book so it could be subsumed into a corporate meta-database optimized for searching.

Talk of snippets and data-mining are sideshows to the real issue: Google's clever infringement scheme deprives authors and publishers of their rights. It deprives them of income and exclusivity. It conflicts with the normal exploitation of the books and unreasonably prejudice the legitimate interests of the authors.

The mere fact that Google's infringement scheme is clever should not make it permissible under the law.

Dated: April 14, 2014                    Respectfully submitted,

                                         s/ David B. Sunshine
                                         David B. Sunshine
                                         COZEN O'CONNOR
                                         277 Park Avenue
                                         New York, New York 10172
                                         (212) 883-4900

                                         *Attorneys for Amicus Curiae*
                                         *International Authors Forum*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because based on the word count of the word-processing system used to prepare the brief (Microsoft Word), this brief contains 3,245 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

s/ David B. Sunshine

*Attorneys for Amicus Curiae*
*International Authors Forum*

# CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ David B. Sunshine

*Attorneys for Amicus Curiae*
*International Authors Forum*

# ADDENDUM

# IAF Members

Academic and Non-fiction Authors' Association of South Africa (ANFASA), South Africa

American Society of Media Photographers, USA

Association of Swedish Illustrators and Graphic Designers, Sweden

Authors' Licensing & Collecting Society Ltd, UK

BUS Visual Arts Copyright Society in Sweden

Design and Artists Copyright Society (DACS)

European Council of Literary Translators' Associations (CEATL), Europe

Graphic Artists Guild, USA

Malawi Writers Union, Malawi

MISZJE, Hungarian Literary Collecting Society

Platform Makers, The Netherlands

Society of Authors, UK

The Authors Guild, USA

The Finnish Association of Non-fiction Writers

The Writers' Union of Canada

Union des écrivaines et des écrivains québécois (UNEQ), Canada

National Writers Union, USA

Pictoright, The Netherlands

Authors Coalition of America, USA

Australian Society of Authors, Australia

Science Fiction and Fantasy Writers of America, USA

Text and Academic Authors Association, USA

Pyramide, Europe

Writers' Guild of Great Britain, UK

Tanzania Writers Association, Tanzania

American Photographic Artists, Inc.

Initiative Urheberrecht, Germany

Artists Rights Society, USA



International
Federation of
Reproduction
Rights
Organisations

Rue Joseph II, 9-13
B-1000 Brussels
Belgium

PRESIDENT
Rainer JUST

CHIEF EXECUTIVE & SECRETARY GENERAL
Olav STOKKMO

Mr Owen Atkinson
IAF Steering Committee
International Authors Forum
The Writers' House
13 Haydon Street
London, EC3N 1DB
United Kingdom

Brussels, 27 March 2014

**IFRRO LETTER OF SUPPORT TO IAF'S *AMICUS CURIAE* BRIEF IN THE CASE *THE AUTHORS GUILD ET AL V. GOOGLE INC.***

Dear Owen,

We refer to your letter of 25 March 2014 and are pleased to confirm herewith that, in the case *The Authors Guild vs. Google Inc.*, IFRRO supports the filing of an *amicus curiae* brief by the International Authors Forum (IAF).

The International Federation of Reproduction Rights Organisations (IFRRO), based in Brussels, and its 143 member organisations worldwide, representing millions of authors and publishers, work to increase the lawful use of text- and image-based copyright works and to eliminate unauthorised copying, by promoting efficient collective rights management through Reproduction Rights Organisations (RROs) to complement authors', publishers' and other rightholders' own activities. IFRRO has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Yours sincerely,

Olav Stokkmo
Chief Executive and Secretary General

IFRRO AISBL • RPM Bruxelles N° D'ENTERPRISE 464622872
PHONE +32 2 234 62 60 FAX +32 2 234 62 69 EMAIL secretariat@ifrro.org        ifrro.org

**ADD-2**

Case: 13-4829   Document: 77   Page: 24   04/14/2014   1201761   80

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

IN THE COURT OF APPEAL.

*Before* LORDS JUSTICES LINDLEY, BOWEN, AND FRY.
November 6th and 7th, 1891.

THE WENHAM GAS COMPANY, LIMITED *v.* THE CHAMPION GAS LAMP
5                      COMPANY.

*Patent.—Action for infringement.—Combination.—Subordinate integers.—
Infringement denied.—Alleged want of novelty.—Alleged anticipation.—Alleged
want of subject-matter.—Construction of Specification.—Pith and marrow of
invention taken.*
10   The owners of a patent for an improved lamp brought an action for
*infringement. The Plaintiffs claimed in their Specification a combination and
subordinate parts. The Defendants denied infringement and alleged the
invalidity of the patent on the grounds of want of novelty and of anticipation,
and also by amendment at the trial, on the ground that the invention was not
15 of such a meritorious character as to be patentable. Previously to the date of
the Plaintiffs' invention S. had published the importance of bringing heated air
to an incandescent flame, and of heating the gas before it reached the burner.*
*There were differences between the Plaintiffs' lamp and that of the Defendants,
and the Plaintiffs had recently used a burner different from that described in*
20 *their Specification, and more like the Defendants' burner.*
*Held on the evidence that the Defendants' lamp was not materially different
from the Plaintiffs', the difference between the two having not been put to the
witnesses, but only pointed out by counsel in argument; secondly, that no
anticipation was shown of the whole combination or the subordinate parts*
25 *claimed; thirdly, that the Plaintiffs' combination, consisting of old and new
elements, was a combination arriving at an old result by new means, and was
meritorious and useful. Judgment was given for the Plaintiffs.*
*The Defendants appealed.*
*Held, that (1) the Plaintiffs' invention was a method of bringing a supply of*
30 *heated air to a particular point, the middle, of the flame, by which they obtained
an improved result, and in a secondary degree of the addition of a cooling
current of air round the lamp, and that the invention was good subject-matter,
and had not been anticipated; (2) that the Defendants had taken the pith and
marrow of the invention, it being immaterial that they might have made*
35 *improvements.*
*Appeal dismissed with costs.*
On the 1st of July 1881 (a patent No. 2869 of 1881) was granted to *Frank
William Clark* for "Improvements in railway carriage, street, and other gas
lamps or lanterns." The Specification was amended on the 14th of December
40 1886, and again on the 6th of February 1888, and as so amended stated as
follows (the recent amendments being shown in erased and italic type):
" This Invention relates to an improved construction of railway carriage, street
" and other gas lamps or lanterns where heated air is introduced in sufficient
" quantities to supply the flame or flames so as to produce more perfect com-
45 " bustion than hitherto, the quantity of heated air introduced being easily
" regulated according to the quality and quantity of the gas to be consumed; by
" my improved construction of lamp, the gas to be burned is itself also heated
" before it reaches the point of ignition. A suitable arrangement for carrying
" out my invention is as follows :—The lamp or lantern body is formed of a
50 " suitable case to which I adapt two concentric tubes of suitable section with a
" space between them; the inner tube which forms the chimney for carrying
" off the products of combustion extends above and below (or only above) the
" outer tube, which serves for the inlet of the air into chambers formed by the

H

ADD-3

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

" body of the lamp and the hereinbefore described tubes, and suitably closed;
" from these chambers the air previously heated in its passage between the
" two tubes and case or body is conveyed to the gas burner or burners or gas
" flame or flames, the said hot air passing either outside or inside the gas flame
" or flames as required.  The gas is supplied to the burner or burners by a    5
" coiled pipe within the said chamber or between the two tubes so that the gas
" also becomes heated in its passage through the coil to the burner or
" burners.  Instead of the arrangement hereinbefore described it will be
" evident that the inner tube may be arranged to serve for the air inlet and
" the space between the two tubes for the chimney. . . . . . .    10
" The action of the improved lamp is as follows: ."The gas entering
" through the inlet pipe *t*, passes into the coil *u*, and thence to the burner
" by the pipe *w*; upon the gas being ignited a draught is formed in the
" chimney, and the air will enter the lamp through the inlets *k*, and *j*,
" and will pass into the chambers *f*, and *h*; the air which passes through the    15
" chamber *f*, becomes heated in its passage and passes in the heated state to
" the flame through the tubes *x*, *x*; the air from the chamber *h*, passes
" through the opening *y*, and round the glass *b*, and under the reflector *g*, and
" serves to keep the glass *b*, and reflector *g*, from becoming too hot, the said
" air itself thereby becoming warmed before it reaches the flame.  From this    20
" construction and arrangement of lamp it will be understood that the gas
" before it reaches the burner will be heated by passing through the coil in the
" hot air chamber *f*, and the air for the combustion being also heated, a more
" economical light will be obtained.  In cases where it is required to enrich
" the gas before it passes to the burner, it may be caused to pass through a    25
" suitable carburetter, conveniently placed in the hot air chamber *f*.  In figures
" 5 and 6 of the drawing I have shown the arrangement of lamp I prefer to
" adopt when the inner concentric tube serves for the air inlet, a lamp of this
" construction being specially suited for use as a street lamp.  *a*, is the lamp
" body; *b*, the glass; *c*, the cover; *d* and *e*, the concentric tubes; *g*, the    30
" reflector; *h*, the chamber formed by the lamp body *a*, and the outer tube *e*;
" *i*, cover to same; *j*, *j*, air inlets; *k*, *k*, the air inlets in the outer tube *c*; *u*, is
" the gas supply pipe which I use in this arrangement instead of a coil as
" hereinbefore described; between the inner tube *d*, and the gas pipe *u*, I
" provide an additional pipe *d¹*, the space between the two tubes forming the    35
" chimney, and the space between the tube *d¹*, and the gas pipe *u*, forming the
" heated air chamber corresponding with the chamber *f*, in the arrangement
" hereinbefore described, and shown in Figures 1 to 4.  In this arrangement
" a ring, or ~~an argand or other suitable burner or burners~~ *v*, *circular burner*
" *of the kind shown in the drawing and marked v*, may be employed; *e¹*, is an    40
" earthenware or metal continuation of the tube *d¹*, such tube *e¹*, being per-
" forated if found desirable for causing a portion of the heated air to be more
" equally supplied to the interior surface of the flame.  The action of this lamp
" will be understood without further description it being substantially the
" same as that of the lamp hereinbefore described and shewn in Figures 1 to 4.    45
" The arrows shew the direction of the passage of the air which as will be seen
" by the arrows is supplied in a heated state to the interior surface of the flame.
" If the gas is to be carburetted the supply pipe *u*, passes through a carburetter
" placed in any convenient position.  In cases where it is not required to
" carburet and heat the gas before burning, the gas may be supplied from below    50
" instead of from above as hereinbefore described and shewn.  Having thus
" described my said invention and the best means with which I am acquainted
" for carrying the same into effect I would have it understood that I do not
" confine myself to the precise details herein laid down and shewn in the
" Drawing as the same may be varied without departing from the peculiar    55
" character of my invention but what I do claim is:—Firstly.  The general
" arrangement and construction of the improved lamp hereinbefore described
" and represented in Figures 1 to 4 of the accompanying Drawing.  Secondly.
" The modified construction of lamp hereinbefore described and represented in

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

" Figures 5 and 6 of the accompanying Drawing.  Thirdly.  The method of
" supplying heated air to the inner surface of the flame by causing such air to
" pass through the chimney in its passage to the flame substantially as herein-
" before described and represented in Figures 5, and 6, of the accompanying

5 " Drawing.  Fourthly.  The employment of the perforated continuation $e^1$ from
" the chimney for distributing the heated air over the interior surface of the
" flame as hereinbefore described and represented in Figure 5, of the accom-
" panying Drawing."

This patent was assigned to *The Wenham Gas Company, Limited.*

10    On the 4th of October, 1890, the *Wenham Company,* commenced an action
against *The Champion Gas Lamp Company* and *Messrs. Todtenhaupt and Co.*
for infringement of this patent, claiming the usual relief.  The Particulars
of the Breaches complained of by the Plaintiffs were that the Defendants
had infringed by using or applying in or to gas lamps or lanterns certain

15 mechanism or arrangements the same, or substantially the same, as the
mechanism or arrangements described in the Plaintiffs' amended Specification
and claimed in the 2nd, 3rd, and 4th claiming clauses thereof, and the Plain-
tiffs complained of a gas lamp sold by the Defendants at their works on the
3rd of October, 1890, to *Messrs. Wentworth and Co.* and invoiced as "1 Lamp,

20 No. 3, Granite."

The Defendants denied infringement and alternatively they said that if,
according to the true construction of the Plaintiffs' Specification, the lamp
complained of by the Plaintiffs was an infringement (which they denied) the
Plaintiffs' patent was invalid on the grounds stated in the Particulars of

25 Objections.  By their Particulars they relied on the following objections to
validity:  1. That the alleged invention was not new.  Before the date of the
Plaintiffs' patent regenerative gas lighting, *i.e.,* heating the gas to be consumed
and the air to support the combustion on their way to the burner by the escaping
products of combustion, and leading the heated air to the upper or inner surface

30 of the flames through perforations or otherwise, was generally and commonly
known and practised.  2. That the alleged invention was previously published.
(*a*) In vol. 35, p. 60, of the *Journal of Gas Lighting, Water Supply, and
Sanitary Improvement,* published 13th of January, 1880, in an article " On
Regenerative Gas Lighting by Herr *F. Siemens.*  (*b*) In vol. 33, p. 3, of the

35 *English Mechanic and World of Science,* published 11th of March, 1881, in an
article entitled "The Hygienic Lamp."  (*c*) In the Specification of *Frederick
Siemens,* No. 2231 of 1879, p. 4, line 4, to p. 6, line 18, and in the 1st, 2nd, and 3rd
claiming clauses thereof and in the drawings referred to in the said portions of
the said Specification and the said claiming clauses.  (*d*) In the Specification of

40 *Richard Archibald Brooman,* No. 1712 of 1856.  (*e*) In the Specification of
*G. J. Parfitt,* No. 1244 of 1859, p. 3, lines 17 to 22, p. 4, line 17 to line 22, and
p. 5, line 12 to line 14, and Fig. 1.  (*f*) In the Provisional Specification of
*J. F. Wright* and *G. E. Wright,* No. 4857 of 1879.

The action was heard with witnesses before Mr. Justice *Williams* who held

45 that the Defendants had infringed and that the patent was valid.[*]

The Defendants appealed.

Sir *Richard Webster,* A.G., *Aston,* Q.C., *Moulton,* Q.C., and *Lawson* (instructed
by *J. H. Johnson, Son,* and *Ellis*) appeared for the Plaintiffs ; *Morton Daniel*
and *C. E. Jenkins* (instructed by *F. S. Perks*) for the Defendants, the Appellants.

50   *Daniel* and *Jenkins* for the Appellants.

The Defendants dispute the novelty of the Plaintiffs' alleged invention and
they submit there is no infringement.  The burner of the Defendants is not
the same as the Plaintiffs'.  It is admitted that the Plaintiffs' patent is merely
for a combination ; the Defendants have substantially a different combination,

55 and the part which both have in common, *i.e.,* regeneration is not new.  The
Defendants have done away with the large chamber ; they have an enlarged
gas tube before the burner ; this has recently been copied by the Plaintiffs.  The

[*] *See* Report 8 R. P. C., 313.

REPORTS OF PATENT, DESIGN,    [Feb. 24, 1892.

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

Defendants have not the extension $e^1$ of the Plaintiffs, and that is imperfectly described in their Specification. Claim 2 of the Plaintiffs is anticipated by *Siemens*. Claim 1 is for the particular lamp described, the essential features of which according to Sir *F. Bramwell's* evidence, are (1) the introduction of the heated air to the inner surface of the flame ; (2) the introduction of the cooling current 5 of air, but this latter is not claimed and the Specification is insufficient. *Foxwell* v. *Bostock*, 4 De G. J. and S. 298. The inventor ought to have distinguished the combination from what had gone before. [*Aston*, Q.C.—There is no plea of insufficiency.] *Daniel* then applied to be allowed to adduce fresh evidence on the ground that the Defendants were taken by surprise at the trial by the construction 10 put on the Specification by the Plaintiffs.

The application was refused.

*Daniel.*—The third claim which is for applying the hot air to the upper surface of the flame is merely an analogous application and is not subject matter of a patent : for *Siemens* had told the world how to bring down the heated air to the 15 flame, and to bring it to a particular part as the Plaintiffs have done is not subject matter of invention.

Sir *R. Webster*, A.G., for the Respondents, maintained that the decision of Mr. Justice *Williams* was right.

LINDLEY, L.J.—This is an appeal from the decision of Mr. Justice *Williams* in 20 an action brought by patentees for the infringement of a patent relating to lamps. The usual points are raised by way of defence, with one exception, which I notice, as I think it is important to bear it in mind : that there is no plea, or particular of objection, on the ground of insufficient specification. That gets rid of a good deal of discussion which might possibly have arisen. Apart from that the main con- 25 troversy is that the patent is bad, and that there is no infringement. Now, as to whether the patent is bad either from want of novelty or utility, or from want of subject-matter we must ascertain as far as we can what was known at the time the patent was taken out, and in particular our attention has been drawn, and very properly, to *Siemens'* inventions. The particular patent with which we are 30 dealing is *Clark's* patent, which I shall have occasion to comment upon presently. It was taken out in December 1881 ; it was amended in 1888, and it is for " Improvements in railway carriage, street, and other gas lamps, or lanterns." Mr. *Siemens* had discovered the importance of having heated air brought to an incandescent flame, and also the importance of heating the gas before it reached the 35 burner, and in his invention he described a method of accomplishing those objects. He showed the advantages of it, and he showed how to do it, and he brought the feeding current of heated air through the chimney in the way described in his letterpress and in the drawings. That idea is seized upon, or adopted, naturally, by the Plaintiff, who is a later inventor—a very valuable idea, 40 because it seems obvious, now that we know all about it, that it was a very important and a very valuable suggestion. *Siemens'* mind was addressed to that which I have mentioned—the importance of burning gas by bringing a hot air current to the flame, and by heating the gas before it reached the burner. That is what his mind was upon ; his mind was not on the particular method of 45 bringing hot air to any particular shaped flame ; that was not what he was about at all. *Clark's* mind was just the other way. His mind was addressed to the particular method of bringing a supply of heated air to particular places on the flame. His is a step in advance of *Siemens'*; he takes *Siemens'* as far as it goes, and modifies that, and produces a new and very valuable result—a brighter 50 flame and a much better result. The hot air current which feeds the flame in *Siemens'* case is not brought down next to the gas pipe, but at a distance from it. It is the ascending current in *Siemens'* case which makes the gas current. In *Clark's* patent it is just the other way. He so arranges his concentric ring, or machinery, or tubes, as to bring his hot current down to the middle of 55 the particular kind of flame which he selects for the purpose of his lamp. In addition to this *Clark* has availed himself of what *Siemens* did not, that I know of, that is the cooling current which kept the temperature of the glass down, and prevented cracking, and so on.

*The Wenham Gas Company, Ld. v. The Champion Gas Lamp Company.*

Now, that being the state of things, and that being, in a few words, the ideas, and the difference between the ideas which *Clark* had, and which *Siemens* had, we must look at what *Clark* has told us.   He has told us in his Amended Specification, which is the one with which I will deal (and I will 5 only refer to those parts which have been commented upon, and in particular I will refer to the drawing, because that is common knowledge ; and in any observations I may make I shall take the enlarged drawing of Fig. 5, which has been so much commented upon), he says—after describing generally the mode in which he arranges his tubes and apparatus for producing the desired result :— 10 " In this arrangement a ring or circular burner of the kind shewn in the " drawing, and marked $v$, may be employed ; $e^1$ is an earthenware or metal " continuation of the tube $d^1$, such tube, $e^1$, being perforated if found desirable " for causing a portion of the heated air to be more equally supplied to the " interior surface of the flame."

15 Now, when you look at the Specification, and the enlarged drawing Fig. 5, and notice the arrows which are inserted above the burner B, it is quite obvious that the bottom of his supply tube must be perforated ; otherwise these arrows are of no use at all ; and if you minutely examine the drawings of that tube, of the bottom of it, you will see that what is meant is that there should be a plate 20 through which air can pass.   The perforations are not shewn as perforations, but the arrows make it perfectly plain to anybody who applies his eyes to it that what is meant is a perforated plate.

Now, his description says that in addition to that which is obvious enough from the drawing itself the tube itself may be perforated if it is found desirable. 25 The drawing does not show any perforations in that tube, nor are they in all cases, as I understand, essential ; but if they are desirable they may be used.

Now, before passing to the claims, I will call attention to the burner B, and look at it with reference to the object of this invention, and see what it shows. It shows, as Mr. *Daniel* has pointed out, a burner equal to, or possibly a little 30 exceeding in size, the bottom of the tube.   There is nothing to show that that was essential—I do not know whether it was or not.   Then there are nipples shewn coming out of that burner.   Now, those nipples, if you take into consideration what is told you in the Specification, are to my mind important.   They show that the jets of gas which form the flame when it is 35 lighted are to come out of the burner in a horizontal direction.   What is to become of them—whether they assume a saucer shape or a cup shape is not shewn—can be ascertained directly by experiment ; but one cannot read this Specification and miss the leading idea, which is that the hot-feeding current is to come upon the top, or the middle of the ring of horizontal jets.   Now, 40 arrangement of jets is important—whether the jets be saucer or stalk is unimportant : what is important is that they shall be arranged in the form of a ring ; so that they start by being horizontal ; and the air is to come into the middle of that arrangement—that is the essential part ; and I think that can be gathered perfectly obviously by anybody who studies the Specification and the 45 drawings.

With these observations I pass to the claim :   It says " First. The general " arrangement and construction of the improved lamp hereinbefore described, " and represented in Figs. 1 to 4," which I pass over as they have not been much " commented upon. "Secondly. The modified construction of lamp hereinbefore 50 " described and represented in Figs. 5 and 6 of the accompanying drawing." That is to say, he claims there the whole of his combination ; he claims that particular method of supplying hot air to a ring of horizontal jets ; and in that part he claims it in combination with the cooling current which has also been described.   Therefore that is the combination ; and if it had stood there alone, 55 possibly there might have been a difficult question whether he could have supported any such claim as he has set forward in the third passage which I will allude to presently.   If that cooling current had been left out there would have been a very difficult question about that.   He guards against that, and anticipates that difficulty by claiming " Thirdly : The method of supplying heated air to the

Case: 13-4829    Document: 77    Page: 29    04/14/2014    1201761    80

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

inner surface of the flame by causing such air to pass through the chimney in its
passage to the flame, substantially as hereinbefore described, and represented in
Figs. 5 and 6 of the accompanying drawing." Now in that he claims (and I
think the *Attorney General* has successfully maintained that he was perfectly
justified and right in doing it) this particular method of supplying heated air to 5
the inner surface of the flame by causing it to pass through the chimney to the
flame substantially as described and represented in Figs. 5 and 6; that is to say,
he says : " Whether you take my cooling current or not, mind you, I claim this
particular method of supplying heated air to this particular kind of flame as
described in my Specification." 10

Now what is the objection raised to it ? The objection raised to it is that that
makes the patent bad, having regard to what was known before, and having regard
to what *Siemens* had disclosed. It is put by Mr. *Jenkins*, in his very admir-
able argument, on the ground that this is not the subject-matter of a patent ; that
it is merely an analogous use of an old arrangement pointed out by *Siemens*. He 15
says *Siemens* told you how to bring heated air down to the flame, and whether
you bring it down to one side of the flame or the other is immaterial, it is not
subject-matter for a patent, and there is no invention anywhere. The answer to
that is to be found in contrasting the two arrangements. The Plaintiffs' patent
is different, and vitally different, from *Siemens*', and is addressed to a totally 20
different object ; and there is that amount of utility and invention which renders
it quite beside the fishplate case of *Harwood* v. *The Great Northern Railway
Company*, 11 H.L.C., 654. There is shown to be, here, invention. You can get
it out yourself, almost, without the evidence ; but when you look at it with the
evidence the conclusion is clear and strong that this gentleman has hit upon 25
something, which something is a distinct advance over *Siemens*' lamp, although
but for *Siemens*' previous discoveries possibly this gentleman would not have
been in a position to invent this lamp at all. We have had a great deal of
comment and criticism upon this third claim. I do not think it is difficult to
construe. It is our duty to apply our minds to this patent with a view to under- 30
stand it. It is nothing to us judicially whether the result of that is to make the
patent good or bad. The thing is to understand what is meant ; and applying
my mind to see what is meant, I think the meaning of it is tolerably plain. It
is the method of supplying heated air to the inner surface of the flame. Now a
great deal of criticism was addressed to us about the inner surface of the flame, 35
but when you come to think it out it appears to me that with regard to what is
called here the inner surface of the flame, and what is called in other parts of the
Specification the interior part of the flame, it is obvious what is meant ; it is that
part of the flame which is presented to the feeding current of heated air. If the
flame was horizontal, that would be the upper one, and there would be no differ- 40
ence between inner and upper. Whether you could arrange the thing so as not
to have it horizontal, but vertical, I do not know, but even if you can there is no
question about it in my mind, and no ambiguity. It is not the inside of each
particular jet that is meant ; it is not that part of the unburnt gas which is within
the conical chamber at the centre of the flame that is meant. What is meant is 45
what I have mentioned ; and that, I think, is tolerably obvious to anybody who
will address his mind to the matter with the view to understand it.

Then there is a great deal of comment about the construction adopted by the
Plaintiffs, passing over and rendering in operative the next words : " by causing
" such air to pass through the chimney in its passage to the flame," and so on. I 50
think the answer to Mr. *Morton Daniel's* argument upon that is that his argument
omits the substance of this "as hereinbefore described and represented in Figs.
" 5 and 6." What is claimed here is this : " The particular method of supplying
" a hot air current to the flame, as described and mentioned in my Specification ;"
and one method of doing that is by passing it through the chimney as *Siemens* 55
did. That is a perfectly justifiable claim, and a good claim, and is perfectly good
subject-matter, treating it as what has been called a subordinate integer of the
general combination. Then "Fourthly : The employment of the perforated con-
" tinuation $e^1$ from the chimney for distributing the heated air over the interior

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

" surface of the flame, as hereinbefore described, and represented in Figure 5 of
" the accompanying drawing." There are two ways of reading that; one way is
to read it as a claim to the use or employment of a perforated continuation of a
tube for the purpose of distributing the hot air over the interior surface of the
5 flame. Mr. *Morton Daniel* and Mr. *Jenkins* asked us to read it in that way, and
then to say that if you read it as a substantive claim in that way it is bad from
want of invention. My answer to that is, I do not know that. How can I
judicially hold that ? I cannot do so. There is no evidence to support such an
inference, and I cannot, with common knowledge of common events of the world,
10 come to any such conclusion. The second answer, and the better answer, to my
mind, is,—that is not the true construction of the claim. I think the true con-
struction of the fourth claim is pointing out the importance of the perforated
tube in claim 3—a repetition in fact of claim 3—I do not think it is anything
more. If so it does not vitiate the patent. It may be open to the criticism that
15 it is redundant ; but if it is nothing more than pointing out what is a valuable
operation, and what has been claimed in clause 3 it does not therefore vitiate
the patent.

Now, having noticed the Specification, and having noticed the objections to it,
it appears to me that this patent is a perfectly good patent, and that there is
20 nothing the matter with it.

Then comes the question whether the Defendants have infringed it. In con-
sidering whether they have infringed it we must fall back and ascertain what is
the real invention, because unless we get hold of that we may be misled by
variations and differences which, having regard to the nature of the invention,
25 may be somewhat immaterial and unimportant. Now, let us consider what the
differences are ; let us consider their importance and bearing on the real nature
of the invention. The two important differences between the Plaintiffs' lamp
and the Defendants' are these : first of all there is a difference in the outside
chamber. In the Plaintiffs' lamp there is a vertical division which divides that
30 chamber into two ; and in the Defendants' there is only one chamber. That is
one difference. Now, is that a material, or an immaterial difference ? What
bearing has that upon that which is the essence of the Plaintiffs' invention ? To
my mind, none at all ; it does not touch it, it is outside it. It is outside it in
position ; and it is not until you get past that that you come to the really
35 important part of the Plaintiffs' invention. Another point of difference is the
burner. The Defendants do not use such a burner as is described, or shewn, or
delineated in Figure 5, that is to say, they do not shew a burner with projecting
nipples or nozzles. They have a smaller burner, and, I daresay, a better burner—
that is very likely ; but here again, although the difference may be of importance,
40 the question is whether they have not got the leading idea which the Plaintiffs
have patented. I say " Yes ;" the leading idea was to have such a burner as that
the current of hot air feeding the burner would come down through the middle
of it, and fall upon the jets as they projected from a ring. They have got that,
and that is the pith. It appears to me therefore that even in that respect they
45 have infringed the Plaintiffs' patent. Before passing from that I would observe
that this particular point does not appear to have been—I do not say alluded to,
because it was alluded to, but it does not appear to have been fought out at all,
so far as the witnesses are concerned—certainly it was not proved in evidence
that there was any distinction in principle between the Defendants' improved
50 smaller burner and the Plaintiffs' larger one. I need not refer to cases to shew
that an improvement may be an infringement if the Defendants have, as I think
they have here, taken that which differentiates the Plaintiffs' patent from
*Siemens*'—if they have taken the substance of that, which they have from first
to last, I think they have infringed this patent, although they have made trifling
55 variations.

In my opinion the decision of the Court below was right, and the appeal must
be dismissed with costs.

BOWEN, *L.J.*—I am entirely of the same opinion, and I shall only add a very
few words.

REPORTS OF PATENT, DESIGN, [Feb. 24, 1892.

*The Wenham Gas Company, Ld.* v. *The Champion Gas Lamp Company.*

This is an action for infringement of a combination. We have therefore to ask ourselves in the first place, what is the real invention of which the combination consists, and what is the pith and marrow of it. Having discovered that, as described in the Specification, we must ask ourselves whether it is properly described—neither ambiguously nor too largely; but having discussed those two 5 important points, the final question we shall have to ask ourselves is whether there has been an infringement?

Now the real invention of which this combination consists has been explained by my brother *Lindley*, to my mind, in such a way as renders it impossible to add to it, or to better it. I will only say that it seems to me to consist princi- 10 pally of the hot feeding current being brought down to the middle of the horizontal circular flame, and in a second degree of the addition in the combination of the cooling current round the lamp. Now, are those properly described? It cannot be denied that the second claim points out the combination by reference to the description and the figures in a way that really includes the description 15 of what is the point of that invention; and with regard to the third claim, to my mind it really is explained in the way in which the *Attorney-General* has explained it, as being a condescension by the patentee upon the particular point of the application of heated air to the inner surface of the flame, as that which he considers, himself, so much the pith and essence of his invention that even 20 if you were to leave out the cooling current, and to take that you would be taking what was his. With regard to the fourth claim I will add nothing to what the learned Lord Justice has said.

Now that being the essence of the invention, and there being no real objection to the way in which it is claimed under the third and fourth heads, what have 25 we to consider? Why, whether the pith and marrow of the invention is taken, and if the pith and marrow of the invention is taken it is no excuse to say that you have added something, or omitted something, even if the addition or omission be useful and valuable. The superadding of ingenuity to a robbery does not make the operation justifiable. The fact that that new lamp, which is 30 the result of having taken the invention of another person, is an improvement upon that other person's idea does not excuse the person who borrows what is not his. We have therefore simply to consider whether the differences that have been made in the Defendants' lamp, in comparison with the Plaintiffs' are such as to prevent the pith and marrow of the invention from having been 35 taken. That appears to me to be the point of the case, in accordance with all the authorities, and when you once see that that is what you have to decide, and see that the Defendants have taken the very point of the invention—and not only what I think is the very point of the invention, but what in the third claim is indicated as the very point of the invention, the differences by which it 40 is sought to excuse the infringement, seem to me, not to make it the less an infringement.

KAY, L.J.—I do not think I can usefully add anything to what the Lords Justices have said. I entirely agree with them, and for the reasons they have given, and I think the appeal must be dismissed with costs. 45

**Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled**[*]

CONTENTS

Preamble

Article 1:    Relation to Other Conventions and Treaties

Article 2:    Definitions

Article 3:    Beneficiary Persons

Article 4:    National Law Limitations and Exceptions Regarding Accessible Format Copies

Article 5:    Cross-Border Exchange of Accessible Format Copies

Article 6:    Importation of Accessible Format Copies

Article 7:    Obligations Concerning Technological Measures

Article 8:    Respect for Privacy

Article 9:    Cooperation to Facilitate Cross-Border Exchange

Article 10:  General Principles on Implementation

Article 11:  General Obligations on Limitations and Exceptions

Article 12:  Other Limitations and Exceptions

Article 13:  Assembly

Article 14:  International Bureau

Article 15:  Eligibility for Becoming Party to the Treaty

Article 16:  Rights and Obligations Under the Treaty

Article 17:  Signature of the Treaty

Article 18:  Entry into Force of the Treaty

Article 19:  Effective Date of Becoming Party to the Treaty

Article 20:  Denunciation of the Treaty

Article 21:  Languages of the Treaty

Article 22:  Depositary

---

[*]    This Treaty was adopted by the Diplomatic Conference to Conclude a Treaty to Facilitate Access to Published Works by Visually Impaired Persons and Persons with Print Disabilities on June 27, 2013.

**Preamble**

The Contracting Parties,

*Recalling* the principles of non-discrimination, equal opportunity, accessibility and full and effective participation and inclusion in society, proclaimed in the Universal Declaration of Human Rights and the United Nations Convention on the Rights of Persons with Disabilities,

*Mindful* of the challenges that are prejudicial to the complete development of persons with visual impairments or with other print disabilities, which limit their freedom of expression, including the freedom to seek, receive and impart information and ideas of all kinds on an equal basis with others, including through all forms of communication of their choice, their enjoyment of the right to education, and the opportunity to conduct research,

*Emphasizing* the importance of copyright protection as an incentive and reward for literary and artistic creations and of enhancing opportunities for everyone, including persons with visual impairments or with other print disabilities, to participate in the cultural life of the community, to enjoy the arts and to share scientific progress and its benefits,

*Aware* of the barriers of persons with visual impairments or with other print disabilities to access published works in achieving equal opportunities in society, and the need to both expand the number of works in accessible formats and to improve the circulation of such works,

*Taking into account* that the majority of persons with visual impairments or with other print disabilities live in developing and least-developed countries,

*Recognizing* that, despite the differences in national copyright laws, the positive impact of new information and communication technologies on the lives of persons with visual impairments or with other print disabilities may be reinforced by an enhanced legal framework at the international level,

*Recognizing* that many Member States have established limitations and exceptions in their national copyright laws for persons with visual impairments or with other print disabilities, yet there is a continuing shortage of available works in accessible format copies for such persons, and that considerable resources are required for their effort of making works accessible to these persons, and that the lack of possibilities of cross-border exchange of accessible format copies has necessitated duplication of these efforts,

*Recognizing* both the importance of rightholders' role in making their works accessible to persons with visual impairments or with other print disabilities and the importance of appropriate limitations and exceptions to make works accessible to these persons, particularly when the market is unable to provide such access,

*Recognizing* the need to maintain a balance between the effective protection of the rights of authors and the larger public interest, particularly education, research and access to information, and that such a balance must facilitate effective and timely access to works for the benefit of persons with visual impairments or with other print disabilities,

*Reaffirming* the obligations of Contracting Parties under the existing international treaties on the protection of copyright and the importance and flexibility of the three-step test for limitations and exceptions established in Article 9(2) of the Berne Convention for the Protection of Literary and Artistic Works and other international instruments,

*Recalling* the importance of the Development Agenda recommendations, adopted in 2007 by the General Assembly of the World Intellectual Property Organization (WIPO), which aim to ensure that development considerations form an integral part of the Organization's work,

*Recognizing* the importance of the international copyright system and desiring to harmonize limitations and exceptions with a view to facilitating access to and use of works by persons with visual impairments or with other print disabilities,

Have agreed as follows:

## Article 1
## Relation to Other Conventions and Treaties

Nothing in this Treaty shall derogate from any obligations that Contracting Parties have to each other under any other treaties, nor shall it prejudice any rights that a Contracting Party has under any other treaties.

## Article 2
## Definitions

For the purposes of this Treaty:

(a)   "works" means literary and artistic works within the meaning of Article 2(1) of the Berne Convention for the Protection of Literary and Artistic Works, in the form of text, notation and/or related illustrations, whether published or otherwise made publicly available in any media[1];

(b)   "accessible format copy" means a copy of a work in an alternative manner or form which gives a beneficiary person access to the work, including to permit the person to have access as feasibly and comfortably as a person without visual impairment or other print disability.  The accessible format copy is used exclusively by beneficiary persons and it must respect the integrity of the original work, taking due consideration of the changes needed to make the work accessible in the alternative format and of the accessibility needs of the beneficiary persons;

(c)   "authorized entity" means an entity that is authorized or recognized by the government to provide education, instructional training, adaptive reading or information access to beneficiary persons on a non-profit basis.  It also includes a government institution or non-profit organization that provides the same services to beneficiary persons as one of its primary activities or institutional obligations[2].

An authorized entity establishes and follows its own practices:

(i)   to establish that the persons it serves are beneficiary persons;

---

[1]   Agreed statement concerning Article 2(a):  For the purposes of this Treaty, it is understood that this definition includes such works in audio form, such as audiobooks.

[2]   Agreed statement concerning Article 2(c):  For the purposes of this Treaty, it is understood that "entities recognized by the government" may include entities receiving financial support from the government to provide education, instructional training, adaptive reading or information access to beneficiary persons on a non-profit basis.

(ii)    to limit to beneficiary persons and/or authorized entities its distribution and making available of accessible format copies;

(iii)    to discourage the reproduction, distribution and making available of unauthorized copies;  and

(iv)    to maintain due care in, and records of, its handling of copies of works, while respecting the privacy of beneficiary persons in accordance with Article 8.

## Article 3
## Beneficiary Persons

A beneficiary person is a person who:

(a)    is blind;

(b)    has a visual impairment or a perceptual or reading disability which cannot be improved to give visual function substantially equivalent to that of a person who has no such impairment or disability and so is unable to read printed works to substantially the same degree as a person without an impairment or disability;  or[3]

(c)    is otherwise unable, through physical disability, to hold or manipulate a book or to focus or move the eyes to the extent that would be normally acceptable for reading;

regardless of any other disabilities.

## Article 4
## National Law Limitations and Exceptions Regarding Accessible Format Copies

1.    (a)    Contracting Parties shall provide in their national copyright laws for a limitation or exception to the right of reproduction, the right of distribution, and the right of making available to the public as provided by the WIPO Copyright Treaty (WCT), to facilitate the availability of works in accessible format copies for beneficiary persons.  The limitation or exception provided in national law should permit changes needed to make the work accessible in the alternative format.

(b)    Contracting Parties may also provide a limitation or exception to the right of public performance to facilitate access to works for beneficiary persons.

2.    A Contracting Party may fulfill Article 4(1) for all rights identified therein by providing a limitation or exception in its national copyright law such that:

(a)    Authorized entities shall be permitted, without the authorization of the copyright rightholder, to make an accessible format copy of a work, obtain from another authorized entity an accessible format copy, and supply those copies to beneficiary persons by any means, including by non-commercial lending or by electronic communication by wire or wireless means, and undertake any intermediate steps to achieve those objectives, when all of the following conditions are met:

---

[3]    Agreed statement concerning Article 3(b):  Nothing in this language implies that "cannot be improved" requires the use of all possible medical diagnostic procedures and treatments.

(i) the authorized entity wishing to undertake said activity has lawful access to that work or a copy of that work;

(ii) the work is converted to an accessible format copy, which may include any means needed to navigate information in the accessible format, but does not introduce changes other than those needed to make the work accessible to the beneficiary person;

(iii) such accessible format copies are supplied exclusively to be used by beneficiary persons; and

(iv) the activity is undertaken on a non-profit basis;

and

(b) A beneficiary person, or someone acting on his or her behalf including a primary caretaker or caregiver, may make an accessible format copy of a work for the personal use of the beneficiary person or otherwise may assist the beneficiary person to make and use accessible format copies where the beneficiary person has lawful access to that work or a copy of that work.

3. A Contracting Party may fulfill Article 4(1) by providing other limitations or exceptions in its national copyright law pursuant to Articles 10 and 11[4].

4. A Contracting Party may confine limitations or exceptions under this Article to works which, in the particular accessible format, cannot be obtained commercially under reasonable terms for beneficiary persons in that market. Any Contracting Party availing itself of this possibility shall so declare in a notification deposited with the Director General of WIPO at the time of ratification of, acceptance of or accession to this Treaty or at any time thereafter[5].

5. It shall be a matter for national law to determine whether limitations or exceptions under this Article are subject to remuneration.

**Article 5**
**Cross-Border Exchange of Accessible Format Copies**

1. Contracting Parties shall provide that if an accessible format copy is made under a limitation or exception or pursuant to operation of law, that accessible format copy may be distributed or made available by an authorized entity to a beneficiary person or an authorized entity in another Contracting Party[6].

2. A Contracting Party may fulfill Article 5(1) by providing a limitation or exception in its national copyright law such that:

---

[4] Agreed statement concerning Article 4(3): It is understood that this paragraph neither reduces nor extends the scope of applicability of limitations and exceptions permitted under the Berne Convention, as regards the right of translation, with respect to persons with visual impairments or with other print disabilities.

[5] Agreed statement concerning Article 4(4): It is understood that a commercial availability requirement does not prejudge whether or not a limitation or exception under this Article is consistent with the three-step test.

[6] Agreed statement concerning Article 5(1): It is further understood that nothing in this Treaty reduces or extends the scope of exclusive rights under any other treaty.

(a)    authorized entities shall be permitted, without the authorization of the rightholder, to distribute or make available for the exclusive use of beneficiary persons accessible format copies to an authorized entity in another Contracting Party;  and

(b)    authorized entities shall be permitted, without the authorization of the rightholder and pursuant to Article 2(c), to distribute or make available accessible format copies to a beneficiary person in another Contracting Party;

provided that prior to the distribution or making available the originating authorized entity did not know or have reasonable grounds to know that the accessible format copy would be used for other than beneficiary persons[7].

3.    A Contracting Party may fulfill Article 5(1) by providing other limitations or exceptions in its national copyright law pursuant to Articles 5(4), 10 and 11.

4.    (a)    When an authorized entity in a Contracting Party receives accessible format copies pursuant to Article 5(1) and that Contracting Party does not have obligations under Article 9 of the Berne Convention, it will ensure, consistent with its own legal system and practices, that the accessible format copies are only reproduced, distributed or made available for the benefit of beneficiary persons in that Contracting Party's jurisdiction.

(b)   The distribution and making available of accessible format copies by an authorized entity pursuant to Article 5(1) shall be limited to that jurisdiction unless the Contracting Party is a Party to the WIPO Copyright Treaty or otherwise limits limitations and exceptions implementing this Treaty to the right of distribution and the right of making available to the public to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the rightholder[8],[9].

(c)   Nothing in this Article affects the determination of what constitutes an act of distribution or an act of making available to the public.

5.    Nothing in this Treaty shall be used to address the issue of exhaustion of rights.


**Article 6**
**Importation of Accessible Format Copies**

To the extent that the national law of a Contracting Party would permit a beneficiary person, someone acting on his or her behalf, or an authorized entity, to make an accessible format copy of a work, the national law of that Contracting Party shall also permit them to import an

---

[7]    Agreed statement concerning Article 5(2):  It is understood that, to distribute or make available accessible format copies directly to a beneficiary person in another Contracting Party, it may be appropriate for an authorized entity to apply further measures to confirm that the person it is serving is a beneficiary person and to follow its own practices as described in Article 2(c).

[8]    Agreed statement concerning Article 5(4)(b):  It is understood that nothing in this Treaty requires or implies that a Contracting Party adopt or apply the three-step test beyond its obligations under this instrument or under other international treaties.

[9]    Agreed statement concerning Article 5(4)(b):  It is understood that nothing in this Treaty creates any obligations for a Contracting Party to ratify or accede to the WCT or to comply with any of its provisions and nothing in this Treaty prejudices any rights, limitations and exceptions contained in the WCT.

accessible format copy for the benefit of beneficiary persons, without the authorization of the rightholder[10].

## Article 7
## Obligations Concerning Technological Measures

Contracting Parties shall take appropriate measures, as necessary, to ensure that when they provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures, this legal protection does not prevent beneficiary persons from enjoying the limitations and exceptions provided for in this Treaty[11].

## Article 8
## Respect for Privacy

In the implementation of the limitations and exceptions provided for in this Treaty, Contracting Parties shall endeavor to protect the privacy of beneficiary persons on an equal basis with others.

## Article 9
## Cooperation to Facilitate Cross-Border Exchange

1.      Contracting Parties shall endeavor to foster the cross-border exchange of accessible format copies by encouraging the voluntary sharing of information to assist authorized entities in identifying one another.  The International Bureau of WIPO shall establish an information access point for this purpose.

2.      Contracting Parties undertake to assist their authorized entities engaged in activities under Article 5 to make information available regarding their practices pursuant to Article 2(c), both through the sharing of information among authorized entities, and through making available information on their policies and practices, including related to cross-border exchange of accessible format copies, to interested parties and members of the public as appropriate.

3.      The International Bureau of WIPO is invited to share information, where available, about the functioning of this Treaty.

4.      Contracting Parties recognize the importance of international cooperation and its promotion, in support of national efforts for realization of the purpose and objectives of this Treaty[12].

---

[10]      Agreed statement concerning Article 6:  It is understood that the Contracting Parties have the same flexibilities set out in Article 4 when implementing their obligations under Article 6.

[11]      Agreed statement concerning Article 7:  It is understood that authorized entities, in various circumstances, choose to apply technological measures in the making, distribution and making available of accessible format copies and nothing herein disturbs such practices when in accordance with national law.

[12]      Agreed statement concerning Article 9:  It is understood that Article 9 does not imply mandatory registration for authorized entities nor does it constitute a precondition for authorized entities to engage in activities recognized under this Treaty;  but it provides for a possibility for sharing information to facilitate the cross-border exchange of accessible format copies.

**Article 10**
**General Principles on Implementation**

1.    Contracting Parties undertake to adopt the measures necessary to ensure the application of this Treaty.

2.    Nothing shall prevent Contracting Parties from determining the appropriate method of implementing the provisions of this Treaty within their own legal system and practice[13].

3.    Contracting Parties may fulfill their rights and obligations under this Treaty through limitations or exceptions specifically for the benefit of beneficiary persons, other limitations or exceptions, or a combination thereof, within their national legal system and practice.  These may include judicial, administrative or regulatory determinations for the benefit of beneficiary persons as to fair practices, dealings or uses to meet their needs consistent with the Contracting Parties' rights and obligations under the Berne Convention, other international treaties, and Article 11.


**Article 11**
**General Obligations on Limitations and Exceptions**

In adopting measures necessary to ensure the application of this Treaty, a Contracting Party may exercise the rights and shall comply with the obligations that that Contracting Party has under the Berne Convention, the Agreement on Trade-Related Aspects of Intellectual Property Rights and the WIPO Copyright Treaty, including their interpretative agreements so that:

   (a)    in accordance with Article 9(2) of the Berne Convention, a Contracting Party may permit the reproduction of works in certain special cases provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author;

   (b)    in accordance with Article 13 of the Agreement on Trade-Related Aspects of Intellectual Property Rights, a Contracting Party shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the rightholder;

   (c)    in accordance with Article 10(1) of the WIPO Copyright Treaty, a Contracting Party may provide for limitations of or exceptions to the rights granted to authors under the WCT in certain special cases, that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author;

   (d)    in accordance with Article 10(2) of the WIPO Copyright Treaty, a Contracting Party shall confine, when applying the Berne Convention, any limitations of or exceptions to rights to certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author.

---

[13]    Agreed statement concerning Article 10(2):  It is understood that when a work qualifies as a work under Article 2(a), including such works in audio form, the limitations and exceptions provided for by this Treaty apply *mutatis mutandis* to related rights as necessary to make the accessible format copy, to distribute it and to make it available to beneficiary persons.

**Article 12**
**Other Limitations and Exceptions**

1.      Contracting Parties recognize that a Contracting Party may implement in its national law other copyright limitations and exceptions for the benefit of beneficiary persons than are provided by this Treaty having regard to that Contracting Party's economic situation, and its social and cultural needs, in conformity with that Contracting Party's international rights and obligations, and in the case of a least-developed country taking into account its special needs and its particular international rights and obligations and flexibilities thereof.

2.      This Treaty is without prejudice to other limitations and exceptions for persons with disabilities provided by national law.


**Article 13**
**Assembly**

1.      (a)      The Contracting Parties shall have an Assembly.

        (b)      Each Contracting Party shall be represented in the Assembly by one delegate who may be assisted by alternate delegates, advisors and experts.

        (c)      The expenses of each delegation shall be borne by the Contracting Party that has appointed the delegation.  The Assembly may ask WIPO to grant financial assistance to facilitate the participation of delegations of Contracting Parties that are regarded as developing countries in conformity with the established practice of the General Assembly of the United Nations or that are countries in transition to a market economy.

2.      (a)      The Assembly shall deal with matters concerning the maintenance and development of this Treaty and the application and operation of this Treaty.

        (b)      The Assembly shall perform the function allocated to it under Article 15 in respect of the admission of certain intergovernmental organizations to become party to this Treaty.

        (c)      The Assembly shall decide the convocation of any diplomatic conference for the revision of this Treaty and give the necessary instructions to the Director General of WIPO for the preparation of such diplomatic conference.

3.      (a)      Each Contracting Party that is a State shall have one vote and shall vote only in its own name.

        (b)      Any Contracting Party that is an intergovernmental organization may participate in the vote, in place of its Member States, with a number of votes equal to the number of its Member States which are party to this Treaty.  No such intergovernmental organization shall participate in the vote if any one of its Member States exercises its right to vote and vice versa.

4.      The Assembly shall meet upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of WIPO.

5.      The Assembly shall endeavor to take its decisions by consensus and shall establish its own rules of procedure, including the convocation of extraordinary sessions, the requirements of a quorum and, subject to the provisions of this Treaty, the required majority for various kinds of decisions.

**Article 14**
**International Bureau**

The International Bureau of WIPO shall perform the administrative tasks concerning this Treaty.


**Article 15**
**Eligibility for Becoming Party to the Treaty**

1.      Any Member State of WIPO may become party to this Treaty.

2.      The Assembly may decide to admit any intergovernmental organization to become party to this Treaty which declares that it is competent in respect of, and has its own legislation binding on all its Member States on, matters covered by this Treaty and that it has been duly authorized, in accordance with its internal procedures, to become party to this Treaty.

3.      The European Union, having made the declaration referred to in the preceding paragraph at the Diplomatic Conference that has adopted this Treaty, may become party to this Treaty.


**Article 16**
**Rights and Obligations Under the Treaty**

Subject to any specific provisions to the contrary in this Treaty, each Contracting Party shall enjoy all of the rights and assume all of the obligations under this Treaty.


**Article 17**
**Signature of the Treaty**

This Treaty shall be open for signature at the Diplomatic Conference in Marrakesh, and thereafter at the headquarters of WIPO by any eligible party for one year after its adoption.


**Article 18**
**Entry into Force of the Treaty**

This Treaty shall enter into force three months after 20 eligible parties referred to in Article 15 have deposited their instruments of ratification or accession.


**Article 19**
**Effective Date of Becoming Party to the Treaty**

This Treaty shall bind:

(a)      the 20 eligible parties referred to in Article 18, from the date on which this Treaty has entered into force;

(b)      each other eligible party referred to in Article 15, from the expiration of three months from the date on which it has deposited its instrument of ratification or accession with the Director General of WIPO.


**ADD-20**

**Article 20**
**Denunciation of the Treaty**

This Treaty may be denounced by any Contracting Party by notification addressed to the Director General of WIPO.  Any denunciation shall take effect one year from the date on which the Director General of WIPO received the notification.


**Article 21**
**Languages of the Treaty**

1.      This Treaty is signed in a single original in English, Arabic, Chinese, French, Russian and Spanish languages, the versions in all these languages being equally authentic.

2.      An official text in any language other than those referred to in Article 21(1) shall be established by the Director General of WIPO on the request of an interested party, after consultation with all the interested parties.  For the purposes of this paragraph, "interested party" means any Member State of WIPO whose official language, or one of whose official languages, is involved and the European Union, and any other intergovernmental organization that may become party to this Treaty, if one of its official languages is involved.


**Article 22**
**Depositary**

The Director General of WIPO is the depositary of this Treaty.


Done in Marrakesh on the 27th day of June, 2013.


[End of document]

# Berne Convention
# for the Protection of Literary and Artistic Works

**Paris Act
of July 24, 1971,
as amended on
September 28, 1979**

# Berne Convention
# for the Protection of Literary and Artistic Works

**of September 9, 1886,
completed at PARIS on May 4, 1896,
revised at BERLIN on November 13, 1908,
completed at BERNE on March 20, 1914,
revised at ROME on June 2, 1928,
at BRUSSELS on June 26, 1948,
at STOCKHOLM on July 14, 1967,
and at PARIS on July 24, 1971,
and amended on September 28, 1979**

## TABLE OF CONTENTS*

| | |
|---|---|
| *Article 1:* | *Establishment of a Union* |
| *Article 2:* | *Protected Works:* 1. "Literary and artistic works"; 2. Possible requirement of fixation; 3. Derivative works; 4. Official texts; 5. Collections; 6. Obligation to protect; beneficiaries of protection; 7. Works of applied art and industrial designs; 8. News |
| *Article 2bis:* | *Possible Limitation of Protection of Certain Works:* 1. Certain speeches; 2. Certain uses of lectures and addresses; 3. Right to make collections of such works |
| *Article 3:* | *Criteria of Eligibility for Protection:* 1. Nationality of author; place of publication of work; 2. Residence of author; 3. "Published" works; 4. "Simultaneously published" works |
| *Article 4:* | *Criteria of Eligibility for Protection of Cinematographic Works, Works of Architecture and Certain Artistic Works* |
| *Article 5:* | *Rights Guaranteed:* 1. and 2. Outside the country of origin; 3. In the country of origin; 4. "Country of origin" |
| *Article 6:* | *Possible Restriction of Protection in Respect of Certain Works of Nationals of Certain Countries Outside the Union:* 1. In the country of the first publication and in other countries; 2. No retroactivity; 3. Notice |
| *Article 6bis:* | *Moral Rights:* 1. To claim authorship; to object to certain modifications and other derogatory actions; 2. After the author's death; 3. Means of redress |
| *Article 7:* | *Term of Protection:* 1. Generally; 2. For cinematographic works; 3. For anonymous and pseudonymous works; 4. For photographic works and works of applied art; 5. Starting date of computation; 6. Longer terms; 7. Shorter terms; 8. Applicable law; "comparison" of terms |
| *Article 7bis:* | *Term of Protection for Works of Joint Authorship* |
| *Article 8:* | *Right of Translation* |

* This Table of Contents is added for the convenience of the reader.  It does not appear in the original (English) text of the Convention.

**ADD-22**

| | |
|---|---|
| *Article 9:* | *Right of Reproduction:* 1. Generally; 2. Possible exceptions; 3. Sound and visual recordings |
| *Article 10:* | *Certain Free Uses of Works:* 1. Quotations; 2. Illustrations for teaching; 3. Indication of source and author |
| *Article 10bis:* | *Further Possible Free Uses of Works:* 1. Of certain articles and broadcast works; 2. Of works seen or heard in connection with current events |
| *Article 11:* | *Certain Rights in Dramatic and Musical Works:* 1. Right of public performance and of communication to the public of a performance; 2. In respect of translations |
| *Article 11bis:* | *Broadcasting and Related Rights:* 1. Broadcasting and other wireless communications, public communication of broadcast by wire or rebroadcast, public communication of broadcast by loudspeaker or analogous instruments; 2. Compulsory licenses; 3. Recording; ephemeral recordings |
| *Article 11ter:* | *Certain Rights in Literary Works:* 1. Right of public recitation and of communication to the public of a recitation; 2. In respect of translations |
| *Article 12:* | *Right of Adaptation, Arrangement and Other Alteration* |
| *Article 13:* | *Possible Limitation of the Right of Recording of Musical Works and Any Words Pertaining Thereto:* 1. Compulsory licenses; 2. Transitory measures; 3. Seizure on importation of copies made without the author's permission |
| *Article 14:* | *Cinematographic and Related Rights:* 1. Cinematographic adaptation and reproduction; distribution; public performance and public communication by wire of works thus adapted or reproduced; 2. Adaptation of cinematographic productions; 3. No compulsory licenses |
| *Article 14bis:* | *Special Provisions Concerning Cinematographic Works:* 1. Assimilation to "original" works; 2. Ownership; limitation of certain rights of certain contributors; 3. Certain other contributors |
| *Article 14ter:* | *"Droit de suite" in Works of Art and Manuscripts:* 1. Right to an interest in resales; 2. Applicable law; 3. Procedure |
| *Article 15:* | *Right to Enforce Protected Rights:* 1. Where author's name is indicated or where pseudonym leaves no doubt as to author's identity; 2. In the case of cinematographic works; 3. In the case of anonymous and pseudonymous works; 4. In the case of certain unpublished works of unknown authorship |
| *Article 16:* | *Infringing Copies:* 1. Seizure; 2. Seizure on importation; 3. Applicable law |
| *Article 17:* | *Possibility of Control of Circulation, Presentation and Exhibition of Works* |
| *Article 18:* | *Works Existing on Convention's Entry Into Force:* 1. Protectable where protection not yet expired in country of origin; 2. Non-protectable where protection already expired in country where it is claimed; 3. Application of these principles; 4. Special cases |
| *Article 19:* | *Protection Greater than Resulting from Convention* |
| *Article 20:* | *Special Agreements Among Countries of the Union* |
| *Article 21:* | *Special Provisions Regarding Developing Countries:* 1. Reference to Appendix; 2. Appendix part of Act |
| *Article 22:* | *Assembly:* 1. Constitution and composition; 2. Tasks; 3. Quorum, voting, observers; 4. Convocation; 5. Rules of procedure |
| *Article 23:* | *Executive Committee:* 1. Constitution; 2. Composition; 3. Number of members; 4. Geographical distribution; special agreements; 5. Term, limits of re-eligibility, rules of election; 6. Tasks; 7. Convocation; 8. Quorum, voting; 9. Observers; 10. Rules of procedure |
| *Article 24:* | *International Bureau:* 1. Tasks in general, Director General; 2. General information; 3. Periodical; 4. Information to countries; 5. Studies and services; 6. Participation in meetings; 7. Conferences of revision; 8. Other tasks |

**ADD-23**

| | |
|---|---|
| *Article 25:* | *Finances:* 1. Budget; 2. Coordination with other Unions; 3. Resources; 4. Contributions; possible extension of previous budget; 5. Fees and charges; 6. Working capital fund; 7. Advances by host Government; 8. Auditing of accounts |
| *Article 26:* | *Amendments:* 1. Provisions susceptible of amendment by the Assembly; proposals; 2. Adoption; 3. Entry into force |
| *Article 27:* | *Revision:* 1. Objective; 2. Conferences; 3. Adoption |
| *Article 28:* | *Acceptance and Entry Into Force of Act for Countries of the Union:* 1. Ratification, accession; possibility of excluding certain provisions; withdrawal of exclusion; 2. Entry into force of Articles 1 to 21 and Appendix; 3. Entry into force of Articles 22 to 38 |
| *Article 29:* | *Acceptance and Entry Into Force for Countries Outside the Union:* 1. Accession; 2. Entry into force |
| *Article 29bis:* | *Effect of Acceptance of Act for the Purposes of Article 14(2) of the WIPO Convention* |
| *Article 30:* | *Reservations:* 1. Limits of possibility of making reservations; 2. Earlier reservations; reservation as to the right of translation; withdrawal of reservation |
| *Article 31:* | *Applicability to Certain Territories:* 1. Declaration; 2. Withdrawal of declaration; 3. Effective date; 4. Acceptance of factual situations not implied |
| *Article 32:* | *Applicability of this Act and of Earlier Acts:* 1. As between countries already members of the Union; 2. As between a country becoming a member of the Union and other countries members of the Union; 3. Applicability of the Appendix in Certain Relations |
| *Article 33:* | *Disputes:* 1. Jurisdiction of the International Court of Justice; 2. Reservation as to such jurisdiction; 3. Withdrawal of reservation |
| *Article 34:* | *Closing of Certain Earlier Provisions:* 1. Of earlier Acts; 2. Of the Protocol to the Stockholm Act |
| *Article 35:* | *Duration of the Convention; Denunciation:* 1. Unlimited duration; 2. Possibility of denunciation; 3. Effective date of denunciation; 4. Moratorium on denunciation |
| *Article 36:* | *Application of the Convention:* 1. Obligation to adopt the necessary measures; 2. Time from which obligation exists |
| *Article 37:* | *Final Clauses:* 1. Languages of the Act; 2. Signature; 3. Certified copies; 4. Registration; 5. Notifications |
| *Article 38:* | *Transitory Provisions:* 1. Exercise of the "five-year privilege"; 2. Bureau of the Union, Director of the Bureau; 3. Succession of Bureau of the Union |

## Appendix

## SPECIAL PROVISIONS REGARDING DEVELOPING COUNTRIES

| | |
|---|---|
| *Article I:* | Faculties Open to Developing Countries: 1. Availability of certain faculties; declaration; 2. Duration of effect of declaration; 3. Cessation of developing country status; 4. Existing stocks of copies; 5. Declarations concerning certain territories; 6. Limits of reciprocity |
| *Article II:* | Limitations on the Right of Translation: 1. Licenses grantable by competent authority; 2 to 4. Conditions allowing the grant of such licenses; 5. Purposes for which licenses may be granted; 6. Termination of licenses; 7. Works composed mainly of illustrations; 8. Works withdrawn from circulation; 9. Licenses for broadcasting organizations |
| *Article III:* | Limitation on the Right of Reproduction: 1. Licenses grantable by competent authority; 2 to 5. Conditions allowing the grant of such licenses; 6. Termination of licenses; 7. Works to which this Article applies |

**ADD-24**

| Article IV: | Provisions Common to Licenses Under Articles II and III: 1 and 2. Procedure; 3. Indication of author and title of work; 4. Exportation of copies; 5. Notice; 6. Compensation |
| Article V: | Alternative Possibility for Limitation of the Right of Translation: 1. Regime provided for under the 1886 and 1896 Acts; 2. No possibility of change to regime under Article II; 3. Time limit for choosing the alternative possibility |
| Article VI: | Possibilities of applying, or admitting the application of, certain provisions of the Appendix before becoming bound by it: 1. Declaration; 2. Depository and effective date of declaration |

The countries of the Union, being equally animated by the desire to protect, in as effective and uniform a manner as possible, the rights of authors in their literary and artistic works,

Recognizing the importance of the work of the Revision Conference held at Stockholm in 1967,

Have resolved to revise the Act adopted by the Stockholm Conference, while maintaining without change Articles 1 to 20 and 22 to 26 of that Act.

Consequently, the undersigned Plenipotentiaries, having presented their full powers, recognized as in good and due form, have agreed as follows:

## Article 1

### [*Establishment of a Union*][1]

The countries to which this Convention applies constitute a Union for the protection of the rights of authors in their literary and artistic works.

## Article 2

[*Protected Works:* 1. "Literary and artistic works"; 2. Possible requirement of fixation; 3. Derivative works; 4. Official texts; 5. Collections; 6. Obligation to protect; beneficiaries of protection; 7. Works of applied art and industrial designs; 8. News]

(1)  The expression "literary and artistic works" shall include every production in the literary, scientific and artistic domain, whatever may be the mode or form of its expression, such as books, pamphlets and other writings; lectures, addresses, sermons and other works of the same nature; dramatic or dramatico-musical works; choreographic works and entertainments in dumb show; musical compositions with or without words; cinematographic works to which are assimilated works expressed by a process analogous to cinematography; works of drawing, painting, architecture, sculpture, engraving and lithography; photographic works to which are assimilated works expressed by a process analogous to photography; works of applied art; illustrations, maps, plans, sketches and three-dimensional works relative to geography, topography, architecture or science.

(2)  It shall, however, be a matter for legislation in the countries of the Union to prescribe that works in general or any specified categories of works shall not be protected unless they have been fixed in some material form.

(3)  Translations, adaptations, arrangements of music and other alterations of a literary or artistic work shall be protected as original works without prejudice to the copyright in the original work.

(4)  It shall be a matter for legislation in the countries of the Union to determine the protection to be granted to official texts of a legislative, administrative and legal nature, and to official translations of such texts.

(5)  Collections of literary or artistic works such as encyclopaedias and anthologies which, by reason of the selection and arrangement of their contents, constitute intellectual creations shall be protected as such, without prejudice to the copyright in each of the works forming part of such collections.

---

[1] Each Article and the Appendix have been given titles to facilitate their identification.  There are no titles in the signed (English) text.

(6)  The works mentioned in this Article shall enjoy protection in all countries of the Union. This protection shall operate for the benefit of the author and his successors in title.

(7)  Subject to the provisions of Article 7(4) of this Convention, it shall be a matter for legislation in the countries of the Union to determine the extent of the application of their laws to works of applied art and industrial designs and models, as well as the conditions under which such works, designs and models shall be protected. Works protected in the country of origin solely as designs and models shall be entitled in another country of the Union only to such special protection as is granted in that country to designs and models; however, if no such special protection is granted in that country, such works shall be protected as artistic works.

(8)  The protection of this Convention shall not apply to news of the day or to miscellaneous facts having the character of mere items of press information.

### Article 2<sup>bis</sup>

[*Possible Limitation of Protection of Certain Works:* 1. Certain speeches; 2. Certain uses of lectures and addresses; 3. Right to make collections of such works]

(1)  It shall be a matter for legislation in the countries of the Union to exclude, wholly or in part, from the protection provided by the preceding Article political speeches and speeches delivered in the course of legal proceedings.

(2)  It shall also be a matter for legislation in the countries of the Union to determine the conditions under which lectures, addresses and other works of the same nature which are delivered in public may be reproduced by the press, broadcast, communicated to the public by wire and made the subject of public communication as envisaged in Article 11<sup>bis</sup>(1) of this Convention, when such use is justified by the informatory purpose.

(3)  Nevertheless, the author shall enjoy the exclusive right of making a collection of his works mentioned in the preceding paragraphs.

### Article 3

[*Criteria of Eligibility for Protection:* 1. Nationality of author; place of publication of work; 2. Residence of author; 3. "Published" works; 4. "Simultaneously published" works]

(1)  The protection of this Convention shall apply to:

   *(a)*   authors who are nationals of one of the countries of the Union, for their works, whether published or not;

   *(b)*   authors who are not nationals of one of the countries of the Union, for their works first published in one of those countries, or simultaneously in a country outside the Union and in a country of the Union.

(2)  Authors who are not nationals of one of the countries of the Union but who have their habitual residence in one of them shall, for the purposes of this Convention, be assimilated to nationals of that country.

(3)  The expression "published works" means works published with the consent of their authors, whatever may be the means of manufacture of the copies, provided that the availability of such copies has been such as to satisfy the reasonable requirements of the public, having regard to the nature of the work. The performance of a dramatic, dramatico-musical, cinematographic or musical work, the public recitation of a literary work, the communication by wire or the broadcasting of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

(4)  A work shall be considered as having been published simultaneously in several countries if it has been published in two or more countries within thirty days of its first publication.

**ADD-26**

## Article 4

[*Criteria of Eligibility for Protection of Cinematographic Works, Works of Architecture and Certain Artistic Works*]

The protection of this Convention shall apply, even if the conditions of Article 3 are not fulfilled, to:

*(a)*  authors of cinematographic works the maker of which has his headquarters or habitual residence in one of the countries of the Union;

*(b)*  authors of works of architecture erected in a country of the Union or of other artistic works incorporated in a building or other structure located in a country of the Union.

## Article 5

[*Rights Guaranteed:* 1. and 2. Outside the country of origin; 3. In the country of origin; 4. "Country of origin"]

(1)  Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

(2)  The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

(3)  Protection in the country of origin is governed by domestic law. However, when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors.

(4)  The country of origin shall be considered to be:

*(a)*  in the case of works first published in a country of the Union, that country; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country whose legislation grants the shortest term of protection;

*(b)*  in the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country;

*(c)*  in the case of unpublished works or of works first published in a country outside the Union, without simultaneous publication in a country of the Union, the country of the Union of which the author is a national, provided that:

  (i)  when these are cinematographic works the maker of which has his headquarters or his habitual residence in a country of the Union, the country of origin shall be that country, and

  (ii)  when these are works of architecture erected in a country of the Union or other artistic works incorporated in a building or other structure located in a country of the Union, the country of origin shall be that country.

## Article 6

[*Possible Restriction of Protection in Respect of Certain Works of Nationals of Certain Countries Outside the Union:* 1. In the country of the first publication and in other countries; 2. No retroactivity; 3. Notice]

(1)  Where any country outside the Union fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union, the latter country may restrict the protection given to the works of authors who are, at the date of the first publication thereof, nationals of the other country and are not habitually resident in one of the countries of the Union. If the country of first publication avails itself of this right, the other countries of the Union shall not be required to grant to works thus subjected to special treatment a wider protection than that granted to them in the country of first publication.

(2)  No restrictions introduced by virtue of the preceding paragraph shall affect the rights which an author may have acquired in respect of a work published in a country of the Union before such restrictions were put into force.

(3)  The countries of the Union which restrict the grant of copyright in accordance with this Article shall give notice thereof to the Director General of the World Intellectual Property Organization (hereinafter designated as "the Director General") by a written declaration specifying the countries in regard to which protection is restricted, and the restrictions to which rights of authors who are nationals of those countries are subjected. The Director General shall immediately communicate this declaration to all the countries of the Union.

## Article 6^bis

[*Moral Rights:* 1. To claim authorship; to object to certain modifications and other derogatory actions; 2. After the author's death; 3. Means of redress]

(1)  Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

(2)  The rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the economic rights, and shall be exercisable by the persons or institutions authorized by the legislation of the country where protection is claimed. However, those countries whose legislation, at the moment of their ratification of or accession to this Act, does not provide for the protection after the death of the author of all the rights set out in the preceding paragraph may provide that some of these rights may, after his death, cease to be maintained.

(3)  The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

## Article 7

[*Term of Protection:* 1. Generally; 2. For cinematographic works; 3. For anonymous and pseudonymous works; 4. For photographic works and works of applied art; 5. Starting date of computation; 6. Longer terms; 7. Shorter terms; 8. Applicable law; "comparison" of terms]

(1)  The term of protection granted by this Convention shall be the life of the author and fifty years after his death.

(2)  However, in the case of cinematographic works, the countries of the Union may provide that the term of protection shall expire fifty years after the work has been made available to the public with the consent of the author, or, failing such an event within fifty years from the making of such a work, fifty years after the making.

(3)  In the case of anonymous or pseudonymous works, the term of protection granted by this Convention shall expire fifty years after the work has been lawfully made available to the public. However, when the pseudonym adopted by the author leaves no doubt as to his identity, the term of protection shall be that provided in paragraph (1). If the author of an anonymous or pseudonymous work discloses his identity during the above-mentioned period, the term of protection applicable shall be that provided in paragraph (1). The countries of the Union shall not be required to protect anonymous or pseudonymous works in respect of which it is reasonable to presume that their author has been dead for fifty years.

(4)  It shall be a matter for legislation in the countries of the Union to determine the term of protection of photographic works and that of works of applied art in so far as they are protected as artistic works; however, this term shall last at least until the end of a period of twenty-five years from the making of such a work.

(5)  The term of protection subsequent to the death of the author and the terms provided by paragraphs (2), (3) and (4) shall run from the date of death or of the event referred to in those paragraphs, but such terms shall always be deemed to begin on the first of January of the year following the death or such event.

**ADD-28**

(6)  The countries of the Union may grant a term of protection in excess of those provided by the preceding paragraphs.

(7)  Those countries of the Union bound by the Rome Act of this Convention which grant, in their national legislation in force at the time of signature of the present Act, shorter terms of protection than those provided for in the preceding paragraphs shall have the right to maintain such terms when ratifying or acceding to the present Act.

(8)  In any case, the term shall be governed by the legislation of the country where protection is claimed; however, unless the legislation of that country otherwise provides, the term shall not exceed the term fixed in the country of origin of the work.

### Article 7<sup>bis</sup>

#### [*Term of Protection for Works of Joint Authorship*]

The provisions of the preceding Article shall also apply in the case of a work of joint authorship, provided that the terms measured from the death of the author shall be calculated from the death of the last surviving author.

### Article 8

#### [*Right of Translation*]

Authors of literary and artistic works protected by this Convention shall enjoy the exclusive right of making and of authorizing the translation of their works throughout the term of protection of their rights in the original works.

### Article 9

#### [*Right of Reproduction:* 1. Generally; 2. Possible exceptions; 3. Sound and visual recordings]

(1)  Authors of literary and artistic works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form.

(2)  It shall be a matter for legislation in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author.

(3)  Any sound or visual recording shall be considered as a reproduction for the purposes of this Convention.

### Article 10

#### [*Certain Free Uses of Works:* 1. Quotations; 2. Illustrations for teaching; 3. Indication of source and author]

(1)  It shall be permissible to make quotations from a work which has already been lawfully made available to the public, provided that their making is compatible with fair practice, and their extent does not exceed that justified by the purpose, including quotations from newspaper articles and periodicals in the form of press summaries.

(2)  It shall be a matter for legislation in the countries of the Union, and for special agreements existing or to be concluded between them, to permit the utilization, to the extent justified by the purpose, of literary or artistic works by way of illustration in publications, broadcasts or sound or visual recordings for teaching, provided such utilization is compatible with fair practice.

(3)  Where use is made of works in accordance with the preceding paragraphs of this Article, mention shall be made of the source, and of the name of the author if it appears thereon.

## Article 10<sup>bis</sup>

[*Further Possible Free Uses of Works:* 1. Of certain articles and broadcast works; 2. Of works seen or heard in connection with current events]

(1)  It shall be a matter for legislation in the countries of the Union to permit the reproduction by the press, the broadcasting or the communication to the public by wire of articles published in newspapers or periodicals on current economic, political or religious topics, and of broadcast works of the same character, in cases in which the reproduction, broadcasting or such communication thereof is not expressly reserved. Nevertheless, the source must always be clearly indicated; the legal consequences of a breach of this obligation shall be determined by the legislation of the country where protection is claimed.

(2)  It shall also be a matter for legislation in the countries of the Union to determine the conditions under which, for the purpose of reporting current events by means of photography, cinematography, broadcasting or communication to the public by wire, literary or artistic works seen or heard in the course of the event may, to the extent justified by the informatory purpose, be reproduced and made available to the public.

## Article 11

[*Certain Rights in Dramatic and Musical Works:* 1. Right of public performance and of communication to the public of a performance; 2. In respect of translations]

(1)  Authors of dramatic, dramatico-musical and musical works shall enjoy the exclusive right of authorizing:

> (i)  the public performance of their works, including such public performance by any means or process;
> (ii)  any communication to the public of the performance of their works.

(2)  Authors of dramatic or dramatico-musical works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.

## Article 11<sup>bis</sup>

[*Broadcasting and Related Rights:* 1. Broadcasting and other wireless communications, public communication of broadcast by wire or rebroadcast, public communication of broadcast by loudspeaker or analogous instruments; 2. Compulsory licenses; 3. Recording; ephemeral recordings]

(1)  Authors of literary and artistic works shall enjoy the exclusive right of authorizing:

> (i)  the broadcasting of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;
> (ii)  any communication to the public by wire or by rebroadcasting of the broadcast of the work, when this communication is made by an organization other than the original one;
> (iii)  the public communication by loudspeaker or any other analogous instrument transmitting, by signs, sounds or images, the broadcast of the work.

(2)  It shall be a matter for legislation in the countries of the Union to determine the conditions under which the rights mentioned in the preceding paragraph may be exercised, but these conditions shall apply only in the countries where they have been prescribed. They shall not in any circumstances be prejudicial to the moral rights of the author, nor to his right to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

(3)  In the absence of any contrary stipulation, permission granted in accordance with paragraph (1) of this Article shall not imply permission to record, by means of instruments recording sounds or images, the work broadcast. It shall, however, be a matter for legislation in the countries of the Union to determine the regulations for ephemeral recordings made by a broadcasting organization by means of its own facilities and used for its own broadcasts. The preservation of these recordings in official archives may, on the ground of their exceptional documentary character, be authorized by such legislation.

**ADD-30**

<div align="center">

**Article 11<sup>ter</sup>**

</div>

[*Certain Rights in Literary Works:* 1. Right of public recitation and of communication to the public of a recitation; 2. In respect of translations]

(1)  Authors of literary works shall enjoy the exclusive right of authorizing:

  (i)  the public recitation of their works, including such public recitation by any means or process;

  (ii)  any communication to the public of the recitation of their works.

(2)  Authors of literary works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.

<div align="center">

**Article 12**

[*Right of Adaptation, Arrangement and Other Alteration*]

</div>

Authors of literary or artistic works shall enjoy the exclusive right of authorizing adaptations, arrangements and other alterations of their works.

<div align="center">

**Article 13**

[*Possible Limitation of the Right of Recording of Musical Works and Any Words Pertaining Thereto:* 1. Compulsory licenses; 2. Transitory measures; 3. Seizure on importation of copies made without the author's permission]

</div>

(1)  Each country of the Union may impose for itself reservations and conditions on the exclusive right granted to the author of a musical work and to the author of any words, the recording of which together with the musical work has already been authorized by the latter, to authorize the sound recording of that musical work, together with such words, if any; but all such reservations and conditions shall apply only in the countries which have imposed them and shall not, in any circumstances, be prejudicial to the rights of these authors to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

(2)  Recordings of musical works made in a country of the Union in accordance with Article 13(3) of the Conventions signed at Rome on June 2, 1928, and at Brussels on June 26, 1948, may be reproduced in that country without the permission of the author of the musical work until a date two years after that country becomes bound by this Act.

(3)  Recordings made in accordance with paragraphs (1) and (2) of this Article and imported without permission from the parties concerned into a country where they are treated as infringing recordings shall be liable to seizure.

<div align="center">

**Article 14**

[*Cinematographic and Related Rights:* 1. Cinematographic adaptation and reproduction; distribution; public performance and public communication by wire of works thus adapted or reproduced; 2. Adaptation of cinematographic productions; 3. No compulsory licenses]

</div>

(1)  Authors of literary or artistic works shall have the exclusive right of authorizing:

  (i)  the cinematographic adaptation and reproduction of these works, and the distribution of the works thus adapted or reproduced;

  (ii)  the public performance and communication to the public by wire of the works thus adapted or reproduced.

(2)  The adaptation into any other artistic form of a cinematographic production derived from literary or artistic works shall, without prejudice to the authorization of the author of the cinematographic production, remain subject to the authorization of the authors of the original works.

(3)  The provisions of Article 13(1) shall not apply.

<div align="center">

**ADD-31**

</div>

## Article 14<sup>bis</sup>

[*Special Provisions Concerning Cinematographic Works:* 1. Assimilation to "original" works;
2. Ownership; limitation of certain rights of certain contributors; 3. Certain other contributors]

(1)  Without prejudice to the copyright in any work which may have been adapted or reproduced, a cinematographic work shall be protected as an original work. The owner of copyright in a cinematographic work shall enjoy the same rights as the author of an original work, including the rights referred to in the preceding Article.

(2)

*(a)*  Ownership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed.

*(b)*  However, in the countries of the Union which, by legislation, include among the owners of copyright in a cinematographic work authors who have brought contributions to the making of the work, such authors, if they have undertaken to bring such contributions, may not, in the absence of any contrary or special stipulation, object to the reproduction, distribution, public performance, communication to the public by wire, broadcasting or any other communication to the public, or to the subtitling or dubbing of texts, of the work.

*(c)* The question whether or not the form of the undertaking referred to above should, for the application of the preceding subparagraph *(b)*, be in a written agreement or a written act of the same effect shall be a matter for the legislation of the country where the maker of the cinematographic work has his headquarters or habitual residence. However, it shall be a matter for the legislation of the country of the Union where protection is claimed to provide that the said undertaking shall be in a written agreement or a written act of the same effect. The countries whose legislation so provides shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.

*(d)* By "contrary or special stipulation" is meant any restrictive condition which is relevant to the aforesaid undertaking.

(3)  Unless the national legislation provides to the contrary, the provisions of paragraph (2)*(b)* above shall not be applicable to authors of scenarios, dialogues and musical works created for the making of the cinematographic work, or to the principal director thereof. However, those countries of the Union whose legislation does not contain rules providing for the application of the said paragraph (2)*(b)* to such director shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.

## Article 14<sup>ter</sup>

[*"Droit de suite" in Works of Art and Manuscripts:*
1. Right to an interest in resales; 2. Applicable law; 3. Procedure]

(1)  The author, or after his death the persons or institutions authorized by national legislation, shall, with respect to original works of art and original manuscripts of writers and composers, enjoy the inalienable right to an interest in any sale of the work subsequent to the first transfer by the author of the work.

(2)  The protection provided by the preceding paragraph may be claimed in a country of the Union only if legislation in the country to which the author belongs so permits, and to the extent permitted by the country where this protection is claimed.

(3)  The procedure for collection and the amounts shall be matters for determination by national legislation.

## Article 15

[*Right to Enforce Protected Rights:* 1. Where author's name is indicated or where pseudonym leaves no doubt as to author's identity; 2. In the case of cinematographic works; 3. In the case of anonymous and pseudonymous works; 4. In the case of certain unpublished works of unknown authorship]

(1)  In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner. This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to his identity.

(2)  The person or body corporate whose name appears on a cinematographic work in the usual manner shall, in the absence of proof to the contrary, be presumed to be the maker of the said work.

(3)  In the case of anonymous and pseudonymous works, other than those referred to in paragraph (1) above, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be deemed to represent the author, and in this capacity he shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply when the author reveals his identity and establishes his claim to authorship of the work.

(4)

*(a)* In the case of unpublished works where the identity of the author is unknown, but where there is every ground to presume that he is a national of a country of the Union, it shall be a matter for legislation in that country to designate the competent authority which shall represent the author and shall be entitled to protect and enforce his rights in the countries of the Union.

*(b)* Countries of the Union which make such designation under the terms of this provision shall notify the Director General by means of a written declaration giving full information concerning the authority thus designated. The Director General shall at once communicate this declaration to all other countries of the Union.

## Article 16

[*Infringing Copies:* 1. Seizure; 2. Seizure on importation; 3. Applicable law]

(1)  Infringing copies of a work shall be liable to seizure in any country of the Union where the work enjoys legal protection.

(2)  The provisions of the preceding paragraph shall also apply to reproductions coming from a country where the work is not protected, or has ceased to be protected.

(3)  The seizure shall take place in accordance with the legislation of each country.

## Article 17

[*Possibility of Control of Circulation, Presentation and Exhibition of Works*]

The provisions of this Convention cannot in any way affect the right of the Government of each country of the Union to permit, to control, or to prohibit, by legislation or regulation, the circulation, presentation, or exhibition of any work or production in regard to which the competent authority may find it necessary to exercise that right.

## Article 18

[*Works Existing on Convention's Entry Into Force:* 1. Protectable where protection not yet expired in country of origin; 2. Non-protectable where protection already expired in country where it is claimed; 3. Application of these principles; 4. Special cases]

(1)  This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.

(2)  If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew.

(3)  The application of this principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.

(4)  The preceding provisions shall also apply in the case of new accessions to the Union and to cases in which protection is extended by the application of Article 7 or by the abandonment of reservations.

## Article 19

[*Protection Greater than Resulting from Convention*]

The provisions of this Convention shall not preclude the making of a claim to the benefit of any greater protection which may be granted by legislation in a country of the Union.

## Article 20

[*Special Agreements Among Countries of the Union*]

The Governments of the countries of the Union reserve the right to enter into special agreements among themselves, in so far as such agreements grant to authors more extensive rights than those granted by the Convention, or contain other provisions not contrary to this Convention. The provisions of existing agreements which satisfy these conditions shall remain applicable.

## Article 21

[*Special Provisions Regarding Developing Countries:* 1. Reference to Appendix; 2. Appendix part of Act]

(1)  Special provisions regarding developing countries are included in the Appendix.

(2)  Subject to the provisions of Article 28(1)*(b)*, the Appendix forms an integral part of this Act.

## Article 22

[*Assembly:* 1. Constitution and composition; 2. Tasks; 3. Quorum, voting, observers; 4. Convocation; 5. Rules of procedure]

(1)

*(a)* The Union shall have an Assembly consisting of those countries of the Union which are bound by Articles 22 to 26.

*(b)* The Government of each country shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(2)

*(a)* The Assembly shall:

  (i)  deal with all matters concerning the maintenance and development of the Union and the implementation of this Convention;

  (ii)  give directions concerning the preparation for conferences of revision to the International Bureau of Intellectual Property (hereinafter designated as "the International Bureau") referred to in the Convention Establishing the World Intellectual Property Organization (hereinafter designated as "the Organization"), due account being taken of any comments made by those countries of the Union which are not bound by Articles 22 to 26;

(iii) review and approve the reports and activities of the Director General of the Organization concerning the Union, and give him all necessary instructions concerning matters within the competence of the Union;

(iv) elect the members of the Executive Committee of the Assembly;

(v) review and approve the reports and activities of its Executive Committee, and give instructions to such Committee;

(vi) determine the program and adopt the biennial budget of the Union, and approve its final accounts;

(vii) adopt the financial regulations of the Union;

(viii) establish such committees of experts and working groups as may be necessary for the work of the Union;

(ix) determine which countries not members of the Union and which intergovernmental and international non-governmental organizations shall be admitted to its meetings as observers;

(x) adopt amendments to Articles 22 to 26;

(xi) take any other appropriate action designed to further the objectives of the Union;

(xii) exercise such other functions as are appropriate under this Convention;

(xiii) subject to its acceptance, exercise such rights as are given to it in the Convention establishing the Organization.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3)

*(a)* Each country member of the Assembly shall have one vote.

*(b)* One-half of the countries members of the Assembly shall constitute a quorum.

*(c)* Notwithstanding the provisions of subparagraph *(b)*, if, in any session, the number of countries represented is less than one-half but equal to or more than one-third of the countries members of the Assembly, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the following conditions are fulfilled. The International Bureau shall communicate the said decisions to the countries members of the Assembly which were not represented and shall invite them to express in writing their vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of countries having thus expressed their vote or abstention attains the number of countries which was lacking for attaining the quorum in the session itself, such decisions shall take effect provided that at the same time the required majority still obtains.

*(d)* Subject to the provisions of Article 26(2), the decisions of the Assembly shall require two-thirds of the votes cast.

*(e)* Abstentions shall not be considered as votes.

*(f)* A delegate may represent, and vote in the name of, one country only.

*(g)* Countries of the Union not members of the Assembly shall be admitted to its meetings as observers.

(4)

*(a)* The Assembly shall meet once in every second calendar year in ordinary session upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of the Organization.

*(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, at the request of the Executive Committee or at the request of one-fourth of the countries members of the Assembly.

(5) The Assembly shall adopt its own rules of procedure.

## Article 23

[*Executive Committee:* 1. Constitution; 2. Composition; 3. Number of members; 4. Geographical distribution; special agreements; 5. Term, limits of re-eligibility, rules of election; 6. Tasks; 7. Convocation; 8. Quorum, voting; 9. Observers; 10. Rules of procedure]

(1)  The Assembly shall have an Executive Committee.

(2)

*(a)* The Executive Committee shall consist of countries elected by the Assembly from among countries members of the Assembly. Furthermore, the country on whose territory the Organization has its headquarters shall, subject to the provisions of Article 25(7)*(b)*, have an ex officio seat on the Committee.

*(b)* The Government of each country member of the Executive Committee shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(3)  The number of countries members of the Executive Committee shall correspond to one-fourth of the number of countries members of the Assembly. In establishing the number of seats to be filled, remainders after division by four shall be disregarded.

(4)  In electing the members of the Executive Committee, the Assembly shall have due regard to an equitable geographical distribution and to the need for countries party to the Special Agreements which might be established in relation with the Union to be among the countries constituting the Executive Committee.

(5)

*(a)* Each member of the Executive Committee shall serve from the close of the session of the Assembly which elected it to the close of the next ordinary session of the Assembly.

*(b)* Members of the Executive Committee may be re-elected, but not more than two-thirds of them.

*(c)* The Assembly shall establish the details of the rules governing the election and possible re-election of the members of the Executive Committee.

(6)

*(a)* The Executive Committee shall:

  (i)  prepare the draft agenda of the Assembly;

 (ii)  submit proposals to the Assembly respecting the draft program and biennial budget of the Union prepared by the Director General;

(iii)  [*deleted*]

(iv)  submit, with appropriate comments, to the Assembly the periodical reports of the Director General and the yearly audit reports on the accounts;

 (v)  in accordance with the decisions of the Assembly and having regard to circumstances arising between two ordinary sessions of the Assembly, take all necessary measures to ensure the execution of the program of the Union by the Director General;

(vi)  perform such other functions as are allocated to it under this Convention.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Executive Committee shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(7)

*(a)* The Executive Committee shall meet once a year in ordinary session upon convocation by the Director General, preferably during the same period and at the same place as the Coordination Committee of the Organization.

*(b)* The Executive Committee shall meet in extraordinary session upon convocation by the Director General, either on his own initiative, or at the request of its Chairman or one-fourth of its members.

(8)

*(a)* Each country member of the Executive Committee shall have one vote.

*(b)* One-half of the members of the Executive Committee shall constitute a quorum.

*(c)* Decisions shall be made by a simple majority of the votes cast.

*(d)* Abstentions shall not be considered as votes.

*(e)* A delegate may represent, and vote in the name of, one country only.

(9) Countries of the Union not members of the Executive Committee shall be admitted to its meetings as observers.

(10) The Executive Committee shall adopt its own rules of procedure.

## Article 24

[*International Bureau:* 1. Tasks in general, Director General; 2. General information; 3. Periodical; 4. Information to countries; 5. Studies and services; 6. Participation in meetings; 7. Conferences of revision; 8. Other tasks]

(1)

*(a)* The administrative tasks with respect to the Union shall be performed by the International Bureau, which is a continuation of the Bureau of the Union united with the Bureau of the Union established by the International Convention for the Protection of Industrial Property.

*(b)* In particular, the International Bureau shall provide the secretariat of the various organs of the Union.

*(c)* The Director General of the Organization shall be the chief executive of the Union and shall represent the Union.

(2) The International Bureau shall assemble and publish information concerning the protection of copyright. Each country of the Union shall promptly communicate to the International Bureau all new laws and official texts concerning the protection of copyright.

(3) The International Bureau shall publish a monthly periodical.

(4) The International Bureau shall, on request, furnish information to any country of the Union on matters concerning the protection of copyright.

(5) The International Bureau shall conduct studies, and shall provide services, designed to facilitate the protection of copyright.

(6) The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the Executive Committee and any other committee of experts or working group. The Director General, or a staff member designated by him, shall be ex officio secretary of these bodies.

(7)

*(a)* The International Bureau shall, in accordance with the directions of the Assembly and in cooperation with the Executive Committee, make the preparations for the conferences of revision of the provisions of the Convention other than Articles 22 to 26.

*(b)* The International Bureau may consult with intergovernmental and international non-governmental organizations concerning preparations for conferences of revision.

*(c)* The Director General and persons designated by him shall take part, without the right to vote, in the discussions at these conferences.

(8) The International Bureau shall carry out any other tasks assigned to it.

## Article 25

[*Finances:* 1. Budget; 2. Coordination with other Unions; 3. Resources; 4. Contributions; possible extension of previous budget; 5. Fees and charges; 6. Working capital fund; 7. Advances by host Government; 8. Auditing of accounts]

(1)

*(a)* The Union shall have a budget.

*(b)* The budget of the Union shall include the income and expenses proper to the Union, its contribution to the budget of expenses common to the Unions, and, where applicable, the sum made available to the budget of the Conference of the Organization.

*(c)* Expenses not attributable exclusively to the Union but also to one or more other Unions administered by the Organization shall be considered as expenses common to the Unions. The share of the Union in such common expenses shall be in proportion to the interest the Union has in them.

(2)  The budget of the Union shall be established with due regard to the requirements of coordination with the budgets of the other Unions administered by the Organization.

(3)  The budget of the Union shall be financed from the following sources:

   (i)  contributions of the countries of the Union;

  (ii)  fees and charges due for services performed by the International Bureau in relation to the Union;

 (iii)  sale of, or royalties on, the publications of the International Bureau concerning the Union;

 (iv)  gifts, bequests, and subventions;

  (v)  rents, interests, and other miscellaneous income.

(4)

*(a)* For the purpose of establishing its contribution towards the budget, each country of the Union shall belong to a class, and shall pay its annual contributions on the basis of a number of units fixed as follows:

| | |
|---|---:|
| Class I | 25 |
| Class II | 20 |
| Class III | 15 |
| Class IV | 10 |
| Class V | 5 |
| Class VI | 3 |
| Class VII | 1 |

*(b)* Unless it has already done so, each country shall indicate, concurrently with depositing its instrument of ratification or accession, the class to which it wishes to belong. Any country may change class. If it chooses a lower class, the country must announce it to the Assembly at one of its ordinary sessions. Any such change shall take effect at the beginning of the calendar year following the session.

*(c)* The annual contribution of each country shall be an amount in the same proportion to the total sum to be contributed to the annual budget of the Union by all countries as the number of its units is to the total of the units of all contributing countries.

*(d)* Contributions shall become due on the first of January of each year.

*(e)* A country which is in arrears in the payment of its contributions shall have no vote in any of the organs of the Union of which it is a member if the amount of its arrears equals or exceeds the amount of the contributions due from it for the preceding two full years. However, any organ of the Union may allow such a country to continue to exercise its vote in that organ if, and as long as, it is satisfied that the delay in payment is due to exceptional and unavoidable circumstances.

*(f)* If the budget is not adopted before the beginning of a new financial period, it shall be at the same level as the budget of the previous year, in accordance with the financial regulations.

(5)  The amount of the fees and charges due for services rendered by the International Bureau in relation to the Union shall be established, and shall be reported to the Assembly and the Executive Committee, by the Director General.

(6)

*(a)* The Union shall have a working capital fund which shall be constituted by a single payment made by each country of the Union. If the fund becomes insufficient, an increase shall be decided by the Assembly.

*(b)* The amount of the initial payment of each country to the said fund or of its participation in the increase thereof shall be a proportion of the contribution of that country for the year in which the fund is established or the increase decided.

*(c)* The proportion and the terms of payment shall be fixed by the Assembly on the proposal of the Director General and after it has heard the advice of the Coordination Committee of the Organization.

(7)

*(a)* In the headquarters agreement concluded with the country on the territory of which the Organization has its headquarters, it shall be provided that, whenever the working capital fund is insufficient, such country shall grant advances. The amount of these advances and the conditions on which they are granted shall be the subject of separate agreements, in each case, between such country and the Organization. As long as it remains under the obligation to grant advances, such country shall have an ex officio seat on the Executive Committee.

*(b)* The country referred to in subparagraph *(a)* and the Organization shall each have the right to denounce the obligation to grant advances, by written notification. Denunciation shall take effect three years after the end of the year in which it has been notified.

(8) The auditing of the accounts shall be effected by one or more of the countries of the Union or by external auditors, as provided in the financial regulations. They shall be designated, with their agreement, by the Assembly.

## Article 26

[*Amendments:* 1. Provisions susceptible of amendment by the Assembly; proposals; 2. Adoption; 3. Entry into force]

(1) Proposals for the amendment of Articles 22, 23, 24, 25, and the present Article, may be initiated by any country member of the Assembly, by the Executive Committee, or by the Director General. Such proposals shall be communicated by the Director General to the member countries of the Assembly at least six months in advance of their consideration by the Assembly.

(2) Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly. Adoption shall require three-fourths of the votes cast, provided that any amendment of Article 22, and of the present paragraph, shall require four-fifths of the votes cast.

(3) Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the countries members of the Assembly at the time it adopted the amendment. Any amendment to the said Articles thus accepted shall bind all the countries which are members of the Assembly at the time the amendment enters into force, or which become members thereof at a subsequent date, provided that any amendment increasing the financial obligations of countries of the Union shall bind only those countries which have notified their acceptance of such amendment.

## Article 27

[*Revision:* 1. Objective; 2. Conferences; 3. Adoption]

(1) This Convention shall be submitted to revision with a view to the introduction of amendments designed to improve the system of the Union.

(2) For this purpose, conferences shall be held successively in one of the countries of the Union among the delegates of the said countries.

(3) Subject to the provisions of Article 26 which apply to the amendment of Articles 22 to 26, any revision of this Act, including the Appendix, shall require the unanimity of the votes cast.

## Article 28

[*Acceptance and Entry Into Force of Act for Countries of the Union:* 1. Ratification, accession; possibility of excluding certain provisions; withdrawal of exclusion; 2. Entry into force of Articles 1 to 21 and Appendix; 3. Entry into force of Articles 22 to 38]

(1)

**ADD-39**

*(a)* Any country of the Union which has signed this Act may ratify it, and, if it has not signed it, may accede to it. Instruments of ratification or accession shall be deposited with the Director General.

*(b)* Any country of the Union may declare in its instrument of ratification or accession that its ratification or accession shall not apply to Articles 1 to 21 and the Appendix, provided that, if such country has previously made a declaration under Article VI(1) of the Appendix, then it may declare in the said instrument only that its ratification or accession shall not apply to Articles 1 to 20.

*(c)* Any country of the Union which, in accordance with subparagraph *(b)*, has excluded provisions therein referred to from the effects of its ratification or accession may at any later time declare that it extends the effects of its ratification or accession to those provisions. Such declaration shall be deposited with the Director General.

(2)

*(a)* Articles 1 to 21 and the Appendix shall enter into force three months after both of the following two conditions are fulfilled:

   (i) at least five countries of the Union have ratified or acceded to this Act without making a declaration under paragraph (1)*(b)*,

  (ii) France, Spain, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, have become bound by the Universal Copyright Convention as revised at Paris on July 24, 1971.

*(b)* The entry into force referred to in subparagraph *(a)* shall apply to those countries of the Union which, at least three months before the said entry into force, have deposited instruments of ratification or accession not containing a declaration under paragraph (1)*(b)*.

*(c)* With respect to any country of the Union not covered by subparagraph *(b)* and which ratifies or accedes to this Act without making a declaration under paragraph (1)*(b)*, Articles 1 to 21 and the Appendix shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, Articles 1 to 21 and the Appendix shall enter into force with respect to that country on the date thus indicated.

*(d)* The provisions of subparagraphs *(a)* to *(c)* do not affect the application of Article VI of the Appendix.

(3) With respect to any country of the Union which ratifies or accedes to this Act with or without a declaration made under paragraph (1)*(b)*, Articles 22 to 38 shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, Articles 22 to 38 shall enter into force with respect to that country on the date thus indicated.

**Article 29**

[*Acceptance and Entry Into Force for Countries Outside the Union:* 1. Accession; 2. Entry into force]

(1) Any country outside the Union may accede to this Act and thereby become party to this Convention and a member of the Union. Instruments of accession shall be deposited with the Director General.

(2)

*(a)* Subject to subparagraph *(b)*, this Convention shall enter into force with respect to any country outside the Union three months after the date on which the Director General has notified the deposit of its instrument of accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, this Convention shall enter into force with respect to that country on the date thus indicated.

*(b)* If the entry into force according to subparagraph *(a)* precedes the entry into force of Articles 1 to 21 and the Appendix according to Article 28(2)*(a)*, the said country shall, in the meantime, be bound, instead of by Articles 1 to 21 and the Appendix, by Articles 1 to 20 of the Brussels Act of this Convention.

**ADD-40**

## Article 29<sup>bis</sup>

[*Effect of Acceptance of Act for the Purposes of Article 14(2) of the WIPO Convention*]

Ratification of or accession to this Act by any country not bound by Articles 22 to 38 of the Stockholm Act of this Convention shall, for the sole purposes of Article 14(2) of the Convention establishing the Organization, amount to ratification of or accession to the said Stockholm Act with the limitation set forth in Article 28(1)*(b)*(i) thereof.

## Article 30

[*Reservations:* 1. Limits of possibility of making reservations; 2. Earlier reservations; reservation as to the right of translation; withdrawal of reservation]

(1)  Subject to the exceptions permitted by paragraph (2) of this Article, by Article 28(1)*(b)*, by Article 33(2), and by the Appendix, ratification or accession shall automatically entail acceptance of all the provisions and admission to all the advantages of this Convention.

(2)

*(a)* Any country of the Union ratifying or acceding to this Act may, subject to Article V(2) of the Appendix, retain the benefit of the reservations it has previously formulated on condition that it makes a declaration to that effect at the time of the deposit of its instrument of ratification or accession.

*(b)* Any country outside the Union may declare, in acceding to this Convention and subject to Article V(2) of the Appendix, that it intends to substitute, temporarily at least, for Article 8 of this Act concerning the right of translation, the provisions of Article 5 of the Union Convention of 1886, as completed at Paris in 1896, on the clear understanding that the said provisions are applicable only to translations into a language in general use in the said country. Subject to Article I(6)*(b)* of the Appendix, any country has the right to apply, in relation to the right of translation of works whose country of origin is a country availing itself of such a reservation, a protection which is equivalent to the protection granted by the latter country.

*(c)* Any country may withdraw such reservations at any time by notification addressed to the Director General.

## Article 31

[*Applicability to Certain Territories:* 1. Declaration; 2. Withdrawal of declaration; 3. Effective date; 4. Acceptance of factual situations not implied]

(1)  Any country may declare in its instrument of ratification or accession, or may inform the Director General by written notification at any time thereafter, that this Convention shall be applicable to all or part of those territories, designated in the declaration or notification, for the external relations of which it is responsible.

(2)  Any country which has made such a declaration or given such a notification may, at any time, notify the Director General that this Convention shall cease to be applicable to all or part of such territories.

(3)

*(a)* Any declaration made under paragraph (1) shall take effect on the same date as the ratification or accession in which it was included, and any notification given under that paragraph shall take effect three months after its notification by the Director General.

*(b)* Any notification given under paragraph (2) shall take effect twelve months after its receipt by the Director General.

(4)  This Article shall in no way be understood as implying the recognition or tacit acceptance by a country of the Union of the factual situation concerning a territory to which this Convention is made applicable by another country of the Union by virtue of a declaration under paragraph (1).

## Article 32

[*Applicability of this Act and of Earlier Acts:* 1. As between countries already members of the Union; 2. As between a country becoming a member of the Union and other countries members of the Union; 3. Applicability of the Appendix in Certain Relations]

(1)  This Act shall, as regards relations between the countries of the Union, and to the extent that it applies, replace the Berne Convention of September 9, 1886, and the subsequent Acts of revision. The Acts previously in force shall continue to be applicable, in their entirety or to the extent that this Act does not replace them by virtue of the preceding sentence, in relations with countries of the Union which do not ratify or accede to this Act.

(2)  Countries outside the Union which become party to this Act shall, subject to paragraph (3), apply it with respect to any country of the Union not bound by this Act or which, although bound by this Act, has made a declaration pursuant to Article 28(1)*(b)*. Such countries recognize that the said country of the Union, in its relations with them:

   (i)   may apply the provisions of the most recent Act by which it is bound, and
   (ii)  subject to Article I(6) of the Appendix, has the right to adapt the protection to the level provided for by this Act.

(3)  Any country which has availed itself of any of the faculties provided for in the Appendix may apply the provisions of the Appendix relating to the faculty or faculties of which it has availed itself in its relations with any other country of the Union which is not bound by this Act, provided that the latter country has accepted the application of the said provisions.

## Article 33

[*Disputes:* 1. Jurisdiction of the International Court of Justice; 2. Reservation as to such jurisdiction; 3. Withdrawal of reservation]

(1)  Any dispute between two or more countries of the Union concerning the interpretation or application of this Convention, not settled by negotiation, may, by any one of the countries concerned, be brought before the International Court of Justice by application in conformity with the Statute of the Court, unless the countries concerned agree on some other method of settlement. The country bringing the dispute before the Court shall inform the International Bureau; the International Bureau shall bring the matter to the attention of the other countries of the Union.

(2)  Each country may, at the time it signs this Act or deposits its instrument of ratification or accession, declare that it does not consider itself bound by the provisions of paragraph (1). With regard to any dispute between such country and any other country of the Union, the provisions of paragraph (1) shall not apply.

(3)  Any country having made a declaration in accordance with the provisions of paragraph (2) may, at any time, withdraw its declaration by notification addressed to the Director General.

## Article 34

[*Closing of Certain Earlier Provisions:* 1. Of earlier Acts; 2. Of the Protocol to the Stockholm Act]

(1)  Subject to Article 29^bis no country may ratify or accede to earlier Acts of this Convention once Articles 1 to 21 and the Appendix have entered into force.

(2)  Once Articles 1 to 21 and the Appendix have entered into force, no country may make a declaration under Article 5 of the Protocol Regarding Developing Countries attached to the Stockholm Act.

## Article 35

[*Duration of the Convention; Denunciation:* 1. Unlimited duration; 2. Possibility of denunciation; 3. Effective date of denunciation; 4. Moratorium on denunciation]

(1)  This Convention shall remain in force without limitation as to time.

(2)  Any country may denounce this Act by notification addressed to the Director General. Such denunciation shall constitute also denunciation of all earlier Acts and shall affect only the country making it, the Convention remaining in full force and effect as regards the other countries of the Union.

(3)  Denunciation shall take effect one year after the day on which the Director General has received the notification.

(4)  The right of denunciation provided by this Article shall not be exercised by any country before the expiration of five years from the date upon which it becomes a member of the Union.

### Article 36

[*Application of the Convention:* 1. Obligation to adopt the necessary measures; 2. Time from which obligation exists]

(1)  Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention.

(2)  It is understood that, at the time a country becomes bound by this Convention, it will be in a position under its domestic law to give effect to the provisions of this Convention.

### Article 37

[*Final Clauses:* 1. Languages of the Act; 2. Signature; 3. Certified copies; 4. Registration; 5. Notifications]

(1)

*(a)* This Act shall be signed in a single copy in the French and English languages and, subject to paragraph (2), shall be deposited with the Director General.

*(b)* Official texts shall be established by the Director General, after consultation with the interested Governments, in the Arabic, German, Italian, Portuguese and Spanish languages, and such other languages as the Assembly may designate.

*(c)* In case of differences of opinion on the interpretation of the various texts, the French text shall prevail.

(2)  This Act shall remain open for signature until January 31, 1972. Until that date, the copy referred to in paragraph (1)*(a)* shall be deposited with the Government of the French Republic.

(3)  The Director General shall certify and transmit two copies of the signed text of this Act to the Governments of all countries of the Union and, on request, to the Government of any other country.

(4)  The Director General shall register this Act with the Secretariat of the United Nations.

(5)  The Director General shall notify the Governments of all countries of the Union of signatures, deposits of instruments of ratification or accession and any declarations included in such instruments or made pursuant to Articles 28(1)*(c)*, 30(2)*(a)* and *(b)*, and 33(2), entry into force of any provisions of this Act, notifications of denunciation, and notifications pursuant to Articles 30(2)*(c)*, 31(1) and (2), 33(3), and 38(1), as well as the Appendix.

### Article 38

[*Transitory Provisions:* 1. Exercise of the "five-year privilege"; 2. Bureau of the Union, Director of the Bureau; 3. Succession of Bureau of the Union]

(1)  Countries of the Union which have not ratified or acceded to this Act and which are not bound by Articles 22 to 26 of the Stockholm Act of this Convention may, until April 26, 1975, exercise, if they so desire, the rights provided under the said Articles as if they were bound by them. Any country desiring to exercise such rights shall give written notification to this effect to the Director General; this notification shall be effective on the date of its receipt. Such countries shall be deemed to be members of the Assembly until the said date.

**ADD-43**

(2)  As long as all the countries of the Union have not become Members of the Organization, the International Bureau of the Organization shall also function as the Bureau of the Union, and the Director General as the Director of the said Bureau.

(3)  Once all the countries of the Union have become Members of the Organization, the rights, obligations, and property, of the Bureau of the Union shall devolve on the International Bureau of the Organization.

**ADD-44**

# APPENDIX

# [SPECIAL PROVISIONS REGARDING DEVELOPING COUNTRIES]

## Article I

[*Faculties Open to Developing Countries:* 1. Availability of certain faculties; declaration: 2. Duration of effect of declaration, 3. Cessation of developing country status; 4. Existing stocks of copies; 5. Declarations concerning certain territories; 6. Limits of reciprocity]

(1) Any country regarded as a developing country in conformity with the established practice of the General Assembly of the United Nations which ratifies or accedes to this Act, of which this Appendix forms an integral part, and which, having regard to its economic situation and its social or cultural needs, does not consider itself immediately in a position to make provision for the protection of all the rights as provided for in this Act, may, by a notification deposited with the Director General at the time of depositing its instrument of ratification or accession or, subject to Article V(1)*(c)*, at any time thereafter, declare that it will avail itself of the faculty provided for in Article II, or of the faculty provided for in Article III, or of both of those faculties. It may, instead of availing itself of the faculty provided for in Article II, make a declaration according to Article V(1)*(a)*.

(2)

(*a*) Any declaration under paragraph (1) notified before the expiration of the period of ten years from the entry into force of Articles 1 to 21 and this Appendix according to Article 28(2) shall be effective until the expiration of the said period. Any such declaration may be renewed in whole or in part for periods of ten years each by a notification deposited with the Director General not more than fifteen months and not less than three months before the expiration of the ten-year period then running.

(*b*) Any declaration under paragraph (1) notified after the expiration of the period of ten years from the entry into force of Articles 1 to 21 and this Appendix according to Article 28(2) shall be effective until the expiration of the ten-year period then running. Any such declaration may be renewed as provided for in the second sentence of subparagraph *(a)*.

(3) Any country of the Union which has ceased to be regarded as a developing country as referred to in paragraph (1) shall no longer be entitled to renew its declaration as provided in paragraph (2), and, whether or not it formally withdraws its declaration, such country shall be precluded from availing itself of the faculties referred to in paragraph (1) from the expiration of the ten-year period then running or from the expiration of a period of three years after it has ceased to be regarded as a developing country, whichever period expires later.

(4) Where, at the time when the declaration made under paragraph (1) or (2) ceases to be effective, there are copies in stock which were made under a license granted by virtue of this Appendix, such copies may continue to be distributed until their stock is exhausted.

(5) Any country which is bound by the provisions of this Act and which has deposited a declaration or a notification in accordance with Article 31(1) with respect to the application of this Act to a particular territory, the situation of which can be regarded as analogous to that of the countries referred to in paragraph (1), may, in respect of such territory, make the declaration referred to in paragraph (1) and the notification of renewal referred to in paragraph (2). As long as such declaration or notification remains in effect, the provisions of this Appendix shall be applicable to the territory in respect of which it was made.

(6)

(*a*) The fact that a country avails itself of any of the faculties referred to in paragraph (1) does not permit another country to give less protection to works of which the country of origin is the former country than it is obliged to grant under Articles 1 to 20.

(*b*) The right to apply reciprocal treatment provided for in Article 30(2)*(b)*, second sentence, shall not, until the date on which the period applicable under Article I(3) expires, be exercised in respect of works the country of origin of which is a country which has made a declaration according to Article V(1)*(a)*.

## Article II

[*Limitations on the Right of Translation:* 1. Licenses grantable by competent authority; 2. to 4. Conditions allowing the grant of such licenses; 5. Purposes for which licenses may be granted; 6. Termination of licenses; 7. Works composed mainly of illustrations;
8. Works withdrawn from circulation; 9. Licenses for broadcasting organizations]

(1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled, so far as works published in printed or analogous forms of reproduction are concerned, to substitute for the exclusive right of translation provided for in Article 8 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.

(2)

*(a)* Subject to paragraph (3), if, after the expiration of a period of three years, or of any longer period determined by the national legislation of the said country, commencing on the date of the first publication of the work, a translation of such work has not been published in a language in general use in that country by the owner of the right of translation, or with his authorization, any national of such country may obtain a license to make a translation of the work in the said language and publish the translation in printed or analogous forms of reproduction.

*(b)* A license under the conditions provided for in this Article may also be granted if all the editions of the translation published in the language concerned are out of print.

(3)

*(a)* In the case of translations into a language which is not in general use in one or more developed countries which are members of the Union, a period of one year shall be substituted for the period of three years referred to in paragraph (2)*(a)*.

*(b)* Any country referred to in paragraph (1) may, with the unanimous agreement of the developed countries which are members of the Union and in which the same language is in general use, substitute, in the case of translations into that language, for the period of three years referred to in paragraph (2)*(a)* a shorter period as determined by such agreement but not less than one year. However, the provisions of the foregoing sentence shall not apply where the language in question is English, French or Spanish. The Director General shall be notified of any such agreement by the Governments which have concluded it.

(4)

*(a)* No license obtainable after three years shall be granted under this Article until a further period of six months has elapsed, and no license obtainable after one year shall be granted under this Article until a further period of nine months has elapsed

(i) from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

(ii) where the identity or the address of the owner of the right of translation is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

*(b)* If, during the said period of six or nine months, a translation in the language in respect of which the application was made is published by the owner of the right of translation or with his authorization, no license under this Article shall be granted.

(5) Any license under this Article shall be granted only for the purpose of teaching, scholarship or research.

(6) If a translation of a work is published by the owner of the right of translation or with his authorization at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such translation is in the same language and with substantially the same content as the translation published under the license. Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.

(7) For works which are composed mainly of illustrations, a license to make and publish a translation of the text and to reproduce and publish the illustrations may be granted only if the conditions of Article III are also fulfilled.

**ADD-46**

(8) No license shall be granted under this Article when the author has withdrawn from circulation all copies of his work.

(9)

*(a)* A license to make a translation of a work which has been published in printed or analogous forms of reproduction may also be granted to any broadcasting organization having its headquarters in a country referred to in paragraph (1), upon an application made to the competent authority of that country by the said organization, provided that all of the following conditions are met:

(i) the translation is made from a copy made and acquired in accordance with the laws of the said country;

(ii) the translation is only for use in broadcasts intended exclusively for teaching or for the dissemination of the results of specialized technical or scientific research to experts in a particular profession;

(iii) the translation is used exclusively for the purposes referred to in condition (ii) through broadcasts made lawfully and intended for recipients on the territory of the said country, including broadcasts made through the medium of sound or visual recordings lawfully and exclusively made for the purpose of such broadcasts;

(iv) all uses made of the translation are without any commercial purpose.

*(b)* Sound or visual recordings of a translation which was made by a broadcasting organization under a license granted by virtue of this paragraph may, for the purposes and subject to the conditions referred to in subparagraph *(a)* and with the agreement of that organization, also be used by any other broadcasting organization having its headquarters in the country whose competent authority granted the license in question.

*(c)* Provided that all of the criteria and conditions set out in subparagraph *(a)* are met, a license may also be granted to a broadcasting organization to translate any text incorporated in an audio-visual fixation where such fixation was itself prepared and published for the sole purpose of being used in connection with systematic instructional activities.

*(d)* Subject to subparagraphs *(a)* to *(c)*, the provisions of the preceding paragraphs shall apply to the grant and exercise of any license granted under this paragraph.

### Article III

[*Limitation on the Right of Reproduction:* 1. Licenses grantable by competent authority; 2. to 5. Conditions allowing the grant of such licenses; 6. Termination of licenses; 7. Works to which this Article applies]

(1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled to substitute for the exclusive right of reproduction provided for in Article 9 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.

(2)

*(a)* If, in relation to a work to which this Article applies by virtue of paragraph (7), after the expiration of

(i) the relevant period specified in paragraph (3), commencing on the date of first publication of a particular edition of the work, or

(ii) any longer period determined by national legislation of the country referred to in paragraph (1), commencing on the same date,

copies of such edition have not been distributed in that country to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any national of such country may obtain a license to reproduce and publish such edition at that or a lower price for use in connection with systematic instructional activities.

*(b)* A license to reproduce and publish an edition which has been distributed as described in subparagraph *(a)* may also be granted under the conditions provided for in this Article if, after the expiration of the applicable period, no authorized copies of that edition have been on sale for a period of six months in

the country concerned to the general public or in connection with systematic instructional activities at a price reasonably related to that normally charged in the country for comparable works.

(3)  The period referred to in paragraph (2)(a)(i) shall be five years, except that

    (i)  for works of the natural and physical sciences, including mathematics, and of technology, the period shall be three years;

    (ii)  for works of fiction, poetry, drama and music, and  for art books, the period shall be seven years.

(4)

    *(a)* No license obtainable after three years shall be granted under this Article until a period of six months has elapsed

      (i)  from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

      (ii)  where the identity or the address of the owner of the right of reproduction is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

    *(b)* Where licenses are obtainable after other periods and Article IV(2) is applicable, no license shall be granted until a period of three months has elapsed from the date of the dispatch of the copies of the application.

    *(c)* If, during the period of six or three months referred to in subparagraphs *(a)* and *(b)*, a distribution as described in paragraph (2)(a) has taken place, no license shall be granted under this Article.

    *(d)* No license shall be granted if the author has withdrawn from circulation all copies of the edition for the reproduction and publication of which the license has been applied for.

(5)  A license to reproduce and publish a translation of a work shall not be granted under this Article in the following cases:

    (i)  where the translation was not published by the owner of the right of translation or with his authorization, or

    (ii)  where the translation is not in a language in general use in the country in which the license is applied for.

(6)  If copies of an edition of a work are distributed in the country referred to in paragraph (1) to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such edition is in the same language and with substantially the same content as the edition which was published under the said license. Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.

(7)

    *(a)* Subject to subparagraph *(b)*, the works to which this Article applies shall be limited to works published in printed or analogous forms of reproduction.

    *(b)* This Article shall also apply to the reproduction in audio-visual form of lawfully made audio-visual fixations including any protected works incorporated therein and to the translation of any incorporated text into a language in general use in the country in which the license is applied for, always provided that the audio-visual fixations in question were prepared and published for the sole purpose of being used in connection with systematic instructional activities.

**Article IV**

[*Provisions Common to Licenses Under Articles II and III:* 1 and 2. Procedure; 3. Indication of author and title of work; 4. Exportation of copies; 5. Notice; 6. Compensation]

(1)  A license under Article II or Article III may be granted only if the applicant, in accordance with the procedure of the country concerned, establishes either that he has requested, and has been denied, authorization by the owner of the right to make and publish the translation or to reproduce and publish the

edition, as the case may be, or that, after due diligence on his part, he was unable to find the owner of the right. At the same time as making the request, the applicant shall inform any national or international information center referred to in paragraph (2).

(2) If the owner of the right cannot be found, the applicant for a license shall send, by registered airmail, copies of his application, submitted to the authority competent to grant the license, to the publisher whose name appears on the work and to any national or international information center which may have been designated, in a notification to that effect deposited with the Director General, by the Government of the country in which the publisher is believed to have his principal place of business.

(3) The name of the author shall be indicated on all copies of the translation or reproduction published under a license granted under Article II or Article III. The title of the work shall appear on all such copies. In the case of a translation, the original title of the work shall appear in any case on all the said copies.

(4)

*(a)* No license granted under Article II or Article III shall extend to the export of copies, and any such license shall be valid only for publication of the translation or of the reproduction, as the case may be, in the territory of the country in which it has been applied for.

*(b)* For the purposes of subparagraph *(a)*, the notion of export shall include the sending of copies from any territory to the country which, in respect of that territory, has made a declaration under Article I(5).

*(c)* Where a governmental or other public entity of a country which has granted a license to make a translation under Article II into a language other than English, French or Spanish sends copies of a translation published under such license to another country, such sending of copies shall not, for the purposes of subparagraph *(a)*, be considered to constitute export if all of the following conditions are met:

    (i) the recipients are individuals who are nationals of the country whose competent authority has granted the license, or organizations grouping such individuals;

    (ii) the copies are to be used only for the purpose of teaching, scholarship or research;

    (iii) the sending of the copies and their subsequent distribution to recipients is without any commercial purpose; and

    (iv) the country to which the copies have been sent has agreed with the country whose competent authority has granted the license to allow the receipt, or distribution, or both, and the Director General has been notified of the agreement by the Government of the country in which the license has been granted.

(5) All copies published under a license granted by virtue of Article II or Article III shall bear a notice in the appropriate language stating that the copies are available for distribution only in the country or territory to which the said license applies.

(6)

*(a)* Due provision shall be made at the national level to ensure

    (i) that the license provides, in favour of the owner of the right of translation or of reproduction, as the case may be, for just compensation that is consistent with standards of royalties normally operating on licenses freely negotiated between persons in the two countries concerned, and

    (ii) payment and transmittal of the compensation: should national currency regulations intervene, the competent authority shall make all efforts, by the use of international machinery, to ensure transmittal in internationally convertible currency or its equivalent.

*(b)* Due provision shall be made by national legislation to ensure a correct translation of the work, or an accurate reproduction of the particular edition, as the case may be.

**Article V**

[*Alternative Possibility for Limitation of the Right of Translation:* 1. Regime provided for under the 1886 and 1896 Acts; 2. No possibility of change to regime under Article II; 3. Time limit for choosing the alternative possibility]

(1)

**ADD-49**

*(a)* Any country entitled to make a declaration that it will avail itself of the faculty provided for in Article II may, instead, at the time of ratifying or acceding to this Act:

  (i)  if it is a country to which Article 30(2)*(a)* applies, make a declaration under that provision as far as the right of translation is concerned;

  (ii)  if it is a country to which Article 30(2)*(a)* does not apply, and even if it is not a country outside the Union, make a declaration as provided for in Article 30(2)*(b)*, first sentence.

*(b)* In the case of a country which ceases to be regarded as a developing country as referred to in Article I(1), a declaration made according to this paragraph shall be effective until the date on which the period applicable under Article I(3) expires.

*(c)* Any country which has made a declaration according to this paragraph may not subsequently avail itself of the faculty provided for in Article II even if it withdraws the said declaration.

(2)  Subject to paragraph (3), any country which has availed itself of the faculty provided for in Article II may not subsequently make a declaration according to paragraph (1).

(3)  Any country which has ceased to be regarded as a developing country as referred to in Article I(1) may, not later than two years prior to the expiration of the period applicable under Article I(3), make a declaration to the effect provided for in Article 30(2)*(b)*, first sentence, notwithstanding the fact that it is not a country outside the Union. Such declaration shall take effect at the date on which the period applicable under Article I(3) expires.

## Article VI

[*Possibilities of applying, or admitting the application of, certain provisions of the Appendix before becoming bound by it:* 1. Declaration; 2. Depository and effective date of declaration]

(1)  Any country of the Union may declare, as from the date of this Act, and at any time before becoming bound by Articles 1 to 21 and this Appendix:

  (i)  if it is a country which, were it bound by Articles 1 to 21 and this Appendix, would be entitled to avail itself of the faculties referred to in Article I(1), that it will apply the provisions of Article II or of Article III or of both to works whose country of origin is a country which, pursuant to (ii) below, admits the application of those Articles to such works, or which is bound by Articles 1 to 21 and this Appendix; such declaration may, instead of referring to Article II, refer to Article V;

  (ii)  that it admits the application of this Appendix to works of which it is the country of origin by countries which have made a declaration under (i) above or a notification under Article I.

(2)  Any declaration made under paragraph (1) shall be in writing and shall be deposited with the Director General. The declaration shall become effective from the date of its deposit.

**Collection of Laws for Electronic Access**                    **WIPO**

# WIPO Copyright Treaty
# (WCT)*

## (adopted in Geneva on December 20, 1996)

CONTENTS

*Article*

Preamble

Relation to the Berne Convention ............................................................ 1
Scope of Copyright Protection .................................................................. 2
Application of Articles 2 to 6 of the Berne Convention ......................... 3
Computer Programs ................................................................................... 4
Compilations of Data (Databases) .......................................................... 5
Right of Distribution ................................................................................. 6
Right of Rental .......................................................................................... 7
Right of Communication to the Public..................................................... 8
Duration of the Protection of Photographic Works ............................... 9
Limitations and Exceptions...................................................................... 10
Obligations concerning Technological Measures ................................... 11
Obligations concerning Rights Management Information ..................... 12
Application in Time ................................................................................... 13
Provisions on Enforcement of Rights...................................................... 14
Assembly .................................................................................................... 15
International Bureau................................................................................... 16
Eligibility for Becoming Party to the Treaty .......................................... 17
Rights and Obligations under the Treaty ................................................ 18
Signature of the Treaty............................................................................. 19
Entry into Force of the Treaty .................................................................. 20
Effective Date of Becoming Party to the Treaty .................................... 21
No Reservations to the Treaty .................................................................. 22
Denunciation of the Treaty ...................................................................... 23
Languages of the Treaty........................................................................... 24
Depositary.................................................................................................. 25

## Preamble

*The Contracting Parties,*

*Desiring* to develop and maintain the protection of the rights of authors in their literary and artistic works in a manner as effective and uniform as possible,

*Recognizing* the need to introduce new international rules and clarify the interpretation of certain existing rules in order to provide adequate solutions to the questions raised by new economic, social, cultural and technological developments,

*Recognizing* the profound impact of the development and convergence of information and communication technologies on the creation and use of literary and artistic works,

*Emphasizing* the outstanding significance of copyright protection as an incentive for literary and artistic creation,

**ADD-51**

 **Collection of Laws for Electronic Access**    **WIPO**

*Recognizing* the need to maintain a balance between the rights of authors and the larger public interest, particularly education, research and access to information, as reflected in the Berne Convention,

*Have agreed as follows:*

## Article 1
## Relation to the Berne Convention

(1)  This Treaty is a special agreement within the meaning of Article 20 of the Berne Convention for the Protection of Literary and Artistic Works, as regards Contracting Parties that are countries of the Union established by that Convention.  This Treaty shall not have any connection with treaties other than the Berne Convention, nor shall it prejudice any rights and obligations under any other treaties.

(2)  Nothing in this Treaty shall derogate from existing obligations that Contracting Parties have to each other under the Berne Convention for the Protection of Literary and Artistic Works.

(3)  Hereinafter, "Berne Convention" shall refer to the Paris Act of July 24, 1971, of the Berne Convention for the Protection of Literary and Artistic Works.

(4)  Contracting Parties shall comply with Articles 1 to 21 and the Appendix of the Berne Convention.[1]

## Article 2
## Scope of Copyright Protection

Copyright protection extends to expressions and not to ideas, procedures, methods of operation or mathematical concepts as such.

## Article 3
## Application of Articles 2 to 6 of the Berne Convention

Contracting Parties shall apply *mutatis mutandis* the provisions of Articles 2 to 6 of the Berne Convention in respect of the protection provided for in this Treaty.[2]

## Article 4
## Computer Programs

Computer programs are protected as literary works within the meaning of Article 2 of the Berne Convention.  Such protection applies to computer programs, whatever may be the mode or form of their expression.[3]

## Article 5
## Compilations of Data (Databases)

**ADD-52**

 **Collection of Laws for Electronic Access**                    **WIPO**

Compilations of data or other material, in any form, which by reason of the selection or arrangement of their contents constitute intellectual creations, are protected as such.  This protection does not extend to the data or the material itself and is without prejudice to any copyright subsisting in the data or material contained in the compilation.[4]

<div align="center">

**Article 6**
**Right of Distribution**

</div>

(1)  Authors of literary and artistic works shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their works through sale or other transfer of ownership.

(2)  Nothing in this Treaty shall affect the freedom of Contracting Parties to determine the conditions, if any, under which the exhaustion of the right in paragraph (1) applies after the first sale or other transfer of ownership of the original or a copy of the work with the authorization of the author.[5]

<div align="center">

**Article 7**
**Right of Rental**

</div>

(1)  Authors of

(i)  computer programs;

(ii)  cinematographic works;  and

(iii)  works embodied in phonograms, as determined in the national law of Contracting Parties,

shall enjoy the exclusive right of authorizing commercial rental to the public of the originals or copies of their works.

(2)  Paragraph (1) shall not apply

(i)  in the case of computer programs, where the program itself is not the essential object of the rental;  and

(ii)  in the case of cinematographic works, unless such commercial rental has led to widespread copying of such works materially impairing the exclusive right of reproduction.

(3)  Notwithstanding the provisions of paragraph (1), a Contracting Party that, on April 15, 1994, had and continues to have in force a system of equitable remuneration of authors for the rental of copies of their works embodied in phonograms may maintain that system provided that the commercial rental of works embodied in phonograms is not giving rise to the material impairment of the exclusive right of reproduction of authors.[6,7]

<div align="center">

**Article 8**
**Right of Communication to the Public**

</div>

<div align="center">

**ADD-53**

</div>

  *Collection of Laws for Electronic Access* **WIPO**

Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii), 14(1)(ii) and 14*bis*(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.[8]

### Article 9
### Duration of the Protection of Photographic Works

In respect of photographic works, the Contracting Parties shall not apply the provisions of Article 7(4) of the Berne Convention.

### Article 10
### Limitations and Exceptions

(1)  Contracting Parties may, in their national legislation, provide for limitations of or exceptions to the rights granted to authors of literary and artistic works under this Treaty in certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author.

(2)  Contracting Parties shall, when applying the Berne Convention, confine any limitations of or exceptions to rights provided for therein to certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author.[9]

### Article 11
### Obligations concerning Technological Measures

Contracting Parties shall provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law.

### Article 12
### Obligations concerning Rights Management Information

(1)  Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty or the Berne Convention:

(i)  to remove or alter any electronic rights management information without authority;

 *Collection of Laws for Electronic Access* **WIPO**

(ii)  to distribute, import for distribution, broadcast or communicate to the public, without authority, works or copies of works knowing that electronic rights management information has been removed or altered without authority.

(2)  As used in this Article, "rights management information" means information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public.[10]

## Article 13
### Application in Time

Contracting Parties shall apply the provisions of Article 18 of the Berne Convention to all protection provided for in this Treaty.

## Article 14
### Provisions on Enforcement of Rights

(1)  Contracting Parties undertake to adopt, in accordance with their legal systems, the measures necessary to ensure the application of this Treaty.

(2)  Contracting Parties shall ensure that enforcement procedures are available under their law so as to permit effective action against any act of infringement of rights covered by this Treaty, including expeditious remedies to prevent infringements and remedies which constitute a deterrent to further infringements.

## Article 15
### Assembly

(1)*(a)*  The Contracting Parties shall have an Assembly.

*(b)*  Each Contracting Party shall be represented by one delegate who may be assisted by alternate delegates, advisors and experts.

*(c)*  The expenses of each delegation shall be borne by the Contracting Party that has appointed the delegation.  The Assembly may ask the World Intellectual Property Organization (hereinafter referred to as "WIPO") to grant financial assistance to facilitate the participation of delegations of Contracting Parties that are regarded as developing countries in conformity with the established practice of the General Assembly of the United Nations or that are countries in transition to a market economy.

(2)*(a)*  The Assembly shall deal with matters concerning the maintenance and development of this Treaty and the application and operation of this Treaty.

*(b)*  The Assembly shall perform the function allocated to it under Article 17(2) in respect of the admission of certain intergovernmental organizations to become party to this Treaty.

  *Collection of Laws for Electronic Access*                    **WIPO**

*(c)* The Assembly shall decide the convocation of any diplomatic conference for the revision of this Treaty and give the necessary instructions to the Director General of WIPO for the preparation of such diplomatic conference.

(3)*(a)* Each Contracting Party that is a State shall have one vote and shall vote only in its own name.

*(b)* Any Contracting Party that is an intergovernmental organization may participate in the vote, in place of its Member States, with a number of votes equal to the number of its Member States which are party to this Treaty. No such intergovernmental organization shall participate in the vote if any one of its Member States exercises its right to vote and *vice versa*.

(4) The Assembly shall meet in ordinary session once every two years upon convocation by the Director General of WIPO.

(5) The Assembly shall establish its own rules of procedure, including the convocation of extraordinary sessions, the requirements of a quorum and, subject to the provisions of this Treaty, the required majority for various kinds of decisions.

## Article 16
## International Bureau

The International Bureau of WIPO shall perform the administrative tasks concerning the Treaty.

## Article 17
## Eligibility for Becoming Party to the Treaty

(1) Any Member State of WIPO may become party to this Treaty.

(2) The Assembly may decide to admit any intergovernmental organization to become party to this Treaty which declares that it is competent in respect of, and has its own legislation binding on all its Member States on, matters covered by this Treaty and that it has been duly authorized, in accordance with its internal procedures, to become party to this Treaty.

(3) The European Community, having made the declaration referred to in the preceding paragraph in the Diplomatic Conference that has adopted this Treaty, may become party to this Treaty.

## Article 18
## Rights and Obligations under the Treaty

Subject to any specific provisions to the contrary in this Treaty, each Contracting Party shall enjoy all of the rights and assume all of the obligations under this Treaty.

### Article 19
### Signature of the Treaty

This Treaty shall be open for signature until December 31, 1997, by any Member State of WIPO and by the European Community.

### Article 20
### Entry into Force of the Treaty

This Treaty shall enter into force three months after 30 instruments of ratification or accession by States have been deposited with the Director General of WIPO.

### Article 21
### Effective Date of Becoming Party to the Treaty

This Treaty shall bind:

(i)  the 30 States referred to in Article 20, from the date on which this Treaty has entered into force;

(ii)  each other State, from the expiration of three months from the date on which the State has deposited its instrument with the Director General of WIPO;

(iii)  the European Community, from the expiration of three months after the deposit of its instrument of ratification or accession if such instrument has been deposited after the entry into force of this Treaty according to Article 20, or, three months after the entry into force of this Treaty if such instrument has been deposited before the entry into force of this Treaty;

(iv)  any other intergovernmental organization that is admitted to become party to this Treaty, from the expiration of three months after the deposit of its instrument of accession.

### Article 22
### No Reservations to the Treaty

No reservation to this Treaty shall be admitted.

### Article 23
### Denunciation of the Treaty

This Treaty may be denounced by any Contracting Party by notification addressed to the Director General of WIPO.  Any denunciation shall take effect one year from the date on which the Director General of WIPO received the notification.

### Article 24
### Languages of the Treaty

(1)  This Treaty is signed in a single original in English, Arabic, Chinese, French, Russian and Spanish languages, the versions in all these languages being equally authentic.

---



(2)  An official text in any language other than those referred to in paragraph (1) shall be established by the Director General of WIPO on the request of an interested party, after consultation with all the interested parties.  For the purposes of this paragraph, "interested party" means any Member State of WIPO whose official language, or one of whose official languages, is involved and the European Community, and any other intergovernmental organization that may become party to this Treaty, if one of its official languages is involved.

### Article 25
### Depository

The Director General of WIPO is the depositary of this Treaty.

---

    *  *Entry into force:*  March 6, 2002.
      *Source:*  International Bureau of WIPO.
      *Note:*  The agreed statements of the Diplomatic Conference that adopted the Treaty (WIPO Diplomatic Conference on Certain Copyright and Neighboring Rights Questions) concerning certain provisions of the WCT are reproduced in endnotes below.

---

    [1]  *Agreed statement concerning Article 1(4):*  The reproduction right, as set out in Article 9 of the Berne Convention, and the exceptions permitted thereunder, fully apply in the digital environment, in particular to the use of works in digital form.  It is understood that the storage of a protected work in digital form in an electronic medium constitutes a reproduction within the meaning of Article 9 of the Berne Convention.

    [2]  *Agreed statement concerning Article 3:*  It is understood that, in applying Article 3 of this Treaty, the expression "country of the Union" in Articles 2 to 6 of the Berne Convention will be read as if it were a reference to a Contracting Party to this Treaty, in the application of those Berne Articles in respect of protection provided for in this Treaty.  It is also understood that the expression "country outside the Union" in those Articles in the Berne Convention will, in the same circumstances, be read as if it were a reference to a country that is not a Contracting Party to this Treaty, and that "this Convention" in Articles 2(8), 2*bis*(2), 3, 4 and 5 of the Berne Convention will be read as if it were a reference to the Berne Convention and this Treaty.  Finally, it is understood that a reference in Articles 3 to 6 of the Berne Convention to a "national of one of the countries of the Union" will, when these Articles are applied to this Treaty, mean, in regard to an intergovernmental organization that is a Contracting Party to this Treaty, a national of one of the countries that is member of that organization.

    [3]  *Agreed statement concerning Article 4:*  The scope of protection for computer programs under Article 4 of this Treaty, read with Article 2, is consistent with Article 2 of the Berne Convention and on a par with the relevant provisions of the TRIPS Agreement.

    [4]  *Agreed statement concerning Article 5:*  The scope of protection for compilations of data (databases) under Article 5 of this Treaty, read with Article 2, is consistent with Article 2 of the Berne Convention and on a par with the relevant provisions of the TRIPS Agreement.

    [5]  *Agreed statement concerning Articles 6 and 7:*  As used in these Articles, the expressions "copies" and "original and copies," being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.

    [6]  *Agreed statement concerning Articles 6 and 7:*  As used in these Articles, the expressions "copies" and "original and copies," being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.

    [7]  *Agreed statement concerning Article 7:*  It is understood that the obligation under Article 7(1) does not require a Contracting Party to provide an exclusive right of commercial rental to authors who, under that Contracting Party's law, are not granted rights in respect of phonograms.  It is understood that this obligation is consistent with Article 14(4) of the TRIPS Agreement.

---

  *Collection of Laws for Electronic Access* **WIPO**

---

[8]  *Agreed statement concerning Article 8:*  It is understood that the mere provision of physical facilities for enabling or making a communication does not in itself amount to communication within the meaning of this Treaty or the Berne Convention.  It is further understood that nothing in Article 8 precludes a Contracting Party from applying Article 11*bis*(2).

[9]  *Agreed statement concerning Article 10:*  It is understood that the provisions of Article 10 permit Contracting Parties to carry forward and appropriately extend into the digital environment limitations and exceptions in their national laws which have been considered acceptable under the Berne Convention.  Similarly, these provisions should be understood to permit Contracting Parties to devise new exceptions and limitations that are appropriate in the digital network environment.

It is also understood that Article 10(2) neither reduces nor extends the scope of applicability of the limitations and exceptions permitted by the Berne Convention.

[10]  *Agreed statement concerning Article 12:*  It is understood that the reference to "infringement of any right covered by this Treaty or the Berne Convention" includes both exclusive rights and rights of remuneration.

It is further understood that Contracting Parties will not rely on this Article to devise or implement rights management systems that would have the effect of imposing formalities which are not permitted under the Berne Convention or this Treaty, prohibiting the free movement of goods or impeding the enjoyment of rights under this Treaty.