# 13-4829-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs,*

—against—

GOOGLE, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE COPYRIGHT ALLIANCE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

ELIZABETH A. MCNAMARA
LINDA STEINMAN
ALISON SCHARY
DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York 10019
(212) 489-8230

*Attorneys for Amicus Curiae
The Copyright Alliance*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, *amicus curiae* the Copyright Alliance states that it has no parent corporation and that no publicly held company owns more than 10% of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT......................................................... i

TABLE OF AUTHORITIES................................................................. iv

INTEREST OF *AMICUS* ...................................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT .........................................................................4

I.    MASS DIGITIZATION IS A COMPLEX ISSUE THAT SHOULD
BE ADDRESSED BY ALL STAKEHOLDERS..........................................4

    A.    The District Court Focused on The Google Books Search
Engine, Not the Mass Copying that Preceded It ..........................4

    B.    Fair Use Is Being Used to Legislate A Vast New Use,
Preempting Ongoing Policy Discussions ......................................5

II.    THE DISTRICT COURT ERRED IN APPLYING THE FAIR USE
DOCTRINE ...............................................................................11

    A.    The First Factor Analysis Was Deeply Flawed ...........................13

        1.    The District Court Misapprehended the Commercial
Nature of Google's Principal Use .......................................13

        2.    Where an Allegedly Transformative Use Is for a New
Functional – Not Expressive – Purpose, this Court
Should Be Especially Careful in Its Analysis....................15

        3.    A Proposed Mode of Analysis for Functional Use
Cases.....................................................................................24

    B.    The District Court's Analysis of the Second Factor Placed
Undue Emphasis on the Works' Factual Nature.........................28

C.    The District Court's Analysis of the Third Factor Mistakenly
      Focused Only on the Amount Displayed in Google Books,
      Rather than the Amount Taken through Mass Digitization......30

D.    The District Court Erred in Finding that the Fourth Factor
      Favors Google ...................................................................................32

CONCLUSION .......................................................................................................34

CERTIFICATE OF COMPLIANCE ...................................................................35

# TABLE OF AUTHORITIES

**Cases**

*American Geophysical Union v. Texaco,*
  60 F.3d 913 (2d Cir. 1994) .................................................................24, 31, 32

*Associated Press v. Meltwater U.S. Holdings,*
  931 F. Supp. 2d 537 (S.D.N.Y. 2013) .............................................................26

*Authors Guild v. Google Inc.,*
  954 F. Supp. 2d 254 (S.D.N.Y. 2013) .................................................12, 30, 31

*Authors Guild v. Google Inc.,*
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) .............................................................15

*AV ex rel. Vanderhye v. iParadigms,*
  562 F.3d 630 (4th Cir. 2009) ...........................................................................16

*Basic Books v. Kinko's Graphics Corp.,*
  758 F. Supp. 1522 (S.D.N.Y. 1991) .................................................................29

*Bill Graham Archives v. Dorling Kinderlsey,*
  448 F.3d 605 (2d Cir. 2006) ............................................................................23

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006) ............................................................................22

*Campbell v. Acuff-Rose Music,*
  510 U.S. 569 (1994).................................................................................*passim*

*Castle Rock Entm't v. Carol Publ'g Grp.,*
  150 F.3d 132 (2d Cir. 1998) ............................................................................31

*Eldred v. Aschroft,*
  537 U.S. 186 (2003).............................................................................................7

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985)......................................................................................29, 32

*HarperCollins Publishers v. Open Road Integrated Media,*
  --- F. Supp. 2d ---, 2014 WL 1013838 (Mar. 14, 2014) ..................................... 5

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998) ..................................................................... *passim*

*Kelly v. Arriba Soft,*
  336 F.3d 811 (9th Cir. 2003) ........................................................... 16, 20, 25

*Monge v. Maya Magazines,*
  688 F.3d 1164 (9th Cir. 2012) ................................................................... 20

*Nihon Keizai Shimbun v. Comline Business Data, Inc.,*
  166 F.3d 65 (2d Cir. 1999) ........................................................................ 19

*On Davis v. The Gap,*
  246 F.3d 152 (2d Cir. 2001) ...................................................................... 32

*Pacific & Southern Co. v. Duncan,*
  744 F.2d 1490 (11th Cir. 1984) ................................................................. 21

*Perfect 10 v. Google,*
  508 F.3d 1146 (9th Cir. 2007) ................................................................... 16

*Princeton Univ. Press v. Michigan Doc. Serv. Inc.,*
  99 F.3d 1381 (6th Cir. 1996) ............................................................... 24, 29

*Random House v. Rosetta Books,*
  150 F. Supp. 2d 613 (S.D.N.Y. 2001) ......................................................... 5

*Sony Corp. v. Universal Studios,*
  464 U.S. 417 (1984) ................................................................................... 7

*Twin Peaks Prods. v. Publ'ns Int'l,*
  996 F.2d 1366 (2d Cir. 1993) .................................................................... 23

*United States v. ASCAP,*
  599 F. Supp. 2d 415 (S.D.N.Y. 2009) ......................................................... 21

*Video Pipeline v. Buena Vista Home Entm't,*
  342 F.3d 191 (3d Cir. 2003) ...................................................................... 21

*Wainwright Securities, Inc. v. Wall St. Transcript Corp.*,
  558 F.2d 91 (2d Cir. 1977) ..............................................................19

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir. 1989) ..........................................................30

**Statutes**

17 U.S.C.
  § 106.....................................................................................................5
  § 108...................................................................................................10

**Rules**

Fed. R. App. P. 29(c)(5) .......................................................................1

**Other Authorities**

Claire Cain Miller, *The Plus in Google Plus? It's Mostly for Google*, N.Y.
  Times, Feb. 14, 2014 ........................................................................13

H.R. Rep. No. 94-1476, at 74 (1976), *reprinted in* 1976 U.S.C.C.A.N.
  5659.....................................................................................................14

Maria A. Pallante, U.S. Copyright Office, *Priorities and Special Projects
  of the United States Copyright Office October 2011-October 2013* (Oct.
  25, 2011) ..............................................................................................7

Miguel Helft, *Microsoft Will Shut Down Book Search Program*, N.Y.
  Times, May 24, 2008...........................................................................8

Pierre N. Leval, *Commentaries: Toward a Fair Use Standard*, 103 Harv.
  L. Rev. 1105 (1990) .....................................................................17, 18

*Preservation and Reuse of Copyrighted Material: Hearing before the H.
  Subcomm. on Courts, Intellectual Property, and the Internet*, 113th
  Cong. (2014) (statement of Richard S. Rudick)..............................8

*The Scope of Fair Use: Hearing before the H. Subcomm. on Courts,
  Intellectual Property, and the Internet*, 113th Cong. (2014) (statement
  of June M. Besek)...........................................................................5, 6

Supplementary Report of the Register of Copyrights on the General
    Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong.,
    1st Sess. (House Comm. Print 1965)........................................................11, 24

U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary
    Analysis and Discussion Document* (Oct. 2011) .......................................7, 8, 9

## INTEREST OF *AMICUS*[1]

The Copyright Alliance is a non-profit organization representing artists, creators and innovators who depend on copyright laws to protect their work, including trade groups, companies, associations, and thousands of individuals.  Its members represent a wide spectrum of creative disciplines, from movies, to music, to photographs, to literature.  It seeks to ensure that copyright jurisprudence continues to spur the development of creative works for the benefit of the public by protecting the rights of those who invest in the development of creative works to be fairly compensated for their efforts.

The Copyright Alliance has a significant interest in the outcome of this dispute. The district court's decision represents an unprecedented expansion of the fair use provisions of the Copyright Act – a doctrine historically created to permit one-off uses of an author's work for such

---

[1] Pursuant to FRAP 29(c)(5), the Copyright Alliance states that no counsel for a party authored this brief in whole or in part, and no person or entity other than the Copyright Alliance and its counsel made a monetary contribution to the preparation or submission of this brief.  Although the Association of American Publishers, Inc. ("AAP") is a member of the Copyright Alliance, AAP has not participated in any way in the preparation or submission of this *amicus curiae* brief.  All parties in this matter have consented to the filing of this brief.

purposes as criticism, commentary or news reporting – to authorize a commercial enterprise to create and profit from a massive digital archive of 20 million books without rightsholders' consent.  Further, since this case and its companion, *Authors Guild v. Hathitrust*, are the first cases where the Second Circuit will address fair use in the context of search engines, or where the new use is justified as serving a different "functional purpose" without the creation of a new expressive work, it is critical that this Court adopts a mode of analysis that is clear and sufficiently protective of copyright owners to serve the overall purposes of the Copyright Act.

## SUMMARY OF ARGUMENT

A digital library of this nation's books, with a strong search function, is unquestionably a desirable goal.  That has never been the issue in this case.  Instead, the question in this case is whether Section 107 should be expanded beyond its traditional contours to permit a private, for-profit company to create a permanent digital repository of, and display excerpts from, over 20 million books without the consent of the rightsholders, and the broader policy ramifications of such a decision.  Mass digitization is a complex issue that is currently being considered by Congress and the Copyright Office.  Nevertheless, Google unilaterally appropriated to itself

2

the right to decide the rules of mass digitization, to the exclusion of all others.  In its enthusiasm for the convenience of search technology, the district court effectively cut off the ongoing policy discussions about how best to incorporate this new technology into a modern, sound copyright policy and ensure that mass digitization has the potential to benefit all stakeholders – including technology companies, libraries, authors, and members of the reading public.

As set forth in Point I, instead of legislating new copyright exemptions through fair use, this Court should allow Congress and the Copyright Office to proceed with their ongoing consideration of mass digitization, rather than pre-empting processes better suited to considering the interests of all constituencies.

As set forth in Point II, we respectfully submit that fair use cases fall into two categories:  (1) where the secondary work aims to serve a new *expressive* use; and (2) where the secondary work aims to serve a different *functional* purpose.  "Functional use" cases should be analyzed slightly differently than "new expressive use" cases – both because they are not at the core of the doctrine historically and because they pose the threat of different and greater harms to the copyright holder.  As set forth below, for

3

these "functional use" cases, there should be a heightened and sophisticated examination of whether the new use is capable of supplanting the original.

## ARGUMENT

## I.    MASS DIGITIZATION IS A COMPLEX ISSUE THAT SHOULD BE ADDRESSED BY ALL STAKEHOLDERS

### A.    The District Court Focused on The Google Books Search Engine, Not the Mass Copying that Preceded It

The district court's most fundamental error was to analyze this case by focusing almost exclusively on the excerpts displayed in Google Books search results.  Only in passing did the court acknowledge that to create this search database, Google has systematically, and without consent, made itself digital copies of 20 million books – including innumerable books available for purchase in digital form – and has permanently stored those books.  Google has made no promises on the future uses of that massive repository; nor would such unilateral promises be legally binding.  Indeed, Google could make future internal uses of its repository without even the knowledge of the rightsholders.

Transforming a print book into an electronic work has long been understood as one stick in the bundle of a copyright holder's exclusive

4

rights, including the right to reproduce the work. 17 U.S.C. § 106.[2]  By authorizing Google's antecedent mass digitization as fair use based on the output in this instance – search results – the district court's decision effectively removed this valuable derivative right from copyright holders. It is critical for this Court to address mass digitization head on.

### B.  Fair Use Is Being Used to Legislate A Vast New Use, Preempting Ongoing Policy Discussions

Many commentators have voiced concern that the fair use doctrine is being expanded beyond its original intent, and the pendulum has now swung dramatically in favor of fair use.  *See, e.g.*, The Scope of Fair Use: Hearing before the H. Subcomm. on Courts, Intellectual Property, and the Internet, 113th Cong. (statement of June M. Besek) (Jan. 28, 2014) ("Besek Testimony"), at 13.  As the examples listed in the preamble to Section 107 demonstrate, mass digitization of all published works by a for-profit company is far afield of the paradigmatic functions – biography, criticism, teaching – that Congress contemplated as fair use.

---

[2] *Random House v. Rosetta Books*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001) (recognizing that digital publication right is distinct from print publication right and must be specifically granted by license); *HarperCollins Publishers v. Open Road Integrated Media*, --- F. Supp. 2d ---, 2014 WL 1013838, at *6-7 (Mar. 14, 2014) (citing *Rosetta Books* with approval but distinguishing its result based on the relevant contract terms).

While the preamble is not meant to be exhaustive, this Court has recognized that "the illustrative nature of the categories should not be ignored." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998). The obvious mismatch between the one-off uses listed in Section 107 and the systematic mass copying at issue here should counsel courts to proceed with caution. Nevertheless, the opposite seems to be happening: the vast scale of the use implicated in mass digitization led the district court to apply a lower level of scrutiny to the impact on any individual rightsholder – or on the copyright regime as a whole. As Professor June Besek recently noted in Congressional testimony, "It's as though courts are according some kind of 'volume discount' for fair use, where a massive taking justifies a lower level of scrutiny in a fair use determination.'" Besek Testimony at 12.

The fair use doctrine is ill-suited to address the many complex issues raised by mass digitization. As a highly fact-specific inquiry, the doctrine was designed primarily to address individual uses on a "case by case" basis, considering each use "in light of the ends of copyright law." *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 581 (1994). Its fact-specific nature is ill-suited to tackle fundamental shifts in technology. "Repeatedly,

6

as new developments have occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary." *Sony Corp. v. Universal Studios,* 464 U.S. 417, 430-31 (1984).

> Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.

*Id;* s*ee also Eldred v. Aschroft*, 537 U.S. 186, 212 (2003) ("[I]t is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.").

The policy discussion regarding mass digitization – and market experimentation – are well underway.  In 2011, the Copyright Office issued an in-depth report, surveying existing projects and considering various licensing frameworks.    U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (Oct. 2011) ("Mass Digitization Report" or "MDR").  Mass digitization remains on the Copyright Office's priorities list,[3] and Congress is hearing testimony on

---

[3] Maria A. Pallante, U.S. Copyright Office, *Priorities and Special Projects of the United States Copyright Office October 2011-October 2013*, at 5 (Oct. 25, 2011).

mass digitization as it considers comprehensive copyright reform.[4] Moreover, Google's approach to creating a mass digital repository without rightsholders' consent was by no means the only alternative to the creation of such a digital archive. For example, in 2006, Microsoft began its own book-digitization venture that scanned only works that were either in the public domain or for which it received consent from copyright holders. It was widely understood that that venture was shuttered when it became clear Microsoft could not compete with Google's no-consent-requested approach. *See* Miguel Helft, *Microsoft Will Shut Down Book Search Program*, N.Y. Times, May 24, 2008 (shutdown decision came "in the face of competition from Google, the industry leader"). In many other countries, national libraries have spearheaded digitization efforts. MDR at 10-11, 15-16 & Appendix C (describing efforts underway involving, *e.g.*, national libraries in France, Netherlands, Britain, Sweden, and China, and among a consortium of European governments).

---

[4] *E.g.*, Preservation and Reuse of Copyrighted Material: Hearing before the H. Subcomm. on Courts, Intellectual Property, and the Internet, 113th Cong. (statement of Richard S. Rudick) (Apr. 2, 2014).

In the Mass Digitization Report, the Copyright Office recognized that digitization raises difficult issues that "require public discussion," and urged "further discussions among all stakeholders."  MDR at ii, 16, 40.  But by declaring Google's mass digitization to be fair use, the district court effectively cut off that ongoing discussion and other alternatives built on author consent – and instead legislated a vast new use through Section 107. This approach is problematic for a number of reasons.

*First,* by evaluating the complex issues of mass digitization through the lens of a fair use defense raised by a single defendant in a single case regarding a single end use, the district court's decision necessarily ignored – and thereby foreclosed – many important considerations identified in the Mass Digitization Report.  Such a piecemeal approach inevitably leads to a skewed result.

*Second*, the structure of the Copyright Act cautions against using fair use to grant categorical exemptions from copyright liability.  Congress has granted many specific exemptions for categories of use, set out in Sections 108-122 of the Copyright Act.  These exemptions are carefully crafted to balance the interests of rightsholders and users, after extensive public

comment. This is the proper route for such large-scale changes to the Copyright Act.

Moreover, the district court's decision runs roughshod over one of those negotiated exemptions, namely Section 108, which carefully lays out the conditions under which libraries may copy works. Section 108 limits the number of copies; the purposes for which copies can be made; and who can make them. 17 U.S.C. § 108. While Section 108 does not preclude fair use claims, it provides guidance for balancing the relevant interests. The district court failed to grapple with the relationship between Sections 107 and 108; instead, by finding unauthorized mass digitization by a for-profit entity that obtained its books from libraries to be a fair use, it effectively read Section 108 and its carefully crafted bargains out of the Copyright Act.

*Finally*, the legislative history of the 1976 revision to the Copyright Act makes clear that Congress intended the protections for rightsholders in the revised Act to be sufficiently broad to encompass "unforeseen technical advances." Presciently, Congress acknowledged the inevitable blind spots in any contemporaneous assessment of a use enabled by new technology:

> Obviously, no one can foresee accurately and in detail the evolving patterns in the ways author's works will reach the public 10, 20, or 50 years from now. Lacking that kind of

10

foresight, the bill should, we believe, adopt a general approach aimed at providing compensation to the author for future as well as present uses of his work that materially affect the value of his copyright. . . .

[A] particular use which may seem to have little or no economic impact on the author's rights today can assume tremendous importance in times to come.  A real danger to be guarded against is that of confining the scope of an author's rights on the basis of the present technology so that, as the years go by, his copyright loses much of its value because of unforeseen technical advances.

Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess. (House Comm. Print 1965) ("Supplementary Report"), at 13-14.  In sum, it is critical that courts not legislate in a manner that favors a particular new technology at the expense of the rights accorded to copyright holders under the Act, but rather stay true to the core intent of the Act.

## II.    THE DISTRICT COURT ERRED IN APPLYING THE FAIR USE DOCTRINE

The district court's sweeping fair use analysis under the four statutory factors was deeply flawed.  While we leave it to Appellant to discuss the particular application of each factor, including to the excerpts provided by Google Books, we focus on the larger conceptual problems.

11

At a global level, in addition to effectively overlooking Google's mass digitization, the opinion exhibits two overarching problems:  *First*, the district court's decision was driven almost entirely by its finding of transformative use, giving short shrift to the other fair use factors.  *Second*, the district court's conclusion was fueled by its conviction that Google Books "provides significant public benefits."  *Authors Guild v. Google Inc.*, 954 F. Supp. 2d 254, 293 (S.D.N.Y. 2013).  But the proper analysis under the fair use doctrine is not the unmoored question of whether a use provides "public benefits" – which is a highly subjective concept.  Undoubtedly, many consumers would love to see all books, movies, songs, and photographs available in full for free in every medium.  Rather, the proper question is whether a finding of fair use would, overall, further the purposes of the Copyright Act to promote the arts and sciences.  To assess the public benefits of a specific use, courts must look at the impact on the incentives of *creators*, not just users, of copyrighted works. In the end, the interests of creators and the public are intertwined: when copyright works for creators, it ensures the development and dissemination of works that benefit the public at large.[5]  The district court opinion never addressed the

---

[5] While *Campbell* references "social benefit," the full quote makes plain that

impact on copyright holders of allowing a commercial actor to maintain a digital repository of all of their works and to monetize that database without agreeing to terms of use or providing any compensation to rightsholders.

### A. The First Factor Analysis Was Deeply Flawed

### 1. The District Court Misapprehended the Commercial Nature of Google's Principal Use

The district court's initial error under the first factor was to woefully undervalue the highly commercial nature of the Google Books service. While the district court briefly acknowledged that this case involves a commercial actor, it minimized that commerciality by focusing on the lack of advertising on Google Books. This misapprehends Google's principal commercial interest in the collection of data about individual user activity across all Google products for use in targeted advertising. *See* Claire Cain Miller, *The Plus in Google Plus? It's Mostly for Google*, N.Y. Times, Feb. 14, 2014. Knowing what types of books its users search for online is a valuable piece of data in building profiles for targeted advertising, whether that

---

it must be interpreted within the context of the Copyright Act's goals. *Campbell*, 510 U.S. at 579 (parody "can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one").

13

advertising is served up on Google Books or elsewhere on the Google platform. Moreover, the book index is integrated into Google's general search index, thus enhancing its search engine, its core product.[6]

Furthermore, the district court failed to acknowledge the unfair commercial advantage it was bestowing upon Google over competitors who might seek to enter the market for digital preservation or search. To bestow this advantage, the district court incorrectly assumed that libraries can contract their Section 108-exempt functions to a private third party. *See* H.R. Rep. No. 94-1476, at 74 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5688 (explaining that "it would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself"). The district court should have recognized the potential for antitrust concerns, as it did in its prior decision, when it noted that the previously proposed settlement in this case "would give Google a right,

---

[6] The district court also improperly characterized Google's use as "educational." Under proper fair use analysis, the court must focus on the nature of the primary user – Google – "not the acts of [its] end-users." *Infinity*, 150 F.3d at 108.

which no one else in the world would have … to digitize works with impunity, without any risk of statutory liability, for something like 150 years," thereby "arguably giv[ing] Google control over the search market." *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 682 (S.D.N.Y. 2011).  While the district court's opinion technically allows other private companies to engage in the same digitization as Google, the immense scale of Google's library – created without the costs of licensing – gives it an effective monopoly over this market and imposes enormous barriers to entry for other entities.  In effect, the district court has anointed Google, a private actor, as the nation's designated depositor of copyrighted works.  The Alliance respectfully submits that this designation should come not from a court on a fair use decision, but from Congress, and should include appropriate restrictions to guard against an abuse of market power.

> **2.    Where an Allegedly Transformative Use Is for a New Functional – Not Expressive – Purpose, this Court Should Be Especially Careful in Its Analysis**

This Court's approach to the transformative use analysis is critical. Because this case and *Authors Guild v. Hathitrust* are the first cases in which the Second Circuit addresses the fair use doctrine in the context of search engines, its mode of analysis will have a broad impact on a wide range of

15

fact settings not before the Court. We respectfully submit that fair use cases should be viewed as falling into two categories: (1) where the secondary work aims to serve a new *expressive* use; and (2) where the secondary work aims to serve a different *functional* purpose.

The first category would incorporate all uses of copyrighted works in books, newspapers, magazines, art, film, music, theater, dance, and other creative works that are within the general subject matter of copyright. For these works, courts should be guided by traditional fair use principles, relying on the guidance of previous cases distinguishing between fair uses and derivative works that must be licensed.

The second category – where the use under review serves a new *functional* purpose – would encompass such cases as the Ninth Circuit's decisions in *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003), and *Perfect 10 v. Google*, 508 F.3d 1146 (9th Cir. 2007), as well as *AV ex rel. Vanderhye v. iParadigms,* 562 F.3d 630 (4th Cir. 2009). In these cases, the plaintiffs asserted that their use performs a useful function that advances "Science and the Arts" – such as providing an electronic pointer or detecting plagiarism – even though the end use does not itself comment upon the original.

16

While we recognize the benefits to society from new technologies, we respectfully submit that "functional use" cases should be analyzed differently than "new expressive use" cases – both because they are not at the core of the fair use doctrine historically and because they pose the threat of different and greater harms to the copyright holder. For these "functional" use cases, there should be a heightened examination of whether the new use is capable of supplanting the original.

As the Supreme Court has instructed, "The central purpose of [the fair use] investigation is to see, in Justice Story's words, whether the new work merely 'supercede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character, *altering the first with new expression, meaning or message*; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (emphasis added, internal citations omitted). The transformative use doctrine has its origins in an article by Judge Pierre N. Leval, titled "Commentaries: Toward a Fair Use Standard." 103 Harv. L. Rev. 1105 (1990). Leval made plain that the doctrine's core aim is to advance *expressive* uses of a prior author or creator's works. Fair use, he explained, is necessary for two reasons: "First, all intellectual creative activity is in

17

part derivative. … Each advance stands on building blocks fashioned by prior thinkers.  Second, important areas of intellectual activity are explicitly referential.  Philosophy, criticism, history, and even the natural sciences require the continuous reexamination of yesterday's theses."  *Id* at 1009*. See also Campbell*, 510 U.S. at 575 (quoting Justice Story).  Leval's examples are telling:  "Transformative uses may include criticizing a quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it. They also may include parody, symbolism, aesthetic declaration, and innumerable other uses."  *Id.* at 1111.

The Supreme Court's decision in *Campbell* likewise was very focused on fair use as a means of permitting the use of an earlier work to advance a new expressive purpose.  The case arose in the context of a song parody – a new expressive use – and the Court's analysis is deeply moored to that context. Moreover, the case clearly addressed a one-time use, not a commercial business built on the systematic exploitation of copyrighted works created by others.  The Supreme Court emphasized that the transformative-use inquiry "may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment,

18

or news reporting." *Id*. at 578-79.  The *Campbell* Court likewise made clear that new uses that largely re-package the original are not transformative, observing that a work "composed primarily of an original, particularly its heart, with little added or changed" "reveal[s] a dearth of transformative character or purpose under the first factor" and "is more likely to be a merely superseding use, fulfilling demand for the original." *Id*. at 587-88.

To date, the Second Circuit cases upholding a finding of fair use have overwhelmingly involved a new work that uses the original work for a new expressive purpose.  Furthermore, individual uses of copyrighted content have fared much better than commercial businesses built on the systematic exploitation of copyrighted works.  *E.g.*, *Nihon Keizai Shimbun v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999).  As the Second Circuit explained in *Wainwright*, "a classic illustration of fair use is quoting from another's work in order to criticize it . . . . Put more graphically, the doctrine distinguishes between 'a true scholar and a chiseler who infringes a work for personal profit.'"[7]

---

[7] *Wainwright Securities, Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) (internal citations omitted).

The Ninth and Fourth Circuits have found that a new *functional* purpose can qualify as a transformative use in cases such as *Kelly*, *Perfect 10* and *iParadigms*. But even these cases are carefully circumscribed to situations in which the new use is *not capable* of serving the same intrinsic purposes as the original work and thus could not supplant the original. *Kelly*, 336 at 819. Moreover, the Ninth Circuit itself has recently reiterated that "*Campbell* makes clear that the 'heart' of a claim for transformative use is 'the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.'" *Monge v. Maya Magazines,* 688 F.3d 1164, 1175 (9th Cir. 2012) (quoting *Campbell*, 510 U.S. at 580).

Further, the Second Circuit has expressed concern with "different functional use" arguments. This Court recognized the critical distinction between a new expressive use and a different functional use in *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998). There, the defendant Dial-Up operated a radio monitoring service that re-transmitted free radio broadcasts to subscribers. Dial-Up was marketed to radio stations, advertisers, talent scouts and performance rights organizations for purposes such as verifying the broadcast of commercials, auditioning on-

20

air talent, and enforcing copyrights. *Id.* at 106. In some instances, customers listened only to "mere snippets of Infinity's broadcasts." *Id.* at 109. Dial-Up argued that it was using the radio broadcasts for a different functional purpose – namely, for information about the broadcasts rather than entertainment. Although this Court noted that the beneficial aspects of the service could be taken into account in assessing fair use, it concluded that "difference in purpose is not quite the same thing as transformation and *Campbell* instructs that transformativeness is the critical inquiry under this factor." *Id.* at 108. As it stated:

> Here, as the district judge observed, "Kirkwood's retransmissions *leave the character of the original broadcasts unchanged*. There is neither new expression, new meaning nor new message." … In short, there is no transformation.

*Id* (emphasis added).[8] Ultimately, the *Infinity* decision concluded that a different purpose alone did not carry the contested use into the zone of fair

---

[8] *See also Video Pipeline v. Buena Vista Home Entm't*, 342 F.3d 191, 198-99 & n.5 (3d Cir. 2003) (rejecting argument that defendant's movie clip previews were transformative because they allegedly served an "informational or promotional" purpose, since previews were "part of – not information about" plaintiff's copyrighted works); *United States v. ASCAP*, 599 F. Supp. 2d 415, 424-27 (S.D.N.Y. 2009) (rejecting AT&T's argument that ringtone previews were transformative because they allegedly served the purpose of informing customers about the ringtones, as opposed to the entertainment purpose of the original music); *Pacific & Southern Co. v. Duncan*, 744 F.2d

use, and that a use which could serve the same purpose as the original for even a small segment of users was not transformative.

In *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), this Court again expressed hesitation with an analysis focused solely on purpose – there, the different purposes of an advertisement and a painting – stating that "[w]e have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work." *Id.* at 252.  It likewise took issue with a Seventh Circuit decision holding that the exploitation of "new, complementary markets" qualified as fair use and with a treatise stating that the fair use defense may be invoked if the defendant's work "performs a different function than that of plaintiff's" because these statements were "in tension with the Copyright Act's express grant to copyright holders of rights over derivative works." *Id.* at 252 n.4.[9]

---

1490, 1496 (11th Cir. 1984) (news clipping service was "neither productive nor creative in any way").

[9] Thus, a different purpose is not a "catch-all" equating with transformative use.  While the Second Circuit's decision in *Bill Graham Archives v. Dorling Kinderlsey* discussed the different purpose of the use, the context was a paradigmatic expressive use: illustrating a biographical work.  The Second Circuit underscored that although "there are no categories of

Fair use is not an "all or nothing matter" but rather focuses on whether the challenged work serves the purposes of the Copyright Act "to an insignificant or a substantial extent." *Twin Peaks Prods. v. Publ'ns Int'l*, 996 F.2d 1366, 1374 (2d Cir. 1993). New expressive works that comment upon the originals or use them as historical artifacts are most likely to substantially advance the goals of the Copyright Act. But when it comes to the unauthorized copying and dissemination of copyrighted works with only a new functional purpose as the justification – such as facilitating search – it is critical that the courts recognize such uses are far from the heart of the transformative use doctrine, and that they condone such uses as transformative uses, if at all, with the utmost of care and in the narrowest of circumstances.

---

presumptively fair use … courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." 448 F.3d 605, 609 (2d Cir. 2006). With that critical backdrop, the court stressed that the images in the biographical work served as "historical artifacts," *id.* at 610, a distinct purpose from the original promotional purpose of the images.

### 3.    A Proposed Mode of Analysis for Functional Use Cases

We respectfully submit that "functional use" cases should be analyzed as follows:

*First*, courts must be wary of confusing "usefulness" with "fair use" and keep in mind the deliberately technology-neutral posture of the Copyright Act (*see* Supplementary Report at 13-14).   Courts have repeatedly held that enhancing convenience and efficiency are not transformative purposes.   As this Court noted in *American Geophysical Union v. Texaco*:

> Texaco's photocopying converts the individual [journal] articles into a useful format. … Nevertheless, whatever independent value derives from the more usable format of the photocopy does not mean that every instance of photocopying wins on the first factor. In this case, the predominant archival purpose of the copying tips the first factor against the copier, despite the benefit of a more usable format.

60 F.3d 913, 923-24 (2d Cir. 1994).  *See also Infinity*, 150 F.3d at 108 & n.2 (a "change of format, though useful" is not transformative); *Princeton Univ. Press v. Michigan Doc. Serv. Inc.,* 99 F.3d 1381, 1389 (6th Cir. 1996).

*Second*, in keeping with *Kelly* and *Infinity*, the key question in "functional use" cases should be whether the new use is *capable* of substituting for the original.  The Ninth Circuit in *Kelly* took pains to try to

24

harmonize its ruling with the Second Circuit's decision in *Infinity*.   It emphasized that in *Infinity*, even though the radio broadcasts were transmitted "for the purpose of allowing advertisers and radio stations to check on the broadcast of commercials or on-air talent, *there was nothing preventing listeners from subscribing to the service for entertainment purposes.* Even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, the result was that people could use both types of transmissions for the same purpose."   336 F.3d at 819 (emphasis added).   Thus, even the Ninth Circuit has endorsed a high standard requiring that the secondary use not be capable of serving the same purpose as the original.

*Third,* courts should employ a sophisticated empirical examination regarding whether the new use is truly acting as a pointer to the original – or whether that is just a facile justification.  In *Associated Press v. Meltwater U.S. Holdings,* a district court found that the defendant, a media-monitoring service that argued it functioned as a "search engine," was not engaged in fair use when it systematically delivered "snippets" of news articles, along with a link to the original article.  The district court underscored that, given

25

the fact-specific nature of fair use, merely invoking the mantle of a search

engine

> does not relieve [the defendant] of its independent burden to prove that its specific [use] qualifies as a fair use.  In other words, using the mechanism of search engines to scrape material from the Internet and provide it to consumers in response to their search requests does not immunize a defendant from the standards of conduct imposed by law through the Copyright Act, including the statutory embodiment of the fair use defense.

931 F. Supp. 2d 537, 556 (S.D.N.Y. 2013).  Finding that the defendant failed

to offer sufficient empirical evidence to support its argument that its

snippets drove users to the original work – thereby acting as a pointer,

rather than a substitute – the court held that the defendant's service was

more akin to a clipping service and that the defendant did not meet its

burden of demonstrating transformative use.  *Id.* at 554-56.

*Fourth*, there should be a sophisticated analysis of whether profits are

being diverted from the original creator.  One of the core problems in the

digital world is the disaggregation of content from its initial publisher, and

therefore a siphoning off of profit.  For example, a service that keeps users

within its own platform may deprive the original publisher of traffic – and

therefore advertising revenues.  Courts should be especially vigilant that

the new functional use does not threaten rightsholders' ability to be compensated for their work, as Congress intended.

*Finally,* where the functional use at issue is systematic, courts should be especially vigilant in weighing the additional considerations listed above. A systematic use raises the stakes considerably for any fair use inquiry, since the court's decision may fundamentally change the market – not only for the works at issue in the case, but for all copyrighted works subject to the functional use proffered as transformative.

Very briefly, any application of these factors in this case must recognize that, in contrast to *Kelly* and *Perfect 10* – and similar to *Infinity* – the copies of 20 million books in Google's permanent repository are high-resolution, machine-readable, copies of entire works. Although Google has voluntarily placed certain restrictions on access to full text through Google Books – for now – the copies in the repository are still fully capable of substituting for the original works. Indeed, they are unchanged from the original except in format and hence do not "alter[] the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579. Despite electronic rights being available for many of the works, Google has ignored that basic fact and has systematically exploited the value of the books,

27

without compensating the rightsholders, in a fashion that may be convenient for consumers, but should have been done with stakeholder participation.    Further, Google's massive digital library realistically supplants the creation of a similar digital library governed by the terms that the books' rightsholders would have desired.  Finally, in a world in which serious security breaches are reported weekly in the news, Google has created a digital repository that, if hacked, could lead to piracy writ large, crippling the industry.

### B.    The District Court's Analysis of the Second Factor Placed Undue Emphasis on the Works' Factual Nature

In analyzing the second factor, the district court placed undue weight on the fact that most of the books at issue are non-fiction, applying an all-or-nothing approach in which factor two automatically weighs in favor of the infringer where the works are not fictional.  Especially where, as here, the works Google copied are scholarly books, the result of extensive scholarship and analysis, the district court's holding cannot stand under the Supreme Court's decision in *Harper & Row*.  It held that:

> [E]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography. The extent to which one must permit expressive

28

language to be copied, in order to assure dissemination of the underlying facts, will thus vary from case to case.

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985).

Thus, the second factor calls for courts to analyze the copyrighted works along a continuum. Even though "the scope of fair use is greater with respect to factual than non-factual works" (*Basic Books v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1532 (S.D.N.Y. 1991)), scholarly works are entitled to robust copyright protection. As the Supreme Court expressed in *Harper & Row*, the aim of copyright is "to stimulate the creation of useful works for the general public good" – a "principle [which] applies equally to works of fiction and nonfiction." 471 U.S. at 546, 558. "It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public." *Id.* at 559.

Many courts analyzing fair use in the context of more sophisticated factual works properly have found that the second factor weighs in favor of the plaintiff or is at worst neutral. In *Harper & Row*, which involved President Ford's autobiography, the Supreme Court found that the second factor weighed in favor of the publisher. 471 U.S. at 564. The Sixth Circuit reached the same conclusion in *Michigan Doc. Servs., Inc.*, 99 F.3d at 1389,

29

when it analyzed copying of scholarly works for coursepacks.    In *Weissmann v. Freeman*, this Court considered the educational use of journal articles on nuclear medicine.  868 F.2d 1313 (2d Cir. 1989).  In view of the purpose of copyright – to "provide the economic incentive to research and disseminate ideas" "whether in the nature of fiction or fact"– the court concluded that "the incentive interests, in our view, balance the equitable scales so that the nature of the work factor does not tip decidedly in favor of either party."  *Id.* at 1325.  The second factor should favor Appellant.

### C.    The District Court's Analysis of the Third Factor Mistakenly Focused Only on the Amount Displayed in Google Books, Rather than the Amount Taken through Mass Digitization

The district court's improper framing of the use under review as the display of excerpts in the Google Books service – rather than the antecedent mass digitization – also led to the wrong result in its analysis of the third factor. As the district court notes, it is undisputed that Google copies the entirety of each book and retains more than one full copy of each work on its servers.[10]  954 F. Supp. 2d at 286.  Google's copies are not simply an

---

[10]    Google has not merely ingested text to create an electronic *index verborum*, a listing of words and locations where those words appear; it has also built a digital repository holding multiple copies of each scanned work in its original form, its text intact.

intermediate step to making available excerpts for Google Books; the search results are merely one current product drawing from the massive digital repository of full-text books that Google has permanently stored on its servers. Google's copying and maintenance of this digital repository, without rightsholders' permission, constitutes a taking of each work in its entirety. The third factor should therefore weigh heavily – not just "slightly" (954 F. Supp. 2d at 292) – against Google. *See, e.g., Texaco*, 60 F.3d at 926.

Furthermore, the district court was required to determine whether Google's permanent storage of copies of each work is "necessary" for its maintenance of the Google Books index. *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 144 (2d Cir. 1998). The district court's conclusion that Google's actions were indeed necessary is problematic, since it ignores alternative methods that Google could have taken to achieve the same goals. For example, Google could have purchased existing digital copies of books, or could have negotiated licenses with rightsholders, as it was already doing through its Partner Program.

31

## D.    The District Court Erred in Finding that the Fourth Factor Favors Google

On the fourth factor, the district court erred again by not focusing on the antecedent mass-digitization.  Here, there is a classic market harm because Google did not "pay[] the customary price" to acquire digital versions of the books.  *Harper & Row*, 471 U.S. at 562.  This Circuit has repeatedly recognized that the loss of "potential licensing revenues" in "traditional, reasonable or likely to be developed markets" represents market harm under the fourth factor.  *Texaco*, 60 F.3d at 929-30; *On Davis v. The Gap*, 246 F.3d 152, 176 (2d Cir. 2001) (copyright owner "suffered market harm through his loss of royalty revenue to which he was reasonably entitled in the circumstances").

Many of the books digitized by Google were available for purchase or license in digital form.  Moreover, the Copyright Clearance Center has a long history of collectively licensing literary works.  *Texaco*, 60 F.3d at 929-31. Indeed, both Amazon's arrangements with publishers for its "Search Inside the Book" program and the fact that Google eventually negotiated voluntary licenses with major publishers for many books through the Google Partner Program illustrates that for innumerable books, a market

32

exists – one in which publishers could obtain terms to protect their concerns. Even more alarming is the future market harm to all rightsholders' future ability to exploit their works, as the district court has effectively granted a powerful private corporation *carte blanche* to build and maintain its own free deposit library of every work published in the United States.[11]

---

[11] As for the search results, even here the district court's analysis was too cramped. There are other digital archives of books, such as Project Muse and JSTOR, whose search functions could have potentially served as opportunities for monetization by copyright holders if Google had not captured the book-search field with Google Books. Furthermore, if Google or its licensees marketed segmented search capacities – targeted, for example, to travel books or algebra books or hair-grooming books – the "snippets" might well substitute for purchase of the original.

## CONCLUSION

For the reasons set forth above, *amicus curiae* The Copyright Alliance respectfully asks this Court to reverse the district court's decision.

Dated:  April 14, 2014

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:  __s/ Elizabeth A. McNamara__
Elizabeth A. McNamara
Linda Steinman
Alison Schary
1633 Broadway
New York, NY  10019
Tel:  (212) 489-8230
Fax:  (212) 489-8340

Attorneys for *Amicus Curiae*
The Copyright Alliance

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B) because it contains 6,989 words, excluding exempted parts, as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Book Antiqua font.

Dated:  April 14, 2014

By:   s/ Elizabeth A. McNamara
Elizabeth A. McNamara
*Attorney for* Amicus Curiae
*The Copyright Alliance*

# CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, copies of the foregoing were served by CM/ECF and first-class mail upon the following counsel:

Joseph C. Gratz
DURIE TANGRI
217 Leidesdorff Street
San Francisco, California 94111

Edward Rosenthal
FRANKFURT KURNIT KLEIN &
SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York  10022

Seth P. Waxman
Randolph Daniel Moss
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006

Paul M. Smith
JENNER & BLOCK
1099 New York Avenue, NW,
Suite 900
Washington, DC  20001

*Attorneys for Defendant-Appellee*

*Attorneys for Plaintiffs-Appellants*

 s/ Elizabeth A. McNamara
Elizabeth A. McNamara