# 13-4829-CV

## United States Court of Appeals

### *for the*

## Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

GOOGLE, INC.,

*Defendant-Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF JON BAUMGARTEN, STUART BROTMAN, RAYMOND T. NIMMER, MARK SCHULTZ, AND JOHN SIMSON AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS THE AUTHORS GUILD, *ET AL.***

JON BAUMGARTEN
  Former General Counsel,
  U.S. COPYRIGHT OFFICE
STUART BROTMAN
  Lecturer on Law,
  HARVARD LAW SCHOOL
RAYMOND T. NIMMER
  Dean, Leonard Childs
  Professor of Law,
  UNIVERSITY OF HOUSTON
  LAW CENTER

MATTHEW BARBLAN, ESQ.
  DIRECTOR, CENTER FOR THE
  PROTECTION OF INTELLECTUAL PROPERTY
GEORGE MASON UNIVERSITY
  SCHOOL OF LAW
3301 Fairfax Drive, Suite 216
Arlington, Virginia 22201
(703) 993-8937
mbarblan@gmu.edu

*Attorney for Amici Curiae*

*(For Continuation of Appearances See Inside Cover)*

MARK SCHULTZ
   Associate Professor of Law,
   SOUTHERN ILLINOIS UNIVERSITY
   SCHOOL OF LAW, and Senior Scholar,
   CENTER FOR THE PROTECTION OF
   INTELLECTUAL PROPERTY, GEORGE
   MASON UNIVERSITY SCHOOL OF LAW
JOHN SIMSON
   Executive in Residence and Program
   Director of Business and
   Entertainment,
   AMERICAN UNIVERSITY

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF INTEREST .............................................................1

SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT ....................................................................................4

I.    THE DISTRICT COURT'S EXPANSIVE
      INTERPRETATION OF FAIR USE SIGNIFICANTLY
      UNDERMINES COPYRIGHT LAW.............................................4

      A. The Supreme Court's Renewed Emphasis on
         "Transformative Use" ..............................................................5

      B. Lower Courts are Citing "Functional Transformation" to
         Justify Complete Copying as Fair Use.......................................7

      C.  "Functional Transformation" Drives the Fair Use Factors..... 11

II.   THE COURT BELOW FAILED TO ADEQUATELY
      ASSESS THE FAIR USE FACTORS .......................................... 12

      A. Factor One:  *The purpose and character of the use,*
         *including whether such use is of a commercial nature or*
         *is for nonprofit educational purpose*....................................... 12

      B. Factor Two:  *The nature of the copyrighted work* ................... 13

      C. Factor Three:  *The amount and substantiality of the*
         *portion used in relation to the copyrighted work as a*
         *whole* ..................................................................................... 14

      D. Factor Four:  *The effect of the use upon the potential*
         *market for or value of the copyrighted work.* .......................... 14

E.  Public Benefit .......................................................................... 19

III.  THE DISTRICT COURT'S APPLICATION OF THE FAIR
USE DOCTRINE IS INCONSISTENT WITH TITLE 17 AS
A WHOLE .................................................................................... 20

A.  Copies Made by Google for Its Own Use Do Not Qualify
as Fair Use .............................................................................. 22

B.  Copies provided by Google to Libraries Do Not Qualify
as Fair Use .............................................................................. 24

IV.  MASS DIGITIZATION IS AN ISSUE FOR CONGRESS ......... 26

CONCLUSION ............................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records v. Napster,*
   239 F.3d 1004 (9th Cir. 2001) ...................................................................17, 18

*Acuff-Rose Music, Inc. v. Campbell,*
   972 F.2d 1429 (6th Cir. 1992) ...........................................................................6

*Authors Guild, Inc. v. Google, Inc.,*
   954 F. Supp. 2d 282 (S.D.N.Y. 2013) ......................................................*passim*

*Authors Guild, Inc. v. Hathitrust*
   902 F. Supp.2d 445 (S.D.N.Y. 2012) ........................................................*passim*

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
   758 F. Supp. 1522 (S.D.N.Y. 1991) .................................................................24

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006) ...............................................................................8

*Bilski v. Kappos,*
   130 S. Ct. 3218 (2010).......................................................................................21

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)....................................................................................*passim*

*Conroy v. Aniskoff,*
   507 U.S. 511 (1993)...........................................................................................21

*Craft v. Kobler,*
   667 F. Supp. 120 (S.D.N.Y. 1987) ...................................................................20

*Harper & Row, Publrs. v. Nation Enters.,*
   471 U.S. 539 (1985).........................................................................................4, 5

*Infinity Broad. Corp. v. Kirkwood,*
   150 F.3d 104 (2d Cir. 1998) ...............................................................................4

*King v. St. Vincent's Hosp.,*
   502 U.S. 215 (1991)...........................................................................................21

*Kungys v. U.S.*,
    485 U.S. 759 (1988)..............................................................................21

*Meredith v. Fed. Mine Safety & Health Review Comm'n*,
    177 F.3d 1042 (D.C. Cir. 1999)............................................................21

*Perfect 10 v. Amazon.com*,
    508 F.3d 1146 (9th Cir. 2007) .....................................................10, 18

*Princeton Univ. Press v. Michigan Document Servs.*,
    99 F.3d 1381 (6th Cir. 1996) ...............................................................24

*Ringgold v. Black Entm't TV*,
    126 F.3d 70 (2d Cir. 1997) ..................................................................16

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).....................................................................*passim*

*Williams & Wilkins v. U.S.*,
    487 F.2d 1345 (Ct. Cl. 1973) ................................................................8

**Statutes**

THE COPYRIGHT ACT, 17 U.S.C. (1976) ....................................................*passim*

17 U.S.C. § 101 ......................................................................................9

17 U.S.C. § 107 ....................................................................3, 5, 11, 23

17 U.S.C. § 108 ...............................................................................*passim*

17 U.S.C. § 108(c) ...........................................................................22, 25

17 U.S.C. § 108(d) ...............................................................................8, 23

17 U.S.C. § 108(e) ................................................................................23

17 U.S.C. § 108(f) ................................................................................24

17 U.S.C. § 108(i) ................................................................................28

17 U.S.C. § 121 ...............................................................................*passim*

17 U.S.C. § 121(d) ................................................................................25

iv

**Legislative History**

77 FED. REG. 64555 (2012) ............................................................29, 30

79 FED. REG. 7706 (2014) ...................................................................30

79 FED. REG. 18932 (2014) .................................................................30

H.R. REP. NO. 94-1476 (1976)................................................19, 24, 25

**Other Authorities**

2A SUTHERLAND STATUTORY CONSTRUCTION §46:5 (7th ed. 2007).......................21

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*,
  § 13.05(A)(3) (1997)..............................................................................4

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*,
  § 13.05(A)(4) (1993).............................................................................16

Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105
  (1990) ....................................................................................................7

United States Copyright Office, *Legal Issues in Mass Digitization: A
  Preliminary Analysis and Discussion Document* (2011), *available at*
  http://www.copyright.gov/docs/massdigitization/USCOMassDigitization
  _October2011.pdf ................................................................................29

United States Copyright Office & LOC, *The Section 108 Study Group
  Report* (2008), *available at*
  http://www.section108.gov...................................................................28

## <u>STATEMENT OF INTEREST</u>[1]

The various professors who join this brief, Stuart Brotman, Raymond Nimmer, Mark F. Schultz, John L. Simson and Jon Baumgarten, a former General Counsel of the United States Copyright Office, teach, research and have an interest in the theory, law and practice of copyrights, property rights and contracts.[2] (Biographies of the professors are included in the Appendix to this brief.)  The professors have no other stake in the outcome of this case, but are interested in ensuring that copyright law develops in a way that best promotes creativity, innovation and competition in the digital world.

## <u>SUMMARY OF ARGUMENT</u>

This copyright infringement case stems from the mass digitization by Google of millions of books made available to it by various libraries. In November

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than the *amici curiae*, their members, or counsel, contributed money intended to fund preparation or submission of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief.

[2] The signatories gratefully acknowledge the work of June Besek, Executive Director of the Kernochan Center for Law, Media and the Arts and Lecturer in Law, Columbia Law School, whose testimony to the House Judiciary Committee Subcommittee on Courts, Intellectual Property and the Internet on fair use was the touchstone for this brief. *The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. On the Judiciary,* 113th Cong. (2014) (statement of June M. Besek, Executive Director, Columbia Law School).  Professor Besek does not join this brief because of Kernochan Center policy.

2013, the district court entered judgment in favor of Google on its fair use defense. Evaluating factor one, the court found Google's use was "highly transformative" because Google had converted the books' text into digital form, creating a full text search capability that made existing works more accessible to users, and enabling new forms of research.  Google also provided each library with a digital copy of all of the books in that library's collection.

The court accorded little weight to the commercial benefit that Google derived from the digital copies of 20 million works that it acquired through this process (without payment to right holders) and retained for its own use.  Neither factor two nor factor three had any significant influence on the fair use determination, but on factor four the court found that Google's activities had little likely effect on the authors' actual or potential markets for their works.  The court failed to consider the market impact that could ensue if the use were to become widespread and other commercial or noncommercial enterprises followed Google's lead in mass digitizing collections of works.

The decision below exacerbates the recent trend of citing "transformative purpose" to excuse the taking and commercial use of complete copies of copyrighted works on a large scale, and consequently undermines the copyright law. Google's transformative purpose seems to drive factors one and four to favor fair use; factors two and three are largely irrelevant.  The district court ignored the

substantial commercial benefit to Google, and fixed primarily on the social benefits from Google's and the libraries' activities.   Social benefit does not provide a carte blanche for unauthorized copying of copyright-protected works. Education, for example, has significant public benefits, yet schools are not free to make unauthorized copies of copyrighted textbooks for their students.

The district court's interpretation of the fair use doctrine, 17 U.S.C. §107, is inconsistent with  the rest of Title 17, and specifically with sections 108 (exceptions for libraries and archives) and 121 (exception to copy and distribute works for the blind or otherwise disabled).  Both of those provisions reflect a careful balancing of interests and have conditions that protect right holders.  In interpreting fair use so expansively that it creates, in effect, a broad new exception to copyright without the conditions and limitations in sections 108 and 121, the court below violated the cardinal rules of statutory construction.

The court implicitly assumed that recognizing fair use on this extraordinary scale was the only way to achieve the public benefit of Google's book search program.  That assumption is unwarranted:  Congress and the Copyright Office are both actively pursuing a legislative solution.  Mass digitization raises a range of complex and interrelated policy issues that are better decided by Congress, with input from a wide range of concerned parties, rather than by a court whose

judgment is inevitably shaped by the particular litigants and circumstances in the case before it.

The decision of the court below should be reversed.

## ARGUMENT

### I.    THE DISTRICT COURT'S EXPANSIVE INTERPRETATION OF FAIR USE SIGNIFICANTLY UNDERMINES COPYRIGHT LAW.

Fair use has undergone an unprecedented expansion over the last few years. Until recently, the courts held that "[t]hough not an absolute rule, 'generally, it may not constitute a fair use if the entire work is reproduced.'" *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998) (quoting *Nimmer on Copyright* §13.05[A][3] at 13-178 (1997)).   From the point where copying *an* entire work generally defeated fair use, the court below held that copying the full contents of *millions* of works can qualify as fair use, regardless of whether it is done for commercial or noncommercial purposes. *See Authors Guild, Inc. v. Google, Inc*., 954 F. Supp. 2d 282 (S.D.N.Y. 2013).

Fair use has never provided a carte blanche to make use of others' work, even for a socially beneficial cause. The rights of creators and the interests of users must be balanced.   As the Supreme Court stated in *Harper & Row v. Nation Enterprises*, reversing the Second Circuit's holding that *Nation* magazine was

protected by fair use when it used pre-publication excerpts of President Ford's memoirs without authorization:

> [C]opyright is intended to increase and not to impede the harvest of knowledge. But we believe the Second Circuit gave insufficient deference to the scheme established by the Copyright Act for fostering the original works that provide the seed and substance of this harvest. The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors.

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 545-46 (1985) (citation omitted).

### A. The Supreme Court's Renewed Emphasis on "Transformative Use."

The principal reason for this rapid expansion of fair use has been the increasing significance of "transformative use" in evaluating a fair use defense. The term "transformative use" is nowhere found in section 107. It is not a new concept, however: "productive use" – in the sense of producing new and independent creative works – has long been part of the fair use determination. In *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994), the Supreme Court embraced "transformative use" as a highly influential (though not determinative) factor in assessing fair use.

*Campbell* involved a parody by 2 Live Crew of Roy Orbison's song, "Pretty Woman." Music publisher Acuff-Rose sued for copyright infringement, and Campbell (2 Live Crew's lead vocalist and the first named defendant) asserted a

5

fair use defense.    The Sixth Circuit Court of Appeals held that fair use did not apply.   Relying on the Supreme Court's statement in *Sony Corp. of America v. Universal City Studios*, *Inc*., 464 U.S. 417, 451 (1984), that "commercial use is presumptively an unfair exploitation" of the copyright owner's rights, the Sixth Circuit resolved the first factor – the purpose and character of the use – in plaintiff's favor, because 2 Live Crew's parody was commercial.    *Acuff-Rose Music, Inc. v. Campbell*, 972 F.2d 1429, 1436-37 (6th Cir. 1992), *rev'd,* 510 U.S. 569 (1994). On the fourth factor, often said to be the most important, the appellate court stated that because 2 Live Crew's parody was entirely commercial, it "presume[d] that a likelihood of future harm to Acuff-Rose exists." *Id.* at 1438-39. The Sixth Circuit's decision was typical of many post-*Sony* decisions, which made commercial use virtually dispositive of factors one and four.  As a result, over the years it had become more difficult to make a commercial fair use.

Reversing, the Supreme Court criticized the appellate court for letting the commercial nature of the use so heavily influence its fair use determination.  *See, e.g., Campbell*, 510 U.S. at 583-84.  The Court explained that commercial use is not dispositive of fair use, and whether a use is "transformative" is a very important consideration.  To determine whether a use is transformative, one looks at whether the allegedly infringing work "merely 'supersede[s]'" the original work "or instead adds something new, with a further purpose or different character,

altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579 (citing Pierre Leval, *Toward a Fair Use Standard*, 103 Harvard L. Rev. 1105, 1111 (1990)).  As Judge Leval explained in the article on which *Campbell* relied, "[i]f . . . the secondary use adds value to the original – if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  Leval, *supra* at 1111.

The Supreme Court emphasized that there is no "bright line rule."  All four fair use factors must be explored and  "the results weighed together."  *Campbell*, 510 U.S. at 577-78.   Still, it observed – in the context of the parody it was evaluating – that "the more transformative the *new work*, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579 (emphasis supplied).

## B. Lower Courts are Citing "Functional Transformation" to Justify Complete Copying as Fair Use.

Prior to *Campbell*, fair use cases involving transformative (or productive) use were generally premised on changes made to the subject work itself:

7

annotating a work, analyzing or critiquing it, creating a parody, and so on.[3] *Campbell* itself involved a parody of "Pretty Woman," achieved through changes to both lyrics and music.

Post-*Campbell* cases began to interpret "transformative" in two significantly expansive ways. First, they increasingly used the term to encompass not only changes to the substance of a work, but also changes to how the work is used (even absent changes to the work's content), referring to this repurposing in a new work as "functional transformation." For example, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006), the court found defendant's use of complete copies of Grateful Dead concert posters to be a fair use because the copies of the posters were used, in reduced size, as part of a historical timeline in a group biography of the Grateful Dead, rather than for their original purpose. This case, however, still concerned a new and independent work, of a kind that has traditionally come within the ambit of fair use: a biography.

---

[3] There are a couple notable exceptions. In *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984), the Supreme Court concluded that in-home copying of free broadcast programming for timeshifting purposes was a fair use, because it was noncommercial and merely allowed consumers to watch at a different time programs they were invited to view without charge. *Id.* at 449-50. *Sony* also labeled any commercial use "presumptively unfair," 464 U.S. at 451 – a position from which the Supreme Court later retreated in *Campbell v. Acuff-Rose*. In *Williams & Wilkins v. U.S.*, 487 F.2d 1345 (Ct. Cl. 1973), *aff'd by an equally divided court*, 420 U.S. 376 (1975), the Court of Claims held that copying by the National Library of Medicine and the National Institutes of Health of scientific journal articles at the specific request of researchers was a fair use. Library photocopying was subsequently addressed in §108(d) of the 1976 Copyright Act.

Second, and more radically, courts began to apply the "transformative" and "functional transformation" labels not only to new works incorporating unaltered copies of preexisting works, but also to new uses that exploited the prior work(s) without creating a new work. "Transformative" has thus become uprooted from its original context of "new *works*" to become applied to a much broader context of "new *purposes.*"

This expansive view of what it means to be transformative has opened the door to claims that making complete copies of multiple works, even for commercial purposes, and even without creating a new work, can be a fair use. This is a substantial departure from the long-prevailing view that copying an entire work is generally not a fair use. It also implies an important constriction of the author's rights respecting "*potential* market[s]" for her work, because once a court has found a "transformative purpose" to a new exploitation, it tends increasingly to find that the new use exploits a "transformative market" that does not compete with the author's markets. Factors two and three play little role in the determination. With respect to factor four, there is inevitable tension between the concept of "transformative use" and the scope of the derivative works right, particularly as the word "transformed" is included in the definition of "derivative work." *See* 17 U.S.C. § 101. The courts' analyses of "transformative markets" that fall outside the author's exclusive rights risk inappropriately cabining the

9

scope of the derivative works right which is firmly grounded in the text of the statute, 17 U.S.C. § 106(2) and in precedent.

For example, in *Perfect 10 v. Amazon.com,* 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit Court of Appeals concluded that making complete copies of Perfect 10's copyrighted photos, and providing "thumbnail" reproductions to consumers in response to image search requests, was a fair use. According to the court, "even making an exact copy of a work may be transformative so long as the copy serves a different function than the original work." *Id*. at 1165 (citation omitted). The court viewed defendants' use as "highly transformative" because their search engine served an "indexing" purpose which improved access to information on the Internet, entirely different from the photographs' aesthetic purpose, and because of the public benefit the search engine conferred. *Id*. at 1165-66.

This was the approach taken by the district court in *Authors Guild, Inc. v. Hathitrust,*[4] 902 F.Supp.2d 445 (S.D.N.Y. 2012), *appeal filed*, No. 12-4547 (2d Cir. Nov. 14, 2012). Hathitrust is a nonprofit entity that manages a shared digital repository of millions of books scanned for Hathitrust's constituent libraries as part of Google's Library project. The repository is used for searches by library users to

---

[4] *Hathitrust* was filed after *Authors Guild v. Google*, but it was decided first.

identify books (those search results yield no excerpts of text), preservation, and to provide full text of books in the libraries to persons who are visually impaired.

The court concluded that Hathitrust's use was a fair use. It considered the use transformative since Hathitrust and the libraries were using the works for a different purpose than the originals. The court found factor two "not dispositive" and concluded on factor three that the full-text copying was necessary to achieve defendants' purposes. *Id*. at 462. The court decided that there was likely to be little impact on the market for plaintiffs' works since the plaintiffs were unlikely to set up a licensing system for this type of use. It also rejected plaintiffs' claim that sections 108 and 121 of the Copyright Act limited the scope of section 107, for the reasons discussed below in section III.

Similarly, the court below relied on this broad notion of "functional transformation" to justify Google's mass digitization of library books.

### C. "Functional Transformation" Drives the Fair Use Factors

Contrary both to statutory text and to the Supreme Court's cautious reminder in *Campbell*, a finding that a use is "transformative" now tends to sweep all before it, reducing the statutory multifactor assessment to a single inquiry. The ascendency of "functional transformation" has created serious concerns that the fair use pendulum has now swung too far away from its roots and purpose, now enabling new business models rather than new works of authorship.

11

## II.    THE COURT BELOW FAILED TO ADEQUATELY ASSESS THE FAIR USE FACTORS

Fair use requires a case-by-case analysis. *Campbell v. Acuff-Rose*, 510 U.S. at 577 (citations omitted). The sheer volume of works involved in mass digitization, however, has led the court to eschew the case-by-case fact-based analysis fair use has traditionally required.

In its effort to treat 20 million works within the confines of a single "case," the court below minimized or disregarded material distinctions between works. Essentially, its approach resembles the pre-*Campbell* pattern, but instead of "commerciality" being dispositive, in the district court's view it was transformativeness that effectively resolved factor one and informed factor four.  It gave short shrift to the other factors but focused on the public benefit while largely disregarding the considerable commercial benefit achieved by Google, and the potential adverse effect on right holders.

A more detailed review of the district court's treatment of the fair use factors demonstrates the problems with its analysis.

### A. Factor One: *The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes*

The court below disregarded the significant commercial benefit Google achieved by copying the libraries' collections.  *Google acquired 20 million books*

*for its own use, without having to purchase any of them.*[5]   Google is not an eleemosynary institution.   It is a highly profitable corporation that exploits information to make money.   The court brushed aside the substantial commercial benefit Google gained through its acquisition of millions of books without payment to the right holders, its use of the books to enhance the performance of its search engine, and the valuable information it gathers from users attracted to Google's site.

At the same time, Google neither transforms existing works nor creates new ones.   It digitizes.   That is an important contribution, but it is not authorship.   Google created a valuable search and retrieval system, and then populated it with unauthorized reproductions of others' works.

## B. Factor Two: *The nature of the copyrighted work*

The district court dismissed this factor in a single paragraph, observing first that although works of fiction are entitled to greater protection, "the vast majority of the books in Google Books are non-fiction" and that all have been published. 954 F. Supp.2d at 292.   Approximately 7% of the works at issue are fiction.   *Id.* at 285.   To bypass this consideration and simply analyze the works in gross because

---

[5] Compare *Sony*, where consumers copied works that they had been invited by the right holder to watch for free. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50 (1984).

only 1.4 million (7% x 20 million) are fiction illustrates how inappropriate it is to shoehorn 20 million works into a single fair use analysis.

### C. Factor Three: *The amount and substantiality of the portion used in relation to the copyrighted work as a whole*

For the district court, this was essentially a nonfactor. According to the court, Google's full-text copying did not preclude a finding of fair use since the copies were necessary to its search function. The court added, "Google limits the amount of text it displays in response to a search." *Id*. at 292.

Even where a second author transforms the copied material, the amount of the copying remains an important consideration. In *Campbell*, the Supreme Court stressed the "transformativeness" of the 2 Live Crew parody, but ultimately remanded to the Sixth Circuit to determine whether the resulting work copied too much – that is, more than was needed to achieve its parodistic purpose. 510 U.S. at 589, 594.

### D. Factor Four: *The effect of the use upon the potential market for or value of the copyrighted work.*

The court below found that the fourth factor weighed heavily in Google's favor, since neither the snippets nor Google's full text scans would serve as "'market replacement[s]'" for plaintiff's books, and Google Books "enhances the sales of books to the benefit of copyright holders." 954 F.Supp.2d at 293. According to the court, a user is unlikely to make the effort to engage in the

numerous searches necessary to reconstruct an entire book, and in any event would be unable to do so, since certain portions are "blacklisted." *Id*. The court assumed that books are valuable to users only if they have access to the entire work. On the contrary, books are valuable to users if they have sufficient access for their purposes. In other words, snippets or collections of snippets may have sufficient value to the user that seeking out the book is unnecessary. The potential effects on sales or licensing cannot be so easily dismissed.

The works in this case are dissimilar in material respects. The court recognized no distinction between books that have been released in digital form and those that have not; those that have been released in accessible form for the disabled and those that have not; books recently published and readily identified and findable in the marketplace, and those old and hard to locate; and those that, by their nature, are very useful even with access only to snippets. The court notes Google's assertion that it treats works with "text organized in short 'chunks'" differently and does not show snippets. *Id.* at 287. There is no independent analysis concerning the nature of works that could be harmed through showing snippets (for example many history, geography, science, and other factual works would seem to fit this description), and whether those books are in the "no snippet" category.

The court's conclusion that Google Books benefits authors is overstated. It surely benefits some authors. Even so, benefit to authors is not dispositive of factor four. *See Campbell*, 510 U.S. at 590 n. 21; *Ringgold v. Black Entm't TV*, 126 F.3d 70, 81 (2d Cir. 1997). Many authors – presumably capable of making informed judgments about their own works – do not regard Google Books as benefiting them, as this lawsuit and *Hathitrust* amply demonstrate. Broad generalizations about authors illustrate once again the problems inherent in taking twenty million books together in evaluating fair use.

Significantly, the court below failed to consider the consequences to plaintiffs' markets "if the use should become widespread." The analysis of factor four requires a court to consider

> not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original.

*Campbell,* 510 U.S. at 590 (quoting *Nimmer on Copyright*, §13.05 [A][4] (1993), at 13-102.61)).

Perhaps the court implicitly assumed that no one but a company such as Google could (or might want to) create such a comprehensive and expensive database. But there is no reason to assume that others might not create their own databases to provide information about a smaller, narrowly-tailored group of

16

works.   The cost of book-scanning is far less now than it was when Google began

its digitization project, so it is hardly unrealistic to imagine that mass digitization

will become more widespread.   It is also possible that other internet service

providers may seek to create databases of digital works to enhance search results

and  advertising revenue.  The court below simply failed to consider the possible

adverse effects on plaintiffs of a multiplicity of such databases.

As the *Sony* Court explained:

> Actual present harm need not be shown; such a requirement would
> leave the copyright holder with no defense against predictable
> damage.  Nor is it necessary to show with certainty that future harm
> will result.  What is necessary is a showing by a preponderance of the
> evidence that *some* meaningful likelihood of harm exists.

*Sony*, 464 U.S. at 451.[6]

Lower courts have in the past heeded this counsel.  For example, in *A&M

Records v. Napster*, 239 F.3d 1004 (9th Cir. 2001), the Ninth Circuit found that

Napster's activities in promoting and enabling consumers to engage in file-sharing

of copyright-protected music CDs harmed the record companies' future markets.

Although  the  record  companies  had  not  yet  entered  the  market  for  digital

downloads, they had "expended considerable funds and effort" to commence

licensing them.   The court found that the presence of unauthorized copies of

---

[6] The Supreme Court placed the burden of this showing on plaintiffs when the
challenged use is noncommercial.  But since fair use is an affirmative defense, the
burden respecting harm remains with defendants who are making commercial use.

plaintiffs' recordings on Napster's file-sharing network "necessarily harm[ed]" the record companies' potential market. *Id*. at 1017.

Contrast *Perfect 10,* in which the Ninth Circuit took an unduly constricted view of a "transformative" use's effect on Perfect 10's potential markets. At issue was Google's use of thumbnails of photographs (complete, albeit small versions) owned by Perfect 10 identified pursuant to user queries to Google's image search engine. The court declined to find an adverse market effect attributable to Google's ostensibly transformative use, even though Perfect 10 had begun a program to sell thumbnail photos as cellphone downloads. In contrast to its decision six years earlier in *Napster*, the Ninth Circuit found Perfect 10's concrete plans to enter this market unworthy of consideration, since the district court found no evidence that Google users downloaded images for cellphone use. 508 F.3d at 1166-67. Just as in this case, the "transformative purpose" effectively "drove" the other factors, resulting in a fair use determination to justify defendant's taking.

Merely because defendants use a work in a different manner or for a different reason than the right holder uses it does not justify a less-than-comprehensive consideration of market effect. In *Campbell,* where the transformative use was a parody, the court didn't merely assume that because there is no cognizable market for licensing parody, factor four favored 2 Live Crew.

Instead, it remanded the case for a determination of potential harm to plaintiff's potential market for rap derivatives.   *Campbell*, 510 U.S. at 593-94.

### E. Public Benefit

The district court focused on the public benefit achieved through the Google Book Search program in assessing fair use. In particular, it focused on the program's use for identifying and locating "forgotten" books, serving the visually impaired, and preservation.

There is little question that many users benefit from Google's Book Search Program.   But just because something is good for users does not mean free use of copyrighted works should be permitted.   Otherwise, copying works for educational purposes would be per se fair use, but it is not.   The House Report accompanying the 1976 Copyright Act states:

> The Committee also adheres to its earlier conclusion, that "a specific exemption freeing certain reproductions of copyrighted works for educational and scholarly purposes from copyright control is not justified."

H.R. REP. NO. 94-1476, at 66-67 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5659-60.   Put simply, the end does not justify the means.

The court seemed to assume that mass digitization of library collections can be undertaken only pursuant to fair use, so this is the only way to achieve the enumerated benefits.   Other countries are developing legislation and other means

19

by which to legally digitize older works. Measures to address mass digitization are currently under active consideration by policy makers in the United States, as discussed in part IV, below.

Considering the district court's overall assessment of the factors, it seems as though the court is turning fair use on its head, applying a lower level of scrutiny to massive takings of copyrighted works. It becomes increasingly difficult to explain to authors and public alike a copyright regime that rigorously examines the extent of a single scholar's partial copying,[7] while essentially according a free pass to a for-profit enterprise's massive takings.

## III.   THE DISTRICT COURT'S APPLICATION OF THE FAIR USE DOCTRINE IS INCONSISTENT WITH TITLE 17 AS A WHOLE.

The district court's capacious concept of "transformative use" swallows the more specific exceptions Congress has crafted for particular uses, overriding their limitations and thus disregarding the careful balance that Congress provided for in those exceptions.

The "Whole Act Rule" instructs a court to interpret a given section of a particular statute in light of the entirety of the act. Individual sub-parts of the statute are not to be read in isolation, but in light of one another in order to produce

---

[7] *See, e.g., Craft v. Kobler*, 667 F. Supp. 120 (S.D.N.Y. 1987) (Leval, J.) (holding that a biographer copied more than was needed for his critical examination of the letters of Igor Stravinsky).

a harmonious reading of the statute as a whole. *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citations omitted); 2A SUTHERLAND STATUTORY CONSTRUCTION §46:5 (7th ed. 2007). The Supreme Court has stated that "the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff*, 507 U.S. 511, 515 (1993). Consequently, courts move beyond a particular section to consider a particular construction thereof in light of the broader statutory scheme. *See Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1054 (D.C. Cir. 1999).

The "Rule against Redundancies," a corollary to the Whole Act Rule, prohibits "interpreting any statutory provision in a manner that would render another provision superfluous," *Bilski v. Kappos*, 130 S. Ct. 3218, 3228-29 (2010) (citation omitted), or redundant, *Kungys v. U.S.,* 485 U.S. 759, 778 (1988). The rule applies regardless of when the provisions in question were enacted.

Because the district court's broad interpretation of fair use is radically inconsistent with title 17 taken as a whole, it fails under these fundamental principles of statutory interpretation. Not only does the court read significant portions of sections 108 and 121 out of the statute, but it also renders illusory the conditions that circumscribe all of the other exceptions.

21

**A. Copies Made by Google for Its Own Use Do Not Qualify as Fair Use.**

Section 108 of the Copyright Act provides certain special exceptions to *libraries*[8] in light of their important functions. For example:

- Section 108(a)(1) provides a threshold condition for all of the section 108 exceptions: Library reproduction or distribution under section 108 must be made "without any purpose of direct or indirect commercial advantage."

- A library may make up to three replacement copies of a published work in its collections if its copy is damaged, deteriorating, lost, or stolen, or if the existing format is obsolete (*i.e.,* the playback device is no longer reasonably available in the marketplace), provided the library has "after reasonable effort, determined that an unused replacement cannot be obtained at a fair price." Any copies made in digital form may be made available to the public in that form only on the premises of the library. 17 U.S.C. § 108(c).

- Libraries may make copies of an article from a copyrighted collection or periodical, or a small part of any other copyrighted work from their collections, at the request of a user or another library. The copy must

---

[8] For ease of reference we refer to libraries and archives collectively as "libraries."

22

become the property of the user, and the library can have no notice that the copy would be used for any purpose other than private study, scholarship or research.  U.S.C. § 108(d).

- Libraries may make a copy of all or a substantial part of a work from their collections at the request of a user or another library if the library has "on the basis of a reasonable investigation, [determined] that a copy or phonorecord of the copyrighted work cannot be obtained at a fair price." The copy must become the property of the user, and the library can have no notice that the copy would be used for any purpose other than private study, scholarship or research.  17 U.S.C. § 108(e).

These sections demonstrate that Congress in drafting section 108 was very mindful of maintaining a balance between right holders and users.  When Google's conduct is measured against this backdrop, it is absurd to think that Google could take advantage of section 107 to authorize copying that Congress so carefully limited in section 108, even for libraries.  Google is a for-profit entity, and its copying was done for its own commercial use.  It copied all of the published works in the libraries' collections, irrespective of their condition, and uses them off-premises.  It copied for acquisition:  Google itself owned none of these works.  And it copied irrespective of availability in the marketplace (whether in analog or

digital form).  To excuse the extensive copying Google did on its own account in this case effectively swallows portions of section 108.

## B. Copies provided by Google to Libraries Do Not Qualify as Fair Use.

The court below held that Google was entitled to summary judgment with respect to copies Google made available to the libraries.  According to the court, Google merely provided the libraries with the means to make digital copies of books the libraries already own.  As demonstrated above, the Copyright Act does not automatically permit libraries to make digital copies of books they already own.  And even if the libraries' uses were permissible, many courts have held that a for-profit user cannot stand in the shoes of its customers and have the benefit of their exceptions.  *See, e.g., Princeton Univ. Press v. Michigan Document Servs*., 99 F.3d 1381, 1389 (6th Cir. 1996), *cert. denied*, 520 U.S. 1156 (1997); *Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F. Supp. 1522, 1531 (S.D.N.Y. 1991).

The court below relied on *Hathitrust* to conclude that the libraries' activities are protected by fair use.  But the libraries' activities, like those of Google, run afoul of the Whole Act Rule.

The statute makes clear that section 108 does not represent the outer limits of permissible library copying.  *See* 17 U.S.C. § 108(f).  But Congress in passing the 1976 Copyright Act intended fair use to be determined on a case-by-case basis.  H.R. REP. NO. 94-1476, at 65. It did not anticipate or authorize the creation of new

blanket exceptions for libraries that would overtake section 108. H.R. REP. NO. 94-1476, at 74 ("[S]ection 108 authorizes certain photocopying practices which may not qualify as fair use"). If fair use entitles the libraries to make or acquire full text digital copies of their *entire* collections, section 108(c) is superfluous.

The same argument applies with respect to section 121 of the Copyright Act. That section provides an exception from copyright to provide accessible copies for those who are blind or otherwise disabled. Section 121(a) states:

> (a) Notwithstanding the provisions of section 106, it is not an infringement of copyright for an authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

Section 121 was meant to be a narrow exception. As with section 108, Congress carefully crafted section 121 to provide a balance between the interests of the blind or other persons with disabilities and those of authors and other right holders. Section 121 allows reproduction and distribution of copies (i) by an authorized entity; (ii) of previously published nondramatic literary works; (iii) that must be distributed in specialized formats exclusively for use by the blind or other persons with disabilities. All of the relevant terms (e.g., "authorized entity," "blind or other persons with disabilities" and "specialized formats") are carefully defined in the statute. 17 U.S.C. § 121(d)(1),(2),(4). Based on its cursory analysis, the court in *Hathitrust* concluded that although defendants in its view "fit[] squarely

25

within" section 121, they "may certainly rely on fair use . . . to justify copies made outside of these categories or in the event they are not authorized entities." *Hathitrust*, 902 F. Supp. 2d at 465 (footnote omitted).

*Hathitrust's* interpretation of fair use effectively reads section 121 out of the statute. According to the court, even without meeting the conditions of section121, libraries are entitled under fair use to provide copies of all published works in their collections in a form accessible to the visually impaired.[9] The court interprets fair use in a manner that renders the provisions of section 121 irrelevant, violating fundamental principles of statutory construction.

## IV.  MASS DIGITIZATION IS AN ISSUE FOR CONGRESS

Defining the terms and conditions under which mass digitization can be undertaken is quintessentially a legislative activity. The courts, whose perspective is based on the single set of facts that confront them in a particular case, are not well suited to determining how best to regulate in this difficult and complex area.

The prevailing message from the existing mass digitization cases, in particular the decision below and *Hathitrust*, is that mass digitization inherently has such important public benefits that even if undertaken by a large and profitable

---

[9] Of course, if the libraries failed to satisfy section 121 and relied on fair use, the effect on the market would be an important consideration, and the libraries would presumably have to establish that the works it provided to the visually impaired were not already available on the market in accessible form.

commercial entity in its own commercial interests, it is permissible under copyright.

These decisions create a slippery slope. If longer snippets make use of a database more attractive, isn't it likely that snippets will expand? Can anyone engage in mass digitization and retain and use the digitized material? As observed earlier, it may well be that no one but Google would create as comprehensive a database as the one at issue here, but it is certainly plausible that others will seek to create digital databases similar in concept but focused on works in a particular field.

What happens when mass "digitization" moves beyond legacy works to born-digital material? Is it an acceptable transformative purpose simply to want the digital full-text books standardized in one's own database? What if the work is already preserved and available for full-text search in a database? Is the public benefit from a second or third (or twentieth) instantiation of the work in digital form still as compelling? What are the security requirements? Who is permitted to acquire books for free, as Google did? And is it realistic that these multiple databases will all exist without anyone using the component works for their

27

substance, rather than merely for indexing purposes?  And if this can be done with books, why not motion pictures or musical works?[10]

There are fundamental issues that should be considered and decided on by Congress.  The conditions for mass digitization should be carefully balanced with input from the wide range of affected parties.  Those issues include, for example, (i) who should be permitted to digitize works and under what circumstances; (ii) when the digitized works may be used for profit of the digitizer; (iii) under what conditions libraries or other institutions may make full text materials available to users; (iv) if digitization is done for the ostensible purpose of "preservation," what preservation standards the digitizer should be required to meet (mere digitization is not preservation[11]); and (v) whether and how some form of collective licensing might be developed to facilitate a mass digitization scheme fair to authors and users alike.

Congress and the Copyright Office are already engaged in copyright reform efforts.  Fair use and mass digitization, together with interrelated issues such as

---

[10] Certain types of works, such as motion pictures and musical works, have an exemption from some of section 108's exceptions.  *See* 17 U.S.C. § 108(i).

[11] *See* U.S. Copyright Office & Library of Congress, *The Section 108 Study Group Report* (2008), *available at* http://www.section108.gov (last visited April 11, 2014).

orphan works, revision of section 108 and possible creation of new library exceptions, are all under consideration.  For example,[12]

- In October 2011 the U.S. Copyright Office published a Preliminary Analysis and Discussion Document to advance the discussions concerning mass digitization, setting out the legal considerations and various possible approaches.  *See* United States Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (2011), *available                                                                                           at* http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf.

- The U.S. Congress is in the process of a comprehensive review of the U.S. Copyright Act.  In this connection, the Subcommittee on Courts, Intellectual Property and the Internet of the House of Representatives Committee of the Judiciary has held several hearings over the past year. The topics already addressed include, inter alia, fair use, mass digitization and preservation. These are matters clearly on the radar for Congress.

- In the meantime, the U.S. Copyright Office is moving ahead in its study of orphan works and mass digitization in order to advise Congress as to possible next steps.  It issued a comprehensive Notice of Inquiry in October

---

[12] A more comprehensive discussion of these efforts can be found in Notice of Inquiry, Orphan Works and Mass Digitization, 77 FED. REG. 64555 (2012).

2012 soliciting comments, *see* Notice of Inquiry, Orphan Works and Mass Digitization, 77 FED. REG. 64555 (2012)); issued a second Notice of Inquiry in February 2014 to seek further input through written comments and roundtable discussions, *see* Notice of Inquiry, Orphan Works and Mass Digitization: Request for Additional Comments and Announcement of Public Roundtables, 79 FED. REG. 7706 (Feb. 10, 2014)); and held public roundtable discussions in Washington D.C. on March 10-11, 2014. Final comments are due on May 21, 2014. FED. REG. 18932 (Apr. 4, 2014).

In short, Congress and the Copyright Office are actively pursuing the complex issues surrounding mass digitization, and are aware of the critical importance of reaching a solution that advances the public interest in manner that takes into account the various competing interests. Congress is best situated to address mass digitization and the cluster of important related issues, and to formulate a balanced solution.

# **CONCLUSION**

For the reasons set forth above, and for those set forth in Appellants' brief, *amici curiae* respectfully request that the decision below be reversed.

Dated:          New York, New York
                April 14, 2014

                                        /s/ Matthew Barblan

                                Matthew Barblan, Esq.
                                CENTER FOR THE PROTECTION OF
                                    INTELLECTUAL PROPERTY
                                GEORGE MASON UNIVERSITY
                                    SCHOOL OF LAW
                                3301 Fairfax Drive, Suite 216
                                Arlington, VA 22201
                                (703) 993-8937
                                mbarblan@gmu.edu

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 6,990 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: April 14, 2014

      /s/    Matthew Barblan

Matthew Barblan, Esq.
CENTER FOR THE PROTECTION OF
   INTELLECTUAL PROPERTY
GEORGE MASON UNIVERSITY SCHOOL
   OF LAW
3301 Fairfax Drive, Suite 216
Arlington, VA 22201
(703) 993-8937
mbarblan@gmu.edu

*Attorney for Amici Curiae*

# Appendix

_____

## APPENDIX

_____

This amicus brief is joined by the following professors:

**Jon Baumgarten**:  After graduating from New York University School of Law in 1967 Jon A. Baumgarten initially spent almost a decade in the private practice of copyright law and policy. Appointed General Counsel of the United States Copyright Office in January 1976 Mr. Baumgarten was a leading participant in the final formulation of the general revision of the U.S. Copyright Act and was responsible for the novel, comprehensive rulemakings and thorough overhaul of all Copyright Office regulations and practices required under the new law. Mr. Baumgarten represented the Copyright Office before courts, Congressional committees and the Department of State and as liaison to the National Commission on New Technological Uses of Copyrighted Works (CONTU), and represented the U.S. Government in the World Intellectual Property Organization, and other international copyright forums. Mr. Baumgarten returned to private practice in 1980. In the course of a distinguished career representing individuals, companies, leading trade associations, and international consortia and lasting for more than four decades until his retirement in 2011, Mr. Baumgarten was a leading figure on the scene of copyright's dramatic encounters with changing technology and

international trade, and was frequently called upon to explain U.S. copyright law to governments, policy makers, and affected groups

**Stuart N. Brotman** is a Lecturer on Law at Harvard Law School, where he currently teaches Entertainment and Media Law and serves as a faculty adviser to the Harvard Law School Committee on Sports and Entertainment Law. Brotman has served in four Presidential administrations on a bipartisan basis, including the landmark federal task forces that led to the introduction of cellular telephone and direct broadcast satellite services in the United States, and to the development of e-mail as a competitive, commercial service. He also was an inaugural member of the  Library of Congress Copyright Arbitration Royalty Panel. Brotman received his J.D. from the University of California at Berkeley, where he served as Note and Comment Editor of the California Law Review. He received his M.A. in Communications from the University of Wisconsin-Madison, where he specialized in communications regulation and policy, and his B.S. in Communication Studies and Mass Media, summa cum laude, from Northwestern University.

**Raymond Nimmer** is the Leonard Childs Professor of Law at the University of Houston Law Center and co-director of the Houston Intellectual Property and Information Law Institute. He is also a Distinguished Chair in Residence at Universidad Catolica in Lisbon, Portugal and former Dean of the Law Center. Admitted to practice in Illinois, Texas, and the U.S. Supreme Court, Nimmer was a

Fulbright Distinguished Chair of International Commercial Law. He has been Of Counsel to the law firms Weil, Gotshal & Manges and Sheinfeld, Maley & Kay. He was the co-Reporter to the Drafting Committee on Revision of U.C.C. Article 2 and the Reporter for the Uniform Computer Information Transactions Act (UCITA). Professor Nimmer is the author of over twenty-five books and numerous articles, including a three-volume treatise on Information Law, a multi-volume book on the Law of Computer Technology, and a treatise on Modern Licensing Law. He is a member of the American Law Institute, the Texas Bar Foundation, and the American College of Commercial Finance Attorneys. The first edition of his book The Law of Computer Technology received a national book award from the Association of American Publishers in 1985. Prof. Nimmer is listed in *The Best Lawyers in America* in the practice areas of: Copyright Law, Information Technology Law, Litigation - Intellectual Property.  He is also one of 700 lawyers listed in the International Who's Who of Business Lawyers in the category of Information Technology Law.  He has been recognized in 2011 by his peers as the as the Best Lawyer in Houston in Information Technology Law.  In 2013, his peers voted him the Best Lawyer in Houston in Copyright Law.

**Mark Schultz** is the Co-Director of Academic Programs and Senior Scholar at the Center for the Protection of Intellectual Property at George Mason University School of Law, a center that he co- founded. He also continues to serve

as Associate Professor & Director of Faculty Development at the Southern Illinois University School of Law where he teaches copyright, patent, cyberlaw, and trademark & unfair competition. He has extensive experience in private practice in the area of intellectual property and served as a judicial clerk in both the U.S. Court of Appeals for the Federal Circuit and U.S. Court of Federal Claims.

**John Simson** is currently the Executive in Residence and Business and Entertainment Program Director at the Kogod School of Business at the American University in Washington, D.C. where he teaches and develops entertainment industry curriculum. Simson has also been an Adjunct Professor of Entertainment Law at Georgetown Law School, as well as at American University's Washington College of Law. He has lectured on entertainment, intellectual property, and business issues at numerous universities. He makes frequent media appearances and has been quoted in the *New York Times, Los Angeles Times, Billboard Magazine, Washington Post, and Wall Street Journal.* Prior to academia, Simson managed Grammy-winning artists Mary-Chapin Carpenter and Harry Belafonte, and he was instrumental in creating SoundExchange, serving as its Executive Director from 2001-2010. He has been nominated for an Emmy Award for his work supervising the music of the PBS series, "American Roots Music." He was also selected as "Outstanding Volunteer Attorney" during the 10th Anniversary celebration of the Washington Area Lawyers for the Arts.