# 13-4829-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



THE AUTHORS GUILD, BETTY MILES, JIM BOUTON,
JOSEPH GOULDEN, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

*and*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly
situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC.,
SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all
others similarly situated,

*Plaintiffs,*

*v.*

GOOGLE, INC.,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF OF *AMICUS CURIAE* AMERICAN SOCIETY
## OF JOURNALISTS AND AUTHORS IN SUPPORT
## OF PLAINTIFFS-APPELLANTS AND REVERSAL

David Leichtman
Hillel I. Parness
Jonathan J. Marcus
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
*Counsel for Amicus Curiae American Society
of Journalists and Authors*
601 Lexington Avenue, Suite 3400
New York, New York 10022
212-980-7400
dleichtman@rkmc.com
hiparness@rkmc.com
jjmarcus@rkmc.com

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* American Society of Journalists and Authors, Inc. ("ASJA")

is a non-governmental, 501(c)(6) not for profit organization incorporated in the

State of New York with a membership of approximately 1,400 outstanding

freelance writers of magazine articles, trade books, and many other forms of

nonfiction writing.  ASJA has no parent corporation, and no publicly held

corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT …………………………………… i

TABLE OF AUTHORITIES …………………………………………………… iii

I.    INTEREST OF AMICUS CURIAE…………………………………………1

II.   STATEMENT OF ARGUMENT………………………………………………2

III.  ARGUMENT ………………………………………………………………3

    A.  The District Court Erroneously Relied on the "Importance" of Google Books in Making Its Fair Use Finding………………………3

    B.  The Decision Violates the Principles of the District Court's Prior Order Rejecting The Proposed Settlement, Which Was Correct Then And Is Still Correct …………………………………9

    C.  The District Court Misunderstood and Misapplied Judge Leval's Fair Use Writings And Supreme Court Precedent …………… 12

    D.  Reversal Is Of Particular Importance To Journal Authors And Authors Of Shorter Works ……………………………………… 23

    E.  Non-Productive (Even If Innovative) Technology Is Not Sufficient to Circumvent Copyright …………………………… 24

        1.  Google's Users Do Not Transform the Infringing Copies ………… 24

        2.  Technological Advances In Distribution Do Not "Transform" A Work…………………………………………… 26

IV.   CONCLUSION …………………………………………………………… 29

CERTIFICATE OF COMPLIANCE………………………………………… 30

CERTIFICATE OF ELECTRONIC FILING………………………………… 31

## TABLE OF AUTHORITIES

**Page**

### Cases

*A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp.2d 896
(N.D.Cal. 2000), *aff'd in part*, 29 F.3d 1004 (9th Cir. 2001) ………….. 10, 11

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913(2d Cir. 1994),
*aff'g*, 802 F. Supp. 1 (S.D.N.Y. 1992)………………………………… 16, 26

*Authors Guild v. Google Inc.*, 770 F. Supp.2d 666 (S.D.N.Y. 2011)……………9

*Author's Guild, Inc. et al. v. Google, Inc.*,
954 F. Supp.2d 282 (S.D.N.Y. 2013)………………………………… *passim*

*Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994) ………………….. 13, 14, 19

*Cariou v. Prince*, 714 F.3d 694(2d Cir.), *cert. denied*,
134 S.Ct. 618 (2013)…………………………………………………… 15

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) …………………. 17, 18

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985) …………… 19, 21

*House of Bryant Publ'ns, LLC v. A&E TV Networks*,
Civ. No. 09-0502, 2009 U.S. Dist. LEXIS 101878
(M.D. Tenn. Oct. 30, 2009) ……………………………………………… 18

*In re: Aimster*, 334 F.3d 643 (7th Cir. 2003) …………………………… 27

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)………… 24, 25, 26

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*,
621 F.2d 57 (2d Cir. 1980) ……………………………………………… 17

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) …………………………………………………… 7, 27, 28

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) ……………………………………………… 26

iii

*On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001) ...............................6

*Rogers v. Koons*, 960 F.2d 301(2d Cir.),
    *cert. denied*, 506 U.S. 934 (1992)................................................ 15

*Sony Corp of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ...................................................................... 8

*UMG Recordings v. MP3.com, Inc.*,
    92 F. Supp.2d 349, 352 (S.D.N.Y. 2000)................................ 20, 25, 26

*U.S. v. ASCAP*, 599 F. Supp.2d 415, 432, n. 16 (S.D.N.Y. 2009) .......... 21, 25, 26

*Warner Bros. Entertainment, Inc. v. RDR Books*,
    575 F. Supp.2d 513 (S.D. N.Y. 2008) ......................................... 18

## Rules

Fed. R. App. P. 29(a) ........................................................................ 1

Fed. R. App. P. 29(c)(5) ................................................................... 1

Rule 29.1 ......................................................................................... 1

## Other Authorities

Hearing on the Scope of "Fair Use," Before the H. Comm.
    on the Judiciary, 113th Cong. ____ (Jan. 28, 2014) ........................... 23

Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue
    of Fair Use*, 13 Cardozo Arts & Ent. L.J. 19, 23 (1994)
    ("Leval II")................................................................ 14, 19, 21, 23

Pierre N. Leval, "Toward a Fair Use Standard,"
    103 Harv. L. Rev. 1105, 1111 (1990) ("Leval I") ............. 12, 17, 18, 19, 20

## I.   INTEREST OF AMICUS CURIAE

*Amicus curiae* American Society of Journalists and Authors, Inc. ("ASJA"), founded in 1948, is a non-governmental, 501(c)(6) not for profit organization with headquarters in New York City and active regional chapters in Arizona, Chicago, New York City (local chapter separate from headquarters), Northern California, Southern California, the Rocky Mountains region (Denver area), the Southeast (Atlanta area), the Upper Midwest (Minneapolis area), upstate New York (Rochester area), and Washington, DC.[1]

ASJA has a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing, each of whom has met ASJA's exacting standards of professional achievement.  The requirements for membership in the organization are stringent: an author is required to demonstrate a substantial professional resume before being admitted to membership.  Nonfiction book authors qualify with two or more traditionally published nonfiction books, or one book with a second under contract. Article authors must provide a minimum of six substantial by-lined articles written on a freelance basis in national publications that pay for content. A reader

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Rule 29.1 of the Local Rules of the Second Circuit, ASJA states that no party or their counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person — other than ASJA, its members, and its counsel — contributed money to this brief.  Pursuant to Fed. R. App. P. 29(a), ASJA also states that all parties have consented to the filing of this brief.

browsing any U.S. news stand would find many articles by ASJA members.  *See generally*, *http://www.asja.org/our-members/member-news/*.

ASJA offers extensive benefits and services focusing on professional development, including regular confidential market information, meetings with editors and others in the field, an exclusive referral service, seminars and workshops, discount services and, above all, the opportunity for members to explore professional issues and concerns with their peers.

Additionally, ASJA is the publisher and author of several works.  Therefore, ASJA is a member of the putative class, and has a great interest in the outcome of this appeal on behalf of its members and itself.  ASJA supports Plaintiff-Appellant's appeal of the opinion of the District Court finding that Google, Inc.'s ("Google") use of copyrighted works in the Google Books project constitute fair use.

## II.   STATEMENT OF ARGUMENT

The District Court's opinion below finding Google Books to be a fair use should be reversed for numerous reasons.  In addition to those reasons cited in the brief of Plaintiffs-Appellants, *amicus* provides five reasons for reversal.  First, the scanning of millions of copyrighted works are not made justifiably "transformative" simply because the copies purportedly have become important to some third-party end-users.  The books and articles copied have not been altered or

imbued with new meaning, and Google's uses are the same as those that the works'

creators intended. They have not been transformed; they merely have been copied.

Second, the ruling below provides Google with the benefits of the failed settlement

in this case, without any compensation to the authors of the works it copied. Third,

the decision violates the principles set forth in numerous Supreme Court and

Second Circuit precedents as well as Judge Leval's extrajudicial writings. Fourth,

it harms a majority of all authors, and those who write nonfiction books and

articles even more than the three authors whose books were at issue. Finally, it

places non-productive technological advances above the law in a manner not

intended by the Copyright Act.

## III.  ARGUMENT

### A.  The District Court Erroneously Relied on the "Importance" of Google Books in Making Its Fair Use Finding

One particularly troubling aspect of the court's opinion is its reliance on the

"importance" of the Google Books service to consumers, which has grown over the

eight-year course of this case, to reach the conclusion that Google's large-scale

copyright infringement is now "highly transformative."

The structure of the District Court's opinion moves directly from the court's

conclusion about the importance or popularity of the service to a very *pro forma*

application of the fair use factors based largely on that conclusion. The opinion's

section entitled "The Benefits of the Library Project and Google Books" influences

systemically the remaining fair use analysis.  The court begins by asserting that

"[t]he benefits of the Library Project are many," and then lists five separate

supposed benefits of the program.  *Author's Guild, Inc. et al. v. Google, Inc.*, 954

F. Supp.2d 282, 287-88 (S.D.N.Y. 2013).  Most of these benefits relate to the

libraries whose collections were copied and new services those libraries can offer;

none pertain to the "snippets view" aspect of Google Books, to which the court

appears to have paid relatively little attention but which is the most offensive

aspect of Google's use to copyright.[2]

The chief benefit (hereafter, the "library uses"), according to the court, is the

following:

> Google Books *has become an essential research tool*, as
> it helps librarians identify and find research sources, it
> makes the process of interlibrary lending more efficient,
> and it facilitates finding and checking citations.  Indeed,
> Google Books *has become such an important tool* for
> researchers and librarians that it has been integrated into
> the educational system – it is taught as part of the
> information literacy curriculum to students at all levels.

---

[2] As discussed below, the fifth supposed benefit – the benefit to authors and
publishers – should not be taken into account at all.

*Id.* at 287 (emphasis added).  The court also finds, "in addition to being an *important* reference tool, Google Books greatly promotes a type of research referred to as 'data mining' or 'text mining.'"  *Id.*[3] (hereafter "data mining uses").

The court then opens its legal discussion of the first fair use factor with the conclusion that "Google's use of the copyrighted works is highly transformative." *Id.* at 291.  Hearkening back to the "Benefits" section, the court once again leads with the growing "importance" of Google Books:

> Google Books *has become an important tool* for libraries and librarians and cite-checkers as it helps to identify and find books.

*Id.*  The court then engages in a huge leap of logic to declare without explanation that "the use of book text to facilitate search through the display of snippets is transformative," and then closes out its analysis of the first fair use factor by once again turning to the purported "importance" of Google Books:

> [E]ven assuming Google's principal motivation is profit, the fact is that Google Books serves several *important* educational purposes.

*Id.* at 292 (emphasis added).

Later, when addressing the third factor (amount and substantiality of the portion used), the court acknowledges that Google makes, distributes, and retains, full-length copies of the works at issue (and displays nearly all of the works),

---

[3] It finds one example of such "mining," about the singular or plural use of the "United States," which feels contrived.

which should have weighed strongly against Google. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001) ("fragmentary copying is more likely to have a transformative purpose than wholesale copying.").  But the court substantially reduces the impact of this factor by once again turning to its conclusion that the project was important:  "one of the keys to Google Books is its offering of full-text search of books, full-work reproduction is *critical* to the functioning of Google Books." *Id.* at 292 (emphasis added).  But the "snippets view" aspect of Google Books has nothing to do with the "data mining" or "library uses" that it emphasized in its factual recitation of the purported benefits to the public.

The court's reasoning is circular:  full-length copying is "critical" to the operation of Google Books, which the court determined "has become important" during the eight-year pendency of the litigation, and thus the grandest scale copyright infringement in the history of the world should be excused.

This logic is deeply flawed. *Amicus* is aware of no authority that supports a finding of fair use based solely on how important or popular the infringing service is to the public.  To the extent there is any guidance in past precedent, it is strongly to the contrary.  For example, in the peer-to-peer music file sharing cases, which made their way through the courts from 2000 to 2005, the Supreme Court eventually rejected the notion that a service supplying copyrighted works that are

important to consumers can provide a justifiable excuse for copying works wholesale.

In the *Grokster* case, the Supreme Court looked past the technological design of the system and focused on the fact that those behind the file-sharing services had designed their systems for the specific purpose of mass copying of music files, finding no justification for such a taking.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).  From this perspective, the Supreme Court's *Grokster* decision is paradigmatic of the need for courts in copyright cases to terminate services that exploit consumers' desire for free access to copyrighted content without compensation to authors.  In *Grokster*, no credit was given to the defendant for the popularity of its system – that the service was an "important" resource for people seeking music, or that the full-length copying facilitated by the service was "essential" or "critical" to the peer-to-peer user base did not weigh in the infringer's favor.

Here, the situation is even worse as Google is not inducing copying by users, but rather doing the copying directly and providing the copied content free to its user base.  That is, Google itself is violating the reproduction, distribution and display rights that are the exclusive province of the author to exploit.  If the motivations of the *Grokster* defendants properly came under scrutiny in the

secondary liability context, Google's motivations should also play a role when considering the fair use defense here.[4]

The District Court's repeated reference to the "essential" and "important" nature of Google Books, as well as the "critical" need for Google to copy full-length texts, and the apparent central role these conclusions played in its fair use analysis, are of substantial concern to all copyright owners. The ruling threatens to swallow copyright entirely because almost any act of copying can be said to be "important" to someone. It is precisely because the Google Books service was up and running for eight years before the District Court issued its fair use decision that any consideration of how popular or important the service had become during that time should have been excluded from the analysis. Instead, the analysis should have applied each of the fair use factors to each separate aspect of the service in question, as explained further below.

---

[4] Google's motives are covered in Plaintiff-Appellants' brief and are not repeated at length here. To the extent that Google may try to rely upon *Sony Corp of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), that decision provides no support. Although the Supreme Court there reached the conclusion that consumers' time-shifting of television programming was a fair use, the content in question was already being provided free to consumers, and the importance or popularity of the service to consumers was not weighted in Sony's favor.

**B.    The Decision Violates the Principles of the District Court's Prior Order Rejecting The Proposed Settlement, Which Was Correct Then And Is Still Correct.**

In its March 2011 opinion, the District Court explained why it was rejecting the proposed settlement of the case which would have permitted Google to "implement a forward-looking business arrangement that would grant Google significant rights to exploit entire books, without permission of the copyright owners." *Authors Guild v. Google Inc.*, 770 F. Supp.2d 666, 669 (S.D.N.Y. 2011). The court concluded that "the concerns raised in the objections would be ameliorated if the [settlement agreement] were converted from an 'opt-out' settlement to an 'opt-in' settlement." *Id.* at 686. The court's message was that the opt-out structure of the proposed settlement, which would have rewarded Google's decision to scan millions of books without permission, was unfair to copyright holders.

Chief among the concerns of objectors and the District Court was that the forward-looking arrangements in the proposed settlement, in essence, would eliminate any competition by providers of similar services. The District Court thus wrote that even though "Google engaged in wholesale, blatant copying, without first obtaining copyright permissions," nevertheless its competitors went "through the 'painstaking' and 'costly' process of obtaining permissions." 770 F. Supp.2d at 679 (quoting objection of Microsoft and adopting statement of another objector

9

that "Google pursued its copyright project in calculated disregard of authors'
rights.").  Of course, the result of the decision now appealed from provides authors
with an even worse scenario:  at least under the rejected settlement authors would
have been paid for Google's exploitation of their work.

The concern of the settlement objectors (and then of the District Court) echoes
those expressed in the early days of the file sharing cases discussed above. For
example, in one of the first of those cases, Napster had developed a popular service
as Google contends it has done here.  *See A&M Records, Inc. v. Napster, Inc.*, 114
F. Supp.2d 896, 902 (N.D.Cal. 2000) ("Although Napster was the brainchild of a
college student who wanted to facilitate music-swapping by his roommate, . . . it is
far from a simple tool of distribution among friends and family. According to
defendant's internal documents, there will be 75 million Napster
users by the end of 2000") (record citations omitted), *aff'd in part*, 29 F.3d 1004
(9th Cir. 2001).

Yet the Napster trial judge enjoined the service and specifically rejected
Napster's argument that:

> [C]onsumers will not necessarily resume *buying* music if
> Napster is enjoined; rather, they will go to other sites
> offering free MP3 files.  Indeed, as [plaintiffs' expert]
> avers, defendant has contributed to a new attitude that
> digitally-downloaded songs ought to be free – an attitude
> that creates formidable hurdles for the establishment of a
> commercial downloading market.

10

*Id.*, 114 F. Supp.2d 896, 910 (N.D. Cal. 2000) (emphasis in original) (granting

preliminary injunction).  Both Napster then, and Google here, sought to avoid the

transaction costs of obtaining permission – but no court has held that wishing for

greater efficiency in the licensing markets makes mass copying a transformative

fair use.

Indeed, after Napster's copyright gambit failed, a robust online marketplace

for downloading (and now streaming) of music proliferated, starting with the wild

success of Apple's iTunes service.  And in the wake of the failed settlement in this

case, the publisher plaintiffs settled by joining Google's voluntary "opt in"

Partners Program, which created a competitive market for sharing books at the

behest of the copyright owners when *they decide* it suits them economically.  Had

the Napster and Grokster decisions, or the proposed settlement in this case, gone

the other way, such markets would not have been created.  The District Court was

thus right to reject the settlement, but its fair use decision undermines the results

that it achieved.

The court's broad declaration of transformative use, based on extraordinarily

generalized principles, such as the increased "importance" of Google Books to

non-party users, was wrong.  What the court has done, in effect, is exactly what it

said it would <u>not</u> do previously – it has rewarded Google for its sweeping and

undiscriminating (and unapologetic) campaign of mass copyright infringement,

11

with an equally sweeping and undiscriminating fair use holding.  Google can now scan any and all books it chooses for free, and use those books in the manner of the Google Books project without ever notifying or compensating the copyright owners, or making any effort whatsoever even to identify them.  It is not clear what happened to the same District Court's concern for fairness to the authors and the compensatory goal of copyright in the interim.

### C.    The District Court Misunderstood and Misapplied Judge Leval's Fair Use Writings And Supreme Court Precedent

The District Court's erroneous determination that Google transformed the copyrighted works at issue infected its entire fair use analysis.  By relying overly on its "social benefit" theory, the District Court mistook a "revision of purpose" for the required "revision of expression" that is required for there to be a "transformation" as properly understood in fair use analysis.

For its understanding of "transformative" fair use, the District Court appears to have relied exclusively upon Judge Leval's 1990 article, "Toward a Fair Use Standard," 103 Harv. L. Rev. 1105, 1111 (1990) ("Leval I").  The District Court summarily decided that the Google Books project, *en grosse*, "'adds value to the original,' and allows for 'the creation of new information, new aesthetics, new insights and understandings.'"  But it did so without dissecting each separate aspect of the use put by Google to the copyrighted works, and simply concluded: "Hence, the use is transformative."  954 F. Supp.2d at 291.

12

The court thus bought into Google's theme that simply changing the manner in which the works are presented to users, without changing any of their expression, could constitute fair use. Changing the context of a work alone is not sufficient to make a transformation; rather, the second work must add something to the expression of the work, not just take the original for some other use.

A non-superficial review of Judge Leval's 1990 article reveals that it does not go as far as the District Court took it. Nor does the Supreme Court's decision in *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994) authorize such an expansion of fair use.

Judge Leval's article was not about the wholesale copying of millions of works verbatim. It was a reaction to express his view about how the Second Circuit went awry in two cases involving biographies where the appellate court reversed his decisions when he was sitting in the district court. And *Acuff-Rose* was about whether the parody at issue in that case was akin to comment and criticism as recited in the preamble of the fair use statute, not about mass digitization. It did not even consider, let alone fully adopt, a "change in context is sufficient" rule. As Judge Leval noted in a later article discussing the *Acuff-Rose* decision, such a rule would be a step too far:

> In my view some of these statements have been so extreme in the proposition that any change rebuts infringement that they threaten to swallow much of copyright law, leaving authors and artists defenseless. If minor changes will circumvent the

13

protection of copyright law, what will protect the ability of authors, composers, and artists to earn a living through their creations?

Pierre N. Leval, *Campbell v. Acuff-Rose:  Justice Souter's Rescue of Fair Use*, 13 Cardozo Arts & Ent. L.J. 19, 23 (1994) ("Leval II").

In *Acuff-Rose*, the Supreme Court first announced that an inquiry into whether the use is "transformative" should be part of the first fair use factor.  The infringing work at issue was a parody, which the Court first found fell within the purview of the statutory purpose because parody can be equated with criticism and comment.  510 U.S. at 579-80.  Having met that threshold, in its examination of the first enumerated factor, purpose and character of the use, the Court said that even where the second use is commercial in nature, the inquiry should include an analysis of whether the second user's effort was transformative in some sense, and defined what it meant by "transformative": whether it "adds something new, with a further purpose or different character, *altering the first* with new expression, meaning, or message." *Id.* at 579 (emphasis added).[5]  Here, Google has not altered the works at all, or imbued them with new meaning or message.  Their meanings and messages are the same, particular the snippet view part of Google's project.

---

[5]    The actual holding of *Acuff-Rose* is merely this: "[w]e thus line up with the courts that have held that parody, like other comment or criticism, may claim fair use under Section 107." *Acuff-Rose* at 579.

As this court has stated, "If an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different [artistic] use . . . there would be no practicable boundary to the fair use defense." *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992). More recently in *Cariou*, this Court reiterated: "A secondary work may modify the original without being transformative. For instance, a derivative work that merely presents the same material but in a new form. . . is not transformative." *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir.), *cert. denied*, 134 S.Ct. 618 (2013). Here, the snippet view aspect of Google Books is non- productive – it allows readers to view creative excerpts without ever changing a word. It is as if Google freely distributed books to students on the grounds that the mere fact they were students is a transformative "productive" use. The fact that the District Court assumed (without adequate proof) that 93% of the works were of the non-fiction variety, makes it all the more troubling, since the very purpose of educational non-fiction books is for education and research. Indeed, it is not hard to imagine groups of students each copying and pasting excerpts from the Google snippets to make a nearly complete copy of a textbook they all can share instead of buying multiple copies of the book. "Snippet view" is thus merely a non-productive way to use the works for their originally intended purpose that make reading a book a worse experience.

15

"Mechanical 'copying' of an entire document, made readily feasible by the advent of xerography…, is obviously an activity entirely different from creating a work of authorship. Whatever social utility copying of this sort achieves, it is not concerned with creative authorship." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 917 (2d Cir. 1994), *aff'g*, 802 F. Supp. 1 (S.D.N.Y. 1992). The District Court's decision cannot be reconciled with *Texaco*. It is hard to imagine that this Court (or Judge Leval at the district court level) would have permitted Texaco to launder its infringement by limiting what portions of the articles its scientists could read. Suppose Texaco scanned all the articles into a database, letting its scientists read only 7/8ths of each page and 90% of the entire Journals. *Amicus* submits that case would not have had a different outcome. *See Texaco*, 802 F. Supp. 1 at 13-14 (wholesale copying of entire work where the purpose was to "advance scientific discovery" was not the kind of productive use contemplated by the fair use jurisprudence; "what was meant was that the copying should produce something new and different from the original, and not that a superseding copy would qualify, so long as it was made in pursuit of a beneficial cause. If the latter were the meaning of the doctrine, precious little would be left of the copyright protection as applied to scholarly or scientific writing.").

Rather than being advocacy pieces to find more fair use, the main argument in Judge Leval's 1990 article and 1994 follow-up pointed to the problem of the

proper remedy for infringement in cases where the secondary use would be publicly

beneficial.  It is important to recall that these articles pre-dated the Supreme Court's

decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), where the

Supreme Court first announced that irreparable harm should no longer be presumed

in intellectual property cases where the granting of injunctions against infringing

works was previously presumed.  Placed in that context, Judge Leval's main thesis

in both articles was that injunctions ought not to be freely

given in cases of infringement where the fair use question pertained to a social

benefit from the infringing use.

Judge Leval conceded, for example, that in his district court opinion in

*Salinger v. Random House* he should have paid more attention to specific acts of

copying and analyzed each separately (rather than treating the work as a whole)

because he was preoccupied with the need to grant an injunction which, pre-*eBay*,

would have been provided as of right.  *Leval I*, at 1113 and 1131 n. 114 ("I confess

. . . [w]ith hindsight, I suspect my belief that the book should not be enjoined made

me too disposed to find fair use where some of the quotations had little fair use

justification.").[6]  Judge Leval thus stated:  "Courts must consider the question of

_____

[6]      As discussed in Plaintiffs-Appellants' opening brief, there are many cases
holding that excerpts shorter than Google's verbatim snippet views were not
transformative, despite having different purposes than the original.  *See*, Pl-
App.Br. at 37-40; *see also e.g.*, *Iowa State Univ. Research Found., Inc. v. Am.
Broad. Cos.*, 621 F.2d 57, 59-62 (2d Cir. 1980) (finding no fair use in broadcast of

17

fair use for *each challenged passage* and not merely for the secondary work overall." *Leval I*, at 1112 (emphasis added). He continued: "Simply to appraise the overall character of the challenged work tells little about whether the various quotations of the original author's writings have a fair use purpose or merely supercede." *Id.* Here, the District Court not only failed to examine the three authors' works at issue, but failed to examine any passages at all and issued such sweeping pronouncements that it cannot possibly meet Judge Leval's test.

To address difficult injunction problems, Judge Leval suggested a third option beyond a thumbs-up or down on fair use:

> In the center is a numerically small but important band encompassing works which, although they fail the fair use test, have originality and independent value, and represent a sufficiently small threat to the economic entitlements of the author of the original, so that the

---

three clips on different occasions collectively comprising 8% of the copyright holder's 28-minute film, many of which comprised 7-to-12-second clips); *Warner Bros. Entertainment, Inc. v. RDR Books*, 575 F. Supp.2d 513 (S.D. N.Y. 2008) (Although the creation of a Harry Potter encyclopedia was determined to be "slightly transformative" because it made the Harry Potter terms and lexicons available in one volume, this transformative quality did not justify a fair use defense because of the extensive verbatim use of text from the Harry Potter books); *House of Bryant Publ'ns, LLC v. A&E TV Networks*, Civ. No. 09-0502, 2009 U.S. Dist. LEXIS 101878 at * 18 (M.D. Tenn. Oct. 30, 2009) ("The transformative nature of "Rocky Top" is unapparent from a basic viewing of the Episode. In the Episode, there is no allusion to "Rocky Top" prior to its playing, and there is no perceptible attempt to actually place "Rocky Top" in any sort of larger context. As indicated above, just before "Rocky Top" plays, there is a general discussion of UT being a haven for college football, but there is no commentary, criticism or even discussion of "Rocky Top." Rather, basically, the excerpt from "Rocky Top" simply plays, fades, and then stops, and the Episode moves on to the next topic.").

> public-enriching objectives of the copyright law are
> better served by withholding injunctive relief.

*Leval II*, at 24.  The District Court here also seemed overly concerned that an

injunction would cut off the perceived public benefits of the indexing feature of the

Google Books project (no public benefit was annunciated as to the "snippets"

feature).  But that is a question for the remedies phase (*i.e.*, whether such

infringements should be compensated only by damages) – not one for the

underlying fair use analysis.

In *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985), which

was not overruled by *Acuff-Rose*, the Supreme Court overturned this Court's

finding of fair use even though it recognized that the secondary works were for a

purpose stated in Section 107's preamble because the second use qualified as

"news."  It did so because the second user simply took much, which it concluded

after a painstaking inquiry into what was actually taken, an exercise the District

Court here failed to perform.  Indeed, the snippets at issue here can often be much

longer than the snippets of Gerald Ford's memoir found to be unfair in *Harper &*

*Row* – which Judge Leval agreed was the correct result.  *See Leval I*, at 1120

(quoting Harper & Row, 471 U.S. at 554-557, noting the Supreme Court's

emphasis on the diminishment of the rewards of authorship and the likely

discouragement of authors from writing and publishing valuable memoirs); *Leval I*,

at 1123 (discussing third factor's qualitative aspect:  "In the case of President

19

Ford's memoirs, a taking of no more than 400 words constitute[ed] the 'heart of the book'" causing the taking to be unfair, and the quantitative aspects: "the more taken the greater the likely impact on the copyright holder's market and the more the factor favors a copyright holder.").

The snippet view aspect of Google Books takes both – 100% of the works (even if only 78% can be viewed) and all of the qualitative aspects of the books. It is not anything like a "lengthy critical study" of a sonnet with "[f]ragments dispersed throughout the work of criticism [that] may well quote every word of the poem" and still be a fair use. *Leval I*, at 1123.

This is where the fourth factor picks up. The District Court speculated, without any proof, that everyone – including the copyright owners – would benefit from Google Books, and therefore found that the fourth factor supported fair use. 954 F. Supp.2d at 293. There is, indeed, doubt by a majority of authors that Google Books helps sales for individual authors rather than hurting them. But the District Court in any event missed the point of Judge Leval's recitation of the import of this factor. As Judge Leval notes, "the fact that the secondary use does not harm the market for the original gives no assurance that the secondary use is justified." *Leval I*, at 1124; *see also id.*, at 1124 n. 84.[7]

---

[7] District courts in this circuit have also correctly rejected similar arguments about the supposed benefit of the infringement to the copyright holders. *See UMG Recordings v. MP3.com, Inc.*, 92 F. Supp.2d 349, 352 (S.D.N.Y. 2000) ("any

The failure of the earlier settlement in this case demonstrates the impairment of the market for the purposes to which Google has put the plaintiff's works as seen in the statements of objectors who were prepared to pay and seek permission, which would have established a competitive market. The court found this was a good reason to reject those provisions of the settlement; yet the decision now appealed from essentially gives Google the same benefit of such forward-looking arrangements without any compensation to the authors.  Google's own Partners Program is structural evidence that a licensing program, with permission obtained first, is not only feasible but already exists.  But Google's use of the books at issue in this case without permission, giving them away for free, has dampened any potential competitor from establishing a similar service.   Again, the saving of transaction costs is a not a justifiable "transformation."

Importantly, the question is not only whether the second work usurps the market for the original, but also for the original's derivatives.  *See Leval II*, at 22 ("The fourth factor looks at the harm which the secondary work may do to the copyright market of the original by offering itself as a substitute (for either the original or its derivatives)."); *see also Harper & Row*, 471 U.S. at 568.  This is of

---

allegedly positive impact of defendant's activities on plaintiffs' prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works"); *U.S. v. ASCAP*, 599 F. Supp.2d 415, 432, n. 16 (S.D.N.Y. 2009) ("the suggestion that previews may increase sales of ringtones, ringback tones and CDs…is irrelevant.").

course axiomatic, because one of the rights under Section 106 of the Act is to give the author the exclusive right to control the exploitation of derivative works. The order appealed from denies such right and eliminates it completely. It thus deprives the copyright owner of its right to make derivative works and choose whether to take advantage him or herself of new technologies.

The question of whether to allow a "socially beneficial" use is a question of the proper remedy, not a question of liability. Massive acts of enterprise-wide reproduction, distribution, and display cannot be trumped by social utility, which perhaps should be important but should not swallow Section 106. The District Court's decision devoured authors' Section §106 rights without a proper inquiry into each work scanned, let alone each of the separate uses Google has put them to. It makes it too easy for defendants in future cases to declare they have a different purpose than the original author, the categories for such purposes too broad, and too capable of manipulation and contrivance. It also improperly changes the focus of the fair use inquiry from the infringer to remote parties down the line (all internet users in the case of snippets and data mining; libraries in the case of full copies).

But the activity complained of is not that of those downstream users; it is the activities of Google, which all but went ignored by the District Court. Essentially the District Court threw up its hands and said that Google was "too big to

22

infringe."   As June Besek of Columbia Law School's Kernochan Center has

testified, that effectively gives Google a "volume discount for copying."  Hearing

on the Scope of "Fair Use," Before the H. Comm. on the Judiciary, 113th Cong.

___ (Jan. 28, 2014). Summary judgment of no liability was improper.

### D.    Reversal Is Of Particular Importance To Journal Authors And Authors Of Shorter Works

  The impact of the District Court's decision is particularly pernicious for

authors of non-fiction books and articles such as the many members of ASJA who

write journal articles and other short works.  Such authors are often times paid by

"page views," which the Google snippets program entirely usurps.  For example,

an article on "7 tips for networking at holiday parties," will receive many fewer

page views if the 7 tips are revealed in a Google snippet.  A reference to the

underlying work or where it can be accessed or purchased still results in lost

income to the author.  As Judge Leval noted in his 1994 article,

> Artists, no matter how great, must pay for what they use in
> making their works. They pay for paint, for canvas, for steel,
> for clay, for a model's time.  *Why should they not also pay a
> reasonable fee for the use of another artist's work as part of a
> new work?* A finding of such an obligation to pay need not
> imply a derogatory judgment of the new appropriative work.

*Leval II*, at 24 (emphasis added).

  This statement applies with even greater force here.  The Google Books

project perhaps can benefit society and benefit authors at the same time – but that

is a question for the remedies phase.  The wholesale appropriation of millions of works is simply not a fair use.

### E.    Non-Productive (Even If Innovative) Technology Is Not Sufficient to Circumvent Copyright

While Google limits what it shows to users each time they search, the "snippet" limitation does not justify the persistent infringing full copies maintained by Google.  The fundamental nature of the scanned books remains unchanged – what Google has done is akin to photocopying an entire book and then allowing people to read the book through a hole in a piece of cardboard.  The user experience is certainly constrained, but the unlicensed copy remains, and remains unchanged.  The fact that the user can only see bits at a time is irrelevant – the infringer is Google which is making commercial use of the whole of the infringing copy.

### 1.  Google's Users Do Not Transform the Infringing Copies

This Court's 1998 decision in *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) firmly rejects any argument that Google has transformed the books it scanned based on the acts of its customers.  *Infinity* considered whether the retransmission of terrestrial radio broadcasts over telephone lines so that they could be heard by people in the radio and advertising industries in other cities was a fair use.  Defendant argued that its "users transform the broadcasts by using them for their factual, not entertainment, content."  *Id.*, at 108. This Court rejected that

24

argument, writing that "it is Kirkwood's own retransmission of the broadcasts, not the acts of his end-users, that is at issue here."  *Id.*

Similarly, in the *MP3.com* case, the fair use defense was rejected where the service provided subscribers with on-line access to copies of music they already owned on CD.  The court found that "defendant adds no new 'new aesthetics, new insights and understandings' to the original music recordings it copies, but simply repackages those recordings to facilitate their transmission through another medium. While such services may be innovative, they are not transformative." *MP3.com, Inc.*, 92 F. Supp.2d  at  351.  Similarly, in 2009, Judge Conner considered whether AT&T had a fair use defense to the public performance of "previews" – short snippets of music played to people shopping for ringtones.  In an opinion that relied heavily on *Infinity* to find no transformation, the District Court held that "any difference in applicant's informational purpose in streaming previews of ASCAP music from the original entertainment purpose of the music is insufficient, by itself, to render applicant's use transformative."  *ASCAP*, 599 F. Supp.2d  at 427 (noting that *Infinity* taught that the focus should be on the defendant's actions, not the motivations of its users.).

Merely changing the purpose of something cannot alone make a use transformative, or else it would mean that people who translate books from English to French enjoy a fair use defense, having transformed the use of the book from its

original purpose – to be read by English speakers – into a totally new use – to be read by French speakers. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc*., 166 F.3d 65, 72 (2d Cir. 1999) (finding copyright infringement "not in the least transformative . . . [because] the abstracts are for the most part direct translations . . . ; defendants added almost nothing new in their works. This factor weighs strongly against fair use."). Nor is the use of new technology to make these non-transformative copies sufficient. *See Texaco,* 60 F.3d at 917.

In this case, as in *Texaco*, *Infinity, MP3.com* and *ASCAP*, the focus should be on Google and what it has done, rather than on Google's users and how they are using the Google system. *Amicus* urges this Court to reject any argument that Google has transformed the books from entertainment to data (suitable for "data mining"). *Infinity* teaches that what Google's users do with the scanned books is irrelevant.[8]

### 2. Technological Advances In Distribution Do Not "Transform" A Work

There has been a growing trend among services exploiting the content of others to try to build their systems in a manner that they argue are not – technically – violating the Copyright Act. Most courts have sided with the copyright owners,

---

[8] As for "data mining," if that was really the purpose of the copying performed here, Google could have disaggregated the data without the snippets and certainly would have no need for retaining the copies of the full works.

the leading example being found in the Supreme Court's decision in *Grokster*. Despite injunctions against earlier services like Napster that offered the same resulting infringing works, both the district court and the Ninth Circuit held that Grokster was not liable as either a contributory or vicarious infringer because of the particular encryption architecture of the peer-to-peer systems at issue in that case. The lower courts both concluded that the design of the software – which intentionally stripped the defendants of requisite knowledge or control – allowed the defendants to evade both of the traditional tests for secondary liability.[9]

The Supreme Court took a more pragmatic approach in line with the purpose of the Copyright Act's incentive structure. Instead it ascribed copyright liability based on the motivations of the defendants:

> [O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

*Grokster*, 545 U.S. at 936-37.

---

[9] In the *Aimster* litigation, by contrast, the Seventh Circuit compared the defendant's use of encryption to a drug trafficker who looked away to try to avoid knowledge: "He did not escape liability by this maneuver; no more can Deep by using encryption software to prevent himself from learning what surely he strongly suspects to be the case: that the users of his service- maybe all the users of his service- are copyright infringers." *In re: Aimster*, 334 F.3d 643, 650 (7th Cir. 2003).

Google Books is no different.  Google has built a business based on the unauthorized copying of others' copyrighted works.  In an attempt to deflect attention from its mass copying, Google designed a user interface that limits what the users can see to "snippets," arguing that because the users' access to the database is limited, Google is entitled to escape liability.  But there is no productive purpose to limiting users' access to a "snippet" view.  Snippet view is an artificial construct for the sole purpose of fabricating a basis for a fair use defense.  Users are interested in free access to the content of copyrighted works and in obtaining as much of that content as possible without constraints.  In this respect there is absolutely no difference in motivation between the users of the peer-to-peer systems to obtain access to music and users of Google Books.  *Amicus* urges this Court to address Google Books "snippet view" with the same pragmatism that the Supreme Court approached the *Grokster* defendants, and decline to endorse those who seek to use technology for the sole purpose of avoiding payment to authors incentivize them to create new works.

28

## IV.  CONCLUSION

For the foregoing reasons, ASJA respectfully requests that the District

Court's finding of fair use be reversed.


Dated: April 14, 2014                    Respectfully submitted,


                                         */s/ David Leichtman*
                                         David Leichtman (DL7233)
                                         Hillel I. Parness (HP1638)
                                         Jonathan J. Marcus (JJ8402)
                                         ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                         601 Lexington Avenue, Suite 3400
                                         New York, NY 10022
                                         Telephone: (212) 980–7400
                                         Facsimile: (212) 980–7499
                                         dleichtman@rkmc.com
                                         hiparness@rkmc.com
                                         jjmarcus@rkmc.com

                                         *Counsel for Amicus Curiae The American Society
                                         of Journalists and Authors*

29

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains  6,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 14th day of April, 2014, I caused a PDF version

of the foregoing brief to be filed electronically using the CM/ECF system.