# 13-4829-cv

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN,
individually and on behalf of all other similarly situated,
*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN,
individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-
HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC.,
ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD
ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others
similarly situated,
*Plaintiffs,*

v.

GOOGLE, INC.
*Defendant-Appellee*

On Appeal from the United States District Court for the Southern District of New York

**BRIEF AMICI CURIAE OF AMERICAN LIBRARY ASSOCIATION, ASSOCIATION
OF COLLEGE AND RESEACH LIBRARIES, AND ASSOCIATION OF RESEARCH
LIBRARIES IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
202-296-5675
jband@policybandwidth.com
Counsel for Amici

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries state that none of these entities has a parent corporation and no publicly held corporation has an ownership stake of 10% or more in any entity.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... i

INTEREST OF AMICI AND INTRODUCTION.................................................... 1

ARGUMENT.................................................................................................... 4

I.   GBS HAS BECOME AN ESSENTIAL RESEARCH TOOL THAT SERVES
     THE PUBLIC INTEREST ....................................................................... 4

II.  SNIPPETS DO NOT SUBSTITUTE FOR FULL TEXT ................................ 8

III. SECTION 108 DOES NOT WEIGH AGAINST A FAIR USE
     DETERMINATION. ............................................................................. 10

     A. The Copyright Act's Specific Exceptions Do Not Limit the Applicability
        of Fair Use.................................................................................... 11

     B. Section 108(f)(4) Unambiguously Provides that Section 108 Does Not
        Limit The Applicability of Fair Use. .............................................. 13

IV. THE LIBRARY COPIES ARE A FAIR USE.............................................. 16

CONCLUSION............................................................................................. 21

APPENDIX.................................................................................................. 22

# TABLE OF AUTHORITIES

## Federal Cases

*Authors Guild, Inc. v. Google, Inc.*,
   954 F. Supp. 2d 282 (S.D.N.Y. 2009) .......................................... 16

*Authors Guild, Inc. v. Hathitrust*,
   __ F. 3d __, 2014 WL 2576342 C.A.2 (2d. Cir. 2014) ..................... 3, 10, 20

*Sega Enters., Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) .................................................... 12

*Stewart v. Abend*,
   495 U.S. 207 (1990) ................................................................ 12, 13

## Federal Statutes

17 U.S.C. § 107................................................................................*passim*

17 U.S.C. § 108................................................................................*passim*

17 U.S.C. § 117.................................................................................... 13

## State Statutes

## Legislative Materials

H.R. Rep. No. 107-685 (2002) .............................................................. 12

H.R. Rep. No. 90-83 (1967) ................................................................. 12

H.R. Rep. No. 94-1476 (1976) ..........................................................14-15

S. Rep. No. 91-1219 (1970)................................................................. 14

## Other Authorities

Amended Settlement Agreement ("ASA") at 4.3(b)(i)(1)....................................... 9

Association of Research Libraries, *Expenditure Trends in ARL Libraries*, 1986-2010. ............................................................................................ 19

Jonathan Band, *The Books Rights Registry in the Google Books Settlement*, 34 Columbia J. of L. & Arts 671 (2011) ........................................... 20

Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y (2012) .............................. 13

Jonathan Band, *The Long and Winding Road to the Google Books Settlement*, 9 John Marshall Review of I.P. Law 227, 229 (2009) .................................... 19

David Harvie, et al., *Publisher be damned! From Price Gauging to the Open Road*, 31 PROMETHEUS CRITICAL STUDIES IN INNOVATION 229 (2014), http://www.tandfonline.com/doi/full/10.1080/08109028.2014.891710#.U577bo1dWVt .......................................................................................... 18

Steve Kolowich, *Mending Fences*, INSIDE HIGHER ED, June 21, 2012, http://www.insidehighered.com/news/2012/06/21/university-presses-debate-how-reconcile-libraries-wake-georgia-state-copyright#ixzz1yQpFoFhe..... 18

Randolph D. Moss, Office of Legal Counsel, *Whether And Under What Circumstances Government Reproduction Of Copyrighted Materials Is A Noninfringing "Fair Use" Under Section 107 Of The Copyright Act Of 1976* (1999) ....................................................................................... 16

Melville & David Nimmer, *Nimmer on Copyright* (2011).................................... 15

John Quinterno & Viany Orozco, *The Great Cost Shift: How Higher Education Costs Undermine the Future Middle Class*, DEMOS (Apr. 3, 2012)............. 18

Mary Rasenberger and Chris Weston*, Overview of the Libraries and Archives Exception in the Copyright Act* (2005)........................................................ 14

Statement of Paul Drake, User Services and Document Delivery Librarian, University of Guam, Guam ........................................................................... 6

Statement of Barbara Fister, Library Professor, Gustavus Adolphus College, Saint Peter, Minnesota ............................................................................ 8

Statement of Jill Gremmels, Library Director, Davidson College, Davidson, North Carolina ...................................................... 6

Statement of Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction, University of Illinois at Urbana-Champaign, Urbana, Illinois.... 7

Statement of Elizabeth Kocevar-Weidinger, Instruction/Reference and Interim E-Resources Services Librarian, Longwood University, Farmville, Virginia ... 8

Statement of Melissa Pond, Director of Library Services, Leech Lake Tribal College, Cass Lake, Minnesota ................................................ 4-5

Statement of Scott Vine, Information Services Librarian and Deputy College Librarian, Franklin & Marshall College, Lancaster, Pennsylvania ............... 7

U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (2011) ............................................. 20

U.S. Copyright Office, *Report on Copyright and Digital Distance Education* (1999) ...................................................... 12

## INTEREST OF AMICI AND INTRODUCTION[1]

The American Library Association ("ALA") is a nonprofit professional organization of more than 58,000 librarians dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians.

The Association of Research Libraries ("ARL") is a nonprofit organization of 125 research libraries in North America, including university, public, government and national libraries.

Collectively, these three associations represent over 100,000 libraries in the United States employing over 350,000 librarians and other personnel.

Imagine it is 2004 and you are a researcher at a small, chronically underfunded university researching indigenous astronomy. Your librarian wants to help you but struggles to find potential sources and determine what is relevant. You both know you are likely missing possible sources because the topic is

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amici, its members, or its counsel contributed money intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

obscure and books on the subject may be out-of-print or buried in other libraries'
collections that may not be well-indexed.

Or, imagine you are a busy mother interested in researching your family's
history to present at an upcoming reunion. You have used census data to identify
the names and locations of some ancestors, but would love to see if their names
appear in any historical accounts. You do not have much time to spend tracking
down obscure texts, much less working with your local library to get hold of them.

Now fast forward to 2014. Thanks to Google Book Search ("GBS"),
librarians can identify and efficiently sift through possible research sources,
amateur historians have access to a wealth of previously obscure material, and
everyday readers can find books stored in research library stacks.

That is what this case is about and why amici file this brief. There is a great
deal more at stake in this case than any company or author's bottom line. If
Appellants succeed, the public could be denied access to a tremendous resource –
even though no author will see a penny of additional revenue. Copyright, intended
to be an engine for the promotion of creative expression, will instead stifle that
promotion, to the detriment of readers and authors alike.

Fortunately, copyright law incorporates a crucial safety valve that prevents
such an outcome: the fair use doctrine. In applying this doctrine to the facts of this
case, the district court correctly found that Google's actions had significant public

2

benefits, and correctly gave great weight to those public benefits in the fair use calculus.

This Court's decision last month in *Authors Guild v. HathiTrust,* __ F. 3d __, 2014 WL 2576342 C.A.2 (2d. Cir. 2014)*,* resolves many of the issues in this case in favor of Google. The *HathiTrust* Court found that the creation of a searchable full text database was a transformative use because "the result of a word search is different in purpose, character, expression, meaning and message from the page (and the book) from which it is drawn." *Id*. at *7. Use of the entire work was reasonably necessary "to enable the full-text search function." *Id*. at *8. Finally, "the full-text search use poses no harm to any existing or potential market" for the books being searched. *Id*. at *9. The only functional difference between the HathiTrust Digital Library ("HDL") and GBS relevant to this case is that GBS displays three short snippets in response to a search query. While HDL is enormously useful to researchers, GBS is even more so because snippet display allows the user to efficiently filter the search results.

This brief demonstrates the great utility of snippet display to librarians and researchers. It then shows that snippet display does not substitute for the full text of books. Next, the brief proves that the library exception in 17 U.S.C. § 108 in no way limits the availability of the fair use right. Finally, the brief explains why the copies that Google made available to its partner libraries are a fair use.

**ARGUMENT**

## I. GBS HAS BECOME AN ESSENTIAL RESEARCH TOOL THAT SERVES THE PUBLIC INTEREST

In preparation for filing an amicus brief in the district court, amici ALA and ACRL conducted an informal survey asking librarians about their experiences with GBS. Their responses revealed that GBS had become an indispensable research tool, particularly for students and faculty at small and remote educational institutions. The responses further revealed that snippet display was critical to GBS's utility. Some illustrative responses are discussed below.[2]

*First*, GBS has become an important means for identifying valuable research sources. One librarian for a small "chronically-underfunded tribal college library" characterized GBS as "a lifesaver" and "indispensable":

> Because my students, and even some of my faculty members, face significant challenges and barriers to accessing resources (including transportation challenges, limited or no internet access, etc.), Google Book Search helps us find if resources exist, to identify if those resources may be helpful to their academic purposes, and get us started on the path to access through other means if not our own library. . . . I cannot overemphasize how much more difficult my job would be and how lacking my faculty's and students' experiences would be without access to a free tool like Google Book Search.

Statement of Melissa Pond, Director of Library Services, Leech Lake Tribal College, Cass Lake, Minnesota.

---

[2] The responses are on file with amici. Other librarians reported similar uses, which are summarized in the attached Appendix.

4

That resource is valuable not just for research, but also for developing

curricula and collections:

> [GBS] has led us to several titles that my faculty have gladly and gratefully ordered for their private research collections and helped me to identify the best uses of our very, very limited collection development resources.

> [For example] one of our science faculty instructors was looking to put together a course on Indigenous astronomy (also called ethnoastronomy and star knowledge and also related to the term archaeoastronomy) and was curious as to what resources existed on the topic. Google Books helped me identify several resources that the instructor purchased for his own personal professional development library and for our LLTC campus library.

*Id*. Thus, GBS's public benefits accrue, in turn, to copyright holders who received

royalties when books are purchased *as a result* of research using GBS.

Sometimes, GBS can be used to identify material that is housed by the

library itself but nonetheless hard to find. A librarian at a liberal arts college used

GBS to find sources in her own stacks:

> A couple of years ago I was helping a Davidson student look for information on a speech that Khrushchev made to the National Press Club. It wasn't one of his famous, shoe-pounding speeches. We struggled mightily for a long time, until we looked at Google Books. There we found a reference to the speech in a book that seems to be one of the important biographies of Khrushchev, and we had the book. So the student went to the shelf, picked up the book, and got the info he needed.

Statement of Jill Gremmels, Library Director, Davidson College, Davidson, North

Carolina.

5

*Second*, and relatedly, librarians can then decide whether to request those books via interlibrary loan. Such decisions can be vital to conserving strapped library budgets and speeding research. At the "geographically isolated" University of Guam, for example, getting books through interlibrary loan can take weeks, with significant postage costs. By using GBS to identify the specific chapters needed, the library can narrow its request and obtain the material in a day or two via fax or email. Statement of Paul Drake, User Services and Document Delivery Librarian, University of Guam, Guam. Snippet display is essential to this function. Without snippet display, the librarian or the researcher only knows where the search term appears in a given book, but cannot determine the context in which the term appears and thus cannot assess whether it is worth borrowing the book or a particular chapter within the book.

*Third,* GBS has become a crucial tool for finding and checking citations. For example, a librarian at a research university notes that she has used GBS "to find full citations and or corrected citations to works I see in bibliographies, to verify quotations and particularly when I am reviewing a manuscript and want to confirm that the author has cited the original correctly, to determine where a quotation is from when a full cite isn't given." Statement of Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction, University of Illinois at Urbana-Champaign, Urbana, Illinois.

The ability to efficiently check citations saves libraries (and scholars) money and time. One librarian described working with a historian to check a citation where the historian had only a quotation in a paper copy of a single page of an older multi-volume biography of President Abraham Lincoln. Using GBS, they were able to track down the quotation and full citation for the original source. Without GBS, the scholar would have had to wait for an interlibrary loan of printed copies and might not have been able to access the texts at all. Statement of Scott Vine, Information Services Librarian and Deputy College Librarian, Franklin & Marshall College, Lancaster, Pennsylvania. Instead, the scholar was able to complete the research quickly and move on to the rest of the project. This cite-checking function could not be performed without snippet-display.

*Fourth*, GBS is thoroughly integrated into the educational system – it is part of the information literacy curriculum, included in research methods taught and integrated into online library catalogs. Indeed, one librarian believes it is simply "unethical not to teach Google Books. We often teach it before our own library catalog." Statement of Elizabeth Kocevar-Weidinger, Instruction/Reference and Interim E-Resources Services Librarian, Longwood University, Farmville, Virginia. Here, too, that education and use can lead to book sales that would not have occurred but for the use of GBS. For example, one librarian described a senior student who reported that she bought the books she planned to use in

research after discovering them via GBS because she liked to own copies that she could mark up. Statement of Barbara Fister, Library Professor, Gustavus Adolphus College, Saint Peter, Minnesota.

The HathiTrust Digital Library is a useful research tool because it directs the user to the book and page number where the information sought may appear. GBS, however, is an even more useful research tool because it displays snippets. It makes the research process far more efficient because it enables the user to quickly filter out the less helpful books employing the search term.

## II.    SNIPPETS DO NOT SUBSTITUTE FOR FULL TEXT

Because Google displays only three snippets of approximately an eighth of a page in response to a given query, GBS does not substitute for the experience of reading the book itself or even a single page of the book.[3] This is demonstrated by the structure of the settlement Appellants negotiated and attempted to convince class members and Judge Chin to accept. Under the settlement, Google would have been able to provide three services. First, under the "Preview" service, Google would have allowed users at no cost to search its database for books responsive to their queries, as in GBS. Second, under the "Consumer Purchase" service, Google

---

[3] Appellants argue that through repeated queries, a user could ultimately read 78 percent of a book. Appellants' Br. at 11. In the time it would take the user to make all these queries, she could have gone to her local public library and checked out the book.

8

would have been able to sell users access to individual titles. Third, under the "Institutional Subscription" service, Google could have sold a library an annual subscription to obtain full text access for all its users to the entire Google database.

Significantly, Google in its free "Preview" service would have been permitted to display far more of any book than Google does under GBS. For out-of-print works, which constitute the vast majority of the books in GBS, Google would have been able to display up to 20 percent of a book's text in response to a particular search query. Amended Settlement Agreement ("ASA") at 4.3(b)(i)(1).[4] The number of adjacent pages Google could have displayed depended on the nature of the work. For non-fiction works, Google could have displayed five adjacent pages. For works of fiction, Google could have displayed fifteen adjacent pages. The fact that Appellants were willing to allow Google to provide free access to up to 20 percent (and fifteen adjacent pages) of a book suggests that Appellants did not believe such free access would in any way diminish sales of books under the Consumer Purchase service, or decrease the attractiveness of an institutional subscription to a library. If display of 20 percent of a book did not cannibalize sales of the book, then surely display of a few snippets of a book would not do so either.

───────────────────

[4] The settlement had different rules for anthologies by multiple authors, collections of poetry and short stories, fact works such as dictionaries or encyclopedias, and books still in print. ASA at 4.3(b).

## III. SECTION 108 DOES NOT WEIGH AGAINST A FAIR USE DETERMINATION.

Appellants and their amici contend that the uses enabled by the copies received by Google's Library Partners are "in direct contravention of the restrictions in Section 108 of the Copyright Act…." Appellants' Br. at 36 n. 10; Amicus Br. of Jon Baumgarten et al. at 23-26; Amicus Br. of Copyright Alliance at 10. However, the *HathiTrust* court dismissed this argument. Pointing to the savings clause in 17 U.S.C. § 108(f)(4), the Court did not "construe 108 as foreclosing our analysis of the Libraries' activities under fair use…." *HathiTrust* at *4 n. 4.

Appellants make the related argument that a fair use finding in favor of Google would upset the balance Congress created when it placed "important restrictions on libraries' ability to use digital copies" in 17 U.S.C. § 108(c)(2). Appellants' Br. at 57. Appellants' amici similarly argue that the district court's analysis "swallows the more specific exceptions Congress has crafted for particular uses, overriding their limitations and thus disregarding the careful balance that Congress provided for in these exceptions." Amicus Br. of Jon Baumgarten et al. at 20. After describing section 108's provisions, these amici state: "When Google's conduct is measured against this backdrop, it is absurd to think that Google could take advantage of section 107 to authorize copying that Congress so carefully limited in section 108, even for libraries." *Id*. at 23.

We believe that the *HathiTrust* court's ruling on section 108 disposes of Appellants' argument that a fair use determination in favor of Google would upset the balance established in section 108. To the extent this Court is nonetheless inclined to consider this argument, we respond that the argument is predicated on a flawed understanding of section 108 and its relationship to section 107 and the rest of the Copyright Act.

Contrary to the suggestion of Appellants and their amici, Congress never intended for the specific limitations in the Copyright Act to constrain the availability of the fair use right. This legislative intent is especially clear with respect to section 108, where Congress included a specific savings clause. Appellants' understanding of the impact of section 108 on the fair use calculus asks this Court to ignore the plain meaning of section 108, legislative intent, and common sense.

### A.    The Copyright Act's Specific Exceptions Do Not Limit the Applicability of Fair Use.

The Copyright Act's specific exceptions narrowly define which uses of which works may be made by which actors under which circumstances. In contrast, section 107 lists four general, nonexclusive factors a court must weigh in evaluating whether a particular use is fair. While the specific exceptions provide courts with little discretion, fair use is "an 'equitable rule of reason' which 'permits courts to avoid rigid application of the copyright statute when, on occasion, it

would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal citations omitted).

The legislative history of the Copyright Act stresses that a specific exception does not limit the availability of fair use for conduct that does not fall within its scope. One congressional report noted "[W]hile some of the exemptions in sections 108 through 116 may overlap the fair use doctrine, they are not intended to supersede it." H.R. Rep. No. 90-83, at 36-37 (1967). The Register of Copyrights, in a report that led to the TEACH Act, stated: "[f]air use could apply as well to instructional transmissions not covered by the changes to section 110(2) recommended above." U.S. Copyright Office, *Report on Copyright and Digital Distance Education* 162 (1999). The Conference Report that accompanied the enactment of the TEACH Act reiterated that the "continued availability of the fair use doctrine" was critical to the Office's recommendation that Congress pass the Act. H.R. Rep. No. 107-685, at 234 (2002) (Conf. Rep.).

Similarly, courts have held that a defendant's failure to qualify for a specific exception does not prejudice its fair use rights. In *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-21 (9th Cir. 1992), Sega argued that because Accolade's disassembly of Sega's computer program did not fall within the section 117 exception relating to software, Accolade could not rely upon section 107. The Ninth Circuit responded that this "argument verges on the frivolous. Each of the

12

exclusive rights created by section 106 of the Copyright Act is expressly made

subject to all of the limitations contained in sections 107 through 120." *Id.* at 1521.

The court went on to observe that

> sections 107 and 117 serve entirely different functions. Section 117
> defines a narrow category of copying that is lawful *per se* …. The fact
> that Congress has not chosen to provide a *per se* exemption to section
> 106 for disassembly does not mean that particular instances of
> disassembly may not constitute fair use.

*Id.* In short, a defendant's inability to meet the requirements of a specific exception

cannot have a negative effect on its assertion of fair use.[5]

### B. Section 108(f)(4) Unambiguously Provides that Section 108 Does Not Limit The Applicability of Fair Use.

Section 108(f)(4) makes explicit what is implicit in the Copyright Act's

other specific exceptions: nothing in section 108 "in any way affects the right of

fair use as provided by section 107 …." The legislative history of this savings

clause underscores the plain meaning. While section 108 creates a safe harbor

where libraries can make settled uses without engaging in a fair use analysis,

nothing in section 108 weighs against libraries (or anyone else) making fair uses.

---

[5] To the contrary, when a defendant engages in the type of activity permitted by a specific exception, but does not qualify for a technical reason, the court should give weight to the defendant's substantial compliance with the exception when considering the first factor. Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. COPYRIGHT SOC'Y 453 (2012).

The 1909 Copyright Act did not contain any exceptions for libraries; instead, libraries relied entirely on the federal common law of fair use. When the possibility of a specific exception for libraries was raised prior to enactment of the 1976 Copyright Act, library representatives expressed concern that the specific exception might limit the availability of fair use to libraries. Mary Rasenberger and Chris Weston, *Overview of the Libraries and Archives Exception in the Copyright Act* 13 (2005) ("Library representatives … asserted that there was 'great danger' in the statutory language, because it would freeze what was allowable at the very moment that technology is advancing.").

Accordingly, when the Senate Subcommittee on Patents, Trademarks, and Copyrights reported out the bill in December 1969, it included the language now in section 108(f)(4). The Subcommittee report's discussion of Section 108 stated: "[t]he rights given to the libraries and archives by this provision of the bill are in addition to those granted under the fair-use doctrine." S. Rep. No. 91-1219, at 6 (1970). Section 108(f)(4) was intended to ensure that Section 108 had no negative impact on fair use.

The House Judiciary Committee Report on the 1976 Act quoted the language of section 108(f)(4) and then explained that "[n]o provision of section 108 is intended to take away any rights existing under the fair use doctrine." H.R.

14

Rep. No. 94-1476, at 74 (1976). Similarly, in the context of section 108(h), the

House Report observed:

> Although subsection (h) generally removes musical, graphic, and
> audiovisual works from the specific exemptions of section 108, it is
> important to recognize that the doctrine of fair use under section 107
> remains fully applicable to the photocopying or other reproduction of
> such works.

H.R. Rep. No. 94-1476, at 78. *See also* 4-13 Melville Nimmer & David Nimmer,

NIMMER ON COPYRIGHT § 13.05 (2011) ("[I]f a given library or archive does not

qualify for the Section 108 exemption, or if a qualifying library or archive engages

in photocopying practices that exceed the scope of the Section 108 exemption, the

defense of fair use may still be available.").

    In other words, section 108 sets forth certain situations where a library can

*always* make reproductions and distributions without the right holder's

authorization. Some of these actions might be fair uses, but section 108 provides

legal certainty that encourages the library to proceed without conducting fair use

analysis.[6] Other actions under section 108 might go beyond fair use, yet Congress

------

[6] *See also* Randolph D. Moss, Office of Legal Counsel, U.S. Department of Justice,
*Whether And Under What Circumstances Government Reproduction Of
Copyrighted Materials Is A Noninfringing "Fair Use" Under Section 107 Of The
Copyright Act Of 1976* 14 n.12 (1999). ("[S]ection 108 of the 1976 Act does not
narrow the protection for fair use provided by the common law doctrine codified in
section 107 …. Section 108 thus fairly can be viewed as a very valuable—and not
superfluous—safe harbor: If a certain library practice is noninfringing under the
specific and detailed provisions of section 108(a) … a library need not be

in its balancing of competing interests decided to permit them. Section 108(f)(4) clarifies that libraries can rely on section 108 when they meet its detailed criteria and on section 107 in other circumstances, when they satisfy its more general criteria.

Given that section 108 places no limits on the availability of section 107, it is not "absurd," as Appellants' amici suggest, for Google to rely on section 107. *See* Baumgarten Br. at 23. If anything is absurd, it is the belief of Appellants and their amici that this Court could not comprehend the plain language of section 108.

## IV.    THE LIBRARY COPIES ARE A FAIR USE

The district court correctly found that the copies Google made available to its partner libraries were a fair use because "the purpose of the library copies is to advance the libraries' lawful uses of the digitized books consistent with the copyright law." *Authors Guild, Inc. v. Google, Inc*., 954 F. Supp. 2d 282, 293 (S.D.N.Y. 2013). The *HathiTrust* court confirmed that the libraries' uses were, in fact, lawful.

Appellants nonetheless contend that the purpose of the library copies must be assessed from the perspective of Google, not the libraries; that is, why Google made the copies available rather than how the libraries use those copies. Appellants

concerned about how that particular photocopying practice would fare under section 107's more complex and indeterminate fair use standards.")

16

Br. at 36. Appellants further contend that Google made the library copies available "as payment for permission to scan." *Id*. at 12. But Google's ultimate purpose in getting permission to scan was creation of the search database necessary for GBS. To the extent that Google's purpose is relevant to determining the fair use status of the library copies, the Court should focus on Google's ultimate purpose of creating its search database.

Further, even if the Court decides that the library copies were not transformative as to Google, the evaluation of the market effect of those copies must center on whether the libraries would have paid license fees for digitizing the books in their collections had Google not made these copies available. We wish to make it perfectly clear that the libraries would *not* have paid any such fees.

*First*, libraries simply do not have the budget to pay license fees for digitizing their collections. Forcing libraries to divert scarce funds to support this activity would undermine their public service missions and simply benefit some rights holders at the expense of others. Like the rest of the economy, libraries were hit hard by the "Great Recession." The trend of state spending on higher education not keeping up with enrollment growth and inflation was exacerbated during the recession and adversely affected many research libraries. *See* John Quinterno & Viany Orozco, *The Great Cost Shift: How Higher Education Costs Undermine the Future Middle Class*, DEMOS (Apr. 3, 2012). At the same time, other library costs

17

have increased dramatically. For example, between 1986 and 2010, research

library expenditures on academic journals increased 379 percent, more than double

the rate of overall library expenditures. *See* Association of Research Libraries,

*Expenditure Trends in ARL Libraries*, *1986-2010*.

Given libraries' stagnant or shrinking budgets, any new spending for

digitization licenses would have to be reallocated from existing expenditures, and

the most likely source would be the budget for collections. As one librarian pointed

out, "[W]e pay six figures each year to [Copyright Clearance Center], and that

money is reallocated from our collections budget.… So that's new content we're

not buying."[7] A digitization license requirement thus would harm the market for

new works and works by new authors. The idea that libraries can afford to pay new

fees for digitization of legacy material while maintaining current levels of

investment in acquisition of new material is a short-sighted, self-defeating

delusion. Libraries' total investment would be the same, but resources would be

_____

[7] Steve Kolowich, *Mending Fences*, INSIDE HIGHER ED, June 21, 2012, http://www.insidehighered.com/news/2012/06/21/university-presses-debate-how-reconcile-libraries-wake-georgia-state-copyright#ixzz1yQpFoFhe. Academic libraries in the United Kingdom are also cannibalizing their book acquisition budgets to pay for increasingly more expensive journals; since 1999, spending on books has fallen by 20 percent in real terms, while expenditures on serials have increased by 63 percent. David Harvie, et al., *Publisher be damned! From Price Gauging to the Open Road*, 31 PROMETHEUS CRITICAL STUDIES IN INNOVATION 229 (2014), http://www.tandfonline.com/doi/full/10.1080/08109028.2014.891710#.U577bo1dWVthttp://www.tandfonline.com/doi/full/10.1080/08109028.2014.891710.

diverted away from new works to redundant payments for existing ones, in direct contradiction of copyright's purpose of "promot[ing] progress." U.S. CONST. Art. I, § 8, cl. 8.

*Second*, there is no efficient mechanism for libraries to pay licensing fees for the mass digitization of books, even if they had the resources to do so. The real value of a searchable database of books such as GBS or HDL is its comprehensiveness. The less comprehensive it is, the less useful it is because holes in the database mean important references researchers may miss. Yet, the copyright clearance difficulties for a database containing millions of books are monumental. Jonathan Band, *The Long and Winding Road to the Google Books Settlement*, 9 JOHN MARSHALL REVIEW OF I.P. LAW 227, 229 (2009). Because most of these books were written in the pre-digital era, the digitization rights were not clearly allocated between the author and the publisher. Even if it could be determined to whom the digitization rights were initially allocated, it is difficult to identify who owns those rights now. Publishers go out of business and their assets (including the copyrights they own) may be distributed among numerous creditors and purchasers. Authors die and their various heirs inherit their copyrights.

The broad and uncertain ownership of the digitization rights in books means that any voluntary, opt-in licensing system would fall far short of the objective of

relative comprehensiveness.[8] What was so creative about the Book Rights Registry proposed under the ASA was that it used the device of a class action settlement to create a collective right organization that would possess a nonexclusive license to the millions of works covered by the settlement. *See* Jonathan Band, *The Books Rights Registry in the Google Books Settlement*, 34 COLUMBIA J. OF L. & ARTS 671 (2011). With the rejection of the settlement by the district court, the only way to create a comprehensive licensing mechanism for books is through legislation, such as a Scandinavian-style extended collective licensing. Appellants and their amici refer to extended collective licensing arrangements as potential markets that GBS has harmed, but they neglect to mention that such markets require Congressional action. Obviously, a market that could exist only by virtue of not-yet enacted legislation should not be considered an "existing or potential *traditional* market." *HathiTrust* at *9 (emphasis supplied). Moreover, the prospect of Congressional adoption of a complex regulatory approach for mass digitization is completely speculative.[9]

_____

[8] The Copyright Office has emphasized the infeasibility of individual licensing arrangements and ineffectiveness of voluntary collective licensing for a project like HDL. U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* 30-34 (2011).

[9] At a 2009 hearing on the Google Books Settlement, then-Register of Copyrights Marybeth Peters suggested that a statutory compulsory license for mass digitization of books might be inconsistent with international treaty obligations. *Hearing on: Competition and Commerce in Digital Books before the H. Comm. on*

**CONCLUSION**

For the foregoing reasons, this Court should affirm the district court.


Dated: July 8, 2014                    Respectfully submitted,

                                       /s/ Jonathan Band
                                       Jonathan Band
                                       Jonathan Band PLLC
                                       21 Dupont Circle NW, 8th Floor
                                       Washington, D.C., 20036
                                       202-296-5675
                                       jband@policybandwidth.com

                                       *Counsel for Amici*

---

*the Judiciary*, 111th Cong. 66 (2009). At the very least, Peters believed that such a statutory compulsory license would subject the United States to "diplomatic stress." *Id.* at 8.

# APPENDIX

In May 2012, amici ALA and ACRL conducted an informal survey asking librarians about their experiences with GBS. Excerpts from the responses received are included in the accompanying amicus brief. Numerous librarians reported similar uses. These reports are summarized below (the responses are on file with amici).

## 1.    GBS helps find valuable research sources

- Rebecca Hedreen, Buley Library, Southern Connecticut State University, New Haven CT ("The main uses I see are taking advantage of the full text search capabilities to find things that aren't findable in traditional book search venues and viewing either the full text or enough of the text to determine if getting a full copy is worth the hassle.").

- Bryan Skib, University of Michigan, Ann Arbor MI (Noticed in the acknowledgements to UM Professor Juan Cole's book *Napoleon's Egypt* that Cole praised GBS. In later conversations with Cole, Skib learned that GBS had unearthed several "needles in the haystack" that Cole felt would have been difficult or impossible to find with other research tools.).

22

- Nancy McClements, University of Wisconsin, Madison WI ("It assists our patrons in the middle of the night, when they cannot enter a particular library with a particular book . . . ." McClements reports using GBS to locate books for a variety of patron research projects, including: scholarship on the role of women in bars and taverns in the nineteenth and twentieth centuries; a graduate thesis about Orson Wells' radio career; and art historical antecedents to ladies almanacs.).

- Lindsay Sarin, University of the District of Columbia, Washington DC (Used GBS to find the names of Haitian soldiers who fought in the American Revolution. "I point students to Google Books to view snippets while they wait for a copy to be returned or to arrive from a library in our consortium." Sarin believes GBS will be getting even more use for searching print journals and microfiche/microfilm as her library is moving its collections off-site. "In my own research I use Google Books frequently to locate old book chapters. I can't always find them in full-text, but I usually find them as snippets so I can decide if I need to get a copy of the book or not . . . . I'm starting to look at how democratic theory and democratic ideals have been used in library advocacy. Eventually, this will turn into a longitudinal analysis . . . . That means I've been looking at some older library and

information science books. Many of these I can find in my library or through the consortium, but since they're older many are in our storage facility. I use Google Books to look at snippets or at least the table of contents before requesting a title be sent over from storage. Basically I want to make sure that it's worth getting . . . . Google Books was a lot easier to use than our catalog to locate [a particular book] and allowed me to verify that it was the book I needed" before requesting it from storage. "The related books feature was extremely helpful when I looked for this book. Library catalogs don't do a great job of finding related titles so this was much faster than browsing the shelves or catalog.").

- Anne Larrivee, Binghamton University State University of New York, Binghamton NY ("Google Book Search is helpful when you are looking for very precise information, if patrons would like to see books that specifically mention a rare ritual, event, etc. Google Book Search can help pinpoint which books might have a small chapter or paragraph about that topic that may not often be mentioned as the primary topic in articles and books.").

- Barbara Fister, Gustavus Adolphus College, St. Peter MN ("I have been impressed by how often students in the past couple of years have

24

used GBS to discover books on topics they are studying.").

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("I helped a student with her senior capstone research on Methodist circuit rider preachers of the west. We found a few books that held promise.").

- Cathy Rettberg, Menlo School, Atherton CA ("Our kids are very adept at using Google Books, and use it frequently. It's a great resource.").

- Thomas T. Kaun, Bessie Chin Library, Redwood High School, Larkspur CA (Students "have successfully used it as a tool for finding books in a local library. The really neat thing about it is the ability to find obscure information since the entire text can be searched even if the page is not available for perusal.").

- Halsted Mencotti Bernard, Wayne State University, Detroit MI (Describing how he used GBS to locate materials on the 1967 Detroit riot.).

- Rachel Gollub ("When I was doing research for my Master's thesis in Military History, I found Google Book Search a valuable resource. Several of the topics I wrote about were somewhat obscure (references to early bayonets, the first uses of gunpowder in the west,

25

etc.). Being able to do a Google Books Search was highly useful, because I found mentions of my topics in obscure books that I otherwise wouldn't have found . . . . I would hate to lose a resource like that.").

2.    **GBS helps in collection development**

- Judy Panitch, University of North Carolina at Chapel Hill, Chapel Hill NC ("Google Books [is] a terrific resource[] for examining books, or for patrons to do so, before purchase, ILL [inter-library loans], retrieval from storage, etc., and for checking citations, quotes, and the like." Panitch also describes a student's use of GBS to identify books discussing the runaway slave Dolly.).

- Susan Whitehead, Union Institute & University, Montpelier VT ("Our faculty and students use Google Book Search all the time" for "previewing books for purchase/requesting.").

- Rebecca Hedreen, Buley Library, Southern Connecticut State University, New Haven, CT ("I've used Google Books for collection development – especially when we're looking for something that covers a very specific topic" such as nursing theorists.).

- Lindsay Sarin, University of the District of Columbia, Washington DC ("I usually use it to read a small section in order to determine if I

26

should get the book in-print either from a library or purchasing it.").

**3.    GBS helps screen books for interlibrary-loan**

- Scott Cohen, Jackson State Community College, Jackson TN ("Our students used Google Books . . . for their papers in World Literature. While some used it and gleaned information from the book online, others used it for interlibrary loan purposes. We used it to order printed books that we didn't have.").

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("The snippets are useful for determining if it's worth the effort to actually get the book in hand" via ILL.).

- Naulayne Enders, Kentucky Christian University, Grayson KY ("Our faculty and students are encouraged to look at previews of books that they have ordered through Interlibrary Loan.").

- Stewart Baker, California State University, Dominguez Hills, Carson CA ("[W]hen students need a book right away, I tend to see if it's available on Google Books, and suggest they browse through it there before requesting it in ILL. This both avoids unnecessary loans and makes the student's life more convenient, as they can start their research right away instead of waiting 1-2 weeks. We don't generally,

however, recommend using GB *instead* of ILL, due to restrictions on pageviews . . .").

- Michael Dudley, University of Winnipeg, Winnipeg MB, Canada ("Google Books has come in very handy … letting people know that an ILL or even running over to the main campus to get something we don't have will be worth their while.").

**4.    GBS helps find and check citations**

- Sarah B. Cornell, Daniel Webster College, Nashua NH (Describing how GBS enabled a student to discover that an article had misquoted "Leadership" by James Burns – "a remarkable demonstration of how Google . . . rescues the unwary researcher.").

- Irene M.H. Herold, Keene State College, Keene NH ("I used Google Book Search to avoid requesting materials via ILL when I just needed to see one page or a chapter that I was tracking down from another source's citations.").

- Serenity Ibsen, Pacific Northwest College of Art, Portland OR ("I [] find GBS helpful to determine whether an essay has been printed in multiple anthologies or whether an artist is in a certain book" when "faculty do not supply students with a full citation for every essay or

article they assign . . . I have even used it to see whether a quote was correct.").

- Beverly Geller, The Frisch School, Paramus NJ ("A student needed to know which book a quote was from (he had forgotten to make a note of it for his footnotes) . . . [GBS] came up with the book and the page [number] in a matter of seconds. I loved it.").

- Lindsay Sarin, University of the District of Columbia, Washington DC ("Sometimes I come across citations for articles or books that are incomplete, wrong, or illegible. I can use Google Books to help find the complete citations and other items that have cited the original work via full text searching . . . . I use Google Books to find citations . . . when I actually have a book but can't find the passage I'm looking for.").

- Nancy McClements, University of Wisconsin, Madison WI ("I have been very successful in finding elusive quotations" using GBS, such as quotations by author Colette about erotic dance. It is also helpful "when a student doesn't have an entire citation.").

- Rebecca Hedreen, Southern Connecticut State University, New Haven CT ("I used Google Books this morning in the hopes of tracking down an 'article' mistily remembered by an emeritus professor.").

- John Gottfried, Western Kentucky University Libraries, Bowling Green KY ("We recently made considerable use of Google Books as we struggled to accurately cite quotations submitted by a large number of contributors working on a campus project. Many of the quotes were simply attributed to a well-known figure, but included no information on where or when the quote had been published. We located several of them through Google Books.").

- Susan Whitehead, Union Institute & University, Montpelier VT ("[GBS is] a wonderful tool for locating original quotations and page numbers (for citations).").

5.    **GBS is integrated into library research and education systems**

- Mary Jane Cedar Face, Southern Oregon University, Ashland OR ("We teach students to use Google Books as a way to keyword search within/across content (full[]- text) of the universe of Google Books. It's especially useful if they have very specific search terms. Then, we show them how to access the book by checking our catalog, the union catalog of our consortium, or request the book by ILL. . . . We have added Google Books links to almost all Lib Guides in a 'Finding Books' box.").

- Michael Mitchell, Brazosport College, Lake Jackson TX ("I've got

our catalog set to include a link to Google Preview (Books) in its search results," which "adds a great deal of supplemental information to our catalog for students and faculty. . . .").

- Tina M. Hovekamp, Barber Library, Central Oregon Community College, Bend OR ("I often pick a catalog search result to show students how they may preview the book on GBS.").

- Lindsay Sarin, University of the District of Columbia, Washington DC ("We [] teach students to use Google Books in their research, especially if they're doing historical or primary research. We even link to it in our Research Guides." "Some faculty members [] have created assignments that require that students use primary source materials especially magazines . . . Because many of these are digitized in Google Books students are using more sources in their assignments than they would if they had to use microfiche (getting students to use that is like pulling teeth). . . .").

31

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: July 8, 2014                    /s/ Jonathan Band
                                       Jonathan Band

## CERTIFICATE OF SERVICE

I hereby certify, that on July 8, 2014, a true and correct copy of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, and Association of Research Libraries was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via CM/ECF.

I further certify that on July 8, 2014, I caused six (6) copies of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, and Association of Research Libraries to be delivered overnight to the Clerk of the United States Court of Appeals for the Second Circuit.

Dated: July 8, 2014                    /s/ Jonathan Band
                                       Jonathan Band