# 13-4829-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all
others similarly situated, PAUL DICKSON, THE MCGRAW-HILL
COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER,
INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and
on behalf of all others similarly situated,

*Plaintiffs*,

v.

GOOGLE INC.,

*Defendant-Appellee*.

———————————————

On Appeal from the United States District Court for the
Southern District of New York, No. 1:05-cv-08136 (Chin, J.)

---

## BRIEF *AMICUS CURIAE* OF THE COMPUTER & COMMUNICATIONS
## INDUSTRY ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLEE
## GOOGLE, URGING AFFIRMANCE

---

Matt Schruers
Vice President, Law & Policy
Computer & Communications
  Industry Association
900 Seventeenth Street NW, 11th Floor
Washington, DC 20006
(202) 783-0070
mschruers@ccianet.org
*Counsel for Amicus Curiae*

July 10, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Computer & Communications Industry Association states that it does not have a parent corporation and that no publicly held corporation has an ownership stake of 10% or more in CCIA.

/s/ Matt Schruers
Counsel for *Amicus Curiae*

July 10, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTEREST OF *AMICUS* ..................................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 3

ARGUMENT ........................................................................................................ 5

I.    LARGE-SCALE COPYING IS INTEGRAL TO THE MODERN
      ECONOMY ................................................................................................ 5

      A. Since *Sony*, numerous courts have found large-scale copying
         to be fair use ....................................................................................... 6

      B. The same technology that enables pervasive copying provides
         new revenue sources for rights-holders ........................................... 10

II.   FAIR USE IS ESSENTIAL TO INDUSTRIES ACROSS THE
      U.S. ECONOMY ...................................................................................... 12

III.  A FAIR USE FINDING DOES NOT USURP CONGRESSIONAL
      AUTHORITY ........................................................................................... 15

CONCLUSION .................................................................................................... 17

CERTIFICATE OF COMPLIANCE ..................................................................... 18

CERTIFICATE OF SERVICE .............................................................................. 19

# TABLE OF AUTHORITIES

## *Cases*

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) .. 10

*Authors Guild, Inc. v. Google Inc.*,
    954 F. Supp. 2d 282 (S.D.N.Y. 2013) .............................................. 14

*Authors Guild, Inc. v. HathiTrust*,
    2014 WL 2576342 (2d Cir. June 10, 2014) ............................ 9, 11, 12

*Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012) ... 11

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ........................................................ 4, 10

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006) ................................................................ 14

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ................................................ 4

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) ................................................ 13

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) ..... 13

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013) ..... 13

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ................................................................ 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ................. 9, 10, 12

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*,
    150 F.3d 132 (2d Cir. 1998) ................................................................ 14

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) .......................................... 14

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...................................................... 1

*Faulkner Literary Rights LLC v. Sony Pictures Classics*,
   953 F. Supp. 2d 701 (N.D. Miss. 2013) ............................................ 14

*Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) ...................... 8, 9

*Fox Broadcasting Co. v. Dish Network LLC*,
   723 F.3d 1067 (9th Cir. 2013)............................................................... 6

*Golan v. Holder*, 132 S. Ct. 873 (2012) ......................................................... 1

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
   497 F. Supp. 2d 627 (E.D. Pa. 2007) ............................................. 8, 10

*In re AutoHop Litigation*, 2013 WL 5477495 (S.D.N.Y. Oct. 1, 2013)......... 6

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ............. 8

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)...................... 4, 7, 8

*MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ... 7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) .......................................................................... 11

*New Kids on the Block v. News America Publ'g, Inc.*,
   971 F.2d 302 (9th Cir. 1992)............................................................... 2

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ............... 4, 7

*Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)............. 6

*Seltzer v. Green Day*, 725 F.3d 1170 (9th Cir. 2013).................................. 14

*SOFA Entm't, Inc. v. Dodger Productions, Inc.*,
   709 F.3d 1273 (9th Cir. 2013)............................................................. 1

*Sony Corp. of America v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ............................................................................ 6

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) ............................................................... 6

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ..................... 1

*White v. West Publ'g Corp.*,
   No. 12-01340, slip op. (S.D.N.Y. July 3, 2014) ....................... 4, 10, 14

**Statutes**

17 U.S.C. § 101 ............................................................................................. 1

17 U.S.C. § 107 ......................................................................................... 5, 16

**Other Materials**

Apple, Press Release, *HBO GO & WatchESPN Come to Apple TV:
iTunes Viewers Now Purchasing Over 800,000 TV Episodes & Over
350,000 Movies Per Day*, June 19, 2013 ...................................................... 11

Berne Convention for the Protection of Literary and Artistic Works, as
last revised July 24, 1971, amended Oct. 2, 1979, S. TREATY DOC. No.
99-27, 828 U.N.T.S. 221 ................................................................................ 8

Congressional Research Serv., *Internet Search Engines: Copyright's
"Fair Use" in Reproduction and Public Display Rights*, July 12, 2007 ........ 8

Dara Kerr, *Digital movie sales climb 47 percent in 2013*, CNET, Jan. 8,
2014 ................................................................................................................ 11

David Dean *et al.*, *The Internet Economy in the G-20: The $4.2 Trillion
Growth Opportunity* (Boston Consulting Grp. 2012) ................................... 13

David Fagundes, *Market Help, Market Harm, and Fair Use*,
17 STAN. TECH. L. REV. 359 (2014) ........................................................... 12

Google Books Ngram Viewer, search query for "intellectual property,
literary property, industrial property, copyrights", 1775-2000 ..................... 3

John Tehranian, *Infringement Nation: Copyright Reform and the Law/Norm Gap*, 2007 UTAH L. REV. 537 (2008) .......................................... 7

Judge Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) ..................................................................... 9

Justin Hughes, *Copyright and Incomplete Historiographies: Piracy, Propertization, and Thomas Jefferson*, 79 SO. CAL. L. REV. 993 (2006) ....... 3

Mark A. Lemley, *Property, Intellectual Property, and Free Riding*, 83 TEX. L. REV. 1031 (2005) .......................................................... 3

Matthew Sag, *Copyright and Copy-reliant Technology*, 103 NW. U. L. REV. 1607 (2009) ........................................................ 8, 9, 10

*Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet, H. Comm. on the Judiciary,* 113th Cong. (2014) (statement of Jan Constantine, General Counsel, The Authors Guild) ........................................... 16

Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use* (2011) ............. 13

## INTEREST OF *AMICUS* [1]

The Computer & Communications Industry Association (CCIA) represents more than twenty large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services – companies that collectively generate more than $465 billion in annual revenues.[2]

CCIA's members benefit from the Copyright Act's "statutory monopoly" when developing new and innovative software and other creative works, and are also substantially regulated by that same system. 17 U.S.C. § 101 *et seq.* This regulation is constitutionally sound when it incentivizes authors in a way that furthers the public interest, *see Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), and because it is circumscribed by exceptions like fair use. *See Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003); *Golan v. Holder*, 132 S. Ct. 873, 890 (2012). Because "an overzealous monopolist can use his copyright to stamp out the very creativity that the Act seeks to ignite," *SOFA Entm't, Inc. v. Dodger*

---

[1] No counsel for any party authored this brief in whole or part; no such party or counsel made a monetary contribution intended to fund its preparation or submission; and no person other than *amicus* made such a contribution. All parties have consented to the filing of this brief. Defendant-appellee Google is a member of CCIA but took no part in the preparation of this brief.

[2] A complete list of CCIA members is available at http://www.ccianet.org/members.

*Productions, Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013), the fair use doctrine exists to ensure he does not "prevent[] the authors and thinkers of the future from making use of, or building upon, his advances." *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 307 n.6 (9th Cir. 1992).

In the commercial context, this increasingly involves transformative uses. In many cases these uses create no new work at all; rather, they allow for the provision of services, which quite frequently help the market for the underlying work, not harm it. Therefore, while CCIA members include copyright holders who benefit from strong copyright protection, they also depend greatly upon a strong fair use doctrine, which enables existing and future innovations in information services and technology. It is no coincidence that many of the most innovative information products and services of the Internet revolution have been developed in the United States, whose copyright law has long balanced robust copyright protection with a robust fair use doctrine. CCIA offers its perspective with the aim of preserving that balance.

## SUMMARY OF ARGUMENT

The functionality of Google Books is without precedent.  As the brief of Appellee Google makes clear, the Google Books service dramatically improves readers' and researchers' abilities to find and purchase books relevant to their interests, by enabling the world to search (but not read) the contents of many of the world's greatest research libraries.  Additionally, Google's book scanning enabled the Google Ngram project, which allows users to measure word use over time in an unprecedented corpus of literature.  Overnight, a question that copyright scholars had debated at length – "when did the term 'intellectual property' achieve popular acceptance?"[3] – could be answered with a single Google Books Ngram query.[4] (The answer: not until the 1980s.)

While the world has never before had the ability to search such vast quantities of human knowledge, and while it is revolutionary to enable researchers to easily and empirically check the vintage of a term such as "intellectual property," the *copying* that made this functionality possible was not at all revolutionary.  In fact, mass copying is extremely common.  Several courts have

---

[3] *Compare* Mark A. Lemley, *Property, Intellectual Property, and Free Riding*, 83 TEX. L. REV. 1031, 1033 (2005) *with* Justin Hughes, *Copyright and Incomplete Historiographies: Piracy, Propertization, and Thomas Jefferson*, 79 SO. CAL. L. REV. 993, 1063 (2006).

[4] *See* Google Books Ngram Viewer, search query for "intellectual property, literary property, industrial property, copyrights", 1775-2000, *available at* http://tiny.cc/ngram-ip (tested July 7, 2014).

3

previously found mass copying of "raw material" to build databases for "sharply different objectives" to be fair use.  *White v. West Publ'g Corp.*, No. 12-01340, slip op. at 5 (S.D.N.Y. July 3, 2014)[5] (quoting *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006)); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009); *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003).  Moreover, mass copying by individuals in the course of their daily activities is an inescapable result of the widespread use of digital technology, and this copying is integral to the modern economy.

All of these copies – often in the commercial context, and invariably facilitated by commercial technology – depend on fair use, and indeed courts have found them to be fair use, acknowledging that they can provide valuable new revenue streams for rights-holders.  In this sense, copying permitted by the fair use doctrine has long been, and remains, essential to the U.S. economy.  Consistent with this, the district court's decision finding Google's copying to be fair use does not usurp Congressional authority, as Appellants and their *amici* suggest.  On the contrary, it reinforces widely understood principles of copyright law.

---

[5] http://www.nysd.uscourts.gov/cases/show.php?db=special&id=412.

## ARGUMENT

## I.    LARGE-SCALE COPYING IS INTEGRAL TO THE MODERN ECONOMY.

Large-scale copying of copyright-protected works is an immutable fact of the modern economy.  Appellants and their *amici*, however, suggest that the digitization of millions of works is a "mammoth," "unprecedented" exercise.  *See, e.g.*, Appellants Br. at 46; Copyright Alliance Br. at 1-2; American Society of Journalists and Authors Br. at 26.  While the *functionality* of Google Books is both unprecedented and revolutionary, the *copying* necessary to develop it was not.  For decades, commercially produced devices and commercial services have facilitated or directly engaged in large-scale digitization and reproduction, for purposes orthogonal to the original objective of the author.  These technologies and services are now commonplace in modern society, and they depend upon the fair use doctrine.  17 U.S.C. § 107.  Indeed, at this very moment, on computers and in networks, on set-top boxes and in smartphones and consumer electronics of all sorts, "mammoth" amounts of copyright-protected works are being lawfully reproduced without permission, on a scale far larger than anything contemplated by the Google Library Project.  Appellants and their *amici* cannot rewrite technology law history by omitting the precedents that have enabled this copying.

A.    *Since* Sony*, numerous courts have found large-scale copying to be fair use.*

This copying rests upon an extensive foundation of legal support. Consistent with *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), millions of American households today record hundreds of millions of hours of television broadcasts with their DVRs.  These broadcasts include a wide range of works, from non-fiction works such as news programs, documentaries, and sporting events to fictional works such as cartoons, comedies, and dramas. Relying on the certainty provided by *Sony*, innovative new consumer electronics products and services have launched—and been sued and upheld as lawful.  *See, e.g.*, *Fox Broadcasting Co. v. Dish Network LLC*, 723 F.3d 1067 (9th Cir. 2013); *In re AutoHop Litigation*, 2013 WL 5477495 (S.D.N.Y. Oct. 1, 2013).

At the same time, countless commercial software and hardware developers are making copies of copyright-protected products in the course of reverse engineering their competitors' products to ensure interoperability – that is, to guarantee that one program or device can talk to another.  Courts routinely uphold this copying as lawful, notwithstanding the direct commerciality of the act.  *See Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 2000); *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992).

Similarly, audio and video consumer electronic devices make temporary buffer copies (which some courts construe to be subject to protection, *see MAI*

6

*Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993)) in memory in order to improve playback quality.  In the same fashion, millions of Internet users' web browsers automatically store and cache copyright-protected content offline to reduce bandwidth use and speed up load times, and their email programs save numerous copies of other people's correspondence, often to multiple devices, and in the cloud, indexed for ease of search.  *Cf.* John Tehranian, *Infringement Nation: Copyright Reform and the Law/Norm Gap*, 2007 UTAH L. REV. 537, 543-47 (2008) (detailing the amount of copying that all modern technology users inevitably engage in).  A robust interpretation of fair use guarantees that this persistent, pervasive temporary copying does not transform us into a nation of infringers.

Routine and indiscriminate copying is particularly essential to the orderly operation of the Internet.  Consistent with the Ninth Circuit's *Perfect 10* decision and related cases, search engines index (and in so doing reproduce) billions of copyright-protected web pages containing an enormous variety of works, such as news, photographs, fan fiction, and blogs, on an ongoing basis, without license. *See, e.g., Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1165-68 (9th Cir. 2007) (indexing held to be fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th

Cir. 2003) (same);[6] *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1118-19 (D. Nev. 2006) (same);[7] *see also Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 638-39 (E.D. Pa. 2007) (viewing, printing, and saving copies of plaintiff's public website for historical reference in litigation from Internet Archive Wayback Machine was fair use).

In order for this functionality to be made available to users, mass copying must occur "routinely, automatically, and indiscriminately".  Matthew Sag, *Copyright and Copy-reliant Technology*, 103 Nw. U. L. Rev. 1607, 1622 (2009). Without such functionality, effectively navigating the modern World Wide Web would be impossible.

---

[6] *Amicus* MPAA relies on *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998).  However, in finding search indexing to be fair use in *Kelly*, the Ninth Circuit explicitly distinguished *Kirkwood*, which lacked any search feature, by noting that the transmissions in *Kirkwood* could completely substitute for the original work.  *Kelly*, 336 F.3d at 819.  Here, Google's 'snippets' or quotations from works do not substitute for the original.  In addition, the United States is explicitly forbidden by its international treaty commitments from extending copyright protection to quotations.  *See* Berne Convention for the Protection of Literary and Artistic Works, Article 10, as last revised July 24, 1971, amended Oct. 2, 1979, S. Treaty Doc. No. 99-27, 828 U.N.T.S. 221.

[7] These precedents "acknowledge the social utility of online indexing, and factor it into fair use analysis... adapt[ing] copyright law to the core functionality and purpose of Internet".  Congressional Research Serv., *Internet Search Engines: Copyright's "Fair Use" in Reproduction and Public Display Rights*, July 12, 2007, at 13.

In our modern digital economy, vast amounts of reproduction are not only commonplace; they are inescapable. In many contexts, unlicensed reproduction is not the exception. It is the rule.

Although these copies frequently necessitate full reproduction of the underlying work by commercial entities, the copying does not impair the Copyright Act's regulatory objective because the copies are highly transformative, and as the Supreme Court stated in *Campbell*, "the more transformative the new work, the less will be the significance of other factors, like commercialism...." *Campbell*, 510 U.S. at 579. To permit reproduction for "different and socially important purposes" that "do not merely supercede the objectives of the original creations", *Field*, 412 F. Supp. 2d at 1119, takes nothing away from the author's right to control the commercial exploitation of their work. Copies that do not substitute for the original do not impair the author's legitimate interests.[8] *Authors Guild, Inc. v. HathiTrust*, 2014 WL 2576342, at *7 (2d Cir. June 10, 2014)

---

[8] In this case, the output of copying is not even a *work* at all, but rather an entirely new function, independent from content consumption. Judge Leval's influential article, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990), refers not only to transformative "works", but also to "uses," suggesting that fair uses of works might not involve placing a new work into the market, but rather performing some other activity entirely. In such a case, the potential effect on the market is at its nadir. Professor Sag characterizes these cases as "nonexpressive uses", *see* Sag, *supra*, at 1624 (observing that "the general principle of nonexpressive use – that acts of copying which do not communicate the author's original expression to the public should not be held to constitute copyright infringement – flows naturally from an analysis of existing copyright doctrines.").

(quoting *Campbell*, 510 U.S. at 591, for proposition that "cognizable market harm" is limited to "market substitution"). In short, it is incorrect to say that large-scale copying is unprecedented. Large-scale copying is omnipresent, perpetually occurring all around us. However, because this copying is highly transformative, and is frequently for nonexpressive uses, it does not impede the Copyright Act's regulatory objective.[9]

B.   *The same technology that enables pervasive copying provides new revenue sources for rights-holders.*

Notwithstanding that all this copying occurs, it does nothing to undercut authors' legitimate interests. In fact, online information services that require or facilitate copying have enabled new markets for content consumption and distribution, providing new revenue sources for authors and rights-holders. For example, as of last year, iTunes users downloaded more than one billion TV

---

[9] This boundary demarcating transformative, nonexpressive uses is generally reflected in precedent. *See* Sag, *Copyright and Copy-reliant Technology*, at 1616-24. While saving web pages locally surely cannot infringe, *see Healthcare Associates*, *supra*, downloading and reselling digital articles might. *See American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994), *but see White v. West Publ'g Corp.*, slip op. at 7-8. And while creating a commercial database of students' term papers to detect plagiarism does not infringe, *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645 (4th Cir. 2009), reselling individual reprints of those same papers might. *Compare Texaco with White*, *supra*.

10

episodes and 380 million movies from iTunes;[10] all told consumers spent an estimated $18.2 billion on digital home entertainment.[11]

Rather than inhibiting authors' legitimate interests, the extensive copying that occurs in the digital environment advances the interests of rights-holders by making content easier to consume, and enabling Internet users to more efficiently find, interact with, and, in many cases, lawfully purchase content. *Accord Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 460 (S.D.N.Y. 2012) (copying of books in HathiTrust Digital Library "is transformative because the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material."), *aff'd* 2014 WL 2576342 (2d Cir. June 10, 2014).

As the Supreme Court has noted, "[t]he more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005). This tradeoff should be easily managed, however, in cases where the use in question provides "market

---

[10] Apple, Press Release, *HBO GO & WatchESPN Come to Apple TV: iTunes Viewers Now Purchasing Over 800,000 TV Episodes & Over 350,000 Movies Per Day*, June 19, 2013, *available at* http://www.apple.com/pr/library/2013/06/19HBO -GO-WatchESPN-Come-to-Apple-TV.html.

[11] Dara Kerr, *Digital movie sales climb 47 percent in 2013*, CNET, Jan. 8, 2014, *available at* http://www.cnet.com/news/digital-movie-sales-climb-47-percent-in-2013/.

help" rather than "market harm," or where the purpose of the copying is both different from that of the author, and socially significant.[12]

Thus, while Google Books is a revolutionary resource, the reproduction that it required is hardly unprecedented. The copying involved in the Library Project is in fact a modest undertaking, compared to the countless fair use copies that businesses and individual technology users rely upon every day. Because these activities do not impede the legitimate interests of authors, and in fact often advance them, they should be considered "quintessentially transformative." *See Authors Guild, Inc. v. HathiTrust*, 2014 WL 2576342, at *7 (2d Cir. June 10, 2014).

## II.    FAIR USE IS ESSENTIAL TO INDUSTRIES ACROSS THE U.S. ECONOMY.

Pervasive copying underlies so much modern economic activity, including Internet functionality and digital technology, that it is no exaggeration to say that fair use is essential to the U.S. economy. For over 30 years, commercial entities have relied on the Supreme Court's *Sony* decision when engaging in fair use, or providing products and services that enable fair use by consumers and users. As the Court reaffirmed ten years later in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 594 (1994), commerciality is not a bar to fair use.

---

[12] David Fagundes, *Market Help, Market Harm, and Fair Use*, 17 STAN. TECH. L. REV. 359, 378-85 (2014), *available at* http://journals.law.stanford.edu/sites/default/files/stanford-technology-law-review/online/marketharmmarkethelp.pdf.

Today, fair use and exceptions to the rights-holder's statutory monopoly are of considerable economic importance.  Research in 2011 concluded that industries depending upon fair use and other exceptions to copyright contributed $2.4 trillion in value-add to the U.S. economy (roughly one-sixth of total U.S. current dollar GDP).[13]  The value of the global Internet economy is projected to reach $4.2 trillion in a few years,[14] and much of that commerce is facilitated by products or services engaging in the copying described above.

The benefits of commercial fair use are not confined to the technology sector, however.  "Creative industries" also regularly depend upon fair use in their commercial endeavors.  *See* MPAA Br. at 2 (citing *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012)); *accord Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010) (football team's use of plaintiff's copyrighted work was transformative because the work "is used 'not for its expressive content, but rather for its … factual content.'" (quoting *Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003)); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013) (football team's successful fair use defense

---

[13] *See* Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use* (2011), *available at* http://www.ccianet.org/wp-content/uploads/library/CCIA-FairUseintheUSEconomy-2011.pdf.

[14] David Dean *et al.*, *The Internet Economy in the G-20: The $4.2 Trillion Growth Opportunity* (Boston Consulting Grp. 2012), at 3, *available at* https://www.bcg.com/documents/file100409.pdf.

was supported by Appellants' *amicus* MPAA, among others); *Seltzer v. Green Day*, 725 F.3d 1170 (9th Cir. 2013); *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013); *Faulkner Literary Rights LLC v. Sony Pictures Classics*, 953 F. Supp. 2d 701 (N.D. Miss. 2013) (movie studio's quotation of Faulkner found to be fair use); *White v. West Publ'g Corp.*, No. 12-01340, slip op. (S.D.N.Y. July 3, 2014).

Yet notwithstanding *Sony*, *Campbell*, and the long established history of commercial fair use, Appellants and their *amici* place particular emphasis on the commerciality of Google's copying. Although Google Books does not sell copies or advertise around them, Appellants complain (Br. at 24) that the fact that Google is a commercial entity carried too little weight in the district court's analysis – even though, as Judge Chin noted, the Second Circuit does not "give much weight to the fact that the secondary use was for commercial gain." *See Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013) (citing *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 141 (2d Cir. 1998)).[15]

For the reasons discussed above, the district court's analysis is not only consistent with this Court's precedent, but also consistent with the expectations of a large component of the economy. The commerciality of transformative uses,

---

[15] *See also Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 615 (2d Cir. 2006) ("copyright owners may not preempt exploitation of transformative markets").

particularly those undertaken for a purpose other than communicating creative expression, should not be considered relevant to the fair use inquiry.

## III.  A FAIR USE FINDING DOES NOT USURP CONGRESSIONAL AUTHORITY

Appellants and their *amici* repeatedly assert that the copyright issues relating to the mass digitization of books are better left to Congress, and that the district court usurped Congressional authority by creating a "blanket exception" for mass digitization.  *See* Appellants Br. at 56-58; Baumgarten Br. at 25-30.  The district court did nothing of the sort.

In support of the contention that the district court overreached, the Copyright Alliance states that the district court preempted ongoing discussions concerning mass digitization, and that "the policy discussion regarding mass digitization … [is] well underway."  Copyright Alliance Br. at 5-7.  *See also* Baumgarten Br. at 30 ("Congress and the Copyright Office are actively pursuing the complex issues surrounding mass digitization").

To be sure, a policy *discussion* concerning mass digitization is underway, but legislative *resolution* of this issue is nowhere in sight.  The Copyright Office in October 2011 did publish a document "to advance the discussions concerning mass digitization," Baumgarten Br. at 29, but it offered no legislative proposals. Similarly, the Library of Congress's Section 108 Study Group (cited by Appellants' *amicus*) issued a report in 2008 after three years of deliberations,

containing certain general recommendations for legislative change, but none of which are applicable to the facts of this case.  In the six years since, neither the Copyright Office nor any member of Congress has proposed implementing legislation.

The history of orphan works legislation is no more encouraging.  A 2006 Copyright Office report on orphan works led to legislative proposals in Congress in 2006 and 2008.  The legislation died in the House in the face of furious opposition from visual artists and some of Appellants' *amici*.  Indeed, Appellant Authors Guild recently told Congress the orphan works problem was "vastly overstated," suggesting that it would oppose orphan works legislation.[16]

In conclusion, while Congress has considered mass digitization in the decade since Google's Library Project began, there has been little legislative action.  And when action has been considered in the venue which Appellants and some of its *amici* ostensibly prefer, Appellants and their *amici* have opposed it.  Fortunately, Congress already authored its "legislative solution" in 1976: the fair use right, in Section 107.

---

[16] *Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet, H. Comm. on the Judiciary,* 113th Cong. (2014) (statement of Jan Constantine, General Counsel, The Authors Guild), at 19, *available at http://judiciary.house.gov/index.cfm/2014/4/hearing-preservation-and-reuse-of-copyrighted-works.*

## CONCLUSION

Although Google Books is unprecedented, the copying necessary to build it was not. Mass copying for various purposes, both transformative and nonexpressive, is pervasive in our modern digital society. As a result, a significant segment of the U.S. economy depends upon the same fair use doctrine that Google relies upon here.

Accordingly, CCIA urges this Court to affirm the district court's ruling and uphold the decades of fair use law that have resulted in substantial dissemination of creative content, as the Copyright Act intended.

Respectfully submitted,
/s/ Matt Schruers
Matt Schruers
Vice President, Law & Policy
Computer & Communications
    Industry Association
900 Seventeenth Street NW, 11th Floor
Washington, DC 20006
(202) 783-0070
mschruers@ccianet.org
*Counsel for Amicus Curiae*

July 10, 2014

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 3,806 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


/s/ Matt Schruers
Counsel for *Amicus Curiae*


July 10, 2014

## CERTIFICATE OF SERVICE

I hereby certify, that on this 10th day of July 2014, a true and correct copy of the foregoing Brief of *Amicus Curiae* the Computer & Communications Industry Association was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via CM/ECF pursuant to Local Rule 25.1(h).


/s/ Matt Schruers
Counsel for *Amicus Curiae*


July 10, 2014