# 13-4829-CV

## United States Court of Appeals

*for the*

## Second Circuit

———◆———

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH
GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf
of all others similarly situated, PAUL DICKSON, THE McGRAW-HILL
COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER,
INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN
STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually
and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

GOOGLE, INC.,

*Defendant-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* AUTHORS ALLIANCE IN
## SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

JENNIFER M. URBAN
SAMUELSON LAW, TECHNOLOGY
& PUBLIC POLICY CLINIC
UNIVERSITY OF CALIFORNIA,
BERKELEY, SCHOOL OF LAW
*Attorney for Amicus Curiae*
396 Simon Hall
Berkeley, California 94720
(510) 642-7338

*On the Brief:*
PAMELA SAMUELSON
DAVID HANSEN

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* Authors Alliance, a private non-governmental party, certifies that it has no parent corporation and that no other company owns 10% or more of its stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................3

INTEREST OF AMICUS .....................................................................7

PRELIMINARY STATEMENT ............................................................9

SUMMARY OF ARGUMENT ............................................................12

ARGUMENT .......................................................................................16

   I.  Because Snippets Make Books More Discoverable, Book Search Has a

Transformative Purpose.........................................................................16

   II.  Authors of Books Typically Found in Major Research Library Collections

Want Their Books to Be Found Through Full-text Searchable Databases. .........20

     A.  Book Search Rescues Works from Oblivion in Print Library Collections

and Makes them Findable, Which is What Authors Want ...............................23

     B.  Because It Makes Books More Discoverable, Book Search is Likely to

Increase Demand for Those Books. ...............................................................26

   III.  The Clear Social Benefits of Book Search for Authors and the Public Are

Relevant to Fair Use ...............................................................................30

Conclusion ..........................................................................................36

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a).......................................38

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ....................................................................35

*A.V. ex rel. Venderhye v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009) ..........................................................................17

*Am. Geophysical Union v. Texaco Inc.*,
   802 F. Supp. 1 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913 (2d Cir. 1994)..................21

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................................22

*Authors Guild, Inc. v. Google Inc.*,
   954 F. Supp. 2d 282 (S.D.N.Y. 2013) .......................................................*passim*

*Authors Guild, Inc. v. HathiTrust*,
   902 F. Supp. 2d 445 (S.D.N.Y. 2012) ............................................................30

*Authors Guild, Inc. v. HathiTrust*,
   No. 12-4547-cv, slip op. (2d Cir. June 14, 2010) ......................................*passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ..........................................................................30

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).........................................................................17, 26, 30

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006)..............................................................34

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985)...................................................................................14, 22

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2002) ...............................................................17, 28, 34

*MCA, Inc. v. Wilson*,
   677 F.2d 180 (2d Cir. 1981) ..........................................................................31

*MGM Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)........................................................................................35

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000)..................................................................28

*Perfect10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ....................................................17, 34

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .........................................................31

**Statutes and Other Authorities**

17 U.S.C. 501(a) (2012)...........................................................................12

Fed. R. App. P. 26.1 ...................................................................................1

Fed. R. App. P. 29(a) .................................................................................7

Fed. R. App. P. 29(c)(4)..............................................................................7

Fed. R. App. P. 29(c)(5)..............................................................................7

Fed. R. App. P. 29.1 ...................................................................................7

Alan Latman, Fair Use of Copyrighted Works 15 (1958), *reprinted as*
    Study No. 14 in Copyright Law Revision Studies Nos. 14-16,
    prepared for the Senate Committee on the Judiciary, 86th Cong., 2d
    Sess., 7 (1960)....................................................................................22

Allen Kent *et al*., USE OF LIBRARY MATERIALS: THE UNIVERSITY OF
    PITTSBURGH STUDY (1979) ................................................................24

Arnold Plant, *The Economic Aspects of Copyright in Books,* 1 (New
    Series) ECONOMICA 167, 169 (1934) ................................................21

BLUE RIBBON COMM'N ON SUSTAINABLE DIGITAL PRESERVATION AND
    ACCESS, FINAL REPORT: SUSTAINABLE ECONOMICS FOR A DIGITAL
    PLANET: ENSURING LONG TERM ACCESS TO DIGITAL INFORMATION
    (Feb. 2010)........................................................................................33

Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of
    Potentially In-copyright Print Books in Library Collections*, D-LIB
    MAGAZINE, NOVEMBER/DECEMBER 2009, http://www.dlib.org/dlib/
    november09/lavoie/11lavoie.html ......................................................21

CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION
  DEVELOPMENT EXECUTIVE COMMITTEE TASK FORCE ON PRINT
  COLLECTION USAGE 2 (2010), http://staffweb.library.cornell.edu/
  system/files/CollectionUsageTF_ReportFinal11-22-10.pdf ............................25

Harold Varmus, *The Art and Politics of Science* (W.W. Norton 2009) ..................8

Mary Sue Coleman, *Google, the Khmer Rouge and the Public Good*,
  Address to the Professional/Scholarly Publishing Division of the
  Association of American Publishers 2 (Feb. 6, 2006),
  http://president.umich.edu/speech/archive/MSC_AAP_Google_addre
  ss.pdf ....................................................................................................................25

Mary Sue Coleman, *Riches We Must Share*, WASH. POST, Oct. 25, 2005,
  http://www.washingtonpost.com/wp-dyn/content/article/2005/10/21/
  AR2005102101451.html..............................................................................26, 32

MATTHEW JOCKERS, MACROANALYSIS: DIGITAL METHODS AND
  LITERARY HISTORY (Univ. Illinois Press, 2013)...................................................32

Paul Courant, *Federal Deficits: America's Great Consumption Binge*
  (Prentice Hall 1986).................................................................................................8

Paul J. Heald, *How Copyright Keeps Works Disappeared*, 11 J.
  EMPIRICAL L. STUDIES (forthcoming 2014), http://ssrn.com/
  abstract=2290181 ...................................................................................................29

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105,
  1111 (1990) .............................................................................................................36

R. Anthony Reese, *What Copyright Owes to the Future*, 50 HOUSTON L.
  REV. 287, 289-91 (2012).........................................................................................33

Robert Darnton, *Mesmerism and the End of the Enlightenment in France*
  (Harv. Univ. Press 1968) .........................................................................................8

Robert Pinsky's, *Sadness and Happiness* (Princeton Univ. Press 1975) .................8

Shahren Ahmad Zaidi Adruce, Academic Authors' Perception on
  Copyright Protection 149-50 (March 11, 2004)....................................................21

Sidonie Smith, *Human Rights and Narrated Lives: The Ethics of Recognition* (Palgrave/Macmillan, 2004)............................................................8

U.S. Bureau of Labor Statistics, *May 2013 National Occupational Employment and Wage Estimates*, http://www.bls.gov/oes/current/ oes_nat.htm#25-0000 (last updated April 1, 2014) ...........................................10

## INTEREST OF AMICUS

*Amicus Curiae* Authors Alliance is a 501(c)(3) nonprofit organization whose mission is to further the public interest in facilitating widespread access to works of authorship by assisting and representing authors who want to disseminate knowledge and products of the imagination broadly.[1] Hence its motto: "Promoting authorship for the public good by supporting authors who write to be read." The advent of global digital networks provides authors with unprecedented opportunities to reach new readers. Authors Alliance represents authors who want to harness this potential.

Officially launched in May 2014, Authors Alliance currently has over 400 members. A majority of members are academic authors, but the Alliance also serves a growing number of creative writers, journalists, and other authors who share its mission. Its Advisory Board includes two Nobel Laureates, a Poet Laureate of the United States, three MacArthur Fellows, distinguished professors

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Rule 29.1 of the Local Rules of the United States Court of Appeals for the Second Circuit, Amicus states that none of the parties to this case nor their counsel authored this brief in whole or in part; no party or any party's counsel contributed money intended to fund preparing or submitting the brief; and no one else other than Amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.
Pursuant to Fed. R. App. P. 29(c)(4) and 29(a), Amicus states that all parties have consented to the filing of this brief, and we rely on that consent as our source of authority to file.

from major universities with expertise in a wide variety of fields, and several prominent independent professional writers and visionaries.[2]

The Authors Alliance has an interest in this litigation because the dismantling of Book Search would be harmful to its mission of helping authors reach readers. Book Search is an important tool through which our members can reach wider audiences. Many Authors Alliance members are authors of the sort of books Google scanned most often for Book Search, which are those typically found in research library collections. Consider, for example, books created by some of the authors who serve on the Authors Alliance Advisory Board. Nine of Harvard historian Robert Darnton's books are discoverable through Book Search, including *Mesmerism and the End of the Enlightenment in France* (Harv. Univ. Press 1968). Five books authored by Michigan economist Paul Courant can be found, including *Federal Deficits: America's Great Consumption Binge* (Prentice Hall 1986). Four of former Poet Laureate Robert Pinsky's books can be located, including *Sadness and Happiness* (Princeton Univ. Press 1975). Three books by former Modern Language Association (MLA) President Sidonie Smith can be found, including *Human Rights and Narrated Lives: The Ethics of Recognition* (Palgrave/Macmillan, 2004). Also findable through Book Search is *The Art and Politics of Science* (W.W. Norton 2009) by Nobel Laureate Harold Varmus. These

---

[2] Information about the Authors Alliance and its Advisory Board can be found at http://www.authorsalliance.org.

are but a few examples of the many hundreds of books authored by Authors

Alliance members that can be found through Book Search.

Book Search also makes it possible for the many who lack physical access to

research library collections to discover that our members' works exist. Interested

researchers should be able to find easily the ideas and contributions to human

knowledge contained in books; researchers can then learn more by buying or

borrowing those books. The Authors Alliance represents authors who want their

intellectual legacies to extend to new generations of readers, including the many

who now search and find books almost exclusively online. Creation of a full-text

searchable database of books makes these benefits possible.

## PRELIMINARY STATEMENT

Reaching potential readers today and for generations to come is a foremost

goal—and a growing challenge—for authors who write in order to make enduring

contributions to knowledge and culture. Tools that allow potential readers to

perform full-text searches reveal the relevance of these authors' books. This

promotes both the progress of science and useful arts and the personal interests of

academics and many professional writers outside the academy.

The overwhelming majority of books that Google has scanned from

university research library collections are non-fiction works, dense with

knowledge, written by academic authors in the hope and expectation that they will

9

be read by others and contribute to the ongoing progress of knowledge creation and dissemination. Most of the over 1.5 million post-secondary educators in the United States are expected regularly to produce scholarly works that will end up in research library collections.[3] Although the Authors Alliance is only a few months old, hundreds of these authors have already become members.

Historically, research libraries have been the principal market for scholarly books. Academic authors, in particular, have been grateful that libraries have purchased their books, indexed and shelved them to ensure their availability, and preserved them so that future generations will be able to learn from the knowledge and insights embedded in them. Research libraries make the research of the past and the present accessible for those who wish to help advance knowledge at present and in the future.

The principal motivation of academic authors who write books primarily bought by research libraries is to communicate knowledge to an audience of readers eager to acquire understanding of a particular domain. For these authors, a full-text search tool like Book Search is a boon—such tools make it possible for interested researchers to discover that their books exist, that the books contain

---

[3] *See* U.S. Bureau of Labor Statistics, *May 2013 National Occupational Employment and Wage Estimates*, http://www.bls.gov/oes/current/oes_nat.htm#25-0000 (last updated April 1, 2014) (Occupational Code 25-1000, "Postsecondary teachers").

information relevant to queries that researchers are making, and that the books can be found in library collections or possibly purchased.

These authors generally fear oblivion more than piracy. Academic authors often spend several years producing monographs that they hope will contribute to scholarly discourse, including after their own careers end. Conventional research library catalogs help readers to find some books, but they provide only limited information about the books in the libraries' collections and fall short of ensuring the long-term intellectual legacies of the books' authors. Full-text search databases such as Google Book Search and HathiTrust do considerably more to stave off scholarly oblivion. These services give authors new hope that their books will find readers, contribute to scholarly discourse, and promote the ongoing progress of knowledge. This is as the Founders intended when they authorized Congress to enact a copyright law.

Perhaps best-selling Authors Guild members such as Scott Turow and Malcolm Gladwell do not need full-text search tools to reach their audiences. Their publishers provide extensive resources to market their works, and their well-known names may provide market cachet. But Turow and Gladwell are not typical authors. In addition to academic authors, many lesser-known professional writers are likely to benefit from full-text search tools. Indeed, as described below, Hal Poret's expert report in this case indicates that well over half of the 880

11

professional writers surveyed affirmatively approved of Book Search snippets, almost half thought that Book Search snippets would help sales of their books, and only a tiny minority (four percent) thought that Book Search snippets would be harmful.

Despite the many benefits that Book Search provides for authors and readers, the Authors Guild and a small number of its members have been seeking a windfall award of $3 billion in statutory damages for the copying of scholarly books from research library collections in which very few of the Guild's members actually own copyright interests.[4] The Guild and its co-plaintiffs are further seeking injunctive relief to remove Book Search from the Internet, a sweeping remedy that would harm the interests of authors who want readers to find their books.

To prevent this harmful result, this Court should affirm the District Court's ruling in favor of Google's fair use defense.

## SUMMARY OF ARGUMENT

Book Search makes fair uses of the books in its corpus because the primary purpose of the Book Search database is to make books more findable. This purpose

---

[4] The Second Circuit recently decided that the Authors Guild lacked statutory standing to sue for copyright infringement as an associational plaintiff because they did not hold "legal or beneficial interest[s]" in the copyrights at issue in that case. Authors Guild, Inc. v. HathiTrust, No. 12-4547-cv, slip op. at 12 (2d Cir. June 14, 2010), (citing 17 U.S.C. 501(a) (2012)). Based on that ruling, *Amicus* questions whether the Authors Guild has associational standing in this case.

favors fair use for three reasons: first, because Google's method of making books more findable—including displaying snippets of text—represents a significant transformative use that is unlikely to serve as a substitute for the original works; second, because Google Books does precisely what authors of books in research library collections want for their books in rescuing them from obscurity in print library collections and making them more discoverable online; and third, because by making knowledge more accessible, Google Books provides broad social benefits to both authors and the public.

The Second Circuit recently held in *Authors Guild, Inc. v. HathiTrust* that digitizing books for the purpose of creating a searchable database is a "quintessentially transformative use." *HathiTrust*, Slip. Op. at 18. This case is similar to *HathiTrust* in many important respects. The principal difference is that Book Search displays snippets of text in response to user search queries, whereas HathiTrust offers only identifying information about books responsive to the query and page numbers where the references can be found.

There are four reasons why Book Search snippet views do not undermine Google's fair use defense. First, snippets serve as pointers to information, akin to the "thumbnail" size images in prior search engine cases. Second, most non-expert Internet users of Book Search will need snippets to decide whether the search results are genuinely relevant to their queries because they are generally less

13

skilled researchers than the typical users of the HathiTrust database. Third, Google has been careful to design Book Search to avoid supplanting demand for books responsive to search queries by including only small portions of responsive text in snippet views. Fourth, snippet views help readers find books and their authors; this is likely to enhance demand for books relevant to search queries, as the District Court rightly concluded. *Authors Guild, Inc. v. Google Inc.,* 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013).

The fairness of a use can sometimes best be evaluated, as the Supreme Court noted in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), by assessing whether the use would likely be acceptable from the point of view of the "reasonable copyright owner." *Id*. at 550. Reasonable authors of works typically found in research library collections are likely to applaud Book Search because it may rescue their works from oblivion in research library stacks and connect the works to new audiences. These authors want their works to be found, and to be used in ways that will establish their reputations and intellectual legacies.

Book Search's use of books in research library collections, if anything, enhances the market for those books. It certainly does not supplant that market. The District Court correctly found that snippet views are highly implausible substitutes for the originals; a user would be hard pressed to recreate a meaningful, readable portion of a work by running snippet view searches and aggregating the

results. In a survey of professional writers on their views about Book Search, the vast majority agreed that snippets posed no risk of substitution. Decl. of Hal Poret in Opp'n to Pls.' Mot. for Class Certification, Ex. 1, at 23 (D. Ct. Dkt. No. 1001-1). Book Search is far more likely to have a positive effect on the market for books, as the District Court correctly concluded. *See Google*, 954 F. Supp. 2d at 288. For many works—especially out-of-print titles that currently have little hope of being resurrected by publishers—the increased visibility and enhanced search capability of Book Search offers hope that users will discover these forgotten works and demonstrate their current usefulness.

Finally, Book Search offers important public benefits that weigh in favor of fair use. The District Court correctly identified five significant social benefits, including creating new ways for users to find books, facilitating new forms of research through text and data-mining, expanding access to books, helping to preserve books, and generating new audiences and new sources of income for authors and publishers by helping readers find books. *See Google*, 954 F. Supp. 2d at 287-88.

The District Court correctly considered these public benefits, consistent with Second Circuit and Supreme Court precedents that direct courts to weigh the fair use factors together in light of the purposes of copyright. In discussing the above five benefits and making its overall fair use assessment, the District Court

15

concluded that Book Search "advances the progress of the arts and sciences, while maintaining respectful consideration for the rights of authors and other creative individuals," *Google Inc.,* 954 F. Supp. 2d at 293. We heartily agree. We therefore respectfully request that this Court uphold the District Court's fair use ruling.

## ARGUMENT

### I.    Because Snippets Make Books More Discoverable, Book Search Has a Transformative Purpose.

This Circuit recently upheld HathiTrust's fair use defense for creating a full-text searchable database that enables researchers to find relevant books in response to their search queries. *HathiTrust*, slip op. at 6-7, 18-26. This case is similar to *HathiTrust* in many important respects: Both cases involve the creation of a full-text searchable database of mostly scholarly books (to a large extent, the very same books); the databases and their search capabilities could not have been created without scanning the entirety of the works; the databases are transformative because they were created for a very different purpose from the originals, namely, to enhance public access to knowledge by making books more findable; and the harms the Authors Guild alleges are speculative.

There are two principal differences between the *HathiTrust* case and the fair use defense now before this court. First, HathiTrust is a nonprofit library affiliated with numerous major university research libraries, whereas Google is a for-profit company. Second, word searches conducted on the HathiTrust database yield only

identifying information about books that contain the search terms and page numbers where the references can be found, whereas Google provides a small number of snippets of text from books responsive to user search queries.

The commerciality point is easily dispensed with. In *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), the Supreme Court explained that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id*. at 569. This Circuit has already recognized that full-text search is a "quintessentially transformative" use. *HathiTrust*, slip op. at 18. The court in *HathiTrust* also cited approvingly to prior search engine cases in which transformative fair use defenses prevailed, despite the commercial nature of the defendants. *HathiTrust*, slip op. at 15, 19.[5] As in those cases, the uses in this case are highly transformative; commerciality should be given little weight.

Consistent with those decisions, the District Court acknowledged that "Google is a for-profit entity and Google Books is largely a commercial enterprise." *Google Inc.,* 954 F.Supp.2d at 291. But the court noted that Google

---

[5] *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2002) (search engine's transformative purpose in providing "thumbnail" images to enable users to find images on the Internet outweighed commercial purpose); *accord Perfect10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1166 (9th Cir. 2007); *A.V. ex rel. Venderhye v. iParadigms, LLC*, 562 F.3d 630, 638-39 (4th Cir. 2009) (commercial nature of plagiarism detection software did not override transformative uses of the works at issue in fair use analysis).

"does not engage in the direct commercialization of copyrighted works." *Id*. More important was the "highly transformative" nature of Google's use. Book Search "transforms expressive text into a comprehensive word index that helps readers, scholars, researchers and others find books." *Id*. at 292. In addition, Book Search transforms book texts "into data for purposes of substantive research" to enable data-mining "opening up new fields of research." *Id*. As in *HathiTrust*, "by enabling full-text search," Book Search "adds to the original something new with a different purpose and a different character," *HathiTrust*, slip op. at 19, namely, providing tools that help readers conduct new kinds of research and find authors' books.

Unlike HathiTrust, Google does provide snippet views of text in response to search queries. The court in *HathiTrust* took note of the fact that HathiTrust "does not allow users to view any portion of the books they are searching." *Id*. at 18.

Book Search snippet views do permit users to view some expression from in-copyright works, but this does not undermine Google's fair use defense. There are at least four reasons why. First, snippets serve as pointers that help researchers identify responsive results, akin to the "thumbnail" size images in the image search engine cases cited approvingly in *HathiTrust*. *Id*. at 15, 19.

Second, most users of Book Search will need snippets to decide whether the search results are really relevant to their queries. Non-expert Internet researchers

typically lack the specialized research training characteristic of users of HathiTrust and traditional research libraries. Experienced academic researchers looking for books that discuss, for example, "anaphylactic shock" will likely already be familiar with that term and with at least some literature on the subject. They will typically have trained research skills and be more motivated to use sophisticated search tools, such as library subject headings, to find books on shelves. By contrast, the general population that uses Google's search engine may be less knowledgeable about their query topics, have less training in research techniques, and have greater need of snippets to help them know if they have found the books or information they are looking for.

Even for experienced researchers, snippet views provide more useful search results than simple page number references because snippets provide context and meaning to results. A snippet view search for the term "copyright" within a given book will, for instance, quickly reveal by surrounding content whether the book actually discusses copyright law or merely contains non-responsive instances of the word "copyright," such as a copyright notice on the book's cover page.

Third, Google has been careful to design Book Search to avoid supplanting demand for originals. Snippets are just that—very small amounts of text surrounding the words in a search query. Further, Book Search does not display the contents of certain types of books (e.g., dictionaries, reference books, and recipe

19

collections) at all, to avoid supplanting demand for copies of the original. Google has designed Book Search to protect against abusive snippet searches that might enable re-creation of much of the text of the works. And rightsholders who object to snippet views can ask for the snippet feature to be unavailable for their works. JA396, ¶ 5.

Fourth, snippet views help readers find relevant books and their authors. As the District Court rightly concluded, this is more likely to enhance demand for the books than to supplant that demand. *Google*, 954 F. Supp.2d at 292-93. Indeed, because snippet view helps Book Search provide more responsive results to a broader and more generalist audience, it is likely to better enhance demand than would a service that provides context-free text search results.

## II. Authors of Books Typically Found in Major Research Library Collections Want Their Books to Be Found Through Full-text Searchable Databases.

The overwhelming majority of books in the Book Search database are from the collections of leading university research libraries, such as those at Harvard, Stanford, Cornell, University of Michigan, and University of California. These research libraries have built their collections over many decades largely by buying scholarly works produced by academic authors. A study of several research library contributors to the Book Search Project reveals that over 93% of the titles are nonfiction, and 78% of these nonfiction titles are aimed at a scholarly audience.

*See* Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-copyright Print Books in Library Collections*, D-LIB MAGAZINE, NOVEMBER/DECEMBER 2009, http://www.dlib.org/dlib/november09/lavoie/11lavoie.html.

Another survey considered the motivations of academic authors in creating works of authorship. Its author reported that "academic authors are not primarily motivated by monetary rewards when they write/create works. . . . Academic authors who are motivated in this context write/create . . . to get appreciation, to get acknowledgement, to gain recognition and popularity, and to leave an intellectual legacy to others." Shahren Ahmad Zaidi Adruce, Academic Authors' Perception on Copyright Protection 149-50 (March 11, 2004) (Ph.D. Dissertation, Syracuse University) (available via ProQuest). These motivations have been widely recognized for a long time. *See, e.g*., Arnold Plant, *The Economic Aspects of Copyright in Books,* 1 (New Series) ECONOMICA 167, 169 (1934) (observing that many authors, especially academics, write "to secure publicity for their contributions to our literary heritage without financial subsidy from themselves."); *Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 27 (S.D.N.Y. 1992) (Leval, J.) ("[G]enerally [academic] authors have a far greater interest in the wide dissemination of their works than in royalties"), *aff'd*, 60 F.3d 913 (2d Cir. 1994).

21

The District Court in an earlier proceeding in this case recognized the generally nonmonetary motivations of academic authors. It rejected a proposed settlement of this litigation in part because the Authors Guild and its members had inadequately represented the interests of academic authors, noting that academic authors, almost by definition, are committed to advancing knowledge, not maximizing profits, as the Authors Guild is. *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 679 (S.D.N.Y. 2011).

To understand the very substantial benefits that the Book Search database provides to the authors of works most typically found within scanned collections, it is important to consider the database's unique makeup. The Supreme Court in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), observed that the fair use inquiry may turn on evaluating the "'importance of the material copied or performed from the point of view of the reasonable copyright owner. In other words, would the reasonable copyright owner have consented to the use?'" *Harper & Row Publishers, Inc*. 471 U.S. at 550 (quoting Alan Latman, Fair Use of Copyrighted Works 15 (1958), *reprinted as* Study No. 14 in Copyright Law Revision Studies Nos. 14-16, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 7 (1960)). Authors Alliance believes that the authors of books in the Book Search database would generally consent to this use.

Authors generally want readers to find their books, and that is precisely what Book Search enables.

### A.     Book Search Rescues Works from Oblivion in Print Library Collections and Makes them Findable, Which is What Authors Want

Virtually all authors want their books to be found and to be read. This is the main purpose of Book Search. Book Search helps readers locate books containing the information they seek; Book Search thus helps authors find readers who are searching for the knowledge their books contain. The strongest reason why fair use should apply here is because Book Search helps to connect authors and readers.

Book Search is a much more comprehensive tool for connecting authors and readers than are traditional library catalogs. Library catalogs are notoriously literal. A minor misspelling of a book title or author's name in a card catalog entry may result in a specific book becoming undiscoverable. Moreover, even researchers using modern online catalogs may fail to find a book if they do not know the correct spelling of the author's name or the book's title. For example, a library catalog search for the titles of two important works of the twentieth century, *The Souls of Black Folk* or *The Folklore of Capitalism*, may yield no results if the catalog entry contains a likely mistake (an omitted "s" or a misplaced plural, respectively) or the researcher misremembered the title. While truly persistent researchers with enough information could eventually find these seminal works of W.E.B. DuBois and Thurman Arnold using the authors' names, Google's full-text

23

indexing retrieves the books, along with hundreds of others that discuss them, because Google has developed technologies that help users find what they are looking for even if they misspell some words.

Without electronic indexes like Google, readers are forced to grope through library holdings with well-used but ultimately inefficient discovery tools. Libraries have devised many ways to search for books using card catalogs, subject indexes, and online library catalogs, but information about and within print books remains relatively inaccessible for all but the expert.

Authors want their works to be found, not languish unread. This is a serious risk for books typically found in the research collections that form the core of the Book Search database. In 1979, the University of Pittsburgh published a study on uses of its research library, which is one of the largest in the world. The study reported what many already suspected: a large number of books are collected in print but seldom found and used. The report indicated that 40% of books that Pittsburgh had purchased in the previous ten years had never circulated. Of those, the study concluded that fewer than 2% would ever be checked out at all. ALLEN KENT ET AL., USE OF LIBRARY MATERIALS: THE UNIVERSITY OF PITTSBURGH STUDY (1979).

The same story sadly holds true today: despite advances in cataloging, Cornell University reported that approximately 55% of the monographs in its

collection published since 1990 had never circulated. CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION DEVELOPMENT EXECUTIVE COMMITTEE TASK FORCE ON PRINT COLLECTION USAGE 2 (2010), http://staffweb.library.cornell.edu/system/files/CollectionUsageTF_ReportFinal11-22-10.pdf.

Google's use of research library holdings to overcome these challenges is precisely what most authors would want. Indeed, the desire of scholars to make works widely accessible is a foundational part of the universities' agreements with Google, all of which begin by explaining their mutual interest in "making information available to the public." *See* Joint Appendix, A-593, A-606, A-619, A-630, A-645 (Google-Library Agreements with the University of Michigan, University of California, University of Wisconsin-Madison, University of Virginia, and the University of Texas at Austin).

The University of Michigan's president, Mary Sue Coleman, explained the opportunity that Book Search presented for a "university whose mission is to create, to communicate, to preserve and to apply knowledge." Mary Sue Coleman, *Google, the Khmer Rouge and the Public Good*, Address to the Professional/Scholarly Publishing Division of the Association of American Publishers 2 (Feb. 6, 2006), http://president.umich.edu/speech/archive/MSC_AAP_Google_address.pdf.

Coleman also explained a fear that many academics authors share about future

generations of researchers: "Students coming to my campus today belong to the

Net Generation. By the time they were in middle school, the Internet was a part of

their daily lives. As we watch the way our students search for and use information,

this much is clear: If information is not digitized, it will not be found." Mary Sue

Coleman, *Riches We Must Share*, WASH. POST, Oct. 25, 2005,

http://www.washingtonpost.com/wp-

dyn/content/article/2005/10/21/AR2005102101451.html.

> **B.     *Because It Makes Books More Discoverable, Book Search is Likely to Increase Demand for Those Books.***

The *Campbell* decision directs courts to distinguish the "fair use sheep from

the infringing goats" by considering whether the challenged use will supplant

demand for the original and thereby harm the market for the work. *Campbell*, 510

U.S. at 586-88. Book Search snippets could but rarely supplant demand for books

in which a search term is found. Snippets typically provide only enough context

around a relevant search term so that users can know whether a book is germane to

their query.

Someone using Book Search to locate a history of Buffalo, for instance, can

easily discern the need to refine his search if the first three Google results show

snippets from a book on buffalo herds in the nineteenth century instead of the city

in upstate New York. Relevant snippets may whet his appetite for books about that

city, but to actually learn about its history, he must go to a library or purchase the books.

*Amicus* agrees with the District Court's conclusion that "a reasonable fact finder could only find that Google Books enhances the sales of books to the benefit of copyright holders." *Google Inc.,* 954 F. Supp.2d at 293. The court observed that "[m]any authors have noted that online browsing in general and Google Books in particular helps readers to find their work, thus increasing their audience," and because "Google provides convenient links to booksellers to make it easy for a reader to order a book . . . , there can be no doubt but that Google Books improves book sales." *Id.*

The conclusion that Book Search likely improves book sales is supported not only by the District Court's sound reasoning, but also by the Expert Report of Hal Poret who conducted a telephone survey of 880 professional writers about their views of Book Search snippet views. Decl. of Hal Poret in Opp'n to Pls.' Mot. for Class Certification (D. Ct. Dkt. No. 1001). Forty-five percent of the respondents thought that Book Search snippets would improve sales of their books, and another fifty-one percent thought it would not harm them. Poret Decl., Ex. 1, at 23. Only four percent thought snippet views would harm book sales. *Id.*

The District Court's conclusion that Book Search will improve the market for authors' works is consistent with rulings in other cases in which courts have

recognized that transformative fair uses may enhance demand for the copyright owner's work. *See Kelly*, 336 F.3d at 821-22; *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1ˢᵗ Cir. 2000) (citing other such cases).

Book Search may be especially helpful to authors of books published in the mid- to late twentieth century. The overwhelming majority of these books published before the 1990s are out of print, commercially unavailable, and earning nothing for authors or their publishers. Publishers have so far had little incentive to take a risk on resurrecting these out-of-print titles by paying the high costs of reprinting them or converting them to digital form. Readers, in turn, have had few ways to discover the existence of these works and create a demand for new editions. It is perhaps for this reason that in-copyright books of the twentieth century are some of the most poorly marketed and sold. Authors Alliance member Paul Heald (Professor of Law at the University of Illinois) has demonstrated the problem with this chart:



NOTE: Because Amazon only tracks the number of editions it sells (one per ISBN), it does not know the number of titles it offers. Books frequently are published in more than one edition, estimating the number of titles available on Amazon requires dividing the number of editions in the random sample by the average number of editions per title. The estimate is given in terms of the percentage of titles likely available on Amazon from each listed decade with adjustments between decades based on the ratio of editions to titles for books initially published within each decade.

Paul J. Heald, *How Copyright Keeps Works Disappeared*, 11 J. Empirical L. Studies (forthcoming 2014), http://ssrn.com/abstract=2290181. Heald reports on a study of a random sample of 2,266 new editions of books available on Amazon.com. The chart above depicts an estimate of the percentage of titles available on Amazon by the date of original publication of the work. Heald's findings show that in-copyright books published in the middle of the twentieth century are significantly less available than books from the late nineteenth and early twentieth centuries that have now entered the public domain. For authors of works published between 1923 and the 1990s, Book Search may be a rare ray of hope that the books will be rediscovered and enjoy renewed demand.

## III.   The Clear Social Benefits of Book Search for Authors and the Public Are Relevant to Fair Use

The District Court considered the social benefits of Book Search and concluded that Book Search "advances the progress of the arts and sciences, while maintaining respectful consideration for the rights of authors and other creative individual," *Google*, 954 F. Supp. 2d at 288,293. The District Court's analysis was correct in light of *Campbell*, in which the Supreme Court endorsed taking social benefits that serve copyright's constitutional purposes into account in fair use cases. *Campbell*, 510 U.S. at 579. The Court noted that all factors "are to be explored, and the results weighed together, in light of the purposes of copyright," *Id.* at 578.

Social benefits alone do not render a use transformative, as the Second Circuit noted in *HathiTrust*, slip op. at 17. The HathiTrust digital library may indeed be an "'invaluable contribution to the progress of science and cultivation of the arts,'" *id*. (quoting the District Court, *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445,464 (S.D.N.Y. 2012)), but that did not make all of its uses transformative, *HathiTrust,* slip op. at 17. However, the existence of social benefits has supported fair use defenses in numerous cases in this Circuit and elsewhere. *See Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 613 (2d Cir. 2006) (fair use analysis requires a balancing of "'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the

use is denied.'") (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir.1981) (balancing interests when considering the purpose and character of the use)); *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) ("[W]e are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially. Public benefit need not be direct or tangible, but may arise because the challenged use serves a public interest.") (citations omitted).

*Amicus* heartily agrees with the District Court's assessment of the social benefits of Book Search. First, Book Search "provides a new and efficient way for readers and researchers to find books" and has become "an essential research tool." *Google*, 954 F.Supp.2d at 288. This benefit is especially meaningful to Authors Alliance because Book Search makes it possible for more readers to find our members' and other authors' books.

Second, Book Search "greatly promotes a type of research referred to as 'data mining' or 'text mining,' . . . [which] 'can provide insights about fields as diverse as lexicography, the evolution of grammar, collective memory, the adoption of technology, and the pursuit of fame, censorship, and historical epidemiology.'"[6] *Id.* (citations omitted). Data-mining—i.e., computer-aided processing and analysis of information within texts—allows authors to write new

---

[6] *See* Brief of Amici Curiae of Digital Humanities Scholars filed in this appeal.

31

works based on insights that data-mining makes possible. *See, e.g.*, MATTHEW JOCKERS, MACROANALYSIS: DIGITAL METHODS AND LITERARY HISTORY (Univ. Illinois Press, 2013). This too benefits *Amicus*, as some Authors Alliance members already engage in this type of research and others will data-mine in the future.

Third, Book Search "expands access to books" so that "traditionally underserved populations will benefit as they gain knowledge of and access to far more books." *Google*, 954 F. Supp.2d at 288. Book Search has a democratizing impact on research, making it possible for authors to reach audiences who would otherwise be unable to find information in research library books, including those whose efforts are hampered by disability, distance, and means. But people with limited economic resources or other disadvantages may have Internet access through libraries, schools, or otherwise. They can now discover these works. As University of Michigan President Coleman observed:

> Throughout history, most of the world's printed knowledge has been created, preserved and used only by society's elites—those for whom education and power meant access to the great research libraries. Now groundbreaking tools for mass digitization are poised to change that paradigm. We believe the result can be a widening of human conversation comparable to the emergence of mass literacy itself.

Mary Sue Coleman, *Riches We Must Share*, WASH. POST, Oct. 22, 2005. For authors who write to be read, this means a wider audience for our works, serving our goals of contributing to and spreading knowledge.

Fourth, Book Search "helps to preserve books and give them new life." *Google*, 954 F. Supp.2d at 288. Preservation of the intellectual and cultural heritage embodied in books and other works of authorship is a very important social benefit. *See, e.g*., BLUE RIBBON COMM'N ON SUSTAINABLE DIGITAL PRESERVATION AND ACCESS, FINAL REPORT: SUSTAINABLE ECONOMICS FOR A DIGITAL PLANET: ENSURING LONG TERM ACCESS TO DIGITAL INFORMATION (Feb. 2010). *Amicus* considers preservation to be especially important because most authors of books in the Book Search database want to leave an intellectual legacy that will enable future generations to have access to their works. Without preservation efforts like Google's, many works of which there are few surviving copies might be destroyed or lost long before they enter the public domain. *See* R. Anthony Reese, *What Copyright Owes to the Future*, 50 HOUSTON L. REV. 287, 289-91 (2012) (emphasizing preservation of intellectual legacies as a social benefit).

Fifth, "by helping readers and researchers identify books, Google Books benefits authors and publishers" because it provides links to sites where books can be purchased or obtained from libraries and book retailers, making it reasonable to conclude that "Google Books will generate new audiences and create new sources of income." *Google,* 954 F.Supp.2d at 288. *Amicus* regards this ability to reach

33

new audiences to be a substantial benefit to Authors Alliance members, to most other authors, and to publishers.[7]

The "significant public benefits" of Book Search are not undercut by Google's for-profit status or its commercial interest in drawing users to its search engine. Indeed, the social benefits the District Court identified cannot be fully achieved unless millions of users are attracted to Google's search engine to find information.

The social benefit of a search engine's improvement in public access to information was recognized in the Ninth Circuit's fair use assessment in *Kelly*. The court noted that Arriba's thumbnails of Kelly's images "benefit the public by enhancing information-gathering techniques on the Internet." *Kelly*, 336 F.3d at 820. The Ninth Circuit reiterated this point in *Perfect10*, saying that Google's "search engine provides a social benefit by incorporating an original work into a new work, namely, an electronic reference tool." *Perfect10*, 508 F.3d at 1165. *See also Field v. Google Inc.*, 412 F. Supp.2d 1106, 1119 (D. Nev. 2006) (cache copies of copyrighted content said to serve "socially important purposes"). The Second Circuit has cited approvingly to the fair use rulings in *Kelly* and *Perfect10*. *HathiTrust*, Slip. Op. at 15, 19-20. Social benefit thus has been and should be

---

[7] Insofar as Book Search enables Google to improve its search technologies and develop or refine other tools such as automated translation software, the District Court might also have noted this as a social benefit given that these improvements and refinements will benefit millions of users.

considered in making fair use determinations, especially when the uses are transformative.

Improving public access to information will not always be fair use, of course. Grokster and Napster are among the firms found to be infringers who have increased public access to copyrighted works. *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (peer-to-peer file-sharing firm held to have induced millions of infringements); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (peer-to-peer file-sharing firm held contributorily and vicariously liable for millions of its users' infringements). The enhanced access in those cases, however, was found to have caused discernible harm to markets for the copyrighted works at issue. Courts held that the infringements these defendants induced or contributed to supplanted demand for legitimate purchases of the creative works and harmed copyright markets. Where, as in this case and in other recent search engine cases, a use enhances public access to information "without adversely impacting the rights of copyright holders," *Google*, 954 F. Supp.2d at 293, improving public access confers a social benefit that weighs in favor of fair use.

Book Search promotes the progress of science, the very goal that fair use is intended to foster. In this transformative use case, this consideration is especially potent. As Judge Leval has observed, when "the secondary use adds value to the original—if the quoted matter is used as raw material, transformed in the creation

35

of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). Authors Alliance urges the Second Circuit to keep this key goal in mind as the court reviews the fair use ruling in this case.

## Conclusion

The vast majority of the millions of scholarly books in research libraries from which Book Search originated are at risk. Without Book Search these works are effectively unusable for new generations of online users and the millions of people without access to a research library, creating the risk that they will languish forgotten in library stacks. Most authors fear this fate more than they fear the speculative harms imagined by the Authors Guild.

Book Search uses, including snippet view, fall squarely within this Court's fair use precedents. Book Search is transformative, in line with *HathiTrust* and transformative use cases from other Circuits, it aligns with most reasonable authors' expectations about use of their works, and it provides broad social benefits that must be considered in the overall fair use analysis. Therefore, we respectfully urge this Court to affirm the District Court's fair use ruling.

DATED:   July 10, 2014                    Respectfully Submitted,


                                           _____/s/ Jennifer M. Urban_____

                                           **Jennifer M. Urban**
                                           Samuelson Law, Technology & Public
                                           Policy Clinic
                                           University of California, Berkeley, School
                                           of Law
                                           *Counsel for Amicus*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains **6,858** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

/s/ Jennifer M. Urban