# 13-4829-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

PLAINTIFFS-APPELLANTS,

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

PLAINTIFFS,

V.

GOOGLE, INC.,

DEFENDANT-APPELLEE.

On Appeal From The United States District Court
For The Southern District of New York (New York City)

## BRIEF OF AMICI CURIAE
## ELECTRONIC FRONTIER FOUNDATION, PUBLIC KNOWLEDGE,
## AND THE CENTER FOR DEMOCRACY & TECHNOLOGY
## IN SUPPORT OF APPELLEE AND AFFIRMANCE

Corynne McSherry
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

July 10, 2014

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
Telephone: (202) 861-0020
ssiy@publicknowledge.org

(*For Continuation of Counsel Listings
See Inside Cover*)

David Sohn
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street NW #1100
Washington, DC 20006
Telephone: (202) 637-9800
dsohn@cdt.org                    *Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae Electronic Frontier Foundation, Public Knowledge, and the Center for Democracy & Technology state that none of them have a parent corporation and that no publicly held company owns 10% or more of the stock of any of them.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ....................................................................... iii

TABLE OF CONVENTIONS ....................................................................... v

STATEMENT OF INTEREST ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 2

I.   Uses That Do Not Add New Expression Can Be Transformative ........... 4

     A.   Appellants Incorrectly Argue That Transformative Use Requires
          New Creative Expression ................................................................ 4

     B.   The First Factor Is Not Limited to "Expressive" Purposes.............. 5

     C.   Other Courts Have Also Correctly Held that Searching and
          Indexing is a Transformative Use .................................................... 7

     D.   Leading Cases Also Dispose of the Issue Left Open in
          *HathiTrust* ................................................................................... 8

II.  Fair Use Is the Safety Valve For Innovation......................................... 10

     A.   Fair Use Helps Copyright Serve Its Purpose ................................. 12

     B.   Fair Use Flexibility Is Essential Now More than Ever .................. 15

     C.   A Methodology for Technological Fair Use ................................... 17

     D.   When In Doubt, Courts Should Interpret Fair Use Liberally, Not
          Narrowly ..................................................................................... 20

CONCLUSION ..................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*A.V. v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) .......................................................... 8, 16, 19

*Authors Guild v. Google,*
  954 F. Supp. 2d 282 (S.D.N.Y. 2012) ...................................................... 9, 10

*Authors Guild, Inc. v. HathiTrust,*
  2014 WL 2576342 (2d Cir. June 10, 2014) ........................................ *passim*

*Berlin v. E. C. Publications Inc.,*
  329 F.2d 541 (2d Cir. 1964) ...................................................................... 13

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006) ...................................................................... 6, 9

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006) ...................................................................... 13

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ................................................................................... 5, 15

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998) ...................................................................... 19

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) ........................................................ 7, 9, 10, 19

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ........................................................ 7, 16, 19

*Rosemont Enters., Inc. v. Random House, Inc.,*
  366 F.2d 303 (2d Cir. 1966) ...................................................................... 13

*Sega Enters. Ltd. v. Accolade, Inc.,*
  977 F.2d 1510 (9th Cir. 1992) .................................................................. 16

*Sony Computer Entm't, Inc. v. Connectix Corp.,*
  203 F.3d 596 (9th Cir. 2000) .................................................................... 16

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................... 14, 15, 20

*Stewart v. Abend*,
  495 U.S. 207  (1990) .................................................................. 15

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151 (1975) .................................................................. 12

*White v. West Pub. Corp.*,
  12 CIV. 1340 JSR, 2014 WL 3057885 (S.D.N.Y. July 3, 2014) ................. 6

## Federal Statutes

17 U.S.C. § 107 ............................................................................. 5, 6

## Legislative Materials

H.R. Rep. No. 94-1476 (1976) ...................................................... 14

## Constitutional Provisions

U.S. Const., art. I, § 8, cl. 8 ....................................................... 12, 13

## Other Authorities

Edward Lee, *Technological Fair Use*, 83 S. Cal. L. Rev. 797 (2010) ... 17, 18, 19

Mark Lemley, *Is the Sky Falling on the Content Industries?*, 9 J. Telecomm. &
  High Tech. L. (2011) ............................................................. 11

Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of Fair Use*,
  13 Cardozo Arts & Ent. L.J. 19 (1994)...................................... 14

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105
  (1990)............................................................................... 13

## TABLE OF CONVENTIONS

| | |
|---|---|
| Appellants or AG | Plaintiffs/Appellants The Authors Guild, Betty Miles, Jim Bouton, Joseph Goulden, individually and on behalf of all others similarly situated (collectively) |
| Google | Defendant/Appellee Google, Inc. |
| AG Br. | Appellants' Opening Brief, dated April 7, 2014 |
| Google Br. | Google's Brief, dated July 3, 2014 |
| Baumgarten Br. | Amicus Brief of Jon Baumgarten, et al., dated April 14, 2014 |
| Photographic Artists Br. | Amicus Brief of American Photographic Artists, et al., dated April 14, 2014 |
| MPAA Br. | Amicus Brief of Motion Picture Association of America ("MPAA"), dated April 14, 2014 |
| ASJA Br. | Amicus Brief of American Society of Journalists and Authors, dated April 14, 2014 |
| Copyright Alliance Br. | Amicus Brief of The Copyright Alliance, dated April 14, 2014 |
| *HathiTrust* | *Authors Guild, Inc. v. HathiTrust*, 2014 WL 2576342 (2d Cir. June 10, 2014) |

# STATEMENT OF INTEREST[1]

*Amici curiae* submit this brief pursuant to Fed. R. App. P. 29.  All parties have consented to the filing of this brief.

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization that has worked for over 20 years to protect consumer interests, innovation, and free expression in the digital world.  EFF and its over 27,000 dues-paying members have a strong interest in assisting the courts and policymakers to help ensure that copyright law serves the interests of creators, innovators, and the general public.

Public Knowledge ("PK") is a non-profit public interest organization that defends citizens' rights in the emerging digital culture.  Public Knowledge promotes balanced intellectual property policies that ensure that the public can access knowledge while protecting the legitimate interests of authors.

The Center for Democracy & Technology ("CDT") is a nonprofit public interest group that seeks to promote free expression, privacy, individual liberty, and technological innovation on the open, decentralized Internet.  CDT

---

[1] No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.  Web sites cited in this brief were last visited on July 8, 2014.

advocates balanced copyright policies that provide appropriate protections to creators without curtailing the unique ability of the Internet and digital media to empower users, speakers, and innovators.  Fair use plays a critical role in achieving that balance.

## INTRODUCTION AND SUMMARY OF ARGUMENT

One of Appellants' amici correctly observed:  "Fair use is an integral part of U.S. copyright law.  It is a doctrine that provides 'breathing room' to copyright law, recognizing that copyright law, in some cases when strictly construed, does not serve its own objectives – to incentivize creation and dissemination of works of authorship."  Photographic Artists Br. at 3.

Having recognized that crucial role, Appellants and their amici nonetheless ask this Court to rewrite the doctrine and create a default presumption against the very uses that most need that "breathing room" today: those made in the development and operation of new technologies. Such technologies often must reproduce copyrighted works as a matter of course but are directed toward a purpose that is entirely new and distinct.  Appellants and their amici insist that such uses, no matter how publicly beneficial, are not "transformative" if they do not add new creative expression.

Fortunately for innovators and users, that narrow view is not supported by the law.  Consistent with its core purpose, Section 107 itself calls out examples

2

of fair uses that may not add new creative expression. And in this Circuit –
most notably this Court's recent decision in *Authors Guild, Inc. v. HathiTrust*,
2014 WL 2576342 (2d Cir. June 10, 2014) ("*HathiTrust*") – and elsewhere,
courts have recognized that technologies that use copyrighted works for non-
expressive purposes can qualify as transformative, even where those
technologies have much less public benefit than the one at issue here. This
Court should decline Appellants' request to repudiate its own recent reasoning
in *HathiTrust* and split with the sound reasoning of its sister Circuits.

Certain of Appellants' amici further complain that allowing fair use in this
case will expand the doctrine too far. Not so. While the doctrine may shelter an
expanding number of *kinds* of technologies, applying traditional fair use
principles to new technologies does not alter those principles. To the contrary,
fair use is serving its core purpose of creating a safety valve for innovation and
creativity. The fact that the safety valve seems more necessary than ever is
merely a natural after-effect of technological development. Simply put, in the
21st century technological innovation often depends on copying and reverse
engineering copyrighted works, in myriad ways and at scale. If that copying –
most of which is entirely invisible to the public – infringes copyright, then huge
swaths of innovation must come to a halt, to the public's detriment and with
little benefit to authors. Yet it is precisely the road on which amici's theories

would put us.  We urge the Court to choose instead to stay on the sensible path it laid out in *HathiTrust*.

## I.    UsES THAT DO NOT ADD NEW EXPRESSION CAN BE TRANSFORMATIVE

### A.    Appellants Incorrectly Argue That Transformative Use Requires New Creative Expression

Appellants and their amici argue that to qualify as "transformative," a proposed fair use must add new creative expression.  Appellants claim that "merely articulating a new 'purpose' for a use of a copyrighted work, without changing or adding anything new, is not enough to render the work transformative."  AG Br. at 31.  One of Appellants' amici argues that fair use should be denied to "new uses that exploited the prior work(s) without creating a new work" – no matter what purpose the new use serves.  Baumgarten Br. at 9.  Other amici would allow fair use only to works that add "new creative expression," add "new expression, meaning or message" to the existing work (Photographic Artists Br. at 7, 9), or are themselves "a new expressive work" (MPAA Br. at 5).

In particular, amici would forbid a finding of transformative fair use if the use adds "new functionality to an existing work without adding new expression" (Photographic Artists Br. at 9), or involves new technologies generally (ASJA Br. at 24-28).

4

**B.    The First Factor Is Not Limited to "Expressive" Purposes**

Appellants and their amici are wrong.  While fair use often protects new expressive uses – such as the parody at issue in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) – there is nothing in the statute or the case law that requires courts to place a thumb on the fair use scale where the secondary use is non-expressive.

That is one reason that this Court itself recently found that "the creation of a full-text searchable database is a quintessentially transformative use." *HathiTrust* at *7.  The Court stated:

> A use is transformative if it does something more than repackage or republish the original copyrighted work.  The inquiry is whether the work "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . ." *Campbell*, 510 U.S. at 579, 114 S. Ct. 1164 (citing Leval, 103 Harv. L. Rev. at 1111). . . . Added value or utility is not the test: a transformative work is one that serves a new and different function from the original work and is not a substitute for it.

*Id*. at *6.  This test does not require *any* added expressive content.

And rightly so.  Indeed, the statute itself identifies a number of non-exclusive examples of fair use that apply directly in this case, yet do not necessarily add new expression, including "teaching," "scholarship," and "research."  17 U.S.C. § 107.  These are new and different functions that do not substitute for the original work.  In fact, giving the terms used in the statute their

plain meaning (under the standard principles of statutory construction), Google Books falls within the express language of § 107 because its primary uses include teaching, scholarship, and research.

Moreover, well before *HathiTrust*, this Court recognized that use of a work for an entirely different purpose can be transformative – even if that use does not transform the expression of the underlying work. For example, in *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 609-11 (2d Cir. 2006), the Court affirmed the district court's conclusion that the use of unaltered copyrighted concert posters in their entirety "to document and represent the actual occurrence" of the concerts in a biography was a fair use because it served a different purpose from the original use's "purposes of artistic expression and promotion." The Court recognized that defendant actually "*minimized the expressive value of the reproduced images* by combining them with a prominent timeline, textual material, and original graphical artwork." *Id*. at 611 (emphasis added). Because the defendant used versions of the posters that were greatly reduced in size, they did not substitute for the original works. *Id*. at 613. *See also HathiTrust* at *7 (citing other Second Circuit cases); *White v. West Pub. Corp.*, 12 CIV. 1340 JSR, 2014 WL 3057885 (S.D.N.Y. July 3, 2014) (finding a fair use where the defendants uploaded legal briefs into the Westlaw and Lexis databases, to create an interactive legal research tool).

### C.    Other Courts Have Also Correctly Held that Searching and Indexing is a Transformative Use

Applying similar tests, several other appellate courts have also found that using works for the specific technological purpose of indexing and search are transformative, even where they display parts of the original works.  In *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit held that Google's indexing and searching of images was "highly transformative" because it was using the images "in a new context to serve a different purpose."  *Id*. at 1165.  The court reasoned that the "search engine transforms the image into a pointer directing a user to a source of information" that "provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool."  *Id*.

In an earlier case, *Kelly v. Arriba Soft Corp*., 336 F.3d 811 (9th Cir. 2003), the Ninth Circuit similarly determined that the use of exact replica thumbnails for image searching served a different function than the original images, and therefore qualified as transformative, even though the new use was not expressive.  The court found that even making an exact copy of a work may be transformative so long as the copy served a different function than the original work.  *Id*. at 818-19.  The court recognized that the accused search engine "functions as a tool to help index and improve access to images on the internet and their related websites."  *Id*. at 818.

7

Finally, in *A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), the accused product was a new online technology system designed to "evaluate[ ] the originality of written works in order to prevent plagiarism" by comparing the students' written works against, *inter alia*, previous student papers. Copies of the student works were archived in a database to be used to evaluate the originality of other students' works in the future. *Id*. at 634. The Fourth Circuit found that the defendant's use was transformative even though the "archiving process does not *add* anything to the work," but "merely stores the work unaltered and in its entirety." *Id*. at 639 (emphasis in original). The court reasoned that:

> The use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose . . .

*Id.* (citation omitted).

The overwhelming weight of case law in this and other circuits weighs firmly in favor of the sensible conclusion that a use is transformative if it serves a new and different purpose.

### D. Leading Cases Also Dispose of the Issue Left Open in *HathiTrust*

This case varies somewhat from *HathiTrust* because the libraries' search engines in *HathiTrust* did not display "snippets" of the books in response to a

8

search query.  However, Google Books' display of "snippets" adds to, and does not detract from, the transformative nature of the search engine.  As the district court explained, the snippets are similar to the thumbnail images in *Kelly* and in *Bill Graham Archives*.  *Authors Guild v. Google,* 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2012).  Regarding non-substitutive works, *Kelly* reasoned:

> The thumbnails would not be a substitute for the full-sized images because the thumbnails lose their clarity when enlarged.  If a user wanted to view or download a quality image, he or she would have to visit Kelly's web site.

*Kelly*, 336 F.3d at 821 (footnote omitted).

Like *Kelly's* poor quality images and *Bill Graham Archives'* reduced size concert posters, the snippets at issue here are no substitute for the original books themselves.  One may search Amazon.com, Barnes & Noble, or any other bookseller in vain to find "snippets" of books offered for sale as a substitute for the original books.  A standard Google Books search only generates three snippets from a book, which is hardly a substitute.  *Authors Guild v. Google*, 954 F. Supp. 2d at 286-87; Google Br. at 9-10.  To obtain a usable copy of a book, one would have to buy or borrow the original book.

To get more than three snippets, in theory one could run multiple searches using a copy of the original book as a guide, but even then large parts of the book would still be missing from the snippets.  954 F. Supp. 2d at 287; Google Br. at 11.  According to the district court, the best an "attacker" could obtain

with multiple searches would be a "patchwork" of a book – not the entire book. 954 F. Supp. 2d at 287.

Appellants claim that the snippets make "78% of each work" available for display. AG Br. at 11. As in *Kelly*, it's "extremely unlikely" that such an attempt at reconstruction would ever happen, if not outright impossible. *Kelly*, 336 F.3d at 821 n.37; Google Br. at 41. To amicis' understanding, no one – not even Appellants' counsel or experts, doing the exercise as a litigation construct – has *ever* actually performed such multiple searches to successfully obtain 78% of *any* book. *See generally* Google Br. at 41-42.

Even if this ever were to happen, it is far-fetched to say that obtaining 78% of a book is a substitute for the whole book. Under Appellants' reasoning, a car with three wheels (75% of four wheels) might be treated as a substitute for an entire car. But of course, a car missing a front wheel or a rear wheel would either be immobile or would spin around in circles. Either way, it wouldn't substitute for a car that works.

## II.    FAIR USE IS THE SAFETY VALVE FOR INNOVATION

This case is just one of many where copyright owners seek to use the copyright laws to shut down new technologies. *See* Mark Lemley, *Is the Sky*

*Falling on the Content Industries?*, 9 J. Telecomm. & High Tech. L. 125 (2011)[2] (noting how the content industries have historically tried to use copyright law to block new technologies). Several of Appellants' amici ask the Court to limit the fair use doctrine drastically, especially in cases involving new technologies such as mass digitization. *See, e.g.*, Copyright Alliance Br. at 5, 6, 11; Baumgarten Br. at 26-30; Photographic Artists Br. at 3-4.

The cramped interpretation of fair use that Appellants and their amici offer has come up with increasing frequency in recent years, in large part because technological innovation increasingly depends on and facilitates the use of copyrighted works. In this context, and despite historical experience showing that new technologies often benefit copyright owners and the public alike, some copyright owners argue that protecting such innovation perverts fair use principles.

It is time to put that argument to rest. Copyright was always intended to protect and indeed foster innovation, and a robust fair use doctrine is one of the key means by which it accomplishes that purpose. Fair use operates precisely as it is supposed to in cases such as this one – where a new technology (1) is highly transformative, (2) does not substitute for the original works, (3) if anything causes far more market good than harm for the copyright owners (by letting

---

[2] *Available at*: http://www.jthtl.org/content/articles/V9I1/JTHTLv9i1_Lemley.PDF

users search and find books they will then purchase), and (4) serves the public interest.

## A.    Fair Use Helps Copyright Serve Its Purpose

The Progress Clause of the Constitution empowers Congress "[t]o promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . .Writings." U.S. CONST., art. I, § 8, cl. 8. The Supreme Court has explained the limits on these rights:

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good. 'The sole interest of the United States and the primary object in conferring the monopoly,' this Court has said, "lie in the general benefits derived by the public from the labors of authors." When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) (footnotes and citations omitted).

This Court, among others, has stressed that copyright must serve the public interest:

> [T]he law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward . . . .

> The monopoly created by copyright thus rewards the individual
> author in order to benefit the public."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting Leval, *Toward a*

*Fair Use Standard*, 103 Harv. L. Rev. at 1108) (ellipsis in original). Thus,

"courts in passing upon particular claims of infringement must occasionally

subordinate the copyright holder's interest in a maximum financial return to the

greater public interest in the development of art, science and industry."

*Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir. 1966)

(quoting *Berlin v. E. C. Publications Inc*., 329 F.2d 541, 544 (2d Cir. 1964)).

Part of that service is support for innovation. Indeed, it is no coincidence

that the Constitutional basis for copyright protection lies in the same section that

protects patentable inventions. U.S. Const., art. I, § 8, cl. 8. In his seminal

article, Judge Leval noted the interplay between the two aspects of the clause:

> First is its express statement of purpose: "To promote the Progress
> of Science and useful Arts . . . ." By lumping together authors and
> inventors, writings and discoveries, the text suggests the rough
> equivalence of those two activities. *In the framers' view, authors*
> *possessed no better claim than inventors.* The clause also clearly
> implies that the "exclusive right" of authors and inventors "to their
> respective Writings and Discoveries" exists only by virtue of
> statutory enactment. Finally, that the right may be conferred only
> "for limited times" confirms that it was not seen as an absolute or
> moral right, inherent in natural law.

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1108

(1990) (emphasis added). Congress could have chosen to separate protections

13

for patents and copyrights, tying them to distinct purposes.  Instead, the special

and limited rights granted to authors, like the rights granted to inventors, were

conceived and designed to serve the public interest in innovation of all stripes.

Fair use is essential to that purpose.  As Judge Leval also observed:

That familiar goal [of fair use] is to bring intellectual enrichment to
the public by giving authors a *limited* control over their writings to
provide them with financial incentive to create.  The control is
*limited* because of the recognition that a stranglehold would be
counterproductive.  . . . An author's exclusive control must not be
so stringent as to prevent those who come after from using the prior
work for further advancement.

Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of Fair Use*,

13 Cardozo Arts & Ent. L.J. 19, 22 (1994) (emphasis in original and bracketed

material added).[3]

As the Supreme Court has also noted, fair use was designed to adapt to

technological change.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*,

464 U.S. 417, 448 n. 31 (1984) (quoting H.R. Rep. No. 94-1476, at 65-66

(1976))  (noting that Congress rejected "a rigid, bright line approach" to fair use

and that such flexibility was key to the continuing achievement of copyright's

aims "during a period of rapid technological change.").  Indeed, the

impossibility of anticipating every new technology is precisely why Congress

and the courts have established a flexible fair use doctrine. *Id*.  Rather than

_____

[3] *Available at*:
http://www.cardozoaelj.com/wp-content/uploads/2013/02/Leval.pdf

14

create a list of specific exceptions, Congress codified fair use as an "equitable rule of reason" which is to be applied in light of the overall purposes of the statute. *Id.* This ensures that a "rigid application of the copyright statute" does not "stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

### B.     Fair Use Flexibility Is Essential Now More than Ever

Neither the Supreme Court in *Sony*, nor Judge Leval, writing a decade later, could have foreseen how new technologies might make use of copyrighted works, in non-substitutive ways. The Google Books project was made possible only recently by advances in computer scanning, indexing, data storage, and optical character recognition (OCR) technologies. The drafters of the Copyright Act of 1976 could not have anticipated these new technologies when they codified fair use in the Act. Neither did they anticipate that every day, technology companies and inventors working out of their garages would be making intermediate copies as they test and develop innovative tools and platforms for expression and commerce.

Unfortunately, such copying and storage often gives rise to reproduction and distribution claims by copyright owners. Fair use is a crucial defense against such claims and its operation has helped protect both add-on innovation and new creative expression. *See, e.g., Sega Enters. Ltd. v. Accolade, Inc.,* 977

15

F.2d 1510, 1523 (9th Cir. 1992) (finding fair use even though defendant "may gain commercially," and noting that defendant's use of the copyrighted works "has led to an increase in the number of independently designed video game[s] . . . It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote."); *Sony Computer Entm't, Inc. v. Connectix Corp*., 203 F.3d 596, 602-606 (9th Cir. 2000) (defendant's "intermediate copying and use of [plaintiff's] copyrighted BIOS" firmware was a fair use in part because defendant's product "creates a new platform, the personal computer, on which consumers can play games designed for [plaintiff's product].").

For example, in *iParadigms*, the copying and archiving of student papers "was completely unrelated to expressive content and was instead aimed at detecting and discouraging plagiarism." 562 F.3d at 638-40. This technology was accordingly transformative because it served a different purpose. The court recognized that the defendants' use of the works for the transformative purpose of detecting and preventing plagiarism would not be possible without copying and storing those works.

Similarly, *Perfect 10* determined that automatic local "caching" (*i.e.*, saving a copy) by internet browsers of full-size original images was a

16

transformative fair use:

> The copying function performed automatically by a user's computer to assist in accessing the Internet is a transformative use. Moreover, as noted by the district court, a cache copies no more than is necessary to assist the user in Internet use. It is designed to enhance an individual's computer use, not to supersede the copyright holders' exploitation of their works. Such automatic background copying has no more than a minimal effect on Perfect 10's rights, but a considerable public benefit.

508 F.3d at 1169-70. The Ninth Circuit recognized that such antecedent copying was necessary to allow the users to efficiently access the Internet – a publicly beneficial technological use that outweighs any potential harm such copying might have on the authors' rights.

### C.    A Methodology for Technological Fair Use

The Court might take some guidance from a recent law review article analyzing technological fair use. Edward Lee, *Technological Fair Use*, 83 S. Cal. L. Rev. 797 (2010) ("Lee").[4] When presented with such a potential use, Professor Lee suggests that a "court should first examine whether the use of a copyrighted work is for *a new or value-adding purpose of creating, operating, or providing an output of a speech technology or application*." *Id*. at 836 (emphasis in original). (By "speech technology," Lee means "any technology that functions in creating, displaying, or disseminating speech," *id*. at 798 n.1).

---

[4] *Available at:*
http://www.law.usc.edu/assets/docs/contribute/SCalRev83_4Lee.pdf.

This is similar to the first part of *HathiTrust's* test. Next, Lee says that a court should ask whether one can reasonably perceive a potential public benefit from the technology in question. *Id*. at 837. Then, Lee proposes that the court "ask whether the use of the copyrighted work *supersedes* the purposes of the original work." *Id*. at 841 (emphasis in original). This is also part of the *HathiTrust* test – whether the new use is a substitute for the original.

Finally, and most helpfully, Lee asks: "In analyzing superseding use in a technological fair use case, one of the key determinations is to identify the *stage(s) of the technology's development* during which the claimed fair use is made – (1) creation, (2) operation, or (3) output." *Id*. at 842 (emphasis in original). Lee proposes a spectrum for these categories, where greater leeway is given for creational uses and less for output uses:



TABLE 2. Creation-Operation-Output Spectrum

*Id*. Creational uses are those used to create the technology; operational uses occur in the course of operating the technology after it has been created; and output uses distribute, display, or perform the original work to the public. *Id*. at 842-44.

Lee applies his analytical spectrum to many of the precedents cited in this case. For example, search engine cases such as *Perfect 10*, *Kelly*, and *iParadigms* are primarily creational, and are fair use. *Id*. at 845. By contrast, some of Appellants' amici cite file sharing cases where the entire output of the technology is shared with the user, *see, e.g.*, MPAA Br. at 9, ASJA Br. at 24-27. But as Lee points out, the "output uses" in those cases were not fair uses because the technology shared the entire original works with the public, often verbatim. Lee at 847.

Under Lee's analysis, Google Books is primarily creational, and thus fair use. Unlike the file sharing cases cited by Appellants' amici, or *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), upon which Appellants rely heavily, Google Books does not output the entire original work to the public – rather, only the non-substitutive snippets discussed above. Google Books uses the entire work only as a necessary part of the process to create the search index. Google copies the libraries' books in digitized form, stores the copies to create the index, and returns digital copies to the libraries. This use of works as part of the *creation* of a valuable new technology is fair use.[5]

---

[5] Lee applies his analysis to this case, and largely agrees. Lee at 860-65. Lee does, however, fail to recognize that the libraries' archival copies are part of the creational process, so instead he merely says that they fall outside of his technological fair use framework. *Id*. at 862. But such copies are part of the creational process – the libraries use the copies to create their own search tools –

19

**D.    When In Doubt, Courts Should Interpret Fair Use Liberally, Not Narrowly**

There is no doubt in this case that Google Books is a transformative fair use.  But even if there were any doubt, the Supreme Court has cautioned that the courts should err, if at all, on the side of limiting copyright protection rather than extending it – the exact opposite of what Appellants' amici argue here.

In *Sony*, the Court observed that where "Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." *Sony*, 464 U.S. at 431.  Thus, the Court held that time-shifting was fair use, and left it to Congress to decide otherwise: "It may well be that Congress will take a fresh look at this new technology, just as it so often has examined other innovations in the past.  But it is not our job to apply laws that have not yet been written."  *Id*. at 456.  The same calculus should apply to any new technology.

---

so such copies still qualify as fair use.  *See* Google Br. at 53-56 (explaining why the library copies are fair use).

# CONCLUSION

The Court should affirm the district court's judgment that Google Books is a transformative fair use.

Dated: July 10, 2014

By:  /s/ Corynne McSherry

Corynne McSherry
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
Telephone:  (202) 861-0020
ssiy@publicknowledge.org

David Sohn
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street NW #1100
Washington, DC 20006
Telephone: (202) 637-9800
dsohn@cdt.org

*Attorneys for Amici Curiae*
*Electronic Frontier Foundation,*
*Public Knowledge and The Center for*
*Democracy & Technology*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amici Curiae Electronic Frontier , Public Knowledge and The Center for Democracy and Technology In Support Of Appellees And Affirmance complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,752 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: July 10, 2014

By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of July, 2014, a true and correct copy of the foregoing Brief of Amici Curiae Electronic Frontier Foundation, Public Knowledge and The Center for Democracy and Technology In Support Of Appellee And Affirmance was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: July 10, 2014

By: __/s/ Corynne McSherry__

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Attorneys for Amici Curiae*
*Electronic Frontier Foundation, Public*
*Knowledge and The Center for*
*Democracy & Technology*