# 13-4829-CV

# United States Court of Appeals
*for the*
# Second Circuit

THE AUTHORS GUILD, BETTY MILES, JIM BOUTON, JOSEPH GOULDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

HERBERT MITGANG, DANIEL HOFFMAN, individually and on behalf of all others similarly situated, PAUL DICKSON, THE MCGRAW-HILL COMPANIES, INC., PEARSON EDUCATION, INC., SIMON & SCHUSTER, INC., ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANADIAN STANDARD ASSOCIATION, JOHN WILEY & SONS, INC., individually and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

GOOGLE, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* LAW PROFESSORS & SCHOLARS IN SUPPORT OF APPELLEE

MEREDITH JACOB
PROGRAM ON INFORMATION JUSTICE
  AND INTELLECTUAL PROPERTY
AMERICAN UNIVERSITY
WASHINGTON COLLEGE OF LAW
*Attorney for Amicus Curiae*
  *Law Professors & Scholars*
4801 Massachusetts Avenue, NW
Washington, DC 20016
(202) 274-4253

*On the Brief:*
  MICHAEL W. CARROLL
  BRANDON BUTLER

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST ............................................................. 1

SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT ...................................................................................... 3

I.    THERE IS NO INTERNATIONAL LAW ISSUE IN THIS CASE AND THE *CHARMING BETSY* CANON OF CONSTRUCTION IS INAPPOSITE TO THIS COURT'S INTERPRETATION AND APPLICATION OF SECTION 107 ...................................................................................... 3

    A.    The international obligations cited by IPA et al. apply to decisions by Congress to enact legislation and not to judicial decisions in individual cases ........................................... 3

    B.    The treaty provisions invoked by IPA et al. do not apply to this Court's application of the fair use doctrine and therefore the *Charming Betsy* doctrine of statutory interpretation is inapposite ....................................................... 11

II.    THE DISTRICT COURT'S INTERPRETATION OF THE SCOPE OF TRANSFORMATIVE USE UNDER THE FIRST FAIR USE FACTOR REFLECTS THE MAINSTREAM JUDICIAL INTERPRETATION OF SECTION 107 ................................................................................ 13

    A.    Use of works for a new purpose is properly characterized as transformative use .......................................... 14

    B.    Transformative use is not categorically limited to uses that result in new works of authorship ..................................... 18

    C.    Transformative use is not categorically limited by the amount of a work that is used or by the number of works used ................................................................................. 20

    D.    Transformative uses are favored even when made in a commercial context ................................................................. 22

CONCLUSION .................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ...................................................................16, 24

*American Broadcasting Cos., Inc. v. Aereo, Inc.*,
  No. 13-461, 2014 WL 2864485 (U.S. June 25, 2014) .....................12, 13, 14

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) .....................................................................20, 24

*Authors Guild, Inc. v. HathiTrust*,
  No. 12-4547-CV, 2014 WL 2576342 (2d Cir. June 10, 2014) .............*passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ...................................................................16, 20

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...................................................................................*passim*

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ..........................................................................20

*Castle Rock Entm't, Inc. v. Carol Publ'g Group*,
  150 F.3d 132 (2d Cir. 1998) ..........................................................................18

*Field v. Google, Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ...........................................................22

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ...................................................................16, 22

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351 (2013)...................................................................................12

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
  964 F.2d 965 (9th Cir. 1992) ........................................................................22

*Murray v. Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) ..........................................................................2

*New York Times Co. v. Roxbury Data Interface, Inc.*,
  434 F. Supp. 217 (D. N.J. 1977)....................................................................24

*Nunez v. Caribbean Int'l News Corp.*,
  235 F.3d 18 (1st Cir. 2000).............................................................................21

*Online Policy Group v. Diebold, Inc.*,
  337 F. Supp. 2d 1195 (N.D. Cal. 2004).........................................................15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...........................................................16, 22, 24

*Quality King Distributors, Inc. v. L'Anza Research Int'l, Inc.*,
  523 U.S. 135 (1998).........................................................................................12

*Rosemont Enters., Inc. v. Random House, Inc.*,
  366 F.2d 303 (2d Cir. 1966) ...........................................................................23

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ........................................................................22

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ........................................................................21

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ..........................................................................22

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984).................................................................................18, 21

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  No. 12-2412, 2014 WL 2219162 (2d Cir. May 30, 2014) ...................*passim*

*Time, Inc. v. Bernard Geis Assocs.*,
  293 F. Supp. 130 (S.D.N.Y. 1968) ................................................................18

*United States v. Weingarten*,
  632 F.3d 60 (2d Cir. 2011) .............................................................................11

*Warren Publ'g Co. v. Spurlock*,
  645 F. Supp. 2d 402 (E.D. Pa. 2009)............................................................21

*Williams & Wilkins Co. v. United States*,
  487 F.2d 1345 (Ct. Cl. 1973), *aff'd by an equally divided Court*,
  420 U.S. 376 (1975).......................................................................................18

**Statutes & Other Authorities:**

17 U.S.C. § 107 ................................................................................*passim*

17 U.S.C. § 110(5)(B) .........................................................................8

Copyright Act, Ch. 63, § 35 (2006) (Sing.) ...........................................10

Copyright Act, § 19, 5768-2007, 2007 LSI 34 (2007) (Isr.) ....................9

Intellectual Property Code, § 185, Rep. Act No. 8293 (Jan. 1, 1998) (Phil.)..........10

1 M.B. Nimmer & D. Nimmer, Nimmer On Copyright § 1.12[A] (2013)...............5

Ariel Katz, *Fair Use 2.0: The Rebirth of Fair Dealing in Canada, in* The Copyright Pentalogy: How the Supreme Court of Canada Shook the Foundations of Canadian Copyright Law  (Michael Geist ed., 2013) ..........10

Australian Law Reform Commission, Copyright and the Digital Economy...........10

Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978–2005*, 156 U. Pa. L. Rev. 549 (2008)...................................................23

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568 § 2(1)............................................................................................5

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised at Paris July 24, 1971, as amended, Sept. 28, 1979, 828 U.N.T.S. 221.............................................................*passim*

Christophe Geiger, Daniel Gervais & Martin Sentfleben, *The Three-Step Test Revisited: How to Use the Test's Flexibility in National Copyright Law*, 29 Am. U. Int'l L. Rev. 581 (2014)...................................5, 6

Declaration: A Balanced Interpretation of the Three-Step Test in Copyright Law ...............................................................................12

Fred von Lohmann, *Fair Use as Innovation Policy*, 23 Berkeley Tech. L.J. 1 (2008)............................................................................................21

Glynn S. Lunney, Jr., *Fair Use and Market Failure: Sony Revisited*, 82 B.U. L. Rev. 975 (2002) ..........................................................21

Ian Hargreaves and Bernt Hugenholtz, *Copyright Reform for Growth and Jobs: Modernising the European Copyright Framework* 13 Lisbon Council Pol'y Brief 1 (2013) ........................................................10

Ian Hargreaves, Digital Opportunity – A Review of Intellectual Property and Growth  (2011) ......................................................................................10

James L. Quarles III & Richard A. Crudo, *[Way]back to the Future*, 6 Landslide 16 (Jan/Feb 2014) ....................................................................22

Jay (Young-June) Yang & Chang-Hwan Shin, *Korea, in* International Copyright Law and Practice  (Paul E. Geller & Lionel Bentley, eds., 2013) ............................................................................................................10

John H. Jackson, The World Trade Organization: Constitution and Jurisprudence (1998) ....................................................................................8

Matthew Sag, *Copyright and Copy-Reliant Technology*, 103 Nw. U. L. Rev. 1607 (2009) ...............................................................................19, 22

Matthew Sag, *Predicting Fair Use*, 73 Ohio St. L.J. 47 (2012)............................23

Message from the President of the United States Transmitting the Uruguay Round Trade Agreements, Texts of Agreements Implementing Bill, Statement of Administrative Action and Required Supporting Statements, House  Doc. NO. 103-316, Vol. 1, 103d Cong., 2d Sess. (Sept. 27, 1994)...........................................................................................9

Michael D. Birnhack, Neil J. Wilkof & Joshua Weisman, *Israel, in* International Copyright Law and Practice  (Paul E. Geller & Lionel Bentley, eds., 2013) ................................................................................9

Michael J. Madison, *A Pattern-Oriented Approach to Fair Use*, 45 Wm. & Mary L. Rev. 1525 (2004) ...............................................................19, 21

Neil Weinstock Netanel, *Making Sense of Fair Use*, 15 Lewis & Clark L. Rev. 715 (2011) .........................................................................*passim*

Pamela Samuelson, *Unbundling Fair Uses*, 77 Fordham L. Rev. 2537 (2009) ..............................................................................................19, 21, 22

Panel Report, *United States-Section* 110(5) *of the U.S. Copyright Act*, WT/DS160/R (June 15, 2000)...........................................................8, 11, 12

Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of Fair Use*, 13 Cardozo Arts & Ent. L. J. 19 (1994) ................................................17

Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105 (1990)...........................................................................................14, 17, 23

R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31
    Colum. J.L. & Arts 101 (2008)...................................................19

Request for Consultations by the European Communities and their
    Member States, *United States – Section 110(5) of the US Copyright
    Act,* WT/DS160/1 IP/D/16 (Feb. 4, 1999).......................................8

Sam Ricketson, The Berne Convention for the Protection of Literary and
    Artistic Works: 1886-1986 (1987) ................................................6

Silke von Lewinski, International Copyright Law and Policy (2008).....................5

Vienna Convention on the Law of Treaties, § 3, art. 31(1), May 23, 1966,
    1155 U.N.T.S. 331 ................................................................7

WIPO Copyright Treaty and Agreed Statements Concerning the WIPO
    Copyright Treaty, Dec. 20, 1996, 2186 U.N.T.S. 152 ..........................*passim*

World Trade Organization Agreement on Trade-Related Aspects of
    Intellectual Property, Apr. 15, 1994, 1869 U.N.T.S. 299......................*passim*

## STATEMENT OF INTEREST

*Amici curiae* are law professors and scholars who teach, research, and write about U.S. or international copyright law.  Our interest is in clarifying the intended interpretation of international copyright law and preventing canons of statutory interpretation from being inappropriately employed by private litigants in cases, such as this one, where international law is not directly applicable, and in clarifying the scope of "transformative use" under the first factor of 17 U.S.C. § 107.[1]

## SUMMARY OF THE ARGUMENT

This Court should not be swayed by two groups of *amici curiae* supporting the Authors Guild who make unsupported claims about international law and about fair use precedent to constrain this Court's interpretive discretion in applying the fair use doctrine. The argument by *amici curiae* International Publishers Association et al. ("IPA et al.") that provisions of three international treaties constrain this Court's decision-making in this case is legally erroneous. The treaty

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution to the preparation or submission of this brief. Google, Inc. has given the American University Washington College of Law a corporate gift to support international travel and related work on projects administered by the law school's Program on Information Justice and Intellectual Property, but none of those funds were used to support the preparation or submission of this brief. Both parties have given consent to the filing of this brief.

provisions they cite apply to the decisions of Congress to enact new limitations or exceptions to the exclusive rights under copyright and not to this Court's application of one such limitation – fair use – to the facts of this case. Consequently, there is no international law issue presented by this case, and the canon of statutory interpretation from *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804), which states a preference for interpretations of federal statutes that are consistent with international law, is simply inapposite.

The Court should similarly reject the claims of IPA et al. and *amici curiae* Jon Baumgarten et al. ("Baumgarten et al.") that purport to find a range of categorical limits on fair use analysis fashioned from a selective and limited review of the precedents. Neither this Court in *Authors Guild, Inc. v. HathiTrust,* No. 12-4547-CV, 2014 WL 2576342 (2d Cir. June 10, 2014) nor its sister circuits have misinterpreted the scope of transformative use as explained by *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). Contrary to the claims of Baumgarten et al., transformative uses are not limited to uses that result in new works of authorship or have expressive elements; uses of entire works are not presumptively unfair; and transformative uses in a commercial context are not presumptively disfavored.

## ARGUMENT

I. **THERE IS NO INTERNATIONAL LAW ISSUE IN THIS CASE AND THE *CHARMING BETSY* CANON OF CONSTRUCTION IS INAPPOSITE TO THIS COURT'S INTERPRETATION AND APPLICATION OF SECTION 107**

Seeking to constrain this Court's interpretive discretion, IPA et al. fundamentally misstate the relationship between the United States' international legal obligations and the role of federal courts in applying the fair use doctrine under Section 107. There is no international law issue presented in this case. The so called "three-step test" treaty provisions cited by IPA et al. apply to legislative decisions made by Congress. This Court should decline IPA et al.'s invitation to commit legal error by applying a "test" applicable to national legislation to the facts of this case.

### A. The international obligations cited by IPA et al. apply to decisions by Congress to enact legislation and not to judicial decisions in individual cases

IPA et al. argue that provisions of three international treaties to which the United States is a party apply in this case: the Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised at Paris July 24, 1971, as amended, Sept. 28, 1979, 828 U.N.T.S. 221 [hereinafter Berne]; the World Trade Organization Agreement on Trade-Related Aspects of Intellectual Property, Apr. 15, 1994, 1869 U.N.T.S. 299 [hereinafter TRIPS]; and the WIPO Copyright

Treaty and Agreed Statements Concerning the WIPO Copyright Treaty, Dec. 20, 1996, 2186 U.N.T.S. 152 [hereinafter WCT]. Each international agreement defines certain minimum exclusive rights of authors and their assigns that treaty parties are required to confer on authors, counterbalanced by provisions that either directly limit or create exceptions to these rights or that provide authority for treaty parties to create such limitations and exceptions through national legislation.

For example, Berne requires Member States to provide authors with the "exclusive right of authorizing the reproduction of these works, in any manner or form." Art. 9(1). This right is then subject to limits required by the treaty and then additional limits that treaty parties may fashion subject to three criteria. Berne imposes a mandatory requirement that Member States permit uses of the work for the purposes of quotation. *See* art. 10(1) ("It shall be permissible to make quotations from a work which has already been lawfully made available to the public, provided that their making is compatible with fair practice, and their extent does not exceed that justified by the purpose, including quotations from newspaper articles and periodicals in the form of press summaries."). Member States also may create additional limitations and exceptions, as they are enabled by provisions such as Berne Article 9(2).

This is a general pattern. Each agreement contains one or more provisions that explicitly acknowledge that treaty parties may create additional limitations and

4

exceptions to the exclusive rights under copyright granted by national law. These provisions also state three criteria, sometimes called a "three-step test," directed to treaty parties' obligations with respect to the scope of *national legislation,* not to judicial interpretation of such legislation. *See* SILKE VON LEWINSKI, INTERNATIONAL COPYRIGHT LAW AND POLICY 160 (2008). Moreover, none of these agreements is self-executing, and the scope of the United States' obligations under each is defined by implementing legislation.[2]

The first of these provisions was introduced to Berne in 1967 to counterbalance a revision that expanded the scope of the reproduction right required by the treaty. *See* Christophe Geiger, Daniel Gervais & Martin Sentfleben, *The Three-Step Test Revisited: How to Use the Test's Flexibility in National Copyright Law*, 29 AM. U. INT'L L. REV. 581, 583-85 (2014). Under Berne, "[i]t shall be *a matter for legislation* in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author." Art. 9(2) (emphasis

---

[2] S*ee* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568 § 2(1) (declaring Berne Convention provisions "not self-executing"); *see also* 1 M.B. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 1.12[A] (2013).

added).[3] Contrary to IPA et al.'s argument, it is well understood that "the test as it emerged in 1967 was meant as a *guide to national legislators*. . . . The test is thus meant to judge the exception *as a rule*, not its application in a specific case to a given author, work, and user." Geiger et al., 29 AM. U. INT'L L. REV. at 586 (emphasis in original).

The flexibility inherent in Article 9(2) for Member States to identify uses that should be permitted without a license became a model for recognizing this flexibility in other international agreements. The TRIPS Agreement, which incorporates by reference nearly all of the obligations of Berne Article 9(1), also extends application of the three criteria to legislation creating exceptions or limitations to the remainder of the exclusive rights. Art. 13 ("Members shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the right holder."). This pattern was then repeated in the WCT Article 10, which introduced two related provisions concerning *national legislation*: one that applies to limitations and exceptions to

---

[3] In particular, Member States wanted to include Article 9(2) as a means of acknowledging that they retained the right to provide for statutory licensing or other legislative responses to limit this expanded reproduction right, particularly in the case of photocopying. *See* SAM RICKETSON, THE BERNE CONVENTION FOR THE PROTECTION OF LITERARY AND ARTISTIC WORKS: 1886-1986, 479-88 (1987) (discussing the proposal and negotiation of the reproduction right and Art. 9(2)).

the new rights introduced in the WCT,[4] and another to when treaty parties apply

Berne to their national legislation.[5]

    If there were any doubt about the role of these so called "three-step test"

provisions in recognizing the positive benefits of using legislation to create limits

on exclusive rights under copyright, these are erased by the Agreed Statement to

Article 10, which has the force of law:[6]

> **Agreed statement concerning Article 10:** It is understood
> that the provisions of Article 10 permit Contracting Parties to
> carry forward and appropriately extend into the digital
> environment limitations and exceptions in their *national laws*
> which have been considered acceptable under the Berne
> Convention. Similarly, these provisions should be understood

---

[4] "Contracting Parties may, in their *national legislation*, provide for limitations of or exceptions to the rights granted to authors of literary and artistic works under this Treaty in certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author." WCT, art. 10(1) (emphasis added).

[5] "Contracting Parties shall, when applying the Berne Convention, confine any limitations of or exceptions to rights provided for therein to certain special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author." WCT, art. 10(2). Although not stated explicitly in the text of Article 10(2), this provision also is directed toward national legislation because this is how Berne obligations are stated in Art. 10(1). Therefore to "apply" Berne means doing so through national legislation. *See* Vienna Convention on the Law of Treaties, § 3, art. 31(1), May 23, 1966, 1155 U.N.T.S. 331("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context . . . .").

[6] *See* Vienna Convention, § 3, art. 31(2) ("The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text . . . [a]ny agreement relating to the treaty which was made between all the parties in connexion (sic) with the conclusion of the treaty.").

> to permit Contracting Parties to devise new exceptions and
> limitations that are appropriate in the digital network
> environment.
>
> It is also understood that Article 10(2) neither reduces nor
> extends the scope of applicability of the limitations and
> exceptions permitted by the Berne Convention.[7]

In the context of United States law, these treaty provisions apply to the

United States' legislative decision to enact Sections 107-122 of the Copyright Act

to the extent that these provisions create exceptions or limitations to the exclusive

rights required by one or more of these treaties. For example, in the Section 110(5)

Report,[8] cited by IPA et al., a panel convened by the World Trade Organization's

Dispute Settlement Body determined that the United States violated the "three-

step" criteria in TRIPS Article 13 when Congress enacted an exception to the

exclusive right of public performance that exempts a substantial number of eating,

drinking and retail establishments from the need for a license to play music for

their patrons and customers.[9] As the treaty texts and the Section 110(5) Report

---

[7] WCT, Agreed Statements Concerning the WIPO Copyright Treaty, 2186
U.N.T.S. at 161, (*Concerning Article 10*) (emphasis added).
[8] Panel Report, *United States-Section 110(5) of the U.S. Copyright Act*, § 7.1, at 69,
WT/DS160/R (June 15, 2000), [hereinafter Section 110(5) Report].
[9] The dispute was prompted by enactment of the Fairness in Music Licensing Act
of 1998, 17 U.S.C. § 110(5)(B). *See* Request for Consultations by the European
Communities and their Member States, *United States – Section 110(5) of the US
Copyright Act,* WT/DS160/1 IP/D/16 (Feb. 4, 1999). The panel decision is binding
on the United States, but it is non-precedential as a matter of international law. *See*
JOHN H. JACKSON, THE WORLD TRADE ORGANIZATION: CONSTITUTION AND
JURISPRUDENCE 83 (1998).

make clear, if there were to be an international dispute about Section 107, it would have to be about whether Congress's enactment of this provision conforms to the United States' obligations to abide by the three treaty criteria applicable to national legislation that creates exceptions or limitations in copyright law.

But, this issue is not before this Court. Congress had no reason to amend Section 107 when it enacted implementing legislation for these treaties,[10] and IPA et al. concede, as they must, that the fair use doctrine is compliant with Berne, TRIPS and the WCT. IPA et al. Br. at 9. The United States' trading partners not only recognize that fair use is treaty-compliant but also that the fair use doctrine's flexibility in adapting copyright law to rapidly changing circumstances is a strength that promotes economic growth, particularly in the digital economy. For example, Israel recently substantially revised its copyright law and chose to import fair use nearly verbatim.[11] The Philippines and Singapore also have transplanted

---

[10] *See*, *e.g.*, Message from the President of the United States Transmitting the Uruguay Round Trade Agreements, Texts of Agreements Implementing Bill, Statement of Administrative Action and Required Supporting Statements, House Doc. NO. 103-316, Vol. 1 at 983, 103d Cong., 2d Sess. (Sept. 27, 1994) (noting that TRIPS Art. 13 "is consistent with Section 107").

[11] Copyright Act, § 19, 5768-2007, 2007 LSI 34 (2007) (Isr.), *available at* http://www.wipo.int/wipolex/en/text.jsp?file_id=132095; Michael D. Birnhack, Neil J. Wilkof & Joshua Weisman, *Israel, in* INTERNATIONAL COPYRIGHT LAW AND PRACTICE § (2)(a) (Paul E. Geller & Lionel Bentley , eds., 2013).

fair use,[12] and South Korea has adopted a general limitation and exception that includes verbatim language from Section 107 for the same reason.[13] Developments in Australia,[14] Canada,[15] and the United Kingdom[16] also highlight the attraction of fair use as treaty-compliant policy.

---

[12] Intellectual Property Code, § 185, Rep. Act No. 8293, (Jan. 1, 1998) (Phil.), *available at* http://www.wipo.int/wipolex/en/text.jsp?file_id=129343; Copyright Act, Ch. 63, § 35 (2006) (Sing.), *available at* http://www.wipo.int/wipolex/en/text.jsp?file_id=187736.

[13] *See* Jay (Young-June) Yang & Chang-Hwan Shin, *Korea, in* INTERNATIONAL COPYRIGHT LAW AND PRACTICE § 8(2)(a)(i) (Paul E. Geller & Lionel Bentley, eds., 2013).

[14] The Australian Law Reform Commission has recommended that the country adopt fair use and has specifically determined that "fair use complies with the three step test" Australian Law Reform Commission, COPYRIGHT AND THE DIGITAL ECONOMY 116. The Commission also noted that fair use is something that "innovative, technology-focused countries have adopted and it is gaining support across Europe." *Id.* at 104 (citing Ian Hargreaves and Bernt Hugenholtz, *Copyright Reform for Growth and Jobs: Modernising the European Copyright Framework* 13 LISBON COUNCIL POL'Y BRIEF 1, 4 (2013)).

[15] The Supreme Court of Canada has interpreted Canada's fair dealing privilege to be nearly as broad as fair use. *See* Ariel Katz, *Fair Use 2.0: The Rebirth of Fair Dealing in Canada, in* THE COPYRIGHT PENTALOGY: HOW THE SUPREME COURT OF CANADA SHOOK THE FOUNDATIONS OF CANADIAN COPYRIGHT LAW 93, 94 (Michael Geist ed., 2013).

[16] Recognizing the value of fair use's flexibility, a review of copyright law concluded that new uses of copyrighted works such as text mining should be permissible. *See* IAN HARGREAVES, DIGITAL OPPORTUNITY – A REVIEW OF INTELLECTUAL PROPERTY AND GROWTH 5.9-5.10 (2011).

**B. The treaty provisions invoked by IPA et al. do not apply to this Court's application of the fair use doctrine and therefore the *Charming Betsy* doctrine of statutory interpretation is inapposite**

IPA et al.'s position is premised on a fundamental legal error. Without citation to any authority on point – and *amici* are unaware of any such authority – they assert that "U.S. courts are required to apply the fair use doctrine in a manner that satisfies the requirements of the three-step test, if there is any 'possible construction' of fair use that would do so." Br. at 9 (citing *United States v. Weingarten,* 632 F.3d 60, 64-65 (2d Cir. 2011) as support for the interpretive canon).  With all due respect, this statement is legally confused. Were IPA et al.'s position correct, federal courts would be required to conduct a parallel international law analysis in *every* fair use case. As the discussion of Berne, TRIPS and the WCT above demonstrates, the "three-step test" IPA et al. invoke applies to national legislation and not to adjudication. Because IPA et al.'s position is fundamentally flawed, *amici* decline to rebut IPA et al.'s application of each of the "three-step" criteria to the district court's application of Section 107 in this case. For the record, were these criteria applicable, we would not agree with IPA et al.'s characterization of the Section 110(5) Report or that the Report's unappealed application of these criteria is correct under international law.[17]

---

[17] Responding in part to the Section 110(5) Report, a number of leading legal scholars in Europe issued a statement clarifying that the three criteria were

Finally, IPA et al.'s legal error is not isolated. It fits within an emerging

pattern and practice by certain international trade associations and other advocates

who argue that federal courts' discretion to interpret the Copyright Act in the

customary manner is circumscribed by international law. This Court should follow

the judicial practice that has emerged in response and reject such arguments,

recognizing that they rely on erroneous, exaggerated, or distorted interpretations of

the United States' international obligations. The Supreme Court has done so three

times.[18] Most recently, in briefing for *American Broadcasting Cos., Inc. v. Aereo,*

*Inc.*, No. 13-461, 2014 WL 2864485 (U.S. June 25, 2014), the Court was told by

an international trade association, other *amici curiae*, and briefly by petitioner --

but notably not by the United States[19] -- that its interpretation of the Copyright Act

was constrained by the United States' international obligations. *See Aereo,* 2014

---

intended to be applied as a whole and not in the mechanical fashion adopted by the
panel in the Section 110(5) Report. *See* Declaration: A Balanced Interpretation of
the Three-Step Test in Copyright Law, *available at*
http://www.ip.mpg.de/files/pdf2/declaration_three_step_test_final_english1.pdf.

[18] For the first two cases, *see Quality King Distributors, Inc. v. L'Anza Research
Int'l, Inc.*, 523 U.S. 135, 153-54 (1998) (rejecting arguments based on five
international bilateral trade agreements); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133
S. Ct. 1351, 1371 (2013) (rejecting argument that the Court should interpret the
Copyright Act in a manner consistent with certain positions the United States had
taken in international trade negotiations, noting that this was not the position taken
by the United States in that case).

[19] The United States did not address this issue in its brief, Brief for the United
States as Amicus Curiae Supporting Petitioners, *Aereo*, 2014 WL 2864485, and the
Associate Solicitor General declined the invitation to do so at oral argument.
*Aereo,* 2014 WL 2864485, Tr. of Oral Arg. at 24-25.

WL 2864485 Petitioner's Br. 44-45, Br. *Amici Curiae* International Federation of the Phonographic Industry (IFPI), et. al.; Br. Amici Curiae Ralph Oman 15-20; Br. Amici Curiae American Soc. of Composers, et. al., 29-35.  The Court rejected this argument out of hand *sub silentio* by grounding its decision entirely on its interpretation of the text and legislative history of the Copyright Act, *see Aereo,* 2014 WL 2864485 at *4-5, and thereby implicitly accepting the arguments made by *amici* supporting Aereo. *See* Brief for Law Professors and Scholars as Amici Curiae Supporting Affirmance, *Aereo,* 2014 WL 2864485. *Amici* note that the United States has not sought to participate in this case as *amicus curiae* and has nowhere stated or suggested that its position concerning its international obligations aligns with that of IPA et al.

## II.    THE DISTRICT COURT'S INTERPRETATION OF THE SCOPE OF TRANSFORMATIVE USE UNDER THE FIRST FAIR USE FACTOR REFLECTS THE MAINSTREAM JUDICIAL INTERPRETATION OF SECTION 107.

Baumgarten et al., and in some measure, IPA et al., argue that the district court erred in its legal interpretation of the first fair use factor on the grounds that: (1) courts have misinterpreted the Supreme Court's opinion in *Campbell*, 510 U.S. 569; (2) transformative uses under the first fair use factor are limited to uses that result in new works of authorship; (3) uses of the entire work are presumptively unfavored; and (4) uses by commercial entities are presumptively unfavored.  In

two opinions issued after briefs were filed in support of Authors Guild in this case, this Court implicitly rejected most of these arguments. *See HathiTrust*, 2014 WL 2576342; S*watch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P*., No. 12-2412, 2014 WL 2219162 (2d Cir. May 30, 2014). *Amici* in this brief provide additional support for why these purported legal constraints on the scope of the fair use doctrine are not supported by the statute or precedent and demonstrate that the views expressed by Baumgarten et al. do not reflect the weight of scholarly opinion concerning uses favored under the first fair use factor.

### A. Use of works for a new purpose is properly characterized as transformative use.

This Court's decisions in *HathiTrust* and *Swatch* conclude that uses of entire works for certain new purposes are transformative. *See HathiTrust*, 2014 WL 2576342 at *7-8; *Swatch*, 2014 WL 2219162 at *8-9 ("[A] secondary work 'can be transformative in function or purpose without altering or actually adding to the original work.'") (citation omitted). This result is faithful both to Congress's intent and to *Campbell*, which expressly left open the "something new" that a transformative use should add. *See Campbell*, 510 U.S. at 579 (citing Pierre N. Leval, *Toward a Fair Use Standard,* 103 HARV. L. REV. 1105, 1111 (1990)); *see also* Neil Weinstock Netanel, *Making Sense of Fair Use*, 15 LEWIS & CLARK L.

14

REV. 715, 768 (2011) (summarizing the role of transformative use analysis in fair use adjudication).

Baumgarten et al.'s argument is in conflict with these decisions. In *HathiTrust*, this Court held uses of entire and multiple copyrighted works to be fair in the context of providing a full-text book search tool very similar to Google Book Search. *See HathiTrust*, 2014 WL 2576342 at *11. The use was transformative because "the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn." *HathiTrust*, 2014 WL 2576342 at *7. Moreover, "the full-text search function does not 'supersede[ ] the objects [or purposes] of the original creation'" because "[t]here is no evidence that the Authors write with the purpose of enabling text searches of their books." *Id*. (citing *Campbell*, 510 U.S. at 579). Instead, this Court observed, full-text search "adds to the original something new with a different purpose and a different character." *Id*. In *Swatch*, this Court concluded that the commercial distribution of a complete and unaltered recording of Swatch Group's copyrighted earnings call with investors was "at least…arguably transformative" because of the dramatically different purpose and audience for Bloomberg's use.[20]

---

[20] *See Swatch*, 2014 WL 2219162 at *8-9. The "something new" added by Bloomberg was the publication of an unaltered version of the work that had news value to an audience that Swatch had intended to exclude. *Id*.; *cf. Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (holding that

Implicitly rejecting Baumgarten et al.'s invitation to create a circuit split on the proper legal interpretation of the first fair use factor, this Court in both *Swatch* and *HathiTrust* cited with approval cases from other circuits involving search technologies.[21] Also contrary to Baumgarten et al.'s argument, Br. at 13, this Court recognized the transformative character of search technology, stating in *HathiTrust* that, "[f]ull-text search adds a great deal more to the copyrighted works at issue than did the transformative uses we approved in several other cases." *HathiTrust*, 2014 WL 2576342 at *7.

Importantly, *HathiTrust* also reinforced the connection between a determination that a use is favored as transformative under the first factor and the analysis of market harm under the fourth fair use factor. Citing *Campbell*, this Court observed that the fourth factor "is concerned with only one type of economic

---

students' publication of copyrighted emails for purpose of supporting criticism of electronic voting was transformative use).

[21] *HathiTrust*, 2014 WL 2576342 at *5. This Court's analysis of transformative use in the search context was in accord with that of the Ninth Circuit in *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1166-68 (9th Cir. 2007) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 822 (9th Cir. 2003), cases that Baumgarten et al. suggest are emblematic of an alleged wrong turn in fair use jurisprudence. *See* Br. at 10, 18. Approving also of the Fourth Circuit's decision in *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009), this Court noted that "copying the entirety of a work is sometimes necessary to make a fair use," *Swatch*, 2014 WL 2219162 at *14 (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.,* 443 F.3d 605, 613 (2d Cir. 2006)), and noted elsewhere that iParadigms made "no 'substantive alteration to' the copyrighted student essays." *HathiTrust*, 2014 WL 2576342 at *8.

injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust,* 2014 WL 2576342 at *9. This approach to the fourth factor complements the factor one inquiry into whether a use "merely repackages or republishes the original." *Id.* at *8 (citing Leval, 103 HARV. L. REV. at 1111). Transformative uses do not create cognizable market harm, nor is the commercial context of the use particularly pertinent, because such uses do not act as mere substitutes in the intended market for the original work. While Baumgarten et al. argue that a determination that a use is transformative inappropriately "drives" fair use analysis, Br. at 11, from *amici*'s perspective, this Court's view of the relation between a transformative use determination and the remainder of the fair use analysis is the salutary hallmark of a rational, coherent fair use jurisprudence.[22]

Finally, the relation between uses that are transformative and those that provide public benefit also deserves comment. As this Court noted in *HathiTrust*, evidence that a use provides a public benefit, serves the public interest or otherwise promotes the progress of science and useful arts often coincides with a transformative use, but as a matter of law the connection is not logically necessary. *See HathiTrust,* 2014 WL 2576342 at *6.  Some transformative uses do not

---

[22] *See* Netanel, 15 LEWIS & CLARK L. REV. 715; Pierre N. Leval, *Campbell v. Acuff-Rose: Justice Souter's Rescue of Fair Use*, 13 CARDOZO ARTS & ENT. L. J. 19 (1994).

immediately provide a public benefit, and some uses that provide a public benefit are not properly characterized as transformative. Recognizing the importance of this analytical clarification, *amici* also point out that evidence that a use provides a public benefit or serves the public interest has been, and should be, evidence that supports a determination that the use is favored, whether as a transformative use or otherwise.[23]

### B. Transformative use is not categorically limited to uses that result in new works of authorship

Baumgarten et al. argue that the district court erred by characterizing Google's purpose as transformative, arguing instead that the Court in *Campbell* intended transformative uses to be limited to those that result in a new work of authorship. Baumgarten, et al. Br. at 9-11. However, Congress explicitly recognized the value of recontextualizing or repurposing a work of authorship

---

[23] *See*, *e.g.*, *Campbell,* 510 U.S. at 579 (parody is favored because it "can provide social benefit"); S*ony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (stating that, in the face of new technological facts, the public purpose of copyright law should guide the Court's analysis); *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1352  (Ct. Cl. 1973) (social value of medical research), *aff'd by an equally divided Court*, 420 U.S. 376 (1975) (per curiam); *Time, Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 145-46 (S.D.N.Y. 1968) (finding "a public interest in having the fullest information available on the murder of President Kennedy"). This Court has declared that "[t]he ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d Cir. 1998) (internal citations and quotation marks omitted).

when it directed federal courts to consider the "purpose" along with the "character"
of the use. 17 U.S.C. § 107. Moreover, this assertion is based on a misreading of
*Campbell*'s open-textured understanding of transformativeness, 510 U.S. at 579,
and is belied by the results of extensive academic studies that demonstrate that
federal courts routinely and appropriately apply the concept of transformativeness
to the purpose of a use separate from whether the use results in the creation of a
new expressive work.[24]

This Court's own fair use jurisprudence, even in cases involving artistic
reuse of plaintiff's work, has emphasized that these form part of a larger set of
favored uses that include creative conduct, political debate, and technological

---

[24] *See* R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31
COLUM. J.L. & ARTS 101, 128 (2008) (study of 41 circuit court opinions post-
*Campbell* finding that "appellate courts…clearly do not view the preparation of a
derivative work—or any transformation or alteration of a work's content—as
necessary to a finding that a defendant's use is transformative. Instead, courts
focus on whether the purpose of the defendant's use is transformative."); *see also*
Matthew Sag, *Copyright and Copy-Reliant Technology*, 103 NW. U. L. REV. 1607,
1646 (2009) (finding that the courts' solicitousness of transformative use goes
"[b]eyond a simple enthusiasm for new works."); Pamela Samuelson, *Unbundling
Fair Uses*, 77 FORDHAM L. REV. 2537 (2009) (describing several "policy-oriented
clusters" of fair use jurisprudence, favoring not only the creation of new works by
authors in the traditional sense but also free speech, competition, scholarship and
teaching, and technological innovation); Michael J. Madison, *A Pattern-Oriented
Approach to Fair Use*, 45 WM. & MARY L. REV. 1525, 1656 (2004) (describing
several favored "patterns" in fair use jurisprudence, including reverse engineering,
legal and political argument, and comparative advertising); Netanel, *supra,* n.22 at
748-49 (describing the variety of purposes that courts have found to be
transformative and, therefore, fair).

19

innovation. In *Cariou v. Prince*, this Court recognized that in addition to "new expression, meaning or message" fair use also protects the "creation of new information . . . new insights and understandings." 714 F.3d 694, 706 (2d Cir. 2013); *see also Swatch*, 2014 WL 2219162 at *8. And, the crux of this Court's decision in *American Geophysical Union v. Texaco Inc.* was not that photocopying for research could not qualify as transformative use, but that on the facts of the particular case, the use was judged to be substitutional in character. 60 F.3d 913, 923 (2d Cir. 1994).

### C.  Transformative use is not categorically limited by the amount of a work that is used or by the number of works used.

Baumgarten et al. argue without citation that courts' willingness to treat the making of "complete copies of multiple works" as transformative use is a departure from precedent. Br. at 9. On the contrary, the Supreme Court held in *Campbell* that, "the extent of permissible copying varies with the purpose and character of the use," 510 U.S. at 586-87, and this Court has found that "copying the entirety of a work is sometimes necessary to make a fair use . . . ." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). Indeed, courts have found a variety of purposes for which use of entire works is

appropriate. Images can often be used in their entirety for valid purposes.[25]
Similarly, "[i]n the context of news reporting and analogous activities…the need to
convey information to the public accurately may in some instances make it
desirable and consonant with copyright law for a defendant to faithfully reproduce
an original work…." *Swatch,* 2014 WL 2219162 at *8.

Scholars have shown that developers or users of new technologies
unforeseen by Congress sometimes use entire works to facilitate fair use.[26] Use of
the VCR by millions of television viewers to copy numerous television programs
in their entirety for the purpose of time-shifting is one such example, *see Sony
Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), but it is hardly
an outlier on this point. Copying entire software programs for the purpose of
reverse engineering (with the further purpose of creating new interoperable or

---

[25] *See, e.g., Bill Graham Archives*, 448 F.3d 605 (reproductions of Grateful Dead
promotional materials in biography); *Nunez v. Caribbean Int'l News Corp.*, 235
F.3d 18, 22–23 (1st Cir. 2000) (newspaper's publication of controversial photos);
*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) (band's use of graffiti
icon in stage show); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 406
(E.D. Pa. 2009) (book reproducing paintings from magazine covers).
[26] *See* Samuelson, *supra,* n.24, at 2602-15; Fred von Lohmann, *Fair Use as
Innovation Policy*, 23 BERKELEY TECH. L.J. 1 (2008); Glynn S. Lunney, Jr., *Fair
Use and Market Failure: Sony Revisited*, 82 B.U. L. REV. 975 (2002); Madison,
*supra,* n.24 at 1656.

competing programs) is another such new technological use,[27] as is copying and

storing copies of billions of images or Internet publications to provide search

engine technology.[28] Courts have consistently determined that these uses are fair.[29]

### D. Transformative uses are favored even when made in a commercial context

Baumgarten et al. and IPA et al. criticize the district court for not giving

presumptive weight to the fact that Google is a for-profit entity or that Google

derives some commercial benefit as a return on its investment in Google Book

Search. *See* Baumgarten et al. Br. at 13; IPA et al. Br. at 18. These criticisms

fundamentally misapprehend the role that the transformativeness standard is

---

[27] *See Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir. 1992); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 599 (9th Cir. 2000).
[28] *See* Samuelson, *supra,* n.24 at 2610; Sag, *supra,* n.24; *see also* James L. Quarles III & Richard A. Crudo, *[Way]back to the Future*, 6 LANDSLIDE 16 (Jan/Feb 2014) (describing how the Internet Archive since 1996 has copied and made publicly available through its Wayback Machine the works of authorship published on *366 billion webpages*, which comprise almost two petabytes of data, and how patent litigators often rely on this resource for informal discovery).
[29] *See HathiTrust*, 2014 WL 2576342; *Arriba Soft*, 336 F.3d 811 (search engine that scanned images and displayed thumbnails); *Perfect 10, Inc.*, 508 F.3d 1146 (Google image search fair despite existing license market for thumbnails and Google's profiting from advertising in search results); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) (full text copying and caching of website, and display of snippets of text are fair); *see also* Sag, *supra,* n.24 at 1639 (search engines copy entire works "not to convey the work's expressive qualities to the public, but rather to enable banks of microprocessors to index the content of those works and to generate metadata about the works."); Netanel, *supra* n.22 at 748 (collecting cases).

designed to play in fair use analysis. Judge Leval's articulation of the

transformativeness standard, Leval, 103 HARV. L. REV. 1105, and its adoption by

the U.S. Supreme Court – in a case involving professional entertainers –

demonstrate why commerciality is of diminished importance in the transformative

use context. One need look no farther than *Campbell* itself for an explanation of

why, despite their commercial character, a wide range of uses could nevertheless

qualify as fair. *See* 510 U.S. at 579 ("[T]he more transformative the new work, the

less will be the significance of other factors, like commercialism, that may weigh

against a finding of fair use."). Indeed, not only is the evidence of commercial use

of diminished importance in transformative use cases, *see* Netanel, 15 LEWIS &

CLARK L. REV. at 742 n125, but more generally commerciality carries little

independent weight in the determination of whether the use is favored under the

first factor.[30]

---

[30] *See* Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978–2005*, 156 U. PA. L. REV. 549, 556, 598 (2008) (although 84% of opinions address the issue of commerciality, the subfactor appears to have no significant influence on case outcomes); Matthew Sag, *Predicting Fair Use*, 73 OHIO ST. L.J. 47, 77 (2012) ("there is no evidence that commercial use…play[s] any objectively ascertainable role in determining the outcome of fair use cases."); Netanel, *supra,* n.22 at 742 ("In short, the data suggests that courts have, in fact,…abandoned the commercial use presumptions."). This understanding that the broader context should determine whether evidence of commercial use should be given weight is not a new development, as this Court and others recognized in cases decided under the Copyright Act of 1909. *See Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966) ("whether an author or publisher has a commercial

This limit on the weight to be given to commerciality in transformative use cases does not vary with the scale of the use. As cases from other circuits that this Court already has cited with approval have determined, in the database and search engine context, large scale use is part and parcel of realizing the transformative benefits of new technologies developed by commercial entities. *See Perfect 10, Inc.*, 508 F.3d at 1168 (determining that Google's use of thumbnail images for search engine purposes is highly transformative, and so market harm cannot be presumed); *A.V. ex rel. Vanderhye*, 562 F.3d at 639 (commercial context is not determinative). This Court's decision in *Texaco* is not to the contrary because in that case the defendant's use was determined to be substitutional rather than transformative. *See* 60 F.3d at 923.

---

motive  . . . is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use."); *New York Times Co. v. Roxbury Data Interface, Inc*., 434 F. Supp. 217 (D. N.J. 1977) (finding that defendants' substantial commercial investment in creating a names index derived entirely from the New York Times' index was a favored use under the first factor because "[o]n its face, defendants' index appears to have the potential to save researchers a considerable amount of time and, thus, facilitate the public interest in the dissemination of information.").

# CONCLUSION

For the reasons set forth above, and for those set forth in Appellee's brief,

*amici curiae* respectfully request that the judgment of the district court be affirmed.

Dated:          Washington, DC

                July 10, 2014

/s/Meredith Jacob

MEREDITH JACOB
*Counsel of Record*
Program on Information Justice
and Intellectual Property
American University
Washington College of Law
4801 Massachusetts Avenue, NW
Washington, DC 20016
202-274-4253
mjacob@wcl.american.edu

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 6,788 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.


Dated:       Washington, DC
             July 10, 2014


                                    s/ Meredith Jacob
                                    PROGRAM ON INFORMATION JUSTICE
                                        AND INTELLECTUAL PROPERTY
                                    AMERICAN UNIVERSITY
                                    WASHINGTON COLLEGE OF LAW
                                    *Attorney for Amicus Curiae*
                                        *Law Professors & Scholars*
                                    4801 Massachusetts Avenue, NW
                                    Washington, DC 20016
                                    (202) 274-4253

**APPENDIX A**

# APPENDIX A

Margo A. Bagley
Professor of Law
University of Virginia School of Law

Dan L. Burk
Chancellor's Professor of Law
University of California, Irvine

Julie E. Cohen
Professor of Law
Georgetown Law Center

Sean M. Fiil-Flynn
Associate Director
Program on Information Justice &
Intellectual Property

Brian L. Frye
Assistant Professor of Law
University of Kentucky College of
Law

Michael Geist
Canada Research Chair in Internet
and E-commerce Law
University of Ottawa, Faculty of Law

Dennis S. Karjala
Jack E. Brown Professor of Law
Arizona State University

Ariel Katz
Associate Professor
Innovation Chair, Electronic
Commerce
Faculty of Law, University of Toronto

Carolina Botero
Director
Fundación Karisma

David Levine
Professor of Law
Elon University School of Law

Yvette Joy Liebesman
Associate Professor of Law
Saint Louis University School of Law

Lydia Pallas Loren
Robert E. Jones Professor of Law
Lewis & Clark Law School

Glynn Lunney
McGlinchey Stafford Professor of
Law
Tulane University School of Law

Michael J. Madison
Professor of Law
University of Pittsburgh

Hiram Meléndez-Juarbe
Associate Professor
University of Puerto Rico Law School

Neil Netanel
Professor
UCLA School of Law

Ana Ramalho
Associate Professor
University of South Wales

Jessica Silbey
Law Professor
Suffolk University School of Law

Christopher Jon Sprigman
Professor
New York University School of Law

Myra Tawfik
Professor
University of Windsor
Faculty of Law

Samuel Trosow
Associate Professor
University of Western Ontario
Faculty of Law / Faculty of
Information & Media Studies

Deborah Tussey
Professor
Oklahoma City University School of
Law